1                IN THE UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF MISSOURI
2                       EASTERN DIVISION

3    STEAK N SHAKE, INC.,            )
                                     )
4         Plaintiff,                 )
                                     ) Case No.
5    VS.                             ) 4:18-CV-00072-RWS
                                     )
6    MELISSA WHITE,                  )
                                     )
7         Defendant.                 )

8

9         _____

10            ORAL AND VIDEOTAPED DEPOSITION OF
                 CATHERINE ADAMS HUTT, Ph.D.
11                    MARCH 19, 2019
          _____

12

13

14

15

16

17       ORAL AND VIDEOTAPED DEPOSITION OF CATHERINE ADAMS

18   HUTT, Ph.D., produced as a witness at the instance of

19   the PLAINTIFF, and duly sworn, was taken in the

20   above-styled and numbered cause on the 19th of March,

21   2019, from 9:00 a.m. to 1:14 p.m., before STEFANIE COX,

22   CSR in and for the State of Texas, reported by machine

23   shorthand, at the law offices of Ogletree, Deakins,

24   Nash, Smoak & Stewart, P.C., Preston Commons West, 8117

25   Preston Road, Suite 500, Dallas, Texas 75225.

CATHERINE ADAMS HUTT, Ph.D.  3/19/2019

Page 4

```
 1                    P R O C E E D I N G S
 2               THE VIDEOGRAPHER:  We are now on the
 3     record for the video deposition of Catherine Adams Hutt.
 4     The date is March 19th, 2019.  The time is 9:00 a.m.
 5     Will counsel please state their appearance for the
 6     record.
 7               MS. WILLIAMS:  Erin Williams on behalf of
 8     the plaintiff.
 9               MR. HENDERSON:  Sam Henderson on behalf
10     of defendant Melissa White.
11               CATHERINE ADAMS HUTT, Ph.D.,
12     having been first duly sworn, testified as follows:
13                         EXAMINATION
14     BY MS. WILLIAMS:
15          Q.    Good morning.
16          A.    Good morning.
17          Q.    Can you please state your full name for the
18     record?
19          A.    Catherine Adams Hutt.
20          Q.    Have you ever gone by any other names or
21     nicknames?
22          A.    My maiden name is Catherine Adams.
23          Q.    I am Erin Williams, I am one of the attorneys
24     representing Steak 'n Shake in this case.  Do you
25     understand that?
```

CATHERINE ADAMS HUTT, Ph.D.  3/19/2019

1    was significant.  Also, interpreting evolving

2    regulations for the legal team, helping them to

3    understand what was happening in food policy and food

4    regulations as well.

5         **Q.    What caused you to leave McDonald's?**

6         A.   It's a long story.  Basically, leadership

7    changes evolved, I had a new boss.  I pointed out to the

8    company a significant food safety public -- public risk,

9    media risk, and I was asked to become a consultant for

10   them, and my job was eliminated.  The chief quality

11   officer job was eliminated, and I was basically fired.

12        **Q.    Okay.  So -- and this, you say, occurred after**

13   **you pointed out a major safety concern?**

14        A.   Yes.  It involved the product which is called

15   finely textured beef.

16        **Q.    Okay.**

17        A.   Which became consumer-friendly term "pink

18   slime."  And McDonald's was, at the time, inviting

19   journalists into their suppliers' operations, a meat

20   supplier making ground meat, for example, and -- and

21   basically would turn off the stream of finely textured

22   beef that was typically going or routinely going into

23   McDonald's ground beef product at a percentage of

24   15 percent, and they would actually stop that and show

25   journalists the process without finely textured beef,

CATHERINE ADAMS HUTT, Ph.D.  3/19/2019

Page 77

1      Q.   When was it that he finally asked you, okay, I

2  want you to go ahead and do an analysis and prepare a

3  report for this case?

4      A.   Towards the end of last year, as I recall.

5      Q.   And just so the record is clear, that would be

6  towards the end of 2018?

7      A.   Correct, 2018.

8      Q.   Now, when Mr. Henderson first contacted you,

9  did he indicate what his role was in the case or who he

10  represented?

11      A.   Yes.  He did brief me on the details of the

12  case, yes.

13      Q.   And so what -- what did he tell you to brief

14  you on those details?

15      A.   He told me that this was primarily an

16  employment case, but that there is a significant portion

17  of it that is relevant to standard industry practice in

18  a restaurant business.

19      Q.   Did he explain how it would be relevant to

20  standard industry practice?

21      A.   I don't know if he explained it or I simply

22  understood it, but, clearly, the issue was about a -- an

23  employee who found a food safety -- food safety risk

24  and -- and again, the -- the purpose of my -- retaining

25  me was to -- was to consider the investigation done by

CATHERINE ADAMS HUTT, Ph.D.  3/19/2019

```
 1    the district manager in this case for Steak 'n Shake and
 2    to consider whether or not that was within industry
 3    standards for the restaurant business.
 4        Q.   What else did -- whether it was on the first
 5    contact or -- or a subsequent time you spoke to him,
 6    what else has Mr. Henderson told you about just the
 7    underlying facts of the case?
 8        A.   I'm not sure what he told me.  He did produce
 9    some documents for me to review, which included Melissa
10    White's counterclaims, transcript of a hearing with
11    Mr. Tardy and Ms. White present.  Again, he's told me
12    that there are other issues as part of this case that
13    I'm not involved with, but that he wanted my opinion
14    relative to the event and to the inspection and
15    investigation conducted by Steak 'n Shake in this
16    particular case.
17        Q.   Got it.  Now, did you agree to provide an
18    opinion for him before or after you discussed the
19    financial terms of your engagement?
20        A.   Again, I don't recall.  I would imagine that
21    he asked for the financial terms before providing me
22    with the documents, but I honestly cannot recall because
23    in some cases -- in some cases attorneys provide
24    documents because of timeliness without -- without
25    investigating fees.
```

CATHERINE ADAMS HUTT, Ph.D.  3/19/2019

Page 82

```
 1    dated December 21, 2018; does that sound right to you?
 2        A.   Yes.
 3        Q.   Okay.  Now, on what date did you actually
 4    arrive at the opinions you expressed in that report?
 5        A.   I would say a few days prior to documenting
 6    it.
 7        Q.   Okay.  Now, you're offering an opinion in this
 8    case that Steak 'n Shake's district manager, Frank
 9    Tardy, failed to perform an investigation into Melissa
10    White's report of alleged worms in a hamburger patty
11    that was con- -- failed to perform an investigation that
12    was consistent with standard practice in the food
13    service industry; is that correct?
14        A.   Yes.
15        Q.   Okay.  So as a preliminary matter, what issue
16    in this lawsuit is your opinion supposed to help the
17    jury decide?
18        A.   That the investigation conducted by Mr. Tardy
19    was not consistent with the nature and the scope of
20    investigation that one would expect relative to industry
21    practice and standard of practice.
22        Q.   Okay.  Is there any other issue that your
23    expert opinion is supposed to help the jury decide?
24        A.   I believe I can also opine on the source of a
25    worm, a maggot in this case, in ground beef and
```

CATHERINE ADAMS HUTT, Ph.D.  3/19/2019

Page 83

```
 1    understand how that could happen, and then understand
 2    also an appropriate response by someone responsible for
 3    a brand in responding to and investigating that -- that
 4    issue.
 5        Q.   Okay.  Now, how that could happen is not
 6    necessarily the same thing as how it did or could have
 7    happened -- or -- well, strike that.  Let me ask you a
 8    better question.
 9                Well, let me ask you this:  Have you been
10    asked to provide an expert opinion on how the hamburger
11    patty allegedly became contaminated?
12        A.   No, not directly.  As I've testified earlier
13    to, I mean, part of my job is to understand the risks in
14    a food manufacturing or food service facility, and so I
15    automatically think about if I find something, I'm
16    thinking about how that could have been caused.  It's an
17    important thought process I have.
18        Q.   Got it.  Okay.  Have you done any actual
19    inspection or research in this particular case to
20    determine how the hamburger patty may have become
21    contaminated?
22        A.   No.
23        Q.   Okay.  So at this point in time, the only
24    opinion that you have been engaged to offer is that --
25    your opinion that Mr. Tardy's investigation did not meet
```

CATHERINE ADAMS HUTT, Ph.D.  3/19/2019

1    **industry standard?**

2       A.    True.  And that it was, again, what I

3    characterize as an insufficient response to the

4    potential risk to the brand and to public health.

5       **Q.   Okay.  So I'd like for you to identify for us**

6    **each source of information that you used in determining**

7    **the method by which Mr. Tardy conducted his**

8    **investigation at Steak 'n Shake on January 5th, 2018.**

9       A.    My primary method used was my experience in

10   doing the very same sort of thing that Mr. Tardy was

11   doing on -- in response to the report of finding worms

12   in ground beef on January 5th, 2018.

13      **Q.   Yeah.  Sorry.  I think we may have had a**

14   **miscommunication.  I'm asking you, how do you know what**

15   **Mr. Tardy's method was on that date?**

16      A.    In reviewing the documents I've had access to,

17   which include Mr. Tardy's testimony.  As part of a

18   hearing, he was asked for his -- to describe his method,

19   what he did, who he engaged, what his actions were in

20   response to being told by an employee that there were

21   worms in ground beef being sold to customers.  Also, I

22   read the counterclaims for Ms. White, which has other

23   details of the event.

24      **Q.   So you read the unemployment hearing**

25   **transcript, is that the transcript you're referring to?**

CATHERINE ADAMS HUTT, Ph.D.  3/19/2019

```
 1        A.   Yes.  I understand it was a transcript --
 2        Q.   Okay.
 3        A.   -- for a hearing for unemployment, but it
 4   included a description of what happened on the day.
 5        Q.   Got it.  And then you reviewed Ms. White's
 6   counterclaim, correct?
 7        A.   Correct.  And I --
 8        Q.   And you understand those are merely -- you
 9   understand those are merely her allegations about what
10   happened, right?
11        A.   Yes, I do understand that.
12        Q.   Okay.  And sorry, you were going to say you
13   reviewed something else?
14        A.   The photographs, but I don't actually think
15   that was part of your question, so...
16        Q.   Did you read any portion of Melissa White's
17   deposition testimony that was taken in this lawsuit?
18        A.   I don't believe I had access to it.
19        Q.   Okay.  So does that mean you did not read any
20   of it?
21        A.   That's true, I did not read any of it.
22        Q.   Okay.  Have you ever spoken to Mr. Frank Tardy
23   about his investigation into Ms. White's complaint?
24        A.   No.
25        Q.   Have you ever talked to anyone from Steak 'n
```

CATHERINE ADAMS HUTT, Ph.D.  3/19/2019

Page 86

```
 1    Shake, the company, about any facts relating to this
 2    case?
 3         A.   No.
 4         Q.   And I think we -- you confirmed earlier you've
 5    never actually spoken to Ms. White directly, correct?
 6         A.   That's correct.
 7              (Exhibit No. 35 marked.)
 8         Q.   Okay.  All right.  So if you could pull out
 9    Exhibit 35, please, which is the unemployment
10    transcript.
11         A.   I have it.
12         Q.   Okay.  Great.  I'll ask you to flip through
13    it, please, and tell me if this looks like the same copy
14    that you would have reviewed in performing your
15    analysis.
16         A.   I believe it is.
17         Q.   Okay.  Now, if you could turn, please, to page
18    49 of the actual transcript, the big numbers at the
19    bottom.
20         A.   (Witness complies.)  Yes.
21         Q.   Okay.  So I'm looking -- starting at the last
22    question on that page, did you ever provide it to any --
23    do you see that, that question?
24         A.   Yes.
25         Q.   Okay.  Now, if you could read that through
```

CATHERINE ADAMS HUTT, Ph.D.  3/19/2019

1    proceeding very abruptly.  And that abruptness, I think,

2    is quite consistent with someone who is upset, but,

3    again, I don't know that I can testify to his emotional

4    state beyond what I'm reading on the pages.

5        **Q.   Okay.  I'll find it for you, hang on.  All**

6    **right.  If you could turn to page 29 of the unemployment**

7    **hearing transcript, which is Exhibit 35.**

8        A.   I'm there.

9        **Q.   Okay.  The very last question on the bottom of**

10   **the page starts, thank you, Judge, and then to**

11   **Mr. Tardy, would you agree that when you arrived at the**

12   **store you were upset?  Mr. Tardy, answer:  No.**

13               **Did I read that correctly?**

14       A.   You read it correctly.

15       **Q.   Okay.  All right.  So my point is simply that**

16   **there are allegations in the counterclaim that are not**

17   **consistent with Ms. White's -- or excuse me, with**

18   **Mr. Tardy's testimony from the unemployment hearing,**

19   **correct?**

20       A.   That's not correct.

21       **Q.   You don't agree with that?**

22       A.   No, I don't.  As I described earlier, the

23   abruptness of his arrival is consistent with someone who

24   is upset.  He wasn't looking for a conversation.  Again,

25   inconsistent with what I would expect a manager or a

CATHERINE ADAMS HUTT, Ph.D.  3/19/2019

Page 95

```
1     person responsible for a brand to do in that case.
2          Q.    And you'd never even met Mr. Tardy, correct?
3          A.    That is correct.
4          Q.    Okay.  So I assume you're not intending to
5     opine on his -- his various emotional states of mind?
6          A.    I do not.
7          Q.    Okay.  Now, if you could -- actually, since we
8     have the counterclaim still in front of you, paragraphs
9     31 to 43.  Again, don't want you to read them out loud,
10    but just read them for me, and let me know when you've
11    finished.
12         A.    (Witness reading.)  I'm done.
13         Q.    Thank you.  Did these allegations in the
14    paragraphs you just read influence your conclusions
15    about the method that Mr. Tardy used in conducting his
16    inspection?
17         A.    They were not the primary source of
18    information, no.
19         Q.    Did they influence it at all?
20         A.    No.  Because the description of the
21    investigation is actually offered by Mr. Tardy's
22    testimony itself.
23         Q.    Okay.  So is it your testimony, then, that the
24    primary source of your conclusions about Mr. Tardy's
25    methods are those four to five pages of testimony we
```

CATHERINE ADAMS HUTT, Ph.D.  3/19/2019

1        Q.   Okay.  And then have we discussed everything

2    that you relied upon in determining the manner of the

3    investigation that was performed?

4        A.   I believe we have.  We've discussed my

5    experience as well as the testimony by Mr. Tardy and

6    also Ms. White.

7        Q.   Got it.  Now, do you have any direct knowledge

8    of any ground beef containing worms or contamination

9    being sold or served to customers on January 5th of

10   2018?

11       A.   I do not.

12       Q.   Okay.  Do you have any direct knowledge of any

13   contaminated meat or any other food being sold to Steak

14   'n Shake customers on any date?

15       A.   I'm only relying on the testimony that I've

16   read.  I have no direct knowledge --

17       Q.   Got it.

18       A.   -- which I would interpret as personal

19   experience -- personal knowledge or personal

20   observation.  And, no, I have not had that.

21       Q.   Yes.  And that impact -- got it.  And that is

22   how I meant that question.  You have no personal

23   knowledge of any contaminated meat being sold or served

24   customers, correct?

25       A.   That's correct.

CATHERINE ADAMS HUTT, Ph.D.  3/19/2019

1        Q.    So that is not part of the opinions you're

2   offering in this case, if Steak 'n Shake did allow

3   contaminated food to be sold to customers?

4        A.    No.   You read the scope of my opinion

5   correctly.

6        Q.    Okay.  Well, I just want to make sure that I'm

7   clear so I can, you know, make sure I ask or don't need

8   to ask certain questions going forward.

9                Are you offering an opinion that Steak 'n

10  Shake, in fact, sold contaminated food to customers in

11  January 2018?

12       A.    Based on what I read and understand, there

13  were -- there was evidence of fly larvae, maggots, worms

14  in at least one ground beef patty that was prepared --

15  or correction, available for sale to customers on

16  January 5th, 2018.

17       Q.    Okay.  That didn't really answer my question,

18  though.  Are you offering as part of your expert

19  opinion -- opinions, the opinion that Steak 'n Shake, in

20  fact, sold or provided, served contaminated food to

21  customers in January 2018?

22       A.    I believe that the ground beef patty that

23  Ms. White had included fly larvae, maggots.  Again, I

24  have no evidence that other product was served to

25  customers, but that product that she obtained, that she

CATHERINE ADAMS HUTT, Ph.D.  3/19/2019

1  occur, and the potential exposure of other product to

2  the same contamination.

3      **Q.    Okay.  But -- and that -- those statements you**

4  **just made, and they included the term "could be" more**

5  **than once, and they are based on past experience and**

6  **your background knowledge, correct?**

7      A.   Yes.  And what I read in the document and

8  within the pictures that I've seen.

9      **Q.   Got it.  Okay.  But what I'm really driving at**

10  **here is you don't have any personal knowledge, you've**

11  **not seen anything to -- to indicate or prove that any**

12  **contaminated food went to customers at Steak 'n Shake on**

13  **January 5th, 2018, correct?**

14      A.   I've seen pictures of fly larvae and a report

15  that they were fly larvae from a ground beef patty that

16  was available for sale.  And, again, report to you that,

17  based on my experience, contamination of this nature

18  would not be isolated.  I have no personal knowledge of

19  any ground meat that was sold that day in the Steak 'n

20  Shake restaurant, but I do have personal knowledge of

21  how such contamination can be a part of a food product.

22            And, again, that would not be isolated, it

23  would be --

24      **Q.   Got it.**

25      A.   -- it would be part of other products in the

1    that Mr. Tardy should have done, including observe -- I

2    guess, why would it be important for him to observe the

3    patty first?

4        A.   Well, again, he proceeded on an investigation

5    to find something or not find something, but he didn't

6    even look at what he was trying to find.  You know,

7    clearly, I would have wanted to see the patty with the

8    reported worm inside to see what it looked like and have

9    an opportunity to assess, in that patty, whether or not

10   it was gristle or whether or not it was a fly larvae, a

11   maggot.  I would have also wanted to know what I was

12   going to look for in other meat product that I looked

13   at.

14              He proceeded to the reach-in to get -- to

15   look at other meat.  He does not describe the

16   thoroughness of his investigation.  A maggot on the

17   interior of a ground meat product, even thawed out,

18   would not be visible to the human eye.  He needs to take

19   the product and tear it apart.  He did not describe

20   doing that.  At no time did anyone describe that he

21   pulled product from the reach-in and actually

22   manipulated it to open it up and to look at it.

23              You know, these are things that you

24   can't -- you can't just see it on the surface.  It's not

25   necessarily going to be in the surface, it wasn't in the

CATHERINE ADAMS HUTT, Ph.D.  3/19/2019

1    surface of the ground meat patty that Melissa White had

2    cooked for her, and she found it when it was being

3    crushed and smashed and opened up.

4        **Q.   Okay.  Now, he did testify that he went**

5    **through several pieces of meat, correct?**

6        A.   He did.  I don't know what going through

7    several pieces of meat means.  And he at no time

8    describes the thoroughness of his investigation.

9        **Q.   Got it.  Okay.  So did -- got it.**

10           **Now, do you have any knowledge of whether**

11   **he actually asked questions of the other staff members**

12   **that were working that morning?**

13       A.   His own testimony described that he did not

14   ask questions of anyone.

15       **Q.   When he first arrived, correct?**

16       A.   The testimony that I read described him

17   walking into the restaurant and intentionally not

18   talking to anyone.

19       **Q.   Correct.  And then proceeding to conduct a**

20   **physical investigation, but do you know if subsequently**

21   **he had conversations with other employees?**

22       A.   I read his conversation with Mr. Nicholson,

23   the manager, and I don't believe I recall him talking to

24   any other employees at that time.

25       **Q.   Okay.  Based on his testimony at the**

CATHERINE ADAMS HUTT, Ph.D.  3/19/2019

1    looking at?

2        A.    I think it's reasonable to believe that

3    they've seen a maggot before and that's what it looked

4    like from the pictures.  And clearly, they were

5    responding -- they were calling it a worm, but -- but it

6    wasn't an earthworm.  It was white and curled and,

7    clearly, in my mind, looked like a maggot that people

8    would be familiar with.

9        Q.    And when you say that this report should have

10    been taken seriously, what does that mean?

11        A.    The sequence of events when Mr. Tardy walked

12    into the restaurant, I think, should have followed a

13    very different course.  He, again, did things that are

14    not consistent with my expectations.  And in that sense,

15    whether or not he was taking seriously or not -- again,

16    a serious investigation, in my opinion, did not

17    transpire by Mr. Tardy, and it would have been more

18    thorough, more comprehensive, more caring, and

19    completely more compre- -- more diligent, methodical and

20    diligent.

21        Q.    Now, have you seen the actual hamburger patty

22    itself?

23        A.    No.

24        Q.    And your report is based on the assumption

25    that the hamburger patty was, in fact, contaminated on

CATHERINE ADAMS HUTT, Ph.D.  3/19/2019

```
 1        A.   He's expressing his opinion on what he was

 2   provided, and reports the findings of three maggots in

 3   the -- in the product.

 4        Q.   Correct.  Based on his inspection, which was

 5   performed on December 17 of 2018; are you aware of that?

 6        A.   I don't recall that I knew exactly the date of

 7   his inspection, but I certainly know the date of his

 8   report.

 9        Q.   And all that Dr. Tomberlin states in his

10   report is that the meat was -- or the meat was

11   contaminated at the time he examined it, correct?

12        A.   That's his report, yes.

13        Q.   And are you aware that his testimony was

14   consistent with that report?

15        A.   I'm not aware of his testimony, but I would

16   expect his testimony to be consistent with his written

17   report, yes.

18        Q.   And are you aware that Dr. Tomberlin has even

19   stated that he has no opinion on whether or not the

20   hamburger patty he examined even came from Steak 'n

21   Shake?

22        A.   I'm -- I'm not familiar with his testimony, so

23   I can't speak to that.

24        Q.   Fair enough.  So how can you rely on his

25   expert report to reach the conclusion that the meat was
```

CATHERINE ADAMS HUTT, Ph.D.  3/19/2019

1    **contaminated on January 5 of 2018?**

2        A.   As I mentioned, I was already drafting my

3    opinion when I received this report.  And my opinion was

4    based on the testimony from the hearing as well as what

5    I saw in the picture that was reported to be the patty

6    that we're talking about.  So my -- my opinion was

7    pretty firm in what I saw.

8                In receiving this expert opinion from

9    Dr. Tom- -- Tomberlin, I understood exactly what it was

10   that -- that he found, and they were consistent with

11   what I saw from the pictures taken from January 5th,

12   2018.

13       **Q.   Well, the pictures that you were told were**

14   **taken on January 5th, 2018, correct?**

15       A.   Yes.  They were presented as the pictures from

16   the event, yes.

17       **Q.   Okay.  All right.  Going back to your expert**

18   **report again, the next paragraph states, given that the**

19   **meat was frozen when it arrived at the restaurant, it is**

20   **most likely that the meat was contaminated by flies**

21   **during processing.**

22               **Why is that most likely?**

23       A.   Because I'm familiar with how frozen ground

24   beef patties come into a restaurant for cooking.

25   They're packaged.  They are frozen, they're kept frozen,

CATHERINE ADAMS HUTT, Ph.D.  3/19/2019

```
 1        A.   As I mentioned, if -- if it's possible for a
 2   fly to land on exposed meat and lay eggs, fly larvae,
 3   then, again, it's a break -- it's a failure of pest
 4   control.  And if you're in a plant that has a fly in it,
 5   it's not a single fly.  Most generally, it is multiple
 6   flies, a chronic problem that's allowed to persist until
 7   it's corrected.  And clearly, there could be other --
 8   other flies that have landed on exposed meat in similar
 9   circumstances and could have created more -- more
10   maggots in the meat.
11        Q.   Did you ever inspect any of the meat that was
12   present at Steak 'n Shake on January 5th of 2018?
13        A.   No.
14        Q.   Do you have any knowledge of anyone who did
15   other than Dr. Tomberlin being told that he was
16   investigating a single hamburger patty from that date?
17        A.   Mr. Tardy reported smashing some ground beef
18   patties --
19        Q.   Correct.
20        A.   -- and that's the only evidence I have of
21   anyone else investigating.
22        Q.   And Mr. Tardy testified that he didn't find
23   any contamination when he did that, correct?
24        A.   When he selected the few pieces of meat that
25   he did investigate and tear apart, he reported not
```

CATHERINE ADAMS HUTT, Ph.D.  3/19/2019

```
 1          Q.    -- looked appropriately, correct?

 2                MR. HENDERSON:  Objection, asked and

 3     answered.

 4          Q.    You can answer.

 5          A.    He states that he tore some patties apart.  I

 6     don't believe he tore enough patties apart and did a

 7     thorough investigation.

 8          Q.    Okay.  You're not actually answering my

 9     question, though.  I understand you think there should

10     have been more samples reviewed, but in terms of the

11     samples that he did actually review, he reviewed them

12     appropriately, correct?

13                MR. HENDERSON:  Objection, asked and

14     answered.

15          Q.    You can answer.

16          A.    I don't know what he meant when he said he

17     tore them apart.  He might have cut -- he might have

18     split them in half.  That was not a sufficient

19     investigation.  He simply is not describing to me what a

20     thorough investigation of each one of those patties was.

21     He mentioned he tore it apart.

22                I believe he also mentioned he smashed

23     them, "put them together" were, I think, his words.  And

24     again, I don't know what that means, but clearly, the

25     correct approach would have been to do a methodical
```

CATHERINE ADAMS HUTT, Ph.D.  3/19/2019

 1    investigation of each one of those patties and more of

 2    them.

 3         Q.    Why didn't you ask for the opportunity to

 4    speak directly with Mr. Tardy before forming your

 5    opinion in this case?

 6         A.    I saw no reason to do that, and frankly, have

 7    not done that in any other case I've been involved in.

 8         Q.    And why would you say you saw no reason to do

 9    that?

10         A.    I was responding to the reports of the events

11    as described by Mr. Tardy in his own testimony, and also

12    by Ms. White and her testimony.

13         Q.    And again, Mr. Tardy's testimony consists of

14    approximately five pages at an unemployment hearing,

15    correct?

16         A.    That is the testimony that I read which

17    reported the events of the case, yes.

18         Q.    Now, you also go on to say in the report,

19    standard practice -- the standard of practice in this

20    case would include an inquiry of the employee with the

21    complaint and full examination of the meat patty

22    containing the maggot, correct?

23         A.    Yes.

24         Q.    Now, how is he supposed to do that when the

25    employee won't speak with him and won't turn over the

CATHERINE ADAMS HUTT, Ph.D.  3/19/2019

 1          Q.    You can turn to the unemployment hearing

 2     transcript, which is 35.  I'm looking at the bottom of

 3     page 13.

 4          A.    I'm sorry.  Page 13?

 5          Q.    Yes, 13.  The last question on the page

 6     states, what did you do when you arrived at the store on

 7     the morning of January 5?

 8                     Answer:  I checked the meat that was

 9     closest to the grill to be cooked.

10                     So he just says he checked it, correct?

11          A.    That's what he says, yes.

12          Q.    But that was the first thing he claimed to

13     have done, right?

14          A.    I don't understand what he meant by check.  He

15     did not report pulling any of it out, he didn't report

16     looking at it, inspecting it visually, tearing it apart,

17     he did not report any of that.  I don't know what he

18     meant when he said checked.

19          Q.    Okay.  So when he said checked, he could have

20     meant all of that, pulling it out, tearing it apart, all

21     of that stuff, it's just that it isn't specified in his

22     testimony, correct?

23          A.    In his testimony when he -- he did report

24     tearing meat patties apart in order to demonstrate that

25     he was doing a thorough investigation in his mind.  He

CATHERINE ADAMS HUTT, Ph.D.  3/19/2019

Page 148

1    did -- he described tearing them apart, smashing them,

2    when he was describing his investigation of the single

3    patty that he pulled from each of the pans.  I would

4    suspect that he -- if he had done that tearing apart,

5    smashing, whatever, of the product that was in the

6    reach-in, he would have described it in a similar

7    fashion.  He did not.

8         Q.   And that's based on your speculation on how he

9    should have behaved, correct?

10        A.   It -- it's stating how I'm interpreting his

11   own statements, how he did behave.

12        Q.   Okay.  Now, I think you told me earlier you

13   have not reviewed Ms. White's deposition testimony from

14   this case, correct?

15        A.   That's correct.

16        Q.   Okay.  Now, did you review the health

17   department inspection report from January 5th of 2018?

18        A.   Yes.

19             (Exhibit No. 14 marked.)

20        Q.   Okay.  And that's in front of you.  It's

21   Exhibit 14, it's a standalone exhibit.

22        A.   I have it.

23        Q.   Okay.  So you've seen these documents before?

24        A.   Yes.

25        Q.   Now, did these documents inform your opinion

CATHERINE ADAMS HUTT, Ph.D.  3/19/2019

 1    **in any way?**

 2        A.    Not particularly.

 3        **Q.    Why not?**

 4        A.    This is a report of an inspection taken a few

 5    hours after the incident where the employee found the

 6    maggots in the ground meat.  It's a standard inspection.

 7    Inspections are snapshots in time.  It's a standard

 8    inspection.  I don't know that there was any particular

 9    effort made to investigate large amounts of raw product,

10    but clearly, a standard inspection is reported here.

11        **Q.    Well, you understand that this was not just a**

12    **random inspection.  This was an inspection that was**

13    **caused by a report of maggots or worms in the meat on**

14    **that date, correct?**

15        A.    Yes.

16        **Q.    And so, is it your testimony that the fact the**

17    **St. Louis County Health Department came out and found**

18    **zero evidence of contamination is not at all relevant to**

19    **your opinion?**

20        A.    It is not relevant to my opinion of finding

21    maggots in the ground meat patty that Ms. White had.

22        **Q.    Okay.  So even knowing that the health**

23    **department found no evidence of contamination, that**

24    **doesn't change your opinion on whether or not**

25    **Ms. White's story was accurate?**

CATHERINE ADAMS HUTT, Ph.D.  3/19/2019

 1    correct?

 2        A.   The meat patty that Melissa White had cooked

 3    for her as part of her employee meal was available to be

 4    sold to any customer.

 5        Q.   But it wasn't, right?

 6        A.   In this case, it was part of her employee

 7    meal.

 8        Q.   I should have asked you this before.  Have you

 9    ever been to this Steak 'n Shake restaurant in

10    Florissant, Missouri?

11        A.   No.

12             (Exhibit No. 41 marked.)

13        Q.   Okay.  All right.  Looking at Exhibit 41,

14    please.

15        A.   I have it.

16        Q.   Okay.  Now, can you describe in layman's terms

17    the substance of this regulation or these regulations, I

18    should say?

19        A.   Well, there are a number of regulations,

20    again, coming from the 2017 edition of the FDA Food

21    Code, which isn't -- is in place as a Missouri

22    requirement.  Although, Missouri actually has modified

23    it somewhat.  But -- but these are requirements that are

24    effective in Missouri about preventing sale of

25    adulterated food, also reconditioning or dis- --