CATHERINE ADAMS HUTT, Ph.D.  3/19/2019

## Page 1

1    IN THE UNITED STATES DISTRICT COURT
      EASTERN DISTRICT OF MISSOURI
2           EASTERN DIVISION
3    STEAK N SHAKE, INC.,    )
                             )
4    Plaintiff,              )
                             ) Case No.
5    VS.                     ) 4:18-CV-00072-RWS
                             )
6    MELISSA WHITE,          )
                             )
7    Defendant.              )
8    _____
9
10      ORAL AND VIDEOTAPED DEPOSITION OF
         CATHERINE ADAMS HUTT, Ph.D.
11            MARCH 19, 2019
      _____
12
13
14
15
16
17       ORAL AND VIDEOTAPED DEPOSITION OF CATHERINE ADAMS
18   HUTT, Ph.D., produced as a witness at the instance of
19   the PLAINTIFF, and duly sworn, was taken in the
20   above-styled and numbered cause on the 19th of March,
21   2019, from 9:00 a.m. to 1:14 p.m., before STEFANIE COX,
22   CSR in and for the State of Texas, reported by machine
23   shorthand, at the law offices of Ogletree, Deakins,
24   Nash, Smoak & Stewart, P.C., Preston Commons West, 8117
25   Preston Road, Suite 500, Dallas, Texas 75225.

## Page 2

1         A P P E A R A N C E S
2    FOR THE PLAINTIFF:
3      Ms. Erin E. Williams (Via Videoconference)
       OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
4      7700 Bonhomme Avenue
       Suite 650
5      St. Louis, Missouri 63105
       (314) 802-3935
6      (314) 802-3936 Fax
       Erin.williams@ogletree.com
7
     FOR THE DEFENDANT:
8
       Mr. Samuel Henderson (Via Videoconference)
9      HENDERSON LAW FIRM
       1027 S. Vandeventer Avenue
10     6th Floor
       St. Louis, Missouri 63110
11     (314) 399-8266
       Hendersa85@hotmail.com
12
     ALSO PRESENT:
13     Chase Huddleston, Videographer
14
15
16
17
18
19
20
21
22
23
24
25

## Page 3

1              INDEX
2                          PAGE
3    Appearances            2
     CATHERINE ADAMS HUTT, Ph.D.
4      Examination by Ms. Williams      4
5      Examination by Mr. Henderson    161
       Examination by Ms. Williams     168
6
7
8            EXHIBITS
9
     NO. DESCRIPTION              PAGE
10
     14  1/5/18 Health Department Inspection Report 148
11
     28  Tomberlin Report              133
12
     33  Curriculum Vitae               8
13
     34  Legal Case List               72
14
     35  Unemployment Hearing Transcript    86
15
     36  Counterclaims                91
16
     37  Expert Report                97
17
     39  Photograph Copies            124
18
     40  Food Code Excerpt            152
19
     41  FDA Food Code 2017 Edition Excerpts   154
20
21
22
23
24
25

## Page 4

1         P R O C E E D I N G S
2         THE VIDEOGRAPHER:  We are now on the
3    record for the video deposition of Catherine Adams Hutt.
4    The date is March 19th, 2019.  The time is 9:00 a.m.
5    Will counsel please state their appearance for the
6    record.
7         MS. WILLIAMS:  Erin Williams on behalf of
8    the plaintiff.
9         MR. HENDERSON:  Sam Henderson on behalf
10   of defendant Melissa White.
11        CATHERINE ADAMS HUTT, Ph.D.,
12   having been first duly sworn, testified as follows:
13           EXAMINATION
14   BY MS. WILLIAMS:
15        Q.  Good morning.
16        A.  Good morning.
17        Q.  Can you please state your full name for the
18   record?
19        A.  Catherine Adams Hutt.
20        Q.  Have you ever gone by any other names or
21   nicknames?
22        A.  My maiden name is Catherine Adams.
23        Q.  I am Erin Williams, I am one of the attorneys
24   representing Steak 'n Shake in this case.  Do you
25   understand that?

CATHERINE ADAMS HUTT, Ph.D.  3/19/2019

Page 5

1    A.  Yes.
2        Q.  You have had your deposition taken before, I
3    believe?
4        A.  Yes.
5        Q.  Okay.  When was the most recent time?
6        A.  Last week.
7        Q.  Oh, okay.  Well, I'm going to go through the
8    procedure, the rules of the road very quickly for you
9    then.  Basically, I'm just asking you a series of
10   questions, which you answer.  You are under oath and the
11   court reporter is taking down everything we say and you
12   are being recorded on video.  Do you understand all of
13   that?
14       A.  Yes, I do.
15       Q.  Okay.  And I'll ask you to listen carefully to
16   my questions and make sure that you understand, and if
17   you don't understand or hear me, please ask me to repeat
18   or rephrase.  Otherwise, I will assume you understood.
19   Is that fair?
20       A.  Yes.
21       Q.  If you need to expand on an answer or if I
22   accidentally cut you off, which might happen, I think
23   there's a slight delay in the audio, please let me know.
24   I don't mean to barrel over you and I want to get your
25   full and complete responses.  Does that make sense?

Page 6

1    A.  Yes.
2        Q.  I'm going to ask you to avoid shaking or
3    nodding your head.  You have to answer verbally so that
4    it can be taken down on the transcript, and particularly
5    in this setting where we're not in the same room, and
6    then I'll ask us both to try to make a really sincere
7    effort to avoid talking over one other.  Does that make
8    sense?
9        A.  Yes.
10       Q.  I don't anticipate this taking a terribly long
11   time, but if at any point you need a break, just let me
12   know, and we'll take a break.  The only exception to
13   that is if there is a question pending, I'll ask you to
14   answer the question, and then we can take a break.  Does
15   that make sense?
16       A.  Yes.
17       Q.  All right.  And you understand that you're
18   under oath and under a penalty of perjury and that it's
19   important to tell the truth?
20       A.  Yes.
21       Q.  And do you understand that if later at trial
22   you give testimony that is inconsistent with your
23   testimony here today, then this deposition testimony can
24   be used to impeach you and to possibly evenly pursue a
25   perjury claim.  Do you understand all of that?

Page 7

1    A.  Yes.
2        Q.  Are you taking any sort of medications that
3    will prevent you from giving a full and fair deposition
4    today?
5        A.  No.
6        Q.  Are you under any sort of stress or mental
7    condition that will prevent you from giving a full and
8    fair deposition today?
9        A.  No.
10       Q.  Is your -- is there any reason that your
11   ability to remember would be worse than normal today?
12       A.  No.
13       Q.  Is there any reason your ability to express
14   yourself would be worse than normal today?
15       A.  No.
16       Q.  Is there any reason you can think of at all
17   that we should not go forward today?
18       A.  No.
19       Q.  What is your home address?
20       A.  4568 Elm Bottom Circle, Aubrey, Texas, 76227.
21       Q.  And what's your date of birth?
22       A.  June 26th, 1957.
23       Q.  Are you married?
24       A.  Yes.
25       Q.  How long have you been married?

Page 8

1    A.  10 years.
2        Q.  Pardon?
3        A.  10 years.
4        Q.  Okay.  Thanks.  And does your husband work
5    outside the home?
6        A.  Yes.
7        Q.  What is his occupation?
8        A.  He's an attorney.
9        Q.  All right.  Now, you provided a copy of your
10   CV a few weeks ago.  Do you recall that?
11       A.  Yes.
12       Q.  Is it up to date, to the best of your
13   knowledge?
14       A.  To the best of my knowledge, yes.
15           (Exhibit No. 33 marked.)
16       Q.  Okay.  You can pull out or have the court
17   reporter pull out Exhibit 33, please?
18           THE WITNESS:  Oh, these?
19           COURT REPORTER:  If you want to, you're
20   welcome.
21       A.  I have it.
22       Q.  All right.  Great.  Do you recognize this as
23   being your CV?
24       A.  Yes.  There are multiple versions, but this
25   is -- this is one of the versions, yes.

2 (Pages 5 to 8)

CATHERINE ADAMS HUTT, Ph.D.  3/19/2019

Page 9

1    Q.   What -- why are there multiple versions?
2  What's the difference?
3    A.   I update -- I update the information.
4  Specifically, I would update the history of legal cases
5  to try to keep that current with my portfolio.
6    Q.   Got it.  So if you could take a look through
7  Exhibit 33 and tell me if this is the most up-to-date
8  version, I would appreciate it.
9    A.   This may not be my most up-to-date version.
10  It also has a page in here which I created specifically
11  for this case, which is a list of --
12    Q.   Oh.
13    A.   -- cases that I have gone to trial or --
14  and/or deposition, which is not part of my normal CV.
15    Q.   Okay.
16    A.   The list of --
17    Q.   Got it.
18    A.   -- legal cases in the past five years is not
19  exactly current.  I have had subsequent cases, but I
20  don't know that I've actually updated my CV with those
21  cases to date, but, yes, this is reasonably current.
22    Q.   Got it.  Is it page 7, the piece of the
23  document that was created for this case?
24    A.   It is page 7, yes.
25    Q.   Okay.  All right.  So even if it's not the

Page 10

1  most up-to-date version of the resume and not sure if
2  you've updated it or not, is everything in here that
3  you've reviewed, to the best of your knowledge, true and
4  accurate?
5    A.   Yes.
6    Q.   Okay.  Now, I'll stick with your resume for a
7  bit of time.  I want to talk about your education and
8  your degrees.  It looks like you got a bachelor of
9  science in food science from Penn State in 1979; is that
10  correct?
11    A.   That's correct, yes.
12    Q.   I'm sorry.  I didn't hear you.
13    A.   I'm sorry.  There's rustling of papers.  Yes.
14  The answer is yes.
15    Q.   Okay.  Thank you.  Did you go directly to a
16  master's program from undergrad?
17    A.   Yes.
18    Q.   Okay.  You got a master's in food science and
19  human nutrition from Michigan State in 1981; is that
20  right?
21    A.   That's correct.
22    Q.   And then did you go directly from there to a
23  Ph.D. program?
24    A.   I did.
25    Q.   Okay.  You got your Ph.D. in food science from

Page 11

1  University of Illinois Champaign Urbana in 1986,
2  correct?
3    A.   Correct.
4    Q.   Okay.  And then after your Ph.D., or after you
5  obtained your Ph.D., you first started working for the
6  U.S. Department of Agriculture; is that right?
7    A.   I actually started working for a trade
8  association first, Nutrition Foundation, and then went
9  to the USDA.
10    Q.   Okay.  How long were you at the trade
11  association?
12    A.   Two years.
13    Q.   Okay.  What were your basic job
14  responsibilities there?
15    A.   It was to edit a nutrition journal, periodic
16  journal, and also to convene conferences on food safety
17  and nutrition around the world.
18    Q.   And then what made you leave for the
19  Department of Agriculture?
20    A.   An excellent opportunity to work in the
21  government in policy work, which is really what I wanted
22  to be doing.
23    Q.   Okay.  And so was there a particular area of
24  policy work that you were going to be working in?
25    A.   Food, food safety was my field, the food

Page 12

1  industry, the food -- you know, food in general, the
2  food business.  I was very interested in food, both from
3  the nutrition side as well as from a manufacturing food
4  service side, area of food just intrigued me.
5    Q.   So your -- your experience as a food service
6  side, does that include both, like, prepackaged food for
7  grocery stores as well as food for restaurants?
8    A.   Typically, what we call the grocery sector,
9  the retail sector, if you will, my work has been for
10  food service organizations which are -- which have --
11  restaurants.
12    Q.   Okay.  Got it.  So when you were at the
13  Department of Agriculture, what were your basic job
14  duties there?
15    A.   I started with the extension service and I was
16  developing a national program for food safety to train
17  the multiple extension agents around the country.  I
18  think there's 3,500 different counties in the United
19  States.  And each one, at that time, and I believe still
20  does, have an extension agent.  They use training
21  materials for food safety, food safety is a key critical
22  concern for them, and I was developing a new national
23  training program for the extension agent.  That was my
24  first role.
25    Q.   Okay.  Were there other roles while you were

ALARIS LITIGATION SERVICES
www.alaris.us                Phone: 1.800.280.3376                Fax: 314.644.1334

CATHERINE ADAMS HUTT, Ph.D.  3/19/2019

Page 13

1    at the Department of Agriculture?
2        A.  Yes.  I held two other jobs in addition to
3    that extension role.  I then joined the Food Safety and
4    Inspection Service, which is the regulatory agency for
5    meat and poultry as part of the USDA.  I joined them
6    first as special assistant to the administrator, and
7    then became assistant administrator of the agency of
8    7,500 or so people.
9        Q.  Okay.  And those would be the next -- the two
10   other roles you held there?
11       A.  Yes.
12       Q.  I notice there's an acronym on your CV, it's
13   HACCP.  Can you tell us what that stands for?
14       A.  Yes.  It's Hazard Analysis and Critical
15   Control Point Program.  It is a seven-point or
16   seven-concept system that designs food safety control
17   systems or programs by looking at what hazards and risks
18   may be present and then developing a plan, methodically
19   developing a plan to anticipate those issues and
20   problems, and then to prevent them.  And if they did
21   happen, to know what to do to correct them, and to make
22   sure they didn't happen again.
23       Q.  And what was your role in working on this
24   program or this system?
25       A.  I actually initiated -- along with a couple of

Page 14

1    colleagues, I initiated the development of HACCP as a
2    regulatory tool for the U.S. government and it became a
3    regulatory tool for the Food & Drug Administration as
4    well as the U.S. Department of Agriculture and remains
5    so today.  It's the basis for which meat and poultry and
6    all other foods are regulated.
7            I worked to develop a program in concert
8    with international colleagues as part of the Codex
9    Alimentarius, and also brought it to the United States
10   as a member and chair of the National Advisory Committee
11   for Microbiological Criteria for Food.  And that is a
12   tool of the Department of Agriculture and the department
13   of Food & Drug Administration to update food policy
14   relative to food safety.
15       Q.  So what caused you to then leave the
16   Department of Agriculture in 1991?
17       A.  A couple of things.  Number one, given the --
18   I worked closely with the Secretary of Agriculture and
19   the Deputy Secretary of Agriculture.  I -- the
20   Secretary, who was then Clayton Yeutter, left to become
21   the head of the Republican National Committee.  I was
22   working with him on trade issues and -- and when he
23   left, it created a change within my agency.  My boss,
24   whose name was Lester Crawford, administrator of the
25   Food & Safety Inspection Service, also left.  And at the

Page 15

1    time, I was implementing significant change within the
2    organization which is comprised of food technologists,
3    but primarily veterinarians and long-term government
4    employees.  And bringing in a new way in which we were
5    regulating meat and poultry was a change agent, and
6    basically, the agency decided to put HACCP on the shelf,
7    and I didn't want to be a part of that.  And so I went
8    to another role where I thought I could have a more
9    substantial path forward.
10       Q.  Okay.  You said that food technologists are
11   basically veterinarians.  Can you explain what you mean
12   by that?
13       A.  No, that's not what I said.  I said, food
14   technologists are part of the work force within the Food
15   Safety Inspection Service, but the primary work force
16   within that agency, that regulatory agency, are
17   veterinarians.
18       Q.  Okay.  What is the role of veterinarians in
19   the agency?
20       A.  They identify animal disease, the
21   regulation -- the legislation for the meat and poultry
22   inspection agency requires that each animal, before
23   slaughter, be presented to a veterinarian to assess them
24   for any potential disease which could be a food safety
25   issue.  The veterinarians then actually go through the

Page 16

1    process of slaughter to make sure that the animal is
2    presented humanely, as well as in a safe way, and then
3    is there to inspect the meat after the animal is
4    slaughtered.
5        Q.  And that was part of the HACCP program?
6        A.  No.  HACCP is a food safety control tool.
7    Again, it's a methodology by which we assess risks for
8    any given scenario, and then design a program to prevent
9    and control those risks from becoming food safety
10   problems.  The veterinarian's --
11       Q.  Got it.
12       A.  -- operation is quite different than that.
13   They don't use HACCP.  HACCP is used in food
14   manufacturing however.  In a food plant, primarily a
15   processing plant, but also slaughter plants have HACCP
16   programs as well, but they are their food safety tools.
17   The veterinarians are there to assess animal disease.
18       Q.  Is a veterinarian present every time an animal
19   is slaughtered?
20       A.  A veterinarian --
21       Q.  I guess I'm not following.
22       A.  Okay.  The law requires that a veterinarian be
23   on-site at any time a slaughter facility is in
24   operation.  So they're not there for every animal being
25   slaughtered, but they are on-site and they are required

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

CATHERINE ADAMS HUTT, Ph.D.  3/19/2019

Page 17

1  to review the entire operation of the -- of the
2  slaughter facility. Again, there are veterinarians also
3  employed in processing plants for meat and poultry, but
4  usually it's a -- it's on a circuit basis, not a
5  full-time basis.
6  Q.  Okay.
7  A.  These are all stipulations of the Federal Meat
8  Inspection Act.
9  Q.  Federal Meat Inspection Act.  Okay.  And then
10  you went from Department of Agriculture to Grocery
11  Manufacturers of America; is that correct?
12  A.  Yes.
13  Q.  Okay.  And what were your job responsibilities
14  there?
15  A.  The Grocery Manufacturers of America, which is
16  now the Grocery Manufacturers Association, is a trade
17  association of industry, looking to affect policy as
18  well as improve food safety.  There are a number of
19  different committees, and I ran the committees that had
20  to do with food safety, which included microbiology.  I
21  believe there was a committee on HACCP, there was a
22  committee on toxicology, I believe, also.  And so,
23  primarily, I ran those committees that had industry
24  members and then also attended conferences and relayed
25  current up-to-date information to industry members about

Page 18

1  food safety.
2  Q.  Now, if it was grocery manufacturers, does
3  that mean it was a trade association for the retail side
4  of food safety that you mentioned before?
5  A.  Actually, I never thought about it, but the
6  grocery manufacturers were the food manufacturing
7  industry, not the grocers themselves.  There is another
8  organization called FMI or Food Marketing Institute
9  which is the primary trade association for the retailers
10  which are actually the grocers.
11  Q.  Got it.
12  A.  Uh-huh.
13  Q.  The folks that were in the trade association
14  that you worked for, what was their role in the food
15  process, you know, getting food from farm to table?
16  A.  The -- the members of the -- of the GMA, the
17  Grocery Manufacturers of America, would be directors,
18  vice presidents, managers, senior managers within food
19  companies that were manufacturing a wide variety of
20  products, including meat and poultry, but also nonmeat
21  and poultry products.  They were the Cargills, the
22  Nestles, the Unilevers, Kraft -- at the time, Kraft,
23  Heinz, Nabisco, things like that, companies that have
24  morphed since then, but those would be the members.
25  They were generally senior -- senior level members.

Page 19

1  The board was comprised of the CEOs of
2  those respective companies, but at my level, I dealt
3  with primarily vice presidents and directors, senior
4  directors.
5  Q.  Did you do any sort of lobbying in that role?
6  A.  I did not, no.  My role was not as a lobbyist.
7  Q.  Okay.  Is that one of the functions of the
8  organization?
9  A.  It is.
10  Q.  And what caused you to leave that job?
11  A.  I had an opportunity to go into industry,
12  which gave me an opportunity to actually develop
13  programs and make them work.  The trade association,
14  your role is to manage issues, if you will, but not
15  necessarily to implement things and move things forward.
16  I had a sincere interest in quality
17  systems and had an opportunity to design quality systems
18  and implement them for Campbell Soup Company in 100
19  plants globally.
20  Q.  Okay.  And that's where you went next,
21  correct, Campbell Soup Company?
22  A.  Yes.
23  Q.  Tell me about your job responsibilities there.
24  A.  It was to develop a quality system, based
25  on -- this was my input, but based on a tool called ISO

Page 20

1  9000.  ISO is the international standards organization
2  and they develop standards.  And there's a quality
3  standard, a quality management standard, which is
4  numbered 9000.  It has subparts, but basically, it goes
5  under the name of 9000.
6  And it was to implement this ISO 9000 tool
7  as a blueprint or a roadmap for a quality management
8  system.  It is the gold standard, if you will, of what a
9  quality professional should be doing in a manufacturing
10  plant, in this case, food.
11  ISO 9000 came late to the food industry,
12  if you will, but as part of my role at GMA, I convened
13  conferences for the members to educate them on what ISO
14  9000 was and how it could have a very positive impact on
15  food safety and quality -- quality performance,
16  including efficiency, and I just believed that that was
17  a really great thing for a quality organization to -- to
18  use.
19  So I developed a -- an internal standard,
20  which we call Campbell's -- Campbell's CIS, Campbell's
21  International Standard 9000, and implemented that in 100
22  plants globally for Campbell Soup Company.
23  Q.  Okay.  So the ISO 9000 was something -- it's a
24  concept that exists in other industries besides the food
25  industry; is that correct?

5 (Pages 17 to 20)

CATHERINE ADAMS HUTT, Ph.D.  3/19/2019

## Page 21

1     A.  Yes.  Actually, it exists in, I believe,
2 almost every industry.  The automotive industry was one
3 of the real early adopters, if you will, of ISO 9000.
4 They actually developed their own standard called Q9000
5 at the time, but it was ISO 9000, which ISO is an
6 international organization and the standard is developed
7 by international members.
8     It's a collegial type of approach to
9 develop standards, if you will, get the best of that
10 discipline in the room and develop the standard.  And so
11 the automobile industry took that upon themselves to
12 utilize that tool and, actually, really evolve it going
13 forward as a Q9000 standard, but it -- it was the tool
14 that the automobile industry really used to renovate
15 quality performance for -- for their business.  So I
16 brought it in to it.
17     **Q.  And then what?**
18     A.  I'm sorry.
19     **Q.  Sorry.**
20     A.  I brought it into the food -- the food
21 industry because, again, we were in need of some really
22 high caliber tools, a blueprint, if you will, for
23 high-quality performance.
24     **Q.  And so, you know, what were the principles of**
25 **the CIS 9000 that you implemented at Campbell's?**

## Page 22

1     A.  They were identical to ISO 9000.  We just did
2 not want to, at that time, pursue external certification
3 to ISO 9000.  If you implement ISO 9000, you -- you have
4 to be assessed to be in compliance with the -- with the
5 standard by a certification body.
6     At that time, Campbell's decided they did
7 not want the external assessment, we wanted to implement
8 it for our own internal purposes to improve quality
9 performance and ensure food safety, and -- and with that
10 we created CIS 9000.  Campbell's went on after I left to
11 actually pursue external certification for their ISO
12 9000 programs, and I believe they still use them today.
13     **Q.  Got it.  And so for those of us who don't**
14 **know, like, oh, there's -- they're the same as the ISO**
15 **9000, tell us what the principles were at Campbell's.**
16     A.  Again, they were identical to ISO 9000, ISO
17 9000 at the time.  There are many different versions.
18 It's updated routinely.  I believe the version that we
19 were using was a 1987 version, basically, had 20
20 different elements as part of the standard.  It includes
21 the things that you find in regulatory requirements as
22 well, for example, pest control, facility management,
23 grounds upkeep.
24     It also includes control of your
25 suppliers, having a supplier approval program.  And the

## Page 23

1 components of that are delineated in the standard also.
2 You have to assess suppliers, review their performance,
3 keep that up, if you will.  There are standards for the
4 process control, the actual manufacturing process, such
5 that there are quality performance standards as part of
6 that process.  You have to describe them.
7     Basically, the ISO 9000 and CIS 9000 tools
8 tell you what are the components of a good quality
9 management system, and then you have to develop your
10 tool.  You document it, and, as they say, what -- what
11 gets documented, gets done.  Their recordkeeping
12 requirements as part of the -- as part of the ISO 9000
13 elements, there were regulatory compliance as part of
14 the 9000 elements, internal audits had to be performed
15 in order to ensure compliance to your standard, but
16 basically, created a manual.  You created a manual with
17 the 20 elements describing how, in this case, Campbell's
18 was doing each one of those 20 elements, and then we
19 were assessed internally at that time to our own
20 standards.
21     **Q.  Got it.  Okay.  And then so your job, as I**
22 **understand it -- and correct me if I'm wrong, but your**
23 **job was to help implement the CIS 9000?**
24     A.  Yes, for Campbell's.  And I think it's
25 important to add, too, that for the food industry we

## Page 24

1 incorporated HACCP as a food safety tool as part of our
2 quality management system because I firmly believe you
3 can't have a quality management system in the food
4 business without a food safety tool as well, so that was
5 part of our delivery, which was a novel twist,
6 obviously.  The automobile industry didn't have that
7 element.
8     **Q.  Sure.  And Campbell's is a retail food**
9 **company, correct?**
10     A.  It is a food manufacturing company that had,
11 at the time, both retail as well as some food service
12 elements.  So they had -- they were marketing not only
13 to the grocers, if you will, but also to the food
14 service companies as well.
15     **Q.  Okay.  So Campbell's was placing or marketing**
16 **its products to more restaurant customers?**
17     A.  I wouldn't say more restaurant customers, but
18 McDonald's, for example, was a customer.  I know that --
19     **Q.  Got it.**
20     A.  -- other food service companies, quick service
21 casual dining restaurants were customers.  They sold
22 soup products and a wide variety of other products as
23 well, condiments.  I can't remember all that was sold
24 into food service, but many of the products that were
25 used in food service came -- came through Campbell's,

ALARIS LITIGATION SERVICES
www.alaris.us                    Phone: 1.800.280.3376                    Fax: 314.644.1334

CATHERINE ADAMS HUTT, Ph.D.  3/19/2019

Page 25

1    yes.
2        Q.  Got it.  And it looks to me from your CV like
3    your job at Campbell's entailed both food safety and
4    health and nutrition; is that fair to say?
5        A.  It was more food safety at that time.  I was
6    really -- my job really focused on quality management
7    and food safety.  I kept an active interest in
8    nutrition, was part of some product development
9    programs, kept, you know, an eye on how things were
10   evolving from a nutritional standpoint, but that was not
11   my role at Campbell Soup Company, no.
12       Q.  Okay.  Because your CV says you led a
13   three-year strategic initiative for nutrition and
14   health.  Can you explain what that aspect of your job
15   was?
16       A.  Well, I don't remember, obviously, but I did
17   work on a team that was working on nutrition.  I just
18   don't really recall very much about the details of it.
19       Q.  Why did you leave Campbell's?
20       A.  I left Campbell's in order to work -- what was
21   my next company?  To work in the food service industry.
22       Q.  Yum!?
23       A.  Yum! Brands, yes.  So I got an opportunity
24   to -- to move and work in Texas actually, and I worked
25   for, first, Pizza Hut, and then -- and then corporate

Page 26

1    global Yum! Brand.
2        Q.  Got it.  Where were you based when you were
3    working at Campbell's?
4        A.  I was based in Philadelphia in -- actually
5    Camden, New Jersey.  I lived in New Jersey and I did
6    actually a four-month project that turned out to --
7    turned out to be eight months, implementing ISO 9000 or
8    CIS 9000 in the Pace food brands.  So I actually moved
9    to San Antonio for that eight-month period, and was
10   interested in staying in Texas, and also interested in
11   working in food service, and so the Yum! Brands job was
12   ideal for me.
13       And also I --
14       Q.  Are you from Texas originally?
15       A.  I'm sorry.  I also would say that I think I
16   had done what I came to do at Campbell's.  Again,
17   implementing CIS 9000, creating CIS 9000 and
18   implementing it in 100 plants globally.  I think, you
19   know, the job was to evolve it at that point and I was
20   ready to do something -- something else.
21       Q.  Got it.  I had asked if you were from Texas
22   originally?
23       A.  My mother was born in Waco.
24       Q.  Got it.  And where did you grow up?
25       A.  In England, actually.

Page 27

1        Q.  When did you return to the U.S.?
2        A.  In 5th grade came back to the U.S.  I
3    wasn't -- I was born in New Jersey, by the way, lived
4    there for six months, but we moved around a great deal.
5    My father worked for Gulf Oil and we were relocated to
6    London for about five years.
7        Q.  Got it.  Okay.  And then when you moved back
8    to the U.S., you went where?
9        A.  To Pittsburgh.
10       Q.  Got it.  All right.  So were you in San
11   Antonio working for Campbell's when the job opportunity
12   at Yum! Brands arose?
13       A.  Yes.
14       Q.  Got it.  And tell us about your job
15   responsibilities there.
16       A.  I -- for one year I ran restaurant food safety
17   and restaurant quality and supplier quality for Pizza
18   Hut, and then because of a change in the organization
19   structure itself, that -- or that entity in Dallas,
20   based in Dallas, became the corporate quality center for
21   Yum! Brands.  So I remained with that group with new
22   leadership for another year, based in Dallas.
23       Q.  And then -- so I noticed some -- the job --
24   one of the job responsibilities identified in your CV
25   is, developed a food safety crisis management program

Page 28

1    and led all food safety related crisis responses.  Can
2    you tell us about those responsibilities?
3        A.  Yes.  Very important part of restaurant
4    business is customer support, customer service, and we
5    had at the time, typical of most any company, an
6    emergency crisis management center that fielded -- did
7    two things, basically.  One, we created a program for
8    crisis management, where we actually didn't have one
9    before at that time, but we created a program to plan
10   for a crisis of -- food safety crisis, food
11   contamination crisis, anything that would affect the
12   brand, if you will, complaints coming in from customers,
13   whatever, that would generate a crisis.
14       We had a tiered approach to determine the
15   level of the concern, what sort of response that
16   activated.  It was all documented and planned, contacts
17   who would be contacted who would be involved in
18   decision-making, who would be the decision-makers, all
19   that was documented as part of the crisis plan.
20       Then I'd say another part of that was also
21   the customer complaint center, which I worked very
22   closely with as well, to field customer complaints and
23   then to respond to them appropriately.
24       Q.  How long were you working on that particular
25   aspect of the job?

7 (Pages 25 to 28)

CATHERINE ADAMS HUTT, Ph.D.  3/19/2019

## Page 29

1    A.  I believe I worked on that the entire extent
2  of my -- my tenure at Yum! Brands, about two years.
3    Q.  And then another aspect of your job, I
4  noticed, was food safety training and restaurant audit
5  programs.  Can you explain those responsibilities?
6    A.  Yes.  We -- at Yum! Brands I had a team of
7  seven people who were positioned around the country who
8  went into each of the restaurants on a daily basis and
9  supported their food safety programs.  We did a lot of
10  training, we developed training programs, we trained our
11  trainers, and then they trained other restaurant
12  trainers as well.
13         Food safety is something we share with
14  operations.  We were the quality team, food safety team.
15  We shared that responsibility with operations, those who
16  run the restaurants themselves, and we were training
17  them in food safety practices, recordkeeping, designing
18  the system, and then implementing it and training
19  individuals to follow that in concert with the
20  operations teams.
21    Q.  And then it says you also created a
22  centralized nutrition database.  Can you tell us about
23  that?
24    A.  Yes.  This is before nutrition labeling and
25  menu labeling came to -- came to be, but we did work on

## Page 30

1  designing a nutrition database so that we had
2  information on each of our ingredients and each of our
3  finished products that we knew what their nutrition
4  profile was.
5    Q.  What was the impetus behind creating that
6  database?
7    A.  Information.  It's important that we had
8  information about our suppliers, which is another part
9  of the program, not related to nutrition, but we -- we
10  developed a tool that we generated information about our
11  suppliers, how to contact them, where they were located,
12  where their manufacturing plants were located.  So that
13  if we had an emergency or if they had an emergency, we
14  knew where they were and how to contact them and where
15  their products were within our system.
16         So all that was tied together, really, as
17  part of a product work flow to make sure that we were
18  creating as much information about our product as we
19  needed in order to protect the brand and also to ensure
20  food safety.
21    Q.  Now, is this the first time you worked for,
22  like, a restaurant organization directly?
23    A.  Yes.
24    Q.  And then if -- you were at that job for about
25  two years.  What caused you to leave?

## Page 31

1    A.  Well, I had an opportunity to go to Heinz as a
2  higher level position, if you will.  And also, as I
3  mentioned, there was a leadership change.  And frankly,
4  I didn't get along as well with the new leader as I did
5  the previous one.
6    Q.  At Yum! Brands?
7    A.  At Yum!  He and I had different values.
8    Q.  All right.  So the different -- oh, sorry.
9    A.  Sorry.  He and I had different values.
10    Q.  Got it.  How so?
11    A.  Just a different approach to managing people,
12  frankly.  I think I managed with respect and in concert
13  with individuals who worked for me, not necessarily
14  dictatorial, and that was his leadership style.
15    Q.  Got it.  Got it.  Okay.  Were you based in
16  Texas the entire time you were with Yum! Brands?
17    A.  Yes.
18    Q.  Okay.  And then the job at Heinz, where was
19  that located?
20    A.  It was in Pittsburgh.
21    Q.  Did you -- did you characterize this as, like,
22  a higher level or sort of a promotion to move to Heinz?
23    A.  Yes.
24    Q.  Okay.  Can you explain why?
25    A.  The title, I believe, was director Heinz used

## Page 32

1  at the time, and I don't know what they do now, but they
2  used European titles, if you will.  So a director's
3  title was actually, basically, a vice president's title,
4  and the role was --
5    Q.  Okay.
6    A.  -- was to design systems and to have more
7  autonomy, more responsibility, and a wide range of food
8  products to work with as well.
9    Q.  What were your job responsibilities at Heinz?
10    A.  I led a quality team for North America.  And
11  at the time, Heinz -- big company, but did not have a
12  strong quality or food safety team that was trained and
13  experienced.  And so my job was to create that team, to
14  populate it, to hire people in, to get them properly
15  trained, and to develop quality systems for Heinz North
16  America that would be in concert with -- with the
17  international aspects of Heinz as well.
18         So I utilized the same tool, ISO 9000, to
19  create a similar program as I did at Campbell Soup, I
20  created for -- for Heinz North America.
21    Q.  Got it.  Your CV or resume actually says your
22  title was quality lead.  Is that -- and you just -- you
23  just said it was director.  So I just want to make sure
24  I know which one was correct.
25    A.  Right.  I put quality lead on the CV because I

8 (Pages 29 to 32)

CATHERINE ADAMS HUTT, Ph.D.  3/19/2019

Page 33

1   believe, again, in the United States, director does not
2   mean what it did for Heinz, if you will.  I was the
3   quality lead and, again, it wasn't given a vice
4   president's title, but I thought the title director was
5   somewhat misleading.
6       Q.   Okay.  And then -- so you were at Heinz for
7   almost or a little over four years it looks like; is
8   that correct?
9       A.   Yes.
10      Q.   Were you in Texas the whole time?
11      A.   Heinz is in Pittsburgh.
12      Q.   I'm sorry.  Yes.  Thank you.
13            Were you in Pittsburgh the whole time?
14      A.   Yes.
15      Q.   Good.  And then what caused you to leave
16  Heinz?
17      A.   I had an opportunity to -- well, actually, two
18  things.  I was -- I was being recruited by McDonald's
19  Corporation at one point.  The recruitment process was
20  advancing.  It stalled out for reasons that weren't
21  transparent to me at the time, and I had an opportunity
22  to be a vice president at Coors Brewing Company as their
23  chief quality officer.  And I thought since I hadn't
24  heard anything from McDonald's and the recruiter was
25  not -- not understanding what was going on, I would take

Page 34

1   this -- this really significant promotion to be a chief
2   quality officer for -- for Coors Brewing Company, which
3   at the time had just purchased or were -- I think
4   purchased Bass Brewing Company in England.  And so it
5   was an opportunity to develop a global center of
6   quality as part of my role there at Coors, and it
7   was a good move.
8       Q.   Were you, like, actively looking to leave
9   Heinz?
10      A.   I wasn't actively looking to leave Heinz at
11  the time, although, I would say the same sorts of
12  conditions were arising as did at Campbell's.  I'd come
13  to do a job and I'd kind of done it and we could evolve
14  the program for a long time, but I'm a leader of
15  positive change, if you will.  We brought in a very
16  significant tool, which was a product development
17  process work flow tool, a tool for technology that was
18  very, very good and novel at its time.  And I created
19  that, also, and implemented that globally.  And it was
20  kind of time to look at other -- other challenges, if
21  you will.
22      Q.   Got it.  So, obviously, Coors is a brewing
23  company, which is different from what you've done in the
24  past, correct?
25      A.   Yes.

Page 35

1       Q.   What were some of the primary differences
2   working at a brewing manufacturer as opposed to food
3   safety?
4       A.   Well, there weren't many food safety
5   challenges in a brewing company.  There is basic food
6   safety.  And I was in charge of environmental health,
7   worker safety, which was a novel role for me, which was
8   interesting and exciting.  And also, I was in charge of
9   the water quality for the Rocky Mountains spring water,
10  which was part of Coors brewing which is kind of
11  exciting, too.
12            But in terms of traditional food safety
13  issues, the product line was pretty narrow and the food
14  safety challenges were also pretty narrow and there
15  wasn't a lot of interest in nutrition.
16      Q.   In beer?
17      A.   Not much, no.  But it was a really good
18  education for me.  I understood much of the marketing.
19  I was part of the marketing team.  I understand how you
20  market beer now, which was -- it was all very
21  interesting, but the -- the role did not end up as
22  significant as it started, which I'll explain, if you
23  wish.
24      Q.   Yes, please do.
25      A.   So I was brought in to develop a global center

Page 36

1   for quality, which would be part of the U.S. as well as
2   the English or the European Bass Brewing Company.  And
3   about four months into my role there, it was determined
4   that the business was simply not robust enough to have a
5   corporate center for quality, that two corporate centers
6   would be developed, one for legal and one for human
7   resources, but that quality would remain North America
8   and -- and Europe, two separate entities with two
9   separate leadership.
10            And, frankly, there was a head of U.S.
11  quality and so my global role really kind of
12  disappeared.  And I was asked to be head of U.S. quality
13  but there was another head of U.S. quality, so we danced
14  for a few months, but I determined that it was -- it was
15  not something I wanted to be a part of for a long time.
16  And also, frankly, McDonald's came back and was
17  recruiting me for a vice president's role, chief quality
18  officer also.
19      Q.   Okay.  While you were at Heinz, which was
20  approximately almost a year, correct?
21      A.   At Heinz?
22      Q.   At Coors.  Sorry.
23      A.   Yeah.  I was -- I was literally there for 12
24  months, yes.
25      Q.   Got it.  You were based in Colorado?

ALARIS LITIGATION SERVICES
www.alaris.us                    Phone: 1.800.280.3376                    Fax: 314.644.1334

CATHERINE ADAMS HUTT, Ph.D.  3/19/2019

Page 37

1    A.  I was based in Golden, Colorado, yes.
2        Q.  You said you had some new work relating to
3    worker safety or employee safety; is that right?
4        A.  Yes.  I was in charge of the --
5        Q.  Can you explain what your job -- go ahead.
6        A.  I was in charge of worker safety, which
7    involved keeping our -- our employees safe on the job,
8    they clean a lot of equipment on a routine basis and
9    that involves getting inside of it sometimes.  So safety
10   procedures were extremely important, the effectiveness
11   of the chemicals used to clean is very important, which
12   kind of delved into the food safety role a little bit.
13       But I thought it was very -- it was a very
14   good education for me to be a part of that worker safety
15   program.  I enjoyed it a great deal.
16       Q.  How did the cleaning chemicals delve into the
17   food safety realm?
18       A.  Because in food manufacturing we also have the
19   challenges of effective cleaning.  A lot of the role in
20   quality and food safety involves cleaning systems,
21   cleaning equipment, cleaning food contact surfaces,
22   nonfood contact surfaces, the environment, all that,
23   so -- so there were similar types of issues and
24   challenges.
25       Q.  Got it.  And then what was your particular

Page 38

1    role in the area of worker safety at Coors?
2        A.  It was to develop programs and evolve them and
3    ensure that they were effectively implemented.
4        Q.  Was that for North America, specifically?
5        A.  Yes.
6        Q.  And then your CV also mentions that you led
7    development of rigorous corporate food safety programs
8    at Coors.  Can you explain what those were?
9        A.  Right.  Again, I was working on the premise of
10   ISO 9000 and bringing HACCP tools into -- into brewing,
11   because there are food safety issues.  There are also
12   food safety issues with some of the byproducts of the
13   brewing business that we sold for pet food and other
14   things.  So as I recall, basically, I was using the
15   principles of HACCP as well as the framework of ISO 9000
16   to -- to develop and install food safety programs when,
17   frankly, that was not a focus for the brewing business
18   previously.
19       Q.  Got it.  And then you said McDonald's came
20   back and was recruiting you again; is that correct?
21       A.  Yes.
22       Q.  And then you began working for them in January
23   of 2004?
24       A.  Yes.  Yes.
25       Q.  Where were you physically located when you

Page 39

1    first started working for McDonald's.
2        A.  I moved to Chicago.  So the Oak Brook
3    Corporate Center is outside of Chicago, and that's where
4    I was located.
5        Q.  Got it.  Were you -- is that your place of
6    work for the entire time you were with McDonald's?
7        A.  Yes.  Oak Brook, Illinois, is the place of
8    work, yes.  Uh-huh.
9        Q.  Got it.  All right.  So tell me about your job
10   responsibilities while you were with McDonald's.
11       A.  I started in charge of quality.  Again, it was
12   a chief quality officer role.  Another group actually,
13   at the time, did food safety, and I integrated -- I
14   worked diligently to integrate them because you can't
15   have quality without food safety.  So I did integrate
16   the food safety team into the quality team.
17       I worked as part of the purchasing arm of
18   McDonald's, which is the largest, probably, purchasing
19   arm that I know of in the food industry.  But -- but we
20   were a part of the supply chain team, which is the
21   purchasing group, and we managed quality for all of the
22   suppliers to McDonald's.
23       And then also, I was in charge of food
24   safety in the restaurants themselves.  And we had a team
25   that designed food safety programs, evolved those

Page 40

1    programs to be state of the art, and made sure that they
2    were implemented in each of the McDonald's restaurants
3    worldwide.
4        Q.  It seems to me in reviewing your CV that a lot
5    of what your role was, was more public safety.  Is that
6    an accurate statement?
7        A.  No.
8        Q.  No.  How much of your role would you consider
9    public safety?
10       A.  A very small part of it.  It was very
11   internally facing to the restaurants themselves.
12   McDonald's didn't see a lot of need for public facing,
13   if you will.  I did some public speaking, I did some
14   representation of the restaurant business as well as
15   McDonald's specifically to policy makers, but that would
16   be a very small portion of my job, and also, probably
17   one which my leadership team did not really appreciate.
18       I don't think they understood the
19   importance of McDonald's role in policy development and
20   policy implementation, policy evolution.  So my --
21   majority of my role was directly working with those
22   restaurants to -- and that was the only value I think
23   McDonald's really saw, of that quality food safety role.
24       But it was very much in the restaurants
25   working with the leadership team in different countries

10 (Pages 37 to 40)

CATHERINE ADAMS HUTT, Ph.D.  3/19/2019

Page 41

1  and different regions of the world to implement those
2  food safety practices, to oversee them, to evolve them
3  when needed, but it was very much in the restaurants.
4  McDonald's required that I worked in the restaurants for
5  weeks prior to actually taking my leadership role.  It
6  was -- McDonald's is extremely restaurant oriented.
7      So, no, not -- a very small piece of that
8  was public facing, you know.  A piece of it was consumer
9  facing because I was responsible also for ultimately
10  responding to consumer complaints about products,
11  however, the majority of it was hands-on, boots on the
12  ground in the restaurants working with the team there.
13      Q.  So what percentage, approximately, of your
14  time would you say you spent -- you were boots on the
15  ground in the restaurant working on food safety?
16      A.  I'd say 80 percent.
17      Q.  And then -- so I'm going to ask you about that
18  80 percent, but what were you doing the other 20 percent
19  of the time?
20      A.  It was being a part of trade groups evolving
21  policy, food safety practices as it related to -- to the
22  restaurant industry.  I worked with the National
23  Restaurant Association in evolving some programs or
24  designing and evolving some programs that were in
25  concert with other industry members.  But, again, those

Page 42

1  parts of my job I think McDonald's tolerated, but really
2  wanted me in the restaurants working with the teams
3  there.
4      Q.  Did you have any role at McDonald's in terms
5  of setting high-level strategy for food safety as
6  opposed to actually just implementing programs that
7  already existed?
8      A.  Oh, yes.  I mean, my role was strategic, but,
9  you know, once you decide, the strategy is to develop
10  the programs and implement them.  McDonald's is very --
11  was at the time and I believe still is, very operations
12  oriented, very implementation oriented.  So, yes, it was
13  strategic in that sense, working with suppliers in a
14  strategic way, making sure the suppliers were
15  implementing current, up-to-date practices, evolving
16  those practices, staying up to, you know, state of the
17  art within the industry, and then making sure, bringing
18  that home to the restaurant, that was my role.
19      Q.  Got it.  And so in terms of the food safety
20  programs that were installed in the restaurants
21  themselves, can you explain what the elements of those
22  programs were?
23      A.  Well, we integrated HACCP as the food safety
24  design and planning and implementation tool, primarily.
25  There were a number of different records that are kept

Page 43

1  as part of food safety practices, checklists that are
2  done, training that is required for -- for the
3  operators, for the staff in the restaurants at various
4  different levels.
5      So we design training programs, we oversaw
6  their implementation in concert with the operations team
7  and made sure that, again, the practices that we were
8  using were state of the art in terms of the food safety
9  checklist, they were looking at the right things.  In
10  some sense, also helping regulators focus on the right
11  things.
12      I did a lot of work with the other -- with
13  other industry members as part of teams within the
14  National Restaurant Association designing food safety
15  programs in concert with FDA, as well as others.
16      Q.  I notice that your resume mentions one of your
17  tasks was supporting the legal team.  Let me read it,
18  supported the legal team proactively and in litigation.
19  Can you tell us what that entailed?
20      A.  Yes.  I was -- as a food safety expert, I was
21  routinely involved in -- in cases, legal cases that
22  McDonald's got involved in, was helping to defend the
23  brand, helping work with a legal team to do some work.
24  And there was one notable case that extended for months,
25  which was a private trial.  I know I'm somewhat limited

Page 44

1  in talking about that, but it has been a very long time,
2  but it was a private trial that I -- I did my highest
3  level legal work with McDonald's for.
4      Q.  What does private trial mean?  I don't know
5  that term.
6      A.  It was a -- a case, a litigation case that
7  McDonald's negotiated a process for an outcome.  And in
8  that negotiation they -- they arranged for a private
9  trial.  It was a federal judge that proceeded -- that
10  proceeded -- that oversaw the trial.  There was a jury
11  that was selected, but it was not a public trial in the
12  sense that there was no media communication and -- and
13  that was the premise, the case went forward.
14      It was something -- again, an issue that
15  McDonald's did not want to see in the public domain and
16  negotiated a way to keep it from that.
17      Q.  Got it.  You know, then, setting aside that
18  one that was specifically designed to be private, what
19  generally was your role in the process, like the
20  litigation when there was actually a case filed in a
21  court?
22      A.  I think that that was the case that I was
23  primarily involved in.  I worked closely with the legal
24  team on a variety of other things, customer complaints,
25  for example, you know, assessing whether or not an issue

11 (Pages 41 to 44)

CATHERINE ADAMS HUTT, Ph.D.  3/19/2019

Page 45

1  was significant.  Also, interpreting evolving
2  regulations for the legal team, helping them to
3  understand what was happening in food policy and food
4  regulations as well.
5      **Q.  What caused you to leave McDonald's?**
6      A.  It's a long story.  Basically, leadership
7  changes evolved, I had a new boss.  I pointed out to the
8  company a significant food safety public -- public risk,
9  media risk, and I was asked to become a consultant for
10  them, and my job was eliminated.  The chief quality
11  officer job was eliminated, and I was basically fired.
12      **Q.  Okay.  So -- and this, you say, occurred after
13  you pointed out a major safety concern?**
14      A.  Yes.  It involved the product which is called
15  finely textured beef.
16      **Q.  Okay.**
17      A.  Which became consumer-friendly term "pink
18  slime."  And McDonald's was, at the time, inviting
19  journalists into their suppliers' operations, a meat
20  supplier making ground meat, for example, and -- and
21  basically would turn off the stream of finely textured
22  beef that was typically going or routinely going into
23  McDonald's ground beef product at a percentage of
24  15 percent, and they would actually stop that and show
25  journalists the process without finely textured beef,

Page 46

1  which was misrepresenting what actually was the truth.
2      **Q.  So they were misrepresenting the overall
3  makeup of the beef that was being sold in their
4  restaurants?**
5      A.  Yes.  And -- and basically bringing in
6  journalists, international journalists as well as
7  domestic journalists, into the processing plants to show
8  them in the program called Open Doors, to show them how
9  McDonald's made the food and -- and we weren't showing
10  them how McDonald's made the food.  We were basically
11  lying to them.
12      **Q.  Right.  And then what -- was there something
13  about that finely processed lean beef, I may have said
14  that not quite right, but was there something about that
15  particular kind of beef that was being turned off when
16  the journalists were there, was there something about
17  that particular meat that made them not want the
18  journalists to know that it was in the beef?**
19      A.  Number one, let me explain the product.
20  Finely textured beef is recognized as meat by USDA,
21  approved in 2004.  However, it is taking trimmings of --
22  of beef, basically, as you trim beef you get a lot of
23  fat and there's some tissue that's linked to the fat.
24  And so you take that fat and you render it, basically.
25  You heat it up and centrifuge it in a process that

Page 47

1  was -- is done by two companies, one called Beef
2  Products, Inc., or BPI in North Dakota and also Cargill,
3  and they're the two that were making this product.
4      But basically, you heat it up, centrifuge
5  it, separate the meat component, which is protein, which
6  goes to the bottom of the centrifuge tube and the fat
7  flows to the top, and then you extract that tissue.  It
8  doesn't look like meat.  And then also, the product is
9  ammoniated.  And so it's frozen in blocks, I believe,
10  20-pound blocks, and it was fed into the stream of the
11  grinder at a percentage, again, of 15 percent.
12      To see it, it looks like adipose tissue.
13  It looks like human fat.  It's pink and smells like a
14  swimming pool because it is ammoniated and would have a
15  very strong odor to it sometimes.
16      **Q.  Okay.  And then so what -- what was the
17  complaint or the concern that you raised about this
18  practice that McDonald's was engaging in?**
19      A.  That we had a very public program called Open
20  Doors, we had a mom's panel that we invited mothers in
21  to see how we made product from French fries to ground
22  beef to McNuggets, chicken McNuggets, and we were not
23  telling them the truth.  And I thought that was the most
24  significant risk a food company could ever -- could ever
25  take on.

Page 48

1      And I had a new boss at the time who did
2  not understand, I think, the significance of that, and,
3  basically, my job was eliminated shortly thereafter.
4      **Q.  Got it.  So you complained to your direct
5  supervisor or manager about this process or this
6  practice?**
7      A.  I -- part of the leadership team for the
8  supply chain, I -- I complained, if you will, or I
9  explained to my entire supply chain leadership team what
10  I thought this was doing to the brand, the risk that it
11  was presenting to the brand.  And yes, I mean, I was --
12  I wasn't complaining.  I was -- I was explaining what I
13  believed this risk was and what it meant to the brand
14  if -- if it came out.  And actually, history --
15      **Q.  Got it.**
16      A.  -- you know, the history is that it did come
17  out.  About six months after I left, McDonald's made the
18  decision to stop putting the finely textured beef into
19  the product along with other companies like Burger King
20  and others.  It is still in the school lunch program,
21  however.  It's approved for use in school lunch, ground
22  meat, and was, I don't believe it still is, but it was
23  in most of the ground meat that was sold in grocery
24  stores for a period of time as well.
25      **Q.  So do you know who was responsible then for

ALARIS LITIGATION SERVICES
www.alaris.us                    Phone: 1.800.280.3376                    Fax: 314.644.1334

CATHERINE ADAMS HUTT, Ph.D.  3/19/2019

Page 49

1  the position elimination that affected you?
2      A.  I'd say it was my boss and the CEO of the
3  company.
4      Q.  Got it.  And what was -- who was your boss?
5  What was his title?
6      A.  His title was senior vice president for supply
7  chain.  I believe that was it.
8      Q.  Got it.  Did you -- after your position was
9  eliminated and you were told you could no longer work
10  there, you were going to go be a consultant, did you
11  take any sort of legal action against them, against
12  McDonald's?
13      A.  Just to correct the statement, I was -- I was
14  told that I could become a consultant, that I actually
15  was hired as a consultant to support the legal case that
16  had already started.  So I was retained for another
17  year, I believe, 10 to 12 months for -- as a consultant
18  to McDonald's, but my job was eliminated.  I was told I
19  could be a consultant, and that was how that transpired.
20      Q.  Got it.  So after that occurred, did you bring
21  any sort of legal action or legal -- or threat of legal
22  action against McDonald's for the elimination of your
23  position?
24      A.  No.
25      Q.  And then, I guess so I'm clear, this -- this

Page 50

1  legal action that was part of a private trial, are you
2  at liberty to discuss what the basic subject matter of
3  that was?
4      A.  I don't -- I know that I was -- I was told at
5  the time not to do -- not to speak about it.  It was --
6  it was related to the Food Allergy Labeling and Consumer
7  Protection Act, FALCPA, and a change in regulations
8  which occurred in 2006 relative to the labeling of
9  allergens.
10      Q.  Okay.  So the next -- after McDonald's, the
11  next thing on your CV is senior advisor at Leavitt
12  Partners?
13      A.  Right.
14      Q.  Is that -- is that what you were doing to
15  consult with McDonald's?  I mean, is that where you went
16  to become a consultant for McDonald's on this legal
17  case?
18      A.  No.  I did that -- I consulted with McDonald's
19  simply with the company that I created, RdR Solutions.
20  I worked as --
21      Q.  Okay.
22      A.  -- a -- as a consultant with Leavitt Partners
23  for a period of time because they were designing a food
24  safety program as a tool that they wanted to market and
25  I had a role in designing that, but that role was

Page 51

1  separate and apart from my consultant role at RdR
2  Solutions.
3      Q.  Got it.  And it looks -- correct me if I'm
4  wrong, but it looks to me from your CV that you've been
5  in a consultant role at one place or another since June
6  of 2008; is that correct?
7      A.  That's correct, yes.
8      Q.  Is there a reason why -- and I understand
9  you -- you know, you left McDonald's under less than
10  favorable terms, and then you became a consultant for a
11  while.  Is there a reason you haven't gotten back into,
12  like, an actual industry job as opposed to being a
13  consultant?
14      A.  Well, I think two reasons.  One, I -- I enjoy
15  my relative freedom, if you will.  I have a wide
16  diversity of work.  After two and a half years or so, I
17  got enough work, I think, to make it go.  And I enjoy
18  working for myself.  I'm able to live where I choose.
19  My husband lives in Washington, D.C., and I have a farm
20  property, a ranch property here in Texas, in Dallas, the
21  area, and so I'm able to travel back and forth.
22          I can work wherever I am, and I can work
23  24/7 or seven days a week, which I do choose to do, and
24  I don't have to commute anywhere.  So it's efficient.  I
25  can go where I need to.  I'm available for my -- for my

Page 52

1  clients whenever they need me.  I don't have a land
2  line, haven't had one for 10 years.  I have a cell
3  phone.  I can work wherever I am.  I think that's a
4  grand luxury, frankly, at this stage in my career.  I'm
5  enjoying it.
6      Q.  Got it.  Okay.  So Leavitt Partners, you said
7  you provided some consulting on a food safety and
8  quality system; is that correct?
9      A.  Correct.
10      Q.  Okay.  Was that for a particular manufacturer?
11      A.  No.  It was a -- it was a tool that Leavitt
12  Partners -- which is a very diverse consulting group,
13  but it was developing a food safety initiative and this
14  was a tool that they wanted to develop to market for
15  food manufacturers, food service organizations, going
16  forward.  The frank matter is that it did not -- it
17  didn't get legs, it did not take off as a tool.  And
18  other events, you know, superseded this program, you
19  know, becoming a reality.
20      Q.  Got it.  It looks like you also did a
21  temporary stint as chief executive officer of Landes
22  Foods; is that correct?
23      A.  Yes.  Landes is a tortilla manufacturing
24  company.  I was brought in, in a consulting role, for
25  several months, about eight months.  There was a CEO

13 (Pages 49 to 52)

CATHERINE ADAMS HUTT, Ph.D.  3/19/2019

Page 53

1  there who resigned abruptly, and the owners of Landes
2  brand brought me in for about four months to act as CEO
3  and to implement some programs that we had initiated
4  as -- that I initiated as a consultant.
5      Q.   What sort of programs and initiatives?
6      A.   Food safety, quality.  We were really
7  improving the quality performance as well as, you know,
8  training, because training is so important for quality
9  performance.  A lot of the equipment was old, but
10  individuals weren't particularly trained on how to
11  operate it.  There was high turnover, and we wanted to
12  try to stabilize the turnover by improving the worker
13  conditions, but also make sure that we had programs in
14  place that they could use not just for food safety but
15  for quality performance as well.
16      Q.   Got it.  And I think it would probably be
17  helpful for the jury if you could explain the
18  distinction between food safety and quality.
19      A.   Food safety is -- is making sure that a person
20  doesn't become ill with food-borne disease, which is a
21  result of bacteria or virus.  Also, protecting product
22  from contamination, contamination can be physical,
23  chemical, or microbial.  And -- and so the whole -- I
24  mean, the scope of food safety is to make sure that bad
25  things don't happen to food that make people sick, that

Page 54

1  make people sick from food-borne disease or choking
2  hazards or other types of contaminants.
3          Also, food safety encompasses regulatory
4  compliance, compliance with the Food & Drug
5  Administration regulations, as well as U.S. Department
6  of Agriculture in the United States, so it's -- it
7  comprises regulatory compliance, again, HACCP
8  implementation now that that's a regulatory tool.  And
9  just making sure that, you know, we're planning for bad
10  things to happen and preventing them from happening.
11          Quality is, as I say, the framework in
12  which a food safety program resides.  Quality is about
13  designing a quality performance level and hitting it
14  routinely, efficiently, effectively for an operation,
15  but it is more about managing a system, which is why I
16  believe that ISO 9000 is a quality management tool, is
17  really the blueprint for quality professionals.  It
18  tells you what needs to be done for quality performance
19  and how to basically architect it.  So it -- it starts
20  with the suppliers and goes all the way through to
21  warehousing, distribution, and making sure that there
22  are processes in place that ensure consistent delivery
23  of whatever you are specifying.
24      Q.   Thank you.  It looks like you also did a
25  period of time, or maybe you're still doing it, as chief

Page 55

1  regulatory and science officer for Sloan Trends; is that
2  correct?
3      A.   Yes.
4      Q.   Are you still in that role?
5      A.   Yes.
6      Q.   Can you explain for us what that entails?
7      A.   Sloan Trends is a consumer predictive modeling
8  group.  It's a very small group.  It consists of
9  Elizabeth Sloan, some market researchers, and myself.
10  And I serve as chief science and regulatory officer for
11  the company.  Basically, Sloan Trends is -- is assessing
12  food trends, separating fad from trends.  Trends stick,
13  fads don't.
14          So we advise food clients that are both
15  food service operators as well as food manufacturers,
16  and also pharmaceutical companies as well, dietary
17  supplement businesses.  We advise them on business
18  strategy.  Looking at the long-term trends, I can help
19  assess whether or not something is going to be a trend
20  and stick, if you will, based on the strength of its
21  science foundation.
22          And so I look at, for example, the
23  ingredients in dietary supplements, sort fiction from --
24  from truth, and -- and help to assess whether, again,
25  something is going to be a mega-trend or -- and

Page 56

1  something that a food company or food service operator
2  should be a part of or not.  And so we -- we provide
3  advice and counsel to a wide variety of clients in the
4  food business.
5      Q.   Okay.  You also have been, since 2008, I
6  think, president and CEO of RdR Solutions Consulting; is
7  that correct?
8      A.   Yes.
9      Q.   Now, is that just you or do you have other
10  people working at the company with you or for you?
11      A.   It's just me.
12      Q.   Got it.  And how do you choose what sort of
13  consultant projects you take on?
14      A.   I do a wide variety of things.  My training
15  and my experience is in food safety, quality management,
16  nutrition, wellness, now in consumer trends and wellness
17  features there.  So basically, I just do a wide variety
18  of things.  I market myself primarily in the food safety
19  space because that's really where people and the
20  professional community sees me, but I enjoy nutrition
21  aspects as well.
22          And I think what I bring to my clients to
23  be the combination of all these different experiences
24  and all this different knowledge in order to design the
25  best and optimal solutions for their business problems.

14 (Pages 53 to 56)

CATHERINE ADAMS HUTT, Ph.D.  3/19/2019

Page 57

1    Q.   So I assume not all of your consulting work
2    has to do with being an expert witness in a case like
3    this; is that fair?
4        A.   Yes, that's true.
5        Q.   Okay.  So about what percentage of your work
6    as a consultant is in this litigation field?
7        A.   I'd say probably about -- it depends on the
8    year.  It depends on the year, but I'd say probably
9    about 50 percent is -- is become -- and that's evolved
10    over time.  I did a lot more food safety, design,
11    planning, crisis management work previously, marketed
12    myself, you know, to the -- to the legal system, if you
13    will, as an expert witness.  And -- and I think that has
14    brought me some -- several cases, so it's becoming a
15    little bit more as expert witness.
16        I enjoy the work, and so I'm doing that,
17    but continue to do work for other clients as they come
18    forward.
19        Q.   Now, do you have what you would consider to be
20    a subspecialty within the area of food safety?
21        A.   I think the subspecialty might be HACCP work,
22    if you will, which is very holistic.  It's, again,
23    designing for recognizing when problems occur and
24    then -- and then doing something to prevent them, but it
25    really -- I think my strength is it's very crosscutting.

Page 58

1    It's in quality systems, it's in food safety design,
2    food safety implementation.  It's in, you know,
3    boots-on-the-ground work with restaurants and
4    manufacturers to recognize problems, to know what level
5    of risk that poses to the brand and to the -- to the
6    company or to the system, and then to do the right thing
7    about it.  So it's very, very broad.  And then also, I
8    bring the nutrition and health and wellness aspects to
9    the party as well.
10        So I don't know that I have a subspecialty
11    within food safety.  I think what I bring and my
12    specialty, if you will, is the diversity of experience
13    and knowledge.
14        Q.   Okay.  Now, you're obviously offering opinions
15    in this case, which I will -- we will talk about in
16    detail, but just before we get there, I want to
17    understand what about your educational background do you
18    believe qualifies you to render the opinions that you've
19    offered in this case?
20        A.   If you limit the question to education, I'd
21    say, let me explain the nature of a food science degree.
22    It is a degree which basically requires you to
23    understand the food industry as well as food products
24    that are sold as part of the food -- or the food
25    products that are in the food industry, if you will.

Page 59

1    So I have an extensive education in food
2    microbiology, food toxicology, quality, again, as it
3    relates to different commodities, meat and poultry,
4    fruits and vegetables, dairy, cheese, et cetera.  It
5    is -- really requires that you understand the science
6    behind food, food chemistry is a very significant part
7    of that, and then also understand the practices of the
8    food industry in making food in order to -- to get that
9    degree.
10        And as a certified food scientist, that
11    acknowledges that I've kept up with my field, that I'm
12    recognized by my peers as a competent and capable food
13    scientist.  My education has been sufficient in order to
14    make me knowledgeable in that broad scope of food
15    products in the food industry, and then I keep that
16    current.
17        Q.   Do you have continuing education requirements
18    in this field?
19        A.   Yes.
20        Q.   And generally speaking, what are those
21    requirements?
22        A.   The requirements are -- as part of the
23    Certified Food Scientist, I have to renew that every
24    five years, I believe.  And you have to have a certain
25    number, and I don't remember the number, frankly.  I

Page 60

1    think it's 75 or so hours of continuing education, which
2    can take the form of attending conferences.  I speak at
3    a number of conferences, which is how I accumulate my
4    hours also.  Publishing articles, which, frankly, I don't
5    focus on, but that's another way you can amalgamate
6    hours.
7        And then also, there are courses, online
8    courses or actually in-person courses now, but much more
9    online, that you can take if you're short on hours.
10    I've not had a problem making my hours.
11        Q.   It doesn't sound like it.  And then so a
12    similar question, but can you explain for us what, from
13    your actual work experience background, qualifies you to
14    render an opinion or render the opinions that you're
15    offering in this case?
16        A.   Certainly.  So I have extensive work -- as
17    we've reviewed my resume quite thoroughly, I believe --
18    extensive work in both the food service sector as well
19    as food manufacturing sector, as well as policy sector
20    as well, the regulatory and policy sector.  So my -- the
21    diversity of experience as well as the depth of
22    experience within each of these communities, each of
23    these disciplines, I think, enables me to see -- to
24    render opinions in this matter.
25        Specifically in this matter, my extensive

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

CATHERINE ADAMS HUTT, Ph.D.  3/19/2019

---

Page 61

1  experience in restaurants and solving problems within
2  restaurants that occur routinely -- we say in the
3  restaurant business, if we don't solve my problems
4  today, tomorrow I have a different one, so don't bother.
5  It's a fast-moving paced -- fast-paced industry,
6  and, again, issues arise that need to be dealt with and
7  managed effectively immediately.
8        So my -- my experience across Yum! Brands,
9  again, working directly with each of their brands, Pizza
10 Hut, KFC, Taco Bell, with McDonald's, specifically,
11 also, international McDonald's, you know, across
12 borders, cultures, and everything else, I think, you
13 know, my experience is very strong and qualifies me for
14 this case.
15      Q.  Are there any experiences or credentials that
16 you have that either we haven't discussed today or do
17 not appear in your CV that you think support your
18 ability to render your opinions in this case?
19      A.  I don't believe so.
20      Q.  Okay.  Now, you, personally, have you ever
21 gone into a restaurant and performed a food safety
22 inspection that was part of an actual threat of
23 contamination as opposed to, say, a learning exercise?
24      A.  Yes.
25      Q.  Okay.  Do you know on approximately how many

---

Page 62

1  occasions you've done that?
2      A.  I couldn't count.  There were -- there were
3  experiences, events in my work with Yum! Brands across
4  all the different three brands at the time, three
5  concepts at the time.  I've done this also for
6  McDonald's multiple times as well.  And it's assessing,
7  it's not limited to -- I think you mentioned food safety
8  check, but it's basically going into a restaurant when
9  we have a problem and assessing the problem and how
10 we're going to manage it.
11      Again, I've always had teams working with
12 me, but, again, McDonald's, Yum! Brands for that matter
13 as well, really wanted you to be hands on.  Again, as I
14 said, boots on the ground, very involved in solutions as
15 opposed to writing policy.  So my job has always been
16 very experiential based.
17      Q.  Got it.  So when you would personally go into
18 a restaurant to do one of these inspections, would you
19 have another team member or members with you or would it
20 be like this one is assigned to you, this is yours to
21 deal with today, or how would that typically work for
22 you?
23      A.  Well, my role with the restaurant companies, I
24 would always have other individuals with me, either --
25 well, including people who worked for me and also

---

Page 63

1  operations team members as well.  So they were always
2  involved.  As a consultant, I go in and solve problems
3  and I don't have other people with me when I'm doing
4  that.
5      Q.  Got it.  Now, as a consultant, do companies
6  ever -- restaurant companies ever call you and say, hey,
7  we've had a customer complain about possible food
8  contamination, can you be here this afternoon and come
9  in and inspect our food for us?  Has that ever happened
10 in your role as a consultant?
11      A.  I would say less so as a consultant in food
12 service, but I did that for a cheese operator.  I was
13 literally in the plant within hours -- well, I shouldn't
14 say that -- in a cheese operation as well as a meat
15 operation as well I've been summoned, if you will, and
16 I've been there within 24 hours, on-site, in the plant.
17      And again, that was -- I did that for a
18 cheese company that had a concern that they were going
19 to have to have a recall, and also for a meat processor
20 in Texas.
21      Q.  Got it.  Now, when you do work these
22 inspections, is your method of inspection the same every
23 time?
24      A.  Well, it depends on the issue, but the method
25 that we use as quality professionals starts at the front

---

Page 64

1  and ends at the back, if you will.  So you would go in
2  to -- and again, it depends on the nature of the
3  problem.  But generally speaking, you look at the flow
4  of ingredients, the flow of products, and you start with
5  ingredients coming into the door and product going out
6  the door and look at what happens to it in -- in the
7  meantime, in the -- in that processing.
8      And you look at, you know, risks that
9  could be environmental, look at potential hazards that
10 could be integrated into the product.  You look at their
11 pest control programs for potential risks of, you know,
12 flies and various other rodents, things like that.
13      Yeah.  You're just -- you're looking
14 comprehensively at everything, floors, walls, ceilings,
15 manufacturing equipment, people, training, culture.
16 Whatever the risk is, you're just taking it in, in a
17 methodical way, basically, so you're not missing things.
18      Q.  Got it.  If you -- have you ever personally
19 been involved in an inspection of a possible pest
20 contamination in which you had to actually go in and
21 inspect the food product to see if there was, in fact,
22 pest contamination?
23      A.  Yes.
24      Q.  Okay.  Do you know about how many occasions
25 you've done that?

---

16 (Pages 61 to 64)

CATHERINE ADAMS HUTT, Ph.D.  3/19/2019

Page 65

1     A.  I couldn't -- I couldn't count, to be honest.
2  You know, there would be reports of rodent hairs or
3  something like that, a consumer complaint of rodent
4  hairs.  I mean, there's been parts of mice that have
5  showed up in -- in food products that required analysis
6  and investigation, if you will.  And so I couldn't begin
7  to count how many, if you will, but I've done these
8  cases routinely throughout my -- my career.
9     Q.  Got it.  Has it ever happened that, you know,
10  you get -- you get the call that there's a possible pest
11  contamination, and then once you do your inspection you
12  determine, I think it was a false alarm, I'm not finding
13  anything here?
14     A.  I've got to say that typically I find
15  something.  You can find indication of slippages, if you
16  will, because you're in that investigation mode.  You
17  are taking in everything, you're asking questions of
18  people, you are observing for a period of time, you're
19  looking at -- at ceiling tiles, has anything been
20  disturbed.  You're looking for, you know, not just signs
21  of rodent excrement or hair or whatever else, you're
22  looking for signs of access.  You're looking for doors
23  that should be closed but oddly are left open, you know,
24  mechanical doors that open and close.  Maybe it's broken
25  or maybe there -- it was broken, you're asking the

Page 66

1  question and somebody just told you, well, a couple of
2  days ago that door didn't work so well.  It was propped
3  up for three days or whatever, you know.  I mean, people
4  tell you things and I've got to say that I don't think
5  there's a case that I haven't found some sort of smoking
6  gun, if you will, that -- that, you know, something --
7  something goes on.
8        I know manufacturing plants, I know
9  restaurants, I know that things happen and -- and, yes,
10  we have procedures and we have inspections and we have
11  checklists and we have training and all that, but it
12  doesn't always go as it is intended.  And so things
13  do happen and that's just a routine part of my
14  experience and -- and I'm pretty good at finding it.
15     Q.  Sure.  I mean, I think you would agree with me
16  that finding risk factors in the facility itself is not
17  the same thing as finding actual contamination in the
18  food product, correct?
19     A.  Well, the risk factors lead to contamination,
20  and usually I'm there because there is a contamination,
21  and I'm brought in to find the risk factors, if you
22  will.
23     Q.  Sure.  But I guess my original question was,
24  have you ever gone in and checked the actual food for
25  contamination and found that you're not finding any

Page 67

1  contamination when you review the actual food product?
2     A.  Well, I know there was a case of -- that I
3  worked with of a meat product that had bone in it that
4  was one of the things I was asked to look for and we
5  found multiple fragments of bone, along with some other
6  things in that -- in that meat product, too.  I don't
7  know that I've ever been brought in and found nothing.
8        You know, I've been able to determine the
9  company -- the cheese company didn't need to have a
10  recall, but that -- that wasn't -- I didn't find
11  nothing.  I still found things that were risk factors
12  that they needed to correct, and they did.
13     Q.  Yeah, and I get that.  But I want to separate
14  out risk factors from finding actual evidence of
15  contamination.
16     A.  Well, yes.
17     Q.  Because I'm sure every facility could be doing
18  things better.  I mean, that's just -- that's human
19  nature, we could always be doing things better most of
20  the time.
21        So are there instances where you've gone
22  in to do an inspection that you felt the food wasn't of
23  sufficient quality to continue serving it to the public
24  or continue packaging it and marketing it to the public,
25  whatever the type of facility it was?

Page 68

1     A.  Well, I was there -- again, I'm trying to
2  emphasize I'm brought in because there is contamination
3  and I'm able to find reasons for it to occur, and then I
4  find further contamination as well.
5     Q.  Got it.
6     A.  I can find insect fragments in places.  I can
7  find -- you know, sometimes it's plastic or whatever
8  else and I may not find it, but I -- you know, I find a
9  screen that's supposed to be a sieve size of a
10  certain mesh qual- -- size and it's -- the one that's
11  actually been used is much bigger, allowing contaminants
12  to go through.  I'm there because people found
13  contaminants in the product and I'm looking for a reason
14  why.
15        So that's -- that's -- generally, my work
16  is to find the reasons why and how to stop it and how to
17  fix it, but clearly --
18     Q.  Got it.
19     A.  -- contamination has already occurred.
20     Q.  Okay.  I see.  I got it.  Okay.
21        So your role is to come in once
22  contamination has been confirmed and figure out what
23  caused it and how do we not have it happen again?
24     A.  That's primarily -- yeah, primarily my role,
25  right.  Uh-huh.

17 (Pages 65 to 68)

CATHERINE ADAMS HUTT, Ph.D.  3/19/2019

## Page 69

1    Q.  Got it.  Okay.  Now, as an expert witness, do
2   you have an estimate of approximately how many cases
3   you've worked on overall?
4    A.  I'd say the number is about 25 now.  22, 25,
5   somewhere around there.
6    Q.  Do you have -- I'm sorry.
7    A.  22 to 25.  I don't know exactly, but somewhere
8   around there.
9    Q.  Sure.  Do you know how many of those have been
10  in Missouri?
11   A.  In Missouri?
12   Q.  Yes.
13   A.  I'd have to look at each case, but there may
14  have been one.  I don't remember.  I really don't
15  remember.
16   Q.  Okay.  Have you ever actually gotten so far as
17  to testify at trial as an expert witness?
18   A.  Yes.
19   Q.  How many times?
20   A.  Twice.
21   Q.  Twice.  Was one of them the McDonald's case
22  that you mentioned?
23   A.  Yes.
24   Q.  Okay.  What was the other case?
25   A.  The other case was a food poisoning in a

## Page 70

1   restaurant.  I'm sorry, I misspeak.  It was a food
2   allergic reaction in a restaurant.
3    Q.  Okay.  And who engaged you, the person who had
4   the reaction or the restaurant company?
5    A.  In that case it was the plaintiff, the person
6   who had the reaction.
7    Q.  Okay.  And can you tell us who the parties
8   were?
9    A.  Can you be more specific?  Who the --
10   Q.  I'm sorry.  Who -- who was the plaintiff and
11  who was the restaurant company?
12   A.  The restaurant company was Terry's Restaurant,
13  which is a small, fine dining chain, and I cannot
14  remember the woman's name, but her first name was
15  Darlene (sic), and it's in my list of legal cases.
16   Q.  Okay.
17   A.  Angerame, I think, was her last name.
18  Angerame, that's right.  The last name was Angerame.
19   Q.  Oh, thank you.  Okay.
20      Do you know the outcome of that trial?
21   A.  I do.
22   Q.  What was it?
23   A.  I don't believe she received any -- any
24  compensation.
25   Q.  Okay.  How long ago was that?

## Page 71

1    A.  It was last year, September, I believe,
2   perhaps.
3    Q.  Okay.
4    A.  Somewhere around there.  Last fall.
5    Q.  Okay.  As an expert witness, how many times,
6   approximately, have you been deposed, like we're doing
7   here today?
8    A.  10, 11 times.
9    Q.  Okay.  In your experience as an expert
10  witness, about how many times have you been engaged by
11  the plaintiff and how many times by the defendant?
12   A.  It's about 50-50.
13   Q.  Okay.  Have you been engaged against other
14  restaurant companies, like the case you just told me
15  about?
16   A.  I have -- let me think for a moment.  I'm
17  sorry.  The majority of my work for restaurants has been
18  in support of the restaurant, but there have been cases
19  I have --
20   Q.  Okay.
21   A.  -- worked for a plaintiff with a case against
22  a restaurant as well.
23   Q.  So it sounds like more of your cases as an
24  expert witness where restaurants were involved, you were
25  on the side of the restaurant?

## Page 72

1    A.  That is correct, to my recollection that's
2   what --
3    Q.  Do you have know -- oh, sure.
4       Do you know about how many of those there
5   have been?
6    A.  Six or seven, eight perhaps.
7    Q.  Have you -- to your knowledge, have you ever
8   been precluded from testifying as an expert witness at a
9   trial?
10   A.  No.
11      (Exhibit No. 34 marked.)
12   Q.  Okay.  I'm going to ask you to pull out
13  Exhibit 34, please.
14      COURT REPORTER:  I believe it's under
15  that one.
16      THE WITNESS:  Oh, thank you.
17   Q.  Do you have it in front of you?
18   A.  I do.
19   Q.  Do you recognize this document?
20   A.  Yes.
21   Q.  Can you explain for us what it is?
22   A.  It is a summary, again, not quite current, up
23  to date, but of legal cases in the past five years or
24  so.
25   Q.  Now, this is different from the list of legal

18 (Pages 69 to 72)

## Page 73

1    cases that appears on your CV in Exhibit 33.  I mean,
2    there's some overlap, but it's not -- the list is not
3    exactly the same.  Can you explain why?
4         A.  Right.  Well, this -- the list that we have
5    here as Exhibit 34 is typically part of my resume, my
6    CV.  When a client or an individual asks for legal
7    history, I created the document, which is page 7 of
8    Exhibit 33, for this case when asked to present my legal
9    case experience in the past four years, that includes
10   trial and/or deposition.
11        Q.  Got it.  So some of the cases on Exhibit 34
12   will include instances where you never made it to the
13   point of being deposed or testifying at trial?
14        A.  That is correct.
15        Q.  Okay.  And I --
16        A.  Well, if I could -- if I could add, I mean, I
17   really -- I'm sorry.  I do need to update my resume and
18   all that with current cases, but there are probably
19   three or four cases recently that did include
20   depositions as well that I just need to update.
21        Q.  Got it.
22             THE VIDEOGRAPHER:  Counsel, sorry to
23   interrupt.  Can we take a break within the next five
24   minutes to change tapes?
25             MS. WILLIAMS:  Sure.  Yeah.  Absolutely.

## Page 74

1             THE VIDEOGRAPHER:  Do you want to do that
2    right now?
3             MS. WILLIAMS:  Yeah.  We can do it now.
4    Now is fine.
5             THE VIDEOGRAPHER:  We are now off record.
6    The time is 10:33 a.m.
7             (Recess from 10:33 a.m. to 10:43 a.m.)
8             THE VIDEOGRAPHER:  We are now back on the
9    record.  The time is 10:43 a.m.
10        Q.  (BY MS. WILLIAMS)  Ma'am, you understand that
11   even though we took a break, you're still under oath,
12   correct?
13        A.  Yes.
14        Q.  Okay.  Now, your billing rates in this case
15   have been identified as $500 per hour; is that correct?
16        A.  That's correct.
17        Q.  Is that always your billing rate?
18        A.  Yes.
19        Q.  And approximately how much have you received
20   so far for your work on this case?
21        A.  I believe I've received about $2,500.
22        Q.  Now, do you receive that money personally or
23   does it go to RdR Consulting?
24        A.  I don't recall how the money was received, but
25   RdR Consulting is me, so...

## Page 75

1         Q.  Sure.
2         A.  I have different bank accounts, but basically
3    I -- I spend from all of them.
4         Q.  It all ends up in same place?
5         A.  Pretty much.  They're accounted for,
6    obviously, but I do have multiple accounts.
7         Q.  Sure.  Did -- who actually paid you, like,
8    whose name was on the check that came to you?
9         A.  I don't recall.  Mr. Henderson paid me, I know
10   that.
11        Q.  Okay.  Got it.  Now, do you have any prior or
12   personal connection with Melissa White?
13        A.  No.
14        Q.  How do you know Mr. Henderson?
15        A.  He called and asked to retain me for this
16   purpose.
17        Q.  Is this the first case you've done for him?
18        A.  Yes.
19        Q.  Have you done any other cases for anyone else
20   in his firm?
21        A.  No.
22        Q.  Do you know how he found you?
23        A.  I don't recall if I ever asked.  I am listed
24   in some expert witness directories, and I assume that
25   that's where he found me.  And I also have a website

## Page 76

1    which he could have -- he could have searched as well.
2         Q.  Got it.  Is the website identified on your CV?
3         A.  No.
4         Q.  All right.  What is your website?
5         A.  It's rdrsolutions.com.
6         Q.  Got it.  Do you know Judge Rodney Sippel in
7    the Eastern District of Missouri?
8         A.  No.
9         Q.  To your knowledge, have you ever had any other
10   cases or been involved in any other cases that were
11   pending before him?
12        A.  No, not to my knowledge.
13        Q.  Is Mr. Henderson the first person who
14   contacted you about this case?
15        A.  Yes.
16        Q.  And do you recall when you were first
17   contacted by him?
18        A.  The answer is, no, I don't recall.  I think
19   I'll just stop there.
20        Q.  Can you recall a ballpark?
21        A.  There are cases where attorneys contact me and
22   then I don't hear from them for some period of time
23   because of the case evolving.  I believe that might have
24   been the case in this particular case, but I honestly
25   cannot recall.

ALARIS LITIGATION SERVICES
www.alaris.us                Phone: 1.800.280.3376                Fax: 314.644.1334

CATHERINE ADAMS HUTT, Ph.D.  3/19/2019

Page 77

1       Q.   When was it that he finally asked you, okay, I
2   want you to go ahead and do an analysis and prepare a
3   report for this case?
4       A.   Towards the end of last year, as I recall.
5       Q.   And just so the record is clear, that would be
6   towards the end of 2018?
7       A.   Correct, 2018.
8       Q.   Now, when Mr. Henderson first contacted you,
9   did he indicate what his role was in the case or who he
10  represented?
11      A.   Yes.  He did brief me on the details of the
12  case, yes.
13      Q.   And so what -- what did he tell you to brief
14  you on those details?
15      A.   He told me that this was primarily an
16  employment case, but that there is a significant portion
17  of it that is relevant to standard industry practice in
18  a restaurant business.
19      Q.   Did he explain how it would be relevant to
20  standard industry practice?
21      A.   I don't know if he explained it or I simply
22  understood it, but, clearly, the issue was about a -- an
23  employee who found a food safety -- food safety risk
24  and -- and again, the -- the purpose of my -- retaining
25  me was to -- was to consider the investigation done by

Page 78

1   the district manager in this case for Steak 'n Shake and
2   to consider whether or not that was within industry
3   standards for the restaurant business.
4       Q.   What else did -- whether it was on the first
5   contact or -- or a subsequent time you spoke to him,
6   what else has Mr. Henderson told you about just the
7   underlying facts of the case?
8       A.   I'm not sure what he told me.  He did produce
9   some documents for me to review, which included Melissa
10  White's counterclaims, transcript of a hearing with
11  Mr. Tardy and Ms. White present.  Again, he's told me
12  that there are other issues as part of this case that
13  I'm not involved with, but that he wanted my opinion
14  relative to the event and to the inspection and
15  investigation conducted by Steak 'n Shake in this
16  particular case.
17      Q.   Got it.  Now, did you agree to provide an
18  opinion for him before or after you discussed the
19  financial terms of your engagement?
20      A.   Again, I don't recall.  I would imagine that
21  he asked for the financial terms before providing me
22  with the documents, but I honestly cannot recall because
23  in some cases -- in some cases attorneys provide
24  documents because of timeliness without -- without
25  investigating fees.

Page 79

1       Q.   Got it.  Now, you've mentioned a couple types
2   of -- or a couple of different categories of documents
3   that he gave you.  Do you recall anything else that was
4   given to you by Ms. White or Mr. Henderson?
5       A.   Yes.  There was a report from a
6   Dr. Tomberlin --
7       Q.   Uh-huh.
8       A.   -- which was provided to me.  There were
9   photographs which were provided to me as well.
10      Q.   Okay.
11      A.   And I believe that is about it.
12      Q.   Okay.  And how much time were you given to
13  review those documentary materials and then prepare your
14  opinion?
15      A.   I don't remember a time frame that he gave me.
16  I know that I prepared this over a period of about 10
17  days or so based on the documents that were provided.  I
18  think he needed the opinion at the end of the -- of the
19  year 2018, so I worked to make sure that I had all the
20  documents that were needed and -- then develop my
21  opinion.
22      Q.   Okay.  And who -- how did you determine what
23  documents were needed to develop your opinion?
24      A.   Well, I needed to understand the circumstances
25  of the event, and also any information that was

Page 80

1   available based on what Mr. Tardy did when he
2   investigated the finding, the reported finding of worms
3   in ground beef patty.
4       Q.   Got it.  Did you -- I guess, did you speak to
5   anyone besides Mr. Henderson about the facts of the
6   case?
7       A.   No.
8       Q.   Okay.  Did you discuss -- well, actually let
9   me back up.
10          Have you had any conversations with
11  Ms. Melissa White about the facts of the case or about
12  your opinions --
13      A.   No.
14      Q.   -- that you're offering?
15      A.   No.
16      Q.   Okay.  Have you had -- I'm sorry.  I didn't
17  mean to cut you off.
18          Have you had any discussions with Melissa
19  White at all?
20      A.   No.
21      Q.   What about written communications with
22  Ms. White, have you had any?
23      A.   No.
24      Q.   Okay.  So is Mr. Henderson, then, the only
25  person you've talked to about the facts of the case or

20 (Pages 77 to 80)

## Page 81

1   your investigation and conclusions?
2       A.  Yes.
3       Q.  Okay.  Now, did you discuss your conclusion or
4   opinion with Mr. Henderson before preparing the final
5   report?
6       A.  I -- I'm -- I'm almost certain I did.  That's
7   my method I use routinely.  I will develop my opinions
8   and then document them for the attorney, my client.
9       Q.  Got it.  Do you have any such documentation to
10  Mr. Henderson that, you know, preceded your final
11  report?
12      A.  Your question is about documentation?
13      Q.  Yes.
14      A.  The answer is no.
15      Q.  Okay.  Did you review all of the materials he
16  provided to you in formulating your opinions?
17      A.  Yes.
18      Q.  There's nothing you decided I don't really
19  think I need to look at that?
20      A.  There were portions of the hearing testimony
21  that, frankly --
22      Q.  Uh-huh.
23      A.  -- I did skim, because it clearly dealt with
24  employment issues that I was not involved with.
25      Q.  Right.  Got it.  Now, your expert report is

## Page 82

1   dated December 21, 2018; does that sound right to you?
2       A.  Yes.
3       Q.  Okay.  Now, on what date did you actually
4   arrive at the opinions you expressed in that report?
5       A.  I would say a few days prior to documenting
6   it.
7       Q.  Okay.  Now, you're offering an opinion in this
8   case that Steak 'n Shake's district manager, Frank
9   Tardy, failed to perform an investigation into Melissa
10  White's report of alleged worms in a hamburger patty
11  that was con- -- failed to perform an investigation that
12  was consistent with standard practice in the food
13  service industry; is that correct?
14      A.  Yes.
15      Q.  Okay.  So as a preliminary matter, what issue
16  in this lawsuit is your opinion supposed to help the
17  jury decide?
18      A.  That the investigation conducted by Mr. Tardy
19  was not consistent with the nature and the scope of
20  investigation that one would expect relative to industry
21  practice and standard of practice.
22      Q.  Okay.  Is there any other issue that your
23  expert opinion is supposed to help the jury decide?
24      A.  I believe I can also opine on the source of a
25  worm, a maggot in this case, in ground beef and

## Page 83

1   understand how that could happen, and then understand
2   also an appropriate response by someone responsible for
3   a brand in responding to and investigating that -- that
4   issue.
5       Q.  Okay.  Now, how that could happen is not
6   necessarily the same thing as how it did or could have
7   happened -- or -- well, strike that.  Let me ask you a
8   better question.
9           Well, let me ask you this:  Have you been
10  asked to provide an expert opinion on how the hamburger
11  patty allegedly became contaminated?
12      A.  No, not directly.  As I've testified earlier
13  to, I mean, part of my job is to understand the risks in
14  a food manufacturing or food service facility, and so I
15  automatically think about if I find something, I'm
16  thinking about how that could have been caused.  It's an
17  important thought process I have.
18      Q.  Got it.  Okay.  Have you done any actual
19  inspection or research in this particular case to
20  determine how the hamburger patty may have become
21  contaminated?
22      A.  No.
23      Q.  Okay.  So at this point in time, the only
24  opinion that you have been engaged to offer is that --
25  your opinion that Mr. Tardy's investigation did not meet

## Page 84

1   industry standard?
2       A.  True.  And that it was, again, what I
3   characterize as an insufficient response to the
4   potential risk to the brand and to public health.
5       Q.  Okay.  So I'd like for you to identify for us
6   each source of information that you used in determining
7   the method by which Mr. Tardy conducted his
8   investigation at Steak 'n Shake on January 5th, 2018.
9       A.  My primary method used was my experience in
10  doing the very same sort of thing that Mr. Tardy was
11  doing on -- in response to the report of finding worms
12  in ground beef on January 5th, 2018.
13      Q.  Yeah.  Sorry.  I think we may have had a
14  miscommunication.  I'm asking you, how do you know what
15  Mr. Tardy's method was on that date?
16      A.  In reviewing the documents I've had access to,
17  which include Mr. Tardy's testimony.  As part of a
18  hearing, he was asked for his -- to describe his method,
19  what he did, who he engaged, what his actions were in
20  response to being told by an employee that there were
21  worms in ground beef being sold to customers.  Also, I
22  read the counterclaims for Ms. White, which has other
23  details of the event.
24      Q.  So you read the unemployment hearing
25  transcript, is that the transcript you're referring to?

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

CATHERINE ADAMS HUTT, Ph.D.  3/19/2019

Page 85

1    A.  Yes.  I understand it was a transcript --
2    Q.  Okay.
3    A.  -- for a hearing for unemployment, but it
4  included a description of what happened on the day.
5    Q.  Got it.  And then you reviewed Ms. White's
6  counterclaim, correct?
7    A.  Correct.  And I --
8    Q.  And you understand those are merely -- you
9  understand those are merely her allegations about what
10  happened, right?
11    A.  Yes, I do understand that.
12    Q.  Okay.  And sorry, you were going to say you
13  reviewed something else?
14    A.  The photographs, but I don't actually think
15  that was part of your question, so...
16    Q.  Did you read any portion of Melissa White's
17  deposition testimony that was taken in this lawsuit?
18    A.  I don't believe I had access to it.
19    Q.  Okay.  So does that mean you did not read any
20  of it?
21    A.  That's true, I did not read any of it.
22    Q.  Have you ever spoken to Mr. Frank Tardy
23  about his investigation into Ms. White's complaint?
24    A.  No.
25    Q.  Have you ever talked to anyone from Steak 'n

Page 86

1  Shake, the company, about any facts relating to this
2  case?
3    A.  No.
4    Q.  And I think we -- you confirmed earlier you've
5  never actually spoken to Ms. White directly, correct?
6    A.  That's correct.
7    (Exhibit No. 35 marked.)
8    Q.  Okay.  All right.  So if you could pull out
9  Exhibit 35, please, which is the unemployment
10  transcript.
11    A.  I have it.
12    Q.  Okay.  Great.  I'll ask you to flip through
13  it, please, and tell me if this looks like the same copy
14  that you would have reviewed in performing your
15  analysis.
16    A.  I believe it is.
17    Q.  Okay.  Now, if you could turn, please, to page
18  49 of the actual transcript, the big numbers at the
19  bottom.
20    A.  (Witness complies.)  Yes.
21    Q.  Okay.  So I'm looking -- starting at the last
22  question on that page, did you ever provide it to any --
23  do you see that, that question?
24    A.  Yes.
25    Q.  Okay.  Now, if you could read that through

Page 87

1  page 50 to where she says she clocked out at 11:31.  You
2  don't have to read it out loud, just read it to
3  yourself.
4    A.  (Witness reading.)  I'm done.
5    Q.  Okay.  Great.  Now, did you read this section
6  of the unemployment transcript as part of forming
7  your -- or part of your analysis in forming your
8  conclusions?
9    A.  Yes.
10    Q.  Okay.  Now in this section of the testimony,
11  Ms. White indicates -- and I'm paraphrasing, but
12  Ms. White indicates that she attempted to give the patty
13  to Frank Tardy when he first arrived and that later she
14  refused to give it to George Nicholson who was the store
15  manager; is that correct?
16    A.  That's my understanding, yes.
17    Q.  Okay.  Now, did this particular section of
18  testimony factor into your ultimate conclusion?
19    A.  It did, along with other elements of this
20  testimony, yes.
21    Q.  Yes.  And I will talk about other elements,
22  but to what extent -- or explain what conclusions you
23  were able to do -- or strike that.
24    Explain what conclusions you drew from
25  this portion of the testimony.

Page 88

1    A.  I think the relevant issue was that when
2  Mr. Tardy entered the restaurant, he was not interested
3  in looking at the patty or talking directly to Ms. White
4  or talking to anyone.  And as he describes himself, he
5  proceeded to do other things, which we can talk about
6  later.
7    But this is Melissa White's accounting of
8  how he brushed by her without asking her any questions
9  or -- or asking to see the patty.
10    Q.  Now, the other things that Mr. Tardy did upon
11  arrival to the restaurant did involve inspecting her
12  complaint, correct?
13    A.  He went about a method of investigation which
14  would not have been my choice, but he -- he did engage
15  in an investigation of some nature, yes.
16    Q.  Okay.  If you could turn back to page --
17  starting on page 13 of this transcript.
18    A.  I'm there.
19    Q.  There's a question towards the bottom of the
20  page that starts, so after you talked to George, did you
21  then go to the Florissant store?
22    Do you see that?
23    A.  Yes.
24    Q.  Okay.  If you could read -- again, to
25  yourself, I don't need you to read it into the actual

22 (Pages 85 to 88)

CATHERINE ADAMS HUTT, Ph.D.  3/19/2019

Page 89

1  record out loud, but read that, from there through the
2  last answer on page 18.
3      A.  (Witness reading.)  I read to page 18.
4      Q.  Okay.  Thanks.  Now, is this the section of
5  the transcript from which you -- you got Mr. Tardy's
6  explanation of the method he used when he arrived at the
7  store on January 5th, 2018?
8      A.  Yes.
9      Q.  So to what extent does this portion of the
10  testimony factor into your ultimate conclusion?
11      A.  I think a significant extent.
12      Q.  Okay.  And could you explain for us what
13  conclusions you drew from this?
14      A.  That Mr. Tardy's approach to the investigation
15  was not sufficient in order to qualify as consistent
16  with standard industry practice of a manager
17  investigating a report of worms in a ground beef patty
18  being served to customers.
19      Q.  All right.  Now -- and I am going to ask you
20  about all of that in extensive detail as we go through
21  today.  Did you -- I guess you saw from the testimony
22  that he did, actually, ultimately try to get the
23  hamburger patty from Ms. White and she refused to
24  cooperate and provide it to him, correct?
25      A.  That's what he says, yes.

Page 90

1      Q.  Now, did that factor into your opinion or into
2  what you considered in formulating your opinion?
3      A.  I would certainly expect him to want to see
4  the patty, yes.  The timing of his request would -- was
5  not consistent with my expectation of how a manager
6  would have performed in that restaurant at that time.
7      Q.  Okay.  And I will come back to that.
8          Did Ms. White's refusal to turn it over
9  influence your ultimate conclusion in this case?
10      A.  I don't believe that it did, no.
11      Q.  Okay.  Now, you understand that this testimony
12  that we've reviewed so far was given at a hearing, the
13  primary purpose of which was for Ms. White to obtain
14  unemployment benefits, correct?
15      A.  That's my understanding, yes.
16      Q.  Okay.  So you understand that the focus was
17  really more on why Ms. White's employment ended as
18  opposed to the extent or nature of Mr. Tardy's
19  investigation, correct?
20      A.  I believe they were closely linked.
21      Q.  Okay.  And why do you believe that?
22      A.  Because I believe that whatever condition
23  surrounded the termination or the departure of Ms. White
24  had to do with the -- her experience when Mr. Tardy
25  arrived at the restaurant and started his, quote,

Page 91

1  unquote, investigation.  I believe that her response
2  to -- to that set of events drove a lot of subsequent
3  events that are reported to have occurred.
4      Q.  Got it.  Now, you're aware from reading this
5  transcript that it is Steak 'n Shake's position that
6  Ms. White quit, correct?
7      A.  That's my understanding, based on what I've
8  read.
9      Q.  Got it.  And are you aware that that has
10  been -- that decision has been upheld through -- up to
11  the point of the Missouri Court of Appeals?
12      A.  That's my understanding, yes.
13          (Exhibit No. 36 marked.)
14      Q.  Okay.  Now, you also mentioned reviewing
15  Ms. White's counterclaims, which are actually Exhibit 36
16  in your stack.  Can you look at that?
17      A.  I have it.
18      Q.  Okay.  Great.  And my question is, what, if
19  anything, in the counterclaim helped inform your
20  understanding of Frank Tardy's method in inspecting the
21  meat or the restaurant on January 5th, 2018?
22      A.  My understanding is that -- is that what's
23  described in the counterclaim is Melissa White's
24  recounting of the sequence of events that occurred on
25  January 5th, 2018, when she found the -- the worm in the

Page 92

1  ground meat and how she reported it to the management
2  team at the restaurant.
3      Q.  Now, in terms of forming your opinions, did
4  you accept her allegations in the counterclaim as true?
5      A.  They were consistent with the testimony by
6  Mr. Tardy in the hearing transcript.
7      Q.  Okay.  Not exactly my question.  Did you just
8  accept that what Melissa stated in her counterclaim was
9  true and accurate?
10      A.  I found them consistent with Mr. Tardy's
11  report and -- and I did accept what she had said, based
12  on the consistent -- consistency between Mr. Tardy's
13  transcript and her allegations.
14      Q.  Okay.  And can you explain for us which
15  portions of the counterclaim are consistent with
16  Mr. Tardy's testimony?
17      A.  She describes the same sequence of events,
18  that -- that Mr. Tardy walked into the restaurant.
19  Obviously, there was some communication that preceded
20  that.  He walked into the restaurant, did not look at
21  the patty that she offered to -- to show him, and he
22  proceeded to walk forward into his own method of
23  investigation and then came back to her, but only after
24  some sequence of events, which included the manager
25  requesting the patty, and a lot of emotion appeared to

ALARIS LITIGATION SERVICES

CATHERINE ADAMS HUTT, Ph.D.  3/19/2019

## Page 93

1  have trans- -- transpired.  And the situation did not
2  end well with her walking out and -- with the patty in
3  her hand.
4      Q.  Now, if you could turn to paragraph 31 of the
5  counterclaim?
6      A.  Paragraph 31.  Okay.
7      Q.  Okay.  It starts by stating, when Frank Tardy
8  arrived to the restaurant, he appeared to be upset.
9          Now, do you recall Mr. Tardy testifying at
10 the unemployment hearing that he was not upset when he
11 arrived at the restaurant?
12     A.  His description of his actions suggested he
13 was -- I don't know if I'd describe it as upset, if you
14 will, but clearly, he was -- he was focused on something
15 other than a conversation with Ms. White.  I don't
16 know -- I can't -- I can't explain nor would I try to
17 explain his emotional state at that time, but his
18 actions appeared quite abrupt and were not consistent
19 with my -- my expectations of investigation into this
20 event that he understood had occurred.
21     Q.  Yes.  And I -- but he -- if he testified he
22 was not upset, that is inconsistent with what Ms. White
23 has alleged in paragraph 31, correct?
24     A.  The description that he offered, again,
25 described someone walking into the restaurant and

## Page 94

1  proceeding very abruptly.  And that abruptness, I think,
2  is quite consistent with someone who is upset, but,
3  again, I don't know that I can testify to his emotional
4  state beyond what I'm reading on the pages.
5      Q.  Okay.  I'll find it for you, hang on.  All
6  right.  If you could turn to page 29 of the unemployment
7  hearing transcript, which is Exhibit 35.
8      A.  I'm there.
9      Q.  Okay.  The very last question on the bottom of
10 the page starts, thank you, Judge, and then to
11 Mr. Tardy, would you agree that when you arrived at the
12 store you were upset?  Mr. Tardy, answer:  No.
13         Did I read that correctly?
14     A.  You read it correctly.
15     Q.  Okay.  All right.  So my point is simply that
16 there are allegations in the counterclaim that are not
17 consistent with Ms. White's -- or excuse me, with
18 Mr. Tardy's testimony from the unemployment hearing,
19 correct?
20     A.  That's not correct.
21     Q.  You don't agree with that?
22     A.  No, I don't.  As I described earlier, the
23 abruptness of his arrival is consistent with someone who
24 is upset.  He wasn't looking for a conversation.  Again,
25 inconsistent with what I would expect a manager or a

## Page 95

1  person responsible for a brand to do in that case.
2      Q.  And you'd never even met Mr. Tardy, correct?
3      A.  That is correct.
4      Q.  Okay.  So I assume you're not intending to
5  opine on his -- his various emotional states of mind?
6      A.  I do not.
7      Q.  Okay.  Now, if you could -- actually, since we
8  have the counterclaim still in front of you, paragraphs
9  31 to 43.  Again, don't want you to read them out loud,
10 but just read them for me, and let me know when you've
11 finished.
12     A.  (Witness reading.)  I'm done.
13     Q.  Thank you.  Did these allegations in the
14 paragraphs you just read influence your conclusions
15 about the method that Mr. Tardy used in conducting his
16 inspection?
17     A.  They were not the primary source of
18 information, no.
19     Q.  Did they influence it at all?
20     A.  No.  Because the description of the
21 investigation is actually offered by Mr. Tardy's
22 testimony itself.
23     Q.  Okay.  So is it your testimony, then, that the
24 primary source of your conclusions about Mr. Tardy's
25 methods are those four to five pages of testimony we

## Page 96

1  read from the unemployment hearing?
2      A.  Yes.  That is then supported by other
3  testimony within the hearing transcript, and then also
4  described again by Ms. White herself in the -- in the
5  counterclaim.
6      Q.  Okay.  So in your opinion, all of these things
7  are consistent with one another?
8      A.  They describe an event that occurred, a
9  sequence of actions in a very consistent way from two
10 sides of the coin, if you will, from two sides -- the
11 two parties.  They interpret -- they interpreted it a
12 little bit different, perhaps, but the sequence of
13 events seems to be quite consistent, in my mind.
14     Q.  Now, do you condone Ms. White's refusal to
15 turn over the hamburger patty when Mr. Tardy did request
16 it from her?
17     A.  I don't think I can condone or condemn.  She
18 was responding, I think, to the sequence of events that
19 had transpired, took the meat patty to the health
20 department, showed it to police, et cetera.  I can
21 certainly understand why she wanted to retain the meat
22 patty at that point, and several people had seen the
23 patty with the worm in it, so I understand why she kept
24 it.  Again, I don't think it's my place to condemn or
25 condone it.

**ALARIS LITIGATION SERVICES**
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

CATHERINE ADAMS HUTT, Ph.D.  3/19/2019

Page 97

1    Q.   You would agree, I assume, that by refusing to
2    allow Mr. Tardy access to the patty, she stymied his
3    ability to complete an investigation on that particular
4    piece that -- that particular hamburger patty?
5    A.   I don't know that she stymied his
6    investigation.  His investigation -- he chose a
7    different path for the investigation, didn't want to see
8    what the worm looked like.  He just chose a different
9    path for his investigation, which I think is not
10   consistent with what a business manager in charge of
11   food safety and his customers' health and public health
12   would have done at that time.
13   Q.   Well, he did want to see the patty, right,
14   just not precisely when it was offered to him by
15   Ms. White?
16   A.   He did report saying that he wanted to see it,
17   yes.
18   Q.   Okay.  So by -- by her refusal to give it to
19   him, he was not able to review the actual piece of meat
20   in question, correct?
21   A.   My understanding is he did not -- he did not
22   see the piece of meat in question.
23        (Exhibit No. 37 marked.)
24   Q.   Now, if you could pull out Exhibit 37, please.
25   This is the actual expert report.

Page 98

1    A.   I have it.
2    Q.   Okay.  Now, is this, in fact, the expert
3    report you've prepared for this matter?
4    A.   It looks like it is.
5    Q.   Okay.  Are there any prior versions of this
6    expert report?
7    A.   No.
8    Q.   Okay.  Are there any sections of this expert
9    report that were not prepared by you?
10   A.   No.
11   Q.   Are there any sections that were prepared,
12   even in part, by counsel for Ms. White, Mr. Henderson?
13   A.   No.
14   Q.   And I believe you said earlier that you
15   performed your analysis in approximately the 10 days
16   preceding the date on this report; is that accurate?
17   A.   To the best of my recollection, that is
18   accurate, yes.
19   Q.   Now, did you personally perform the analysis
20   or did you engage anybody else to assist with that
21   process?
22   A.   I did it all personally, yes.
23   Q.   And at this point in time, does this report
24   contain the full extent of the opinions that you have
25   been engaged and intend to offer in this case?

Page 99

1    A.   Yes.  I will just qualify that by the
2    definition, the regulatory definition of adulteration,
3    adulterated products.  I have -- since writing this
4    expert opinion, I've done a little bit more research in
5    the Missouri Food Code and do understand that they are
6    more explicit in preventing -- or correction, I should
7    say, characterizing filth and contam- -- filth as
8    contamination than the federal definitions are, but
9    that's my -- that's the extent of the additional part of
10   the opinion that I would render.
11   Q.   Okay.  So do you have actual plans to go in
12   and revise this report?
13   A.   I don't believe that's necessary, unless
14   requested.
15   Q.   Got it.  Okay.  But if you were to revise the
16   report, the only thing you would change would be to
17   include or incorporate the Missouri Food Code -- Food
18   Code definition of what -- what filth or contamination
19   is?
20   A.   Actually, specifically, the Missouri Food Code
21   has a more stringent definition of adulteration, which
22   would definitely include a ground beef patty that has
23   fly larvae or maggots or worms in it as an adulterated
24   product.  They are more explicit on the inclusion of
25   filth, putrid conditions, as contamination, which

Page 100

1    qualifies as adulterated, which is a regulatory
2    noncompliance.
3    Q.   Got it.  And that is not part of the Federal
4    Food Code?
5    A.   The Food Code defines adulteration more
6    generally as a substance which is poisonous or
7    deleterious to health which may cause injury.  Again,
8    the Missouri Food Code is more explicit in their
9    definition of adulteration to include filth.
10   Q.   Okay.  Is there anything else that is not in
11   your expert opinion report that you would add or change?
12   A.   No.
13   Q.   Okay.  Now, if you could turn to page 2 of the
14   report.  At the very top we have a section called Scope
15   of Opinion that states as follows:  The following
16   opinion concerns the manner in which the district
17   manager of Steak 'n Shake, Inc. performed an
18   investigation into the reported finding of worms in
19   ground beef being sold to customers on January 5, 2018,
20   and whether or not the investigation performed is
21   consistent with standard practice of professionals in
22   the food service industry.
23        Is that accurate, did I read that
24   correctly?
25   A.   Yes.

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

CATHERINE ADAMS HUTT, Ph.D.  3/19/2019

## Page 101

1  Q. Okay. And then have we discussed everything
2  that you relied upon in determining the manner of the
3  investigation that was performed?
4  A. I believe we have. We've discussed my
5  experience as well as the testimony by Mr. Tardy and
6  also Ms. White.
7  Q. Got it. Now, do you have any direct knowledge
8  of any ground beef containing worms or contamination
9  being sold or served to customers on January 5th of
10 2018?
11 A. I do not.
12 Q. Okay. Do you have any direct knowledge of any
13 contaminated meat or any other food being sold to Steak
14 'n Shake customers on any date?
15 A. I'm only relying on the testimony that I've
16 read. I have no direct knowledge --
17 Q. Got it.
18 A. -- which I would interpret as personal
19 experience -- personal knowledge or personal
20 observation. And, no, I have not had that.
21 Q. Yes. And that impact -- got it. And that is
22 how I meant that question. You have no personal
23 knowledge of any contaminated meat being sold or served
24 customers, correct?
25 A. That's correct.

## Page 102

1  Q. So that is not part of the opinions you're
2  offering in this case, if Steak 'n Shake did allow
3  contaminated food to be sold to customers?
4  A. No. You read the scope of my opinion
5  correctly.
6  Q. Okay. Well, I just want to make sure that I'm
7  clear so I can, you know, make sure I ask or don't need
8  to ask certain questions going forward.
9        Are you offering an opinion that Steak 'n
10 Shake, in fact, sold contaminated food to customers in
11 January 2018?
12 A. Based on what I read and understand, there
13 were -- there was evidence of fly larvae, maggots, worms
14 in at least one ground beef patty that was prepared --
15 or correction, available for sale to customers on
16 January 5th, 2018.
17 Q. Okay. That didn't really answer my question,
18 though. Are you offering as part of your expert
19 opinion -- opinions, the opinion that Steak 'n Shake, in
20 fact, sold or provided, served contaminated food to
21 customers in January 2018?
22 A. I believe that the ground beef patty that
23 Ms. White had included fly larvae, maggots. Again, I
24 have no evidence that other product was served to
25 customers, but that product that she obtained, that she

## Page 103

1  cooked for an employee meal, was available for sale to
2  customers on that day.
3  Q. Okay. So -- I got it. So other than that one
4  hamburger patty, you're not offering an opinion on
5  whether any other contaminated food was out there being
6  served, sold, or offered to customers?
7  A. Well, that's not exactly true because, again,
8  as I told you before, I understand the reason there can
9  be a contaminant in food, the source of that
10 contaminant. And fly larvae on ground beef, I don't
11 believe is an isolated event. It would emanate from
12 exposure in a manufacturing plant, for example. And in
13 this case, most likely in a manufacturing plant because
14 it was frozen beef, packaged frozen beef, but exposure
15 to the environment which had inadequate pest control.
16       And I believe that, again, one -- there's
17 not one fly in a manufacturing plant. There's not three
18 flies in a manufacturing plant. There are multiple
19 flies, if there are any, in a manufacturing plant, and
20 if there was exposure to meat, it could be in other
21 product.
22       And I would have -- and I think best
23 practice, good practice, standard practice for a food
24 safety, food service professional would be to understand
25 the nature of that potential contamination, how it could

## Page 104

1  occur, and the potential exposure of other product to
2  the same contamination.
3  Q. Okay. But -- and that -- those statements you
4  just made, and they included the term "could be" more
5  than once, and they are based on past experience and
6  your background knowledge, correct?
7  A. Yes. And what I read in the document and
8  within the pictures that I've seen.
9  Q. Got it. Okay. But what I'm really driving at
10 here is you don't have any personal knowledge, you've
11 not seen anything to -- to indicate or prove that any
12 contaminated food went to customers at Steak 'n Shake on
13 January 5th, 2018, correct?
14 A. I've seen pictures of fly larvae and a report
15 that they were fly larvae from a ground beef patty that
16 was available for sale. And, again, report to you that,
17 based on my experience, contamination of this nature
18 would not be isolated. I have no personal knowledge of
19 any ground meat that was sold that day in the Steak 'n
20 Shake restaurant, but I do have personal knowledge of
21 how such contamination can be a part of a food product.
22       And, again, that would not be isolated, it
23 would be --
24 Q. Got it.
25 A. -- it would be part of other products in the

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

CATHERINE ADAMS HUTT, Ph.D.  3/19/2019

## Page 105

1  restaurant.  It would be from the same lot and the same
2  supplier that -- as this ground beef patty.
3      Q.  Got it.  Okay.  Now -- now, if you could go
4  back to the expert report, please, which is 37?
5      A.  Yes.
6      Q.  I'm looking at the first paragraph under
7  summary of opinion, and it starts, it is my professional
8  opinion that Mr. Frank Tardy, a district manager for
9  Steak 'n Shake restaurants, failed to perform a proper
10  investigation into the reported finding of worms in
11  ground beef sold to customers on January 5, 2018, in the
12  Steak 'n Shake restaurant located at 1955 North Highway
13  57, Florissant, Missouri.
14          Did I read that correctly?
15      A.  Yes.
16      Q.  Okay.  So I really -- this is sort of where I
17  want to ask you, what would a, quote, unquote, proper
18  investigation have entailed?
19      A.  It would have been a comprehensive, thorough,
20  methodical investigation which would have included,
21  first, the investigation of the problem itself; and
22  secondly, a number of questions for -- for the staff
23  working there in the restaurant at the time; a more
24  thorough investigation of -- of other product that was
25  available; taking measures that would have perhaps even

## Page 106

1  suspended sale of the ground beef to customers at that
2  particular moment until the investigation was completed.
3  It would simply be much more interactive, more
4  methodical, more comprehensive, more diligent.  And
5  certainly much more caring.
6          This person is responsible for a brand.
7  He's responsible for public health.  Customers who are
8  entering that restaurant expect to be served safe food
9  and not contaminated or adulterated food.
10          The standard industry practice would be to
11  proceed with that sense of urgency and that sense of
12  care and diligence in investigating such a report.
13      Q.  Okay.  Now, you said it would include, first,
14  investigating the problem itself.  What do you mean by
15  the phrase "the problem itself"?
16      A.  I believe that standard practice would have
17  been to take a look at the patty and understand what
18  this employee was observing, and understand what
19  actually he was looking for in other product.
20      Q.  And we know -- well, strike that.
21          Do you know anything about the preexisting
22  relationship between Melissa White and Frank Tardy
23  before this incident occurred?
24      A.  No.
25      Q.  Okay.  So you mentioned a number of things

## Page 107

1  that Mr. Tardy should have done, including observe -- I
2  guess, why would it be important for him to observe the
3  patty first?
4      A.  Well, again, he proceeded on an investigation
5  to find something or not find something, but he didn't
6  even look at what he was trying to find.  You know,
7  clearly, I would have wanted to see the patty with the
8  reported worm inside to see what it looked like and have
9  an opportunity to assess, in that patty, whether or not
10  it was gristle or whether or not it was a fly larvae, a
11  maggot.  I would have also wanted to know what I was
12  going to look for in other meat product that I looked
13  at.
14          He proceeded to the reach-in to get -- to
15  look at other meat.  He does not describe the
16  thoroughness of his investigation.  A maggot on the
17  interior of a ground meat product, even thawed out,
18  would not be visible to the human eye.  He needs to take
19  the product and tear it apart.  He did not describe
20  doing that.  At no time did anyone describe that he
21  pulled product from the reach-in and actually
22  manipulated it to open it up and to look at it.
23          You know, these are things that you
24  can't -- you can't just see it on the surface.  It's not
25  necessarily going to be in the surface, it wasn't in the

## Page 108

1  surface of the ground meat patty that Melissa White had
2  cooked for her, and she found it when it was being
3  crushed and smashed and opened up.
4      Q.  Okay.  Now, he did testify that he went
5  through several pieces of meat, correct?
6      A.  He did.  I don't know what going through
7  several pieces of meat means.  And he at no time
8  describes the thoroughness of his investigation.
9      Q.  Got it.  Okay.  So did -- got it.
10          Now, do you have any knowledge of whether
11  he actually asked questions of the other staff members
12  that were working that morning?
13      A.  His own testimony described that he did not
14  ask questions of anyone.
15      Q.  When he first arrived, correct?
16      A.  The testimony that I read described him
17  walking into the restaurant and intentionally not
18  talking to anyone.
19      Q.  Correct.  And then proceeding to conduct a
20  physical investigation, but do you know if subsequently
21  he had conversations with other employees?
22      A.  I read his conversation with Mr. Nicholson,
23  the manager, and I don't believe I recall him talking to
24  any other employees at that time.
25      Q.  Okay.  Based on his testimony at the

27 (Pages 105 to 108)

CATHERINE ADAMS HUTT, Ph.D.  3/19/2019

Page 109

1    unemployment hearing?
2        A.  Yes.
3        Q.  Okay.  What makes you think that measures were
4    not taken to halt the sale of ground beef, at least
5    temporarily?
6        A.  At no time did anyone testify to that effect,
7    that meat continued to be cooked.  I believe it was
8    Ms. White's and the counterclaim and her description of
9    the event that she tried to stop meat being sold, but it
10   wasn't.  And at no time did I see any report that meat
11   was suspended -- the sale of meat was suspended in order
12   to conduct the investigation.  It seemed to be business
13   as usual.
14       Q.  And Mr. Tardy was not asked during the
15   unemployment hearing if he took any steps to stop or
16   halt the sale of beef, correct?
17       A.  He did not report any.  I don't know he was --
18   I don't see any evidence that he was asked, but he
19   certainly did not report that he made any effort to stop
20   the sale of meat to the public.
21       Q.  You said his investigation should have been
22   more interactive, methodical, and caring.  So I want to
23   take those one by one.  Interactive, how should it have
24   been more interactive?
25       A.  I don't know if I used the word "interactive,"

Page 110

1    but it's a good word to use.  Again, when a person --
2    when a food safety professional, a food industry
3    professional is investigating a complaint, the first
4    thing you do is ask questions of the people involved.
5    And the questions are -- it can range from, what did you
6    see, what have you done, whatever.  But clearly, an
7    investigation includes questioning, interview.  I mean,
8    ask questions to find out what happened, what people
9    know, what people saw, what people did.
10       Walking into a restaurant and proceeding
11   without -- without interacting with anyone is simply not
12   going to produce much information that would be
13   extremely relevant to your purpose in being there at
14   that time.
15       Q.  What about the caring piece, how should the
16   investigation have been more caring?
17       A.  Again, public -- correction, food industry
18   professionals, food safety professionals responsible for
19   a brand and for customers' health, that is urgent.  That
20   is important.  That is something that there's got to
21   be -- there has to be some sympathy, empathy.  The
22   report that -- finding worms in food that was being
23   sold to customers is a substantial food safety event.
24   It's a threat to the brand.
25       We're trained.  In order to work with

Page 111

1    people, we understand their problems, we understand
2    where they are, we work with them.  And you know, again,
3    I didn't see any of that empathy, that caring, that
4    sense of urgency about the brand even, and certainly the
5    public health.  I just didn't see that in the
6    description of events and -- that Mr. Tardy described.
7        I just -- I don't see any evidence and I
8    just -- I cannot imagine a person responsible for a
9    brand, responsible for customers' health relative to
10   food safety acting as he did when he walked into the
11   restaurant on January 5th, 2018.
12       Q.  Now, you mentioned urgency.  He did testify he
13   came right away once he realized what was going on,
14   correct?
15       A.  I think there was some timing because he was
16   involved in a training event, but as soon as he
17   understood what was going on, he did show up at the
18   restaurant.  My sense of -- my --
19       Q.  Okay.
20       A.  -- description of urgency pertains to what he
21   did when he went into the restaurant and his actions
22   there.
23       Q.  Got it.  Okay.  Your -- your report actually
24   does state, basically, right after the sentence I read
25   before, the nature of the investigation failed to

Page 112

1    demonstrate a concern for the public health of Steak 'n
2    Shake customers.
3        I guess what -- what should Frank Tardy
4    have done differently that would have demonstrated to
5    you that he had a concern for public health?
6        A.  I think the first thing he would have done is
7    understand that this is a serious issue, spoken with
8    Ms. White, who had the patty, looked at the patty.  And
9    if it were me, I would have stopped sale of the product
10   until I had a full understanding of what was being
11   served to customers.  And then to do a thorough
12   investigation of the lot, if you will, of that --
13   that -- of ground beef, the patties, that included the
14   ground beef patty that Ms. White had had with -- where
15   she found the worms.  And that would have included the
16   product that was in the reach-in, which seemed to be a
17   visual observation, didn't see anything on the surface,
18   didn't go further.
19       And then what he did in the -- when -- the
20   walk-in, in just pulling one patty out of each pan, that
21   is not what I would consider a representative sample
22   that he tore apart and destroyed.
23       Now, I understand the cost of the product
24   involved and all that, but this is, again, your brand
25   reputation, your customers' health, possible other

28 (Pages 109 to 112)

## Page 113

1  complaints which would be very damaging.  There's a set
2  of events that should have occurred that simply didn't
3  in this matter on January 5th, 2018.
4      Q.  If I told you that no one else, no other
5  customers complained about any sort of food issues on
6  January 5th of 2018, do you have any reason to dispute
7  that?
8      A.  I don't.
9      Q.  The next sentence in your expert report says,
10  the standard of practice for a professional in the food
11  service industry would first be to show concern for food
12  safety, work to safeguard the reputation of the brand,
13  and protect the company against liability.
14          So this is the standard practice,
15  according to whom?
16      A.  According to me, with 30 years of experience
17  in this field.
18      Q.  Okay.  So that's a standard that you set for
19  this sort of process?
20      A.  No.  My work -- you didn't ask earlier --
21  includes a lot of work with my colleagues and
22  professionals as quality lead, as food safety leads, for
23  respective companies.  I've created audits, which are
24  industry audits, which were collaborative events with 26
25  other companies where we basically put our quality

## Page 114

1  programs on the table, food safety programs, and picked
2  the best in order to design an audit program, a gold
3  standard audit program.
4          I've worked hand in hand with my quality
5  professionals as well as my food service, food safety,
6  and quality professionals for years, and understand that
7  we -- we think alike, we are of like mind because we
8  like to say that food safety is not a competitive
9  advantage, if you will.  Everybody has to have safe
10  food, and we have very consistent practices within the
11  industry in order to execute that.
12      Q.  And at which company or companies did you work
13  on these food audit projects?
14      A.  A variety of companies actually, but started
15  first when I worked for Heinz.  I've done similar work
16  with Yum! Brands.  I've done similar work with
17  McDonald's.  We benchmark -- we call it benchmarking --
18  other companies' quality and food safety programs.
19          And the year that Jack In The Box had an
20  issue, 2003, I believe, an E. coli food poisoning that
21  killed people, we did a lot of benchmarking to
22  understand how we can avoid such a situation and what is
23  the proper response of a company with such an issue
24  having occurred.
25          So, again, quality professionals are a

## Page 115

1  community.  We're trained similarly, we work on similar
2  objectives, which is to protect a brand and protect
3  public health, our customers' health, and it's very
4  consistent.  It's not a one-off.  It's very consistent,
5  the things we do in order to execute our jobs and
6  implement -- influence safe practices.
7      Q.  And I did -- I mean, I certainly did ask you
8  about your job responsibilities at those companies and
9  obviously the audits didn't come up.  Are there other
10  things that we haven't touched on that you believe that
11  you had job responsibilities at prior employers, or even
12  at your current company, that render you specifically or
13  uniquely qualified to render the opinions in this case?
14      A.  Yes.  And I'll describe.
15      Q.  What are those things?
16      A.  For seven years I worked as a consultant to
17  the National Restaurant Association.  And my role there
18  was in support of their nutrition programs, but
19  primarily in support of their food safety programs and
20  their quality assurance programs.
21          And so I helped support an annual meeting
22  that was held with the quality professionals which
23  shared best practices.  We brought in speakers from
24  regulatory agents, we had, again, an emphasis on "shared
25  best practices" is a term I know I'm using a lot, but

## Page 116

1  that's exactly how we call it, what we call it, and it's
2  a big emphasis.  And that's how the National Restaurant
3  Association actually supports their members by making
4  sure their members have access to, quote, unquote, best
5  practices or standard practices and have training
6  available to help implement them.
7          But I also supported that quality
8  assurance, which is called a quality assurance study
9  group, which is a group of 50, 60 quality professionals
10  in various food service companies, quick service as well
11  as casual dining restaurants.  And, again, my job was to
12  help identify and promote and train on industry standard
13  practice and best practices.
14      Q.  Are there other things from your job
15  experience that you think render you qualified to do
16  the -- particularly qualified to give your opinions in
17  this case that we haven't already discussed?
18      A.  I believe we've discussed them, both in my
19  role with food manufacturing organizations, food service
20  organizations, the National Restaurant Association work,
21  et cetera, I think we've covered it.
22      Q.  Okay.  Now, going back to the expert report,
23  the section we were looking at, how should Frank Tardy
24  have worked to safeguard the reputation of the brand?
25      A.  I believe he should have taken more immediate

29 (Pages 113 to 116)

CATHERINE ADAMS HUTT, Ph.D.  3/19/2019

## Page 117

1    action to ensure that no additional meat products were
2    being served to customers that might include fly larvae.
3        Q.  Okay.  Anything else?
4        A.  I think given that the -- there was
5    conversation within the restaurant that was talking
6    about worms in food, taking pictures of worms in food.
7    Restaurants are busy places, but customers overhear
8    things, and clearly, if a customer overheard that,
9    that could cause a very adverse reaction, and something
10   could come out of that in terms of customer complaints,
11   social media issues, et cetera, could cause damage to
12   the brand.
13           I would have been very concerned about --
14   about all those things and made sure that the
15   individuals involved were -- were talking to me instead
16   of talking to each other or talking to other people.
17       Q.  Do you know how many tables of customers were
18   in the restaurant when this incident occurred?
19       A.  I do not.
20       Q.  Is there anything else he could have done to
21   protect or safeguard the reputation of the brand?
22       A.  In follow-up, I would have expected him -- and
23   I don't have any evidence whether he did or not, but I
24   would certainly expect him to follow up with corporate
25   Steak 'n Shake, follow up about this particular

## Page 118

1    supplier, initiate an inquiry into the nature of their
2    quality and food safety programs such that you look for
3    the root cause of the issue.  And even if he did not see
4    the worm, there were reports there that it was there.
5            There's photographs that were taken, other
6    individuals saw the worms in the meat.  Another
7    employee -- the meat -- the meat patty was shown to the
8    health department, the meat patty was shown to police
9    officers.  There were multiple people who saw the
10   evidence of this meat patty in Melissa White's hand, and
11   certainly, I would have initiated a serious root cause
12   analysis of what could have caused that to occur.
13       Q.  So have you talked to any of the other
14   employees that were working that day?
15       A.  No.
16       Q.  Have you talked to either the police officer
17   who came to the Florissant Steak 'n Shake that morning?
18       A.  No.
19       Q.  Have you talked to any of the employees at the
20   Florissant health department where Ms. White took the
21   patty when she left Steak 'n Shake?
22       A.  No.
23       Q.  Okay.  So on what basis do you make this
24   statement that other people saw the contamination?
25       A.  Testimony that I read to that effect.

## Page 119

1        Q.  From Ms. White?
2        A.  From the hearing where Mr. Tardy was also
3    present and -- full stop.
4        Q.  Yeah.  Mr. Tardy didn't testify that other
5    employees saw any contamination, correct?
6        A.  He didn't refute the testimony either.
7        Q.  He wasn't asked, was he?
8        A.  I believe if it weren't true, he would have
9    said something to the effect that it was not true.  I
10   believe it was true.
11       Q.  Well, you -- okay.  So you're assuming that
12   all these different groups of people, the police, the
13   health department, other employees, all saw
14   contamination simply because Ms. White says that they
15   did?
16       A.  I'm reading testimony in a hearing, which is
17   under oath, and I'm --
18       Q.  Yes.
19       A.  -- I'm reporting to you what I read as that
20   which I believe.
21       Q.  Okay.  Now, what should Frank Tardy have done
22   to protect the company against liability, per your
23   expert report?
24       A.  It's the same thing that I reported he should
25   have done to protect the customers' health.  Again,

## Page 120

1    initiate a root cause investigation, stop sale of the
2    product until he had full knowledge about what it
3    contained.  He should have taken his employees who were
4    involved in this and had them talk to him rather than
5    talk to each other or stand around and just wait, which
6    caused further disruption.  I would have made sure that
7    they were not being overheard by customers.
8            Again, I would make sure that there
9    weren't -- there was not any further contamination of
10   product which was being sold that day and in the
11   restaurant to individuals who could have then had a
12   complaint and created additional liability.
13       Q.  So your report goes on to say, the report by
14   an employee of finding worms in meat that had been
15   observed and verified by multiple employees should have
16   been taken seriously.
17           Now, do you know who these multiple
18   employees were who supposedly verified that they saw
19   worms in the meat?
20       A.  As I understand from the testimony, it
21   included the grill cook who was cooking the patty for
22   Ms. White's employee meal and other -- pictures that
23   were taken were shown to other individuals as well in
24   the restaurant.  I think there's another individual that
25   was involved in actually seeing the meat patty at

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

CATHERINE ADAMS HUTT, Ph.D.  3/19/2019

Page 121

1    that -- at that point.
2        Q.   Do you know if any of these individuals,
3    including Ms. White, have had any sort of training or
4    education in entomology or microbiology?
5        A.   I have no knowledge.
6        Q.   What makes you believe that hourly employees
7    at Steak 'n Shake have any qualifications to say whether
8    what they saw was a worm or not?
9        A.   Well, I've seen a lot of maggots, and I
10   think -- I think people see maggots.  I mean, these are
11   on the sidewalk, they're in various places where flies
12   lay their eggs and they hatch in the rain and you see --
13   you see larvae.  I think that it's fair to believe that
14   they know what a fly maggot looks like.  I don't think
15   that's un -- an isolated event or unique event.
16   Certainly they're -- they're easy to recognize when you
17   see -- when you see them.
18       Q.   Well, Ms. White didn't even describe it as a
19   fly larvae or a maggot, right?  She called it a worm;
20   isn't that correct?
21       A.   Yes.
22       Q.   All right.  So what -- again, I guess I go
23   back to what makes you think that any of these
24   individuals who were working at Steak 'n Shake on
25   January 5th were qualified to identify what they were

Page 122

1    looking at?
2        A.   I think it's reasonable to believe that
3    they've seen a maggot before and that's what it looked
4    like from the pictures.  And clearly, they were
5    responding -- they were calling it a worm, but -- but it
6    wasn't an earthworm.  It was white and curled and,
7    clearly, in my mind, looked like a maggot that people
8    would be familiar with.
9        Q.   And when you say that this report should have
10   been taken seriously, what does that mean?
11       A.   The sequence of events when Mr. Tardy walked
12   into the restaurant, I think, should have followed a
13   very different course.  He, again, did things that are
14   not consistent with my expectations.  And in that sense,
15   whether or not he was taking seriously or not -- again,
16   a serious investigation, in my opinion, did not
17   transpire by Mr. Tardy, and it would have been more
18   thorough, more comprehensive, more caring, and
19   completely more compre- -- more diligent, methodical and
20   diligent.
21       Q.   Now, have you seen the actual hamburger patty
22   itself?
23       A.   No.
24       Q.   And your report is based on the assumption
25   that the hamburger patty was, in fact, contaminated on

Page 123

1    January 5th of 2018, correct?
2        A.   I've seen pictures of the patty that was taken
3    at -- in the restaurant at the time, and it was -- it
4    was contaminated.
5        Q.   Okay.  Well, you've seen pictures that
6    Ms. White claims were taken of the patty at the time,
7    right?
8        A.   I believe that other people -- people other
9    than Ms. White took the pictures and actually posted it
10   on social media, but that's what I've read.
11       Q.   Now, Ms. White did it -- okay.  You don't
12   understand that it was Ms. White who posted it on social
13   media?
14       A.   My recollection is that there's another
15   employee who also posted pictures, but it was another
16   employee who took the picture, and that's the picture
17   that I believe we're -- we're all seeing.
18       Q.   Okay.  And are -- is it your testimony you
19   can't affirmatively say, based on those photos alone,
20   that what -- that there is maggots in that meat?
21       A.   The picture that I've seen of that meat patty
22   clearly shows to me evidence of a fly larvae, a maggot,
23   in the meat.
24       Q.   And there is no way it could be gristle or fat
25   or anything else, in your opinion?

Page 124

1        A.   In my opinion, that is not gristle, that is a
2    maggot.
3        Q.   And you're basing that off a photograph taken
4    with a cell phone?
5        A.   I assume it was a cell phone.  I'm basing it
6    off a photograph that is reported to be that meat --
7    ground meat patty that Ms. White had.  And I should say,
8    multiple pictures of the event, which included people in
9    the restaurant at the time.
10       (Exhibit No. 39 marked.)
11       Q.   If you could pull up Exhibit 39, please.
12       A.   I have it.
13       Q.   Okay.  Are these the photos you're referring
14   to?
15       A.   Yes.
16       Q.   Okay.  Are there any other photos you reviewed
17   in forming your opinion?
18       A.   I believe there might have been.  I can't
19   remember the file exactly.  But clearly, the pictures I
20   found most useful were the -- on the bottom right
21   column, and the top left, the bottom right in
22   particular --
23       Q.   Okay.
24       A.   -- which shows a partially cooked ground beef
25   patty with what I recognize to be a maggot in it, which

31 (Pages 121 to 124)

CATHERINE ADAMS HUTT, Ph.D.  3/19/2019

Page 125

1  is -- which is not going to be confused with gristle.
2      Q.  Okay.  And you said that's particularly the
3  bottom right photo?
4      A.  Yes.
5      Q.  Let me ask you this:  Did you turn over your
6  entire -- did you give to Mr. Henderson the entire scope
7  of materials you reviewed in order to produce for us for
8  this deposition?
9      A.  I received from Mr. Henderson most of the
10 materials, and then I did turn over the segments of the
11 2017 FDA Food Code, USDA's regulations on adulteration,
12 other things that I looked at.  I don't believe there's
13 anything else, notwithstanding the Missouri Food Code,
14 that I considered in this case that's missing.
15     Q.  Did you -- did you just say you turned over
16 the portions of the 2017 Federal Food Code -- Food Code
17 that you reviewed?
18     A.  Yes.
19     Q.  Okay.  Do you have any idea why that wasn't
20 produced to us?
21     A.  My understanding was that it was.
22     Q.  Okay.  We received some regulations, but we
23 didn't receive anything -- we didn't receive the 2017
24 Food Code.  Are we talking about two different things?
25     A.  No.  May I go to your own exhibit?

Page 126

1      Q.  Sure, absolutely.
2      A.  It's 41 and 40.
3      Q.  Okay.
4      A.  These are extracted from --
5      Q.  I will ask you --
6      A.  -- the Food Code.
7      Q.  Pardon?
8      A.  They're extracted from the Food Code.
9      Q.  I'll ask you about those in a minute, or in a
10 little bit, really.  All right.
11         So I guess I'm trying to -- getting back
12 to Exhibit 39, you don't know if these are the only
13 photos that you reviewed in preparing your opinions?
14     A.  I don't recall.  I know that they were -- they
15 were blocked like this.  I don't know.  I think there
16 was another page of photos, but I can't really recall.
17     Q.  Okay.  Now, moving on to the next paragraph in
18 your expert report, going back to Exhibit 37, you state,
19 it is a fact that Mr. Tardy was first dismissive of the
20 complaint.
21         And on what do you base that statement?
22     A.  The description by Mr. Tardy in the testimony
23 at the hearing, the employment -- the unemployment
24 hearing.
25     Q.  Okay.  So you believe his testimony

Page 127

1  demonstrated a dismissive attitude toward the complaint
2  raised by Ms. White?
3      A.  Yes.  I think his actions, particularly his
4  actions when he entered the restaurant, bypassing the
5  opportunity to actually see the -- the beef patty with
6  the worm in it, with the maggot in it, to me was -- was
7  dismissive.  It was not, again, what I would consider or
8  expect to be consistent with -- with someone trying to
9  do a thorough investigation into a food safety matter.
10     Q.  Do you know on how many prior occasions
11 Ms. White had raised concerns or complaints about issues
12 that turned out to be nothing?
13     A.  I have no knowledge.
14     Q.  All right.  And then you go on to say, his
15 investigation on-site was cursory.
16         Is there anything more to that than what
17 we've already discussed?
18     A.  Again, his actions were just so inconsistent
19 with my expectations of what he would look at, the
20 number of meat patties he would investigate, the -- you
21 know, the type of -- the method of his investigation in
22 the reach-in where product was actually being served to
23 customers immediately.  Again, there's no description
24 that he took any of those patties and tore them apart.
25 I just -- I think it was -- it was, in my best

Page 128

1  statement, cursory.
2      Q.  You say that his manner and demeanor failed to
3  reflect the concern and sense of importance that would
4  be expected and considered standard practice by a
5  professional in the restaurant.
6         Now, again, is that based on anything that
7  we haven't already discussed?
8      A.  Well, I think there's some back and forth, if
9  you will, with Mr. Nicholson involved that we haven't
10 discussed, but, again, the sequence of events which are
11 described in the testimony at the hearing clearly show
12 me his manner and demeanor and his method of
13 investigation, which I just don't believe was consistent
14 with my expectation of what he should have been doing in
15 his role of responsibility at that time.
16     Q.  So what about his interactions with
17 Mr. Nicholson -- I guess let me back up and ask you,
18 what did you observe or review, read about his
19 interactions with Mr. Nicholson that you considered in
20 forming your opinion?
21     A.  Again, the description of his interaction in
22 his office with Mr. Nicholson, sending Mr. Nicholson to
23 obtain the meat patty from Ms. White.  I read the
24 sequence of events -- again, very consistent between
25 Ms. White's testimony and Mr. Tardy's testimony, and it

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

CATHERINE ADAMS HUTT, Ph.D.  3/19/2019

Page 129

1    just -- it just -- it's just not -- it's not what that
2    professional should have been doing at that time,
3    given -- given the set of information, the data sets
4    that he had.
5        Q.  Why would it be a problem for him to send
6    Mr. Nicholson, the general manager of the store, to
7    collect the meat patty from Ms. White?
8        A.  Well, again, I guess I interpret that, based
9    on my experience, as a sense of distancing himself from
10   this event, dismissing it, if you will.
11              Again, if somebody had that degree of
12   complaint, evidence in her hand, I would -- I would do
13   it personally.  I think anyone in that circumstance --
14   any food safety professional in that circumstance would
15   have taken a more personal role and not sent somebody
16   else to -- to get the product or talk to the person.
17   There was no interaction between himself, Mr. Tardy and
18   Ms. White, which I think is essential in investigating
19   an event of this nature.
20       Q.  If you didn't believe Mr. Tardy had already
21   demonstrated a dismissive attitude or a lack of
22   interest, would you have a problem simply with the fact
23   that he asked Mr. Nicholson to collect the patties for
24   inspection?
25       A.  If he had performed differently when he walked

Page 130

1    in the restaurant, asked questions, engaged Ms. White,
2    followed through, I would not have a problem with him
3    asking somebody else to collect the patty which he would
4    have already seen at that point, but he hadn't and
5    those -- those events did not transpire.
6        Q.  So it seems to me like one of the very, like,
7    foundations of your opinion is that the first thing
8    Mr. Tardy should have done is inspect the actual
9    hamburger patty in question and talk to Ms. White; is
10   that fair to say?
11       A.  I believe that's -- that's consistent with
12   what a food safety professional, again, a manager in
13   charge of a restaurant, would have done when presented
14   with the set of facts that he had.
15       Q.  And I'm just asking, is that one of the very
16   foundations of your overall opinion in this case?
17       A.  It's part of -- of the -- of the basis for my
18   opinion.  Again, from the moment he walked into the
19   door, he was not behaving consistent with what I believe
20   a food safety or a business leader would have done in
21   that case.
22       Q.  Right.  No, I understand.  I understand.  And
23   you've said that, like, a dozen-plus times, so,
24   basically, I understand that it's part of your opinion.
25   I want to try to stick with the questions I'm actually

Page 131

1    asking because this deposition is going to take all day
2    if we don't.
3              So I understand you to be saying that it's
4    part of the foundation of your opinion that he should
5    have inspected the hamburger patty and talked to
6    Ms. White when he walked in the door, right?
7        A.  It is part of my opinion, yes.
8        Q.  Now, of course, you -- you were not there,
9    correct?
10       A.  That's correct.
11       Q.  So you don't have any, I guess -- would you
12   agree with me that it is difficult to determine
13   someone's manner and demeanor based simply on a written
14   statement?
15       A.  No, I don't agree with that.
16       Q.  Okay.  And you've never spoken to Mr. Tardy to
17   know what his overall personality is like, correct?
18       A.  I've never spoken with Mr. Tardy, no.
19       Q.  And you have no idea what his overall, you
20   know, average personality is like, correct?
21       A.  No.  I'm very familiar with managers of
22   restaurants, though, and they don't get to be managers
23   of restaurants unless they're generally people food --
24   people persons -- people-people.  My regrets there.  But
25   a manager in a restaurant should be a people person and

Page 132

1    engage people.
2              And we train managers.  Certainly, as part
3    of my experience with McDonald's and also Yum! Brands,
4    we train managers to be engaging.  We want them to be
5    engaging.  I don't know, Mr. Tardy being a district
6    manager, he clearly had experience in managing
7    restaurants and managing people, and I -- his behavior
8    seemed to be very abrupt, and it was suggestive of
9    his -- of his emotions at that time.
10       Q.  Okay.
11              THE VIDEOGRAPHER:  Counsel.
12       Q.  So you're extrapolating -- well --
13              THE VIDEOGRAPHER:  Sorry to interrupt.  I
14   just wanted to let you know we've got about 10 minutes
15   before we need another break for a tape.
16              MS. WILLIAMS:  Okay.  Give me like a
17   three-minute warning.
18              THE VIDEOGRAPHER:  Okay.
19              MS. WILLIAMS:  Thanks.
20       Q.  Okay.  Now, you also go on to say in your
21   expert report, the worm shown in the picture taken by an
22   employee is a maggot or fly larvae, correct?
23       A.  Where are you reading that, please?
24       Q.  I'm sorry.  I'm still on page 2.  I've moved
25   down a little bit.  I'm under the bold number 1.

CATHERINE ADAMS HUTT, Ph.D.  3/19/2019

## Page 133

1      A.  Okay.  Yes.
2      Q.  Okay.  Do you know which employee allegedly
3  took the photo that you're talking about?
4      A.  My recollection from the testimony was that it
5  was the grill cook.
6      Q.  Okay.
7      A.  Or someone standing nearby him.  I don't
8  recall.
9      Q.  Okay.  The report goes on to state, this
10  finding was confirmed by Dr. Jeffery K. Tomberlin,
11  assistant professor at Texas A&M University.  In fact,
12  Dr. Tomberlin identified a total of three maggots in the
13  meat patty, correct?
14      A.  Yes, you read that correctly.
15      Q.  Yes.  So now you understand Mr. Tomberlin made
16  his assessment based on the actual patty itself, not the
17  photograph?
18      A.  That's my understanding, yes.
19      Q.  Okay.  And do you have any knowledge of
20  whether he ever even reviewed those photographs?
21      A.  I have no knowledge.
22      Q.  And are you -- you have read Mr. Tomberlin's
23  report, though, correct?
24      A.  Yeah.
25          (Exhibit No. 28 marked.)

## Page 134

1      Q.  Okay.  And in fact, it is Exhibit 28 in your
2  stack if you want to pull it out.
3      A.  I have it.
4      Q.  Is this the report from Dr. Tomberlin that you
5  reviewed?
6      A.  Yes.
7      Q.  And it is dated December 20th, 2018, correct?
8      A.  Yes.
9      Q.  Which is only a day before your expert report
10  is dated, right?
11      A.  Yes.
12      Q.  So how much time did you have to review
13  Dr. Tomberlin's report in forming your expert report?
14      A.  I had sufficient time in order to understand
15  his findings.  I was drafting my report --
16      Q.  Right.
17      A.  -- prior to receiving this, and his findings,
18  his written findings confirmed my -- my initial thoughts
19  for my expert opinion.
20      Q.  Now, are you aware that Dr. Tomberlin was
21  deposed last week?
22      A.  I am aware of that, yes.
23      Q.  Okay.  Now, you understand that Dr. Tomberlin
24  is not expressing an opinion that the meat was
25  contaminated on January 5th of 2018, correct?

## Page 135

1      A.  He's expressing his opinion on what he was
2  provided, and reports the findings of three maggots in
3  the -- in the product.
4      Q.  Correct.  Based on his inspection, which was
5  performed on December 17 of 2018; are you aware of that?
6      A.  I don't recall that I knew exactly the date of
7  his inspection, but I certainly know the date of his
8  report.
9      Q.  And all that Dr. Tomberlin states in his
10  report is that the meat was -- or the meat was
11  contaminated at the time he examined it, correct?
12      A.  That's his report, yes.
13      Q.  And are you aware that his testimony was
14  consistent with that report?
15      A.  I'm not aware of his testimony, but I would
16  expect his testimony to be consistent with his written
17  report, yes.
18      Q.  And are you aware that Dr. Tomberlin has even
19  stated that he has no opinion on whether or not the
20  hamburger patty he examined even came from Steak 'n
21  Shake?
22      A.  I'm -- I'm not familiar with his testimony, so
23  I can't speak to that.
24      Q.  Fair enough.  So how can you rely on his
25  expert report to reach the conclusion that the meat was

## Page 136

1  contaminated on January 5 of 2018?
2      A.  As I mentioned, I was already drafting my
3  opinion when I received this report.  And my opinion was
4  based on the testimony from the hearing as well as what
5  I saw in the picture that was reported to be the patty
6  that we're talking about.  So my -- my opinion was
7  pretty firm in what I saw.
8          In receiving this expert opinion from
9  Dr. Tom- -- Tomberlin, I understood exactly what it was
10  that -- that he found, and they were consistent with
11  what I saw from the pictures taken from January 5th,
12  2018.
13      Q.  Well, the pictures that you were told were
14  taken on January 5th, 2018, correct?
15      A.  Yes.  They were presented as the pictures from
16  the event, yes.
17      Q.  Okay.  All right.  Going back to your expert
18  report again, the next paragraph states, given that the
19  meat was frozen when it arrived at the restaurant, it is
20  most likely that the meat was contaminated by flies
21  during processing.
22          Why is that most likely?
23      A.  Because I'm familiar with how frozen ground
24  beef patties come into a restaurant for cooking.
25  They're packaged.  They are frozen, they're kept frozen,

34 (Pages 133 to 136)

CATHERINE ADAMS HUTT, Ph.D.  3/19/2019

## Page 137

1   which means they're kept in a freezer in frozen box --
2   or in boxes in frozen environments during
3   transportation.  They would not have been exposed to --
4   to air.  Clearly, the thawing of the ground beef patties
5   at the restaurant was very likely to be in a cooler
6   which would not be likely to have flies in it, to be
7   honest, based on my experience.  So it seems like this
8   could have been more clearly a possibility coming from
9   the raw meat supplier.
10          Q.   And are you -- well, strike that.
11              Skipping down a couple of sentences, you
12   state, the presence of maggots in meat indicate a
13   failure of regulatory requirements for pest control in a
14   processing facility and the finding of a maggot in meat
15   indicates to an experienced food professional that it is
16   not likely to be an isolated event.
17              Did I read that correctly?
18          A.   Yes, you did.
19          Q.   Okay.  And you -- you've expressed that
20   opinion already in this deposition that, if you find
21   maggots in one piece of meat, it's likely in others as
22   well.  Is that your opinion?
23          A.   Yes.
24          Q.   Can you explain why that -- that is your
25   opinion?

## Page 138

1          A.   As I mentioned, if -- if it's possible for a
2   fly to land on exposed meat and lay eggs, fly larvae,
3   then, again, it's a break -- it's a failure of pest
4   control.  And if you're in a plant that has a fly in it,
5   it's not a single fly.  Most generally, it is multiple
6   flies, a chronic problem that's allowed to persist until
7   it's corrected.  And clearly, there could be other --
8   other flies that have landed on exposed meat in similar
9   circumstances and could have created more -- more
10   maggots in the meat.
11          Q.   Did you ever inspect any of the meat that was
12   present at Steak 'n Shake on January 5th of 2018?
13          A.   No.
14          Q.   Do you have any knowledge of anyone who did
15   other than Dr. Tomberlin being told that he was
16   investigating a single hamburger patty from that date?
17          A.   Mr. Tardy reported smashing some ground beef
18   patties --
19          Q.   Correct.
20          A.   -- and that's the only evidence I have of
21   anyone else investigating.
22          Q.   And Mr. Tardy testified that he didn't find
23   any contamination when he did that, correct?
24          A.   When he selected the few pieces of meat that
25   he did investigate and tear apart, he reported not

## Page 139

1   finding anything, but my -- my supposition, my position
2   is -- my opinion is that he did not do a thorough
3   investigation.
4          Q.   But if the -- if it's not an isolated event,
5   why wouldn't it be sufficient for him to take a
6   hamburger patty from each pan in the cooler and, you
7   know, if those patties were clean, why not extrapolate
8   that the others were as well?
9          A.   Well, I don't know how this vendor designated
10   lots.  Clearly, the most suspect product, I believe, was
11   in the reach-in, not the walk-in.  Well, actually, I
12   misspeak because the patty was pulled from the walk-in,
13   so I retract that.
14              But I believe that more patties should
15   have been investigated from the product that was panned
16   up for thawing, for slacking out and, again, I would
17   have looked at all of that product as suspect, not just
18   one patty out of the nine or ten that -- that were in a
19   pan, each pan.
20          Q.   Yeah.  And I guess I'm trying to get at, like,
21   why?  So if you're saying that this is -- this -- it was
22   contamination, it's not isolated, why wouldn't it be
23   sufficient to look at one patty from each pan?
24          A.   It's not --
25              MR. HENDERSON:  Objection, asked and

## Page 140

1   answered.
2          A.   It's not a representative sample of what he's
3   looking at.  Again, I don't know how the lots are
4   designated, how this patty that was affected relates to
5   the other patties.  Clearly, from the same vendor, most
6   likely from the same vendor, could have been made on the
7   same day.
8              Tracing ground meat is a little difficult
9   because there's -- it's ground, if you will, so I don't
10   know, again, if there's, you know, where this particular
11   patty came from.  But clearly, I wouldn't expect every
12   patty to have fly larvae in it, but others could have,
13   and he did not do a thorough investigation of the other
14   highly suspect meat patties.
15              THE VIDEOGRAPHER:  Counsel, we've got
16   about two minutes left.
17              MS. WILLIAMS:  Okay.  We can take -- we
18   can pause now and you can do the tape switch.
19              THE VIDEOGRAPHER:  We are now off the
20   record.  The time is 12:21 p.m.
21              (Recess from 12:21 p.m. to 12:29 p.m.)
22              THE VIDEOGRAPHER:  We are now back on the
23   record.  The time is 12:29 p.m.
24          Q.   (BY MS. WILLIAMS)  Now, if Frank Tardy had
25   talked to Melissa White and reviewed the -- or, I guess,

35 (Pages 137 to 140)

CATHERINE ADAMS HUTT, Ph.D.  3/19/2019

Page 141

1  examined the hamburger patty that she had tried to grill
2  up for herself when he first came into the store, isn't
3  it possible that could have influenced him to overlook
4  other possible contamination in the meat if he was only
5  looking for one particular thing?
6      A.  I'm not sure I understand your question nor do
7  I understand how to respond to it.  It seems
8  hypothetical, first.
9      Q.  Okay.
10     A.  And I can't predict his actions if something
11  different had happened than what was documented.
12     Q.  Pardon?
13     A.  I can't predict his actions if it was
14  different --
15     Q.  Yeah, I know -- I just wanted to ask --
16     A.  If I can just finish, please.  I can't predict
17  his actions if something happened that was different
18  than what he documented didn't actually transpire.
19     Q.  And I am allowed to ask hypothetical
20  questions, that is part of how these things work.
21         So my question is, simply, isn't it
22  possible that just information from Melissa White before
23  conducting an investigation on his own could have
24  influenced what he was looking for and the ultimate
25  outcome?

Page 142

1      A.  I believe it would have informed what he was
2  looking for.
3      Q.  And so is it -- do I understand correctly that
4  you believe his investigation was sufficient, even
5  though he asked to see the hamburger patty shortly after
6  he arrived, it just wasn't the first thing he did?
7      A.  My understanding, based on the testimony, was
8  that he completed his investigation of other meat
9  products before seeing the actual contaminated meat
10  product.
11     Q.  Well, how did you know he wasn't planning to
12  go back and look at other meat products after he
13  reviewed the hamburger patty that Ms. White had found?
14     A.  Can you repeat that?  I don't understand the
15  question.
16     Q.  Yeah.  I guess, what makes you think he
17  would -- he was done and all he was going to go do was
18  go look at the patty Ms. White had found?  Like, what
19  makes you think he wasn't going to go back and do more
20  after he looked at that patty?
21     A.  I have no knowledge.
22     Q.  Okay.  Now, your own report -- I'll find it
23  here.  Hang on, give me one second.  I'm looking.  Ah.
24         So I'm on page 3 of the report, second
25  paragraph from the bottom.  Towards the end of the

Page 143

1  paragraph it states, Mr. Tardy took only a single patty
2  from other pans that would be suspected of being in the
3  same lot and from the same supplier as the adulterated
4  patty.  He claims that he tore these patties apart to
5  examine them.
6          Did I read that correctly?
7      A.  Yes.
8      Q.  Okay.  So I want to focus in on the "tore the
9  patties apart to examine them."  Isn't that what you
10  said earlier he should have done?
11     A.  I said that he should have taken more of a
12  representative sample, and one patty out of each of the
13  various other pans that were slacking out would not be,
14  in my opinion, a representative sample.
15     Q.  Okay.  But as -- in terms of what he did with
16  the samples he took, tearing them apart, isn't that
17  what you said he should have done?
18     A.  That would have been part of his
19  investigation.  I just would have torn more meat patties
20  apart, including the product that were in the reach-in
21  cooler.
22     Q.  Okay.  Yes, I understand your testimony is he
23  should have looked at more samples, but in terms of the
24  samples he did look at, it sounds like he --
25         MR. HENDERSON:  Objection --

Page 144

1      Q.  -- looked appropriately, correct?
2          MR. HENDERSON:  Objection, asked and
3  answered.
4      Q.  You can answer.
5      A.  He states that he tore some patties apart.  I
6  don't believe he tore enough patties apart and did a
7  thorough investigation.
8      Q.  Okay.  You're not actually answering my
9  question, though.  I understand you think there should
10  have been more samples reviewed, but in terms of the
11  samples that he did actually review, he reviewed them
12  appropriately, correct?
13         MR. HENDERSON:  Objection, asked and
14  answered.
15     Q.  You can answer.
16     A.  I don't know what he meant when he said he
17  tore them apart.  He might have cut -- he might have
18  split them in half.  That was not a sufficient
19  investigation.  He simply is not describing to me what a
20  thorough investigation of each one of those patties was.
21  He mentioned he tore it apart.
22         I believe he also mentioned he smashed
23  them, "put them together" were, I think, his words.  And
24  again, I don't know what that means, but clearly, the
25  correct approach would have been to do a methodical

36 (Pages 141 to 144)

CATHERINE ADAMS HUTT, Ph.D.  3/19/2019

Page 145

1  investigation of each one of those patties and more of
2  them.
3      Q.  Why didn't you ask for the opportunity to
4  speak directly with Mr. Tardy before forming your
5  opinion in this case?
6      A.  I saw no reason to do that, and frankly, have
7  not done that in any other case I've been involved in.
8      Q.  And why would you say you saw no reason to do
9  that?
10     A.  I was responding to the reports of the events
11  as described by Mr. Tardy in his own testimony, and also
12  by Ms. White and her testimony.
13     Q.  And again, Mr. Tardy's testimony consists of
14  approximately five pages at an unemployment hearing,
15  correct?
16     A.  That is the testimony that I read which
17  reported the events of the case, yes.
18     Q.  Now, you also go on to say in the report,
19  standard practice -- the standard of practice in this
20  case would include an inquiry of the employee with the
21  complaint and full examination of the meat patty
22  containing the maggot, correct?
23     A.  Yes.
24     Q.  Now, how is he supposed to do that when the
25  employee won't speak with him and won't turn over the

Page 146

1  patty?
2      A.  According to his testimony, he walked in the
3  restaurant and did not speak with the employee right
4  away, did not look at the patty that she was offering
5  to -- to show him.  He proceeded with other parts of his
6  investigation and then went back to her, but clearly, he
7  had opportunity and, I think, the proper and appropriate
8  investigation would have started with the employee and
9  started with the product of -- in question.
10     Q.  Well, how could he possibly know that, if he
11  turned her down the first time she offered, she would
12  then refuse to cooperate at all in the future?
13     A.  I don't believe there's any reason for him to
14  think that she would refuse to cooperate.
15     Q.  And then you go on to say, meat by the grill
16  ready to be cooked would be examined quickly since this
17  meat is next to be cooked for customers, correct?
18     A.  Yes.
19     Q.  And Mr. Tardy did testify at the unemployment
20  hearing that the first thing he did was check the meat
21  by the grill, correct?
22     A.  I don't remember the words in the testimony,
23  but he looked at the meat.  He did not report pulling
24  any of it out or tearing it apart, looking for any
25  contaminant.

Page 147

1      Q.  You can turn to the unemployment hearing
2  transcript, which is 35.  I'm looking at the bottom of
3  page 13.
4      A.  I'm sorry.  Page 13?
5      Q.  Yes, 13.  The last question on the page
6  states, what did you do when you arrived at the store on
7  the morning of January 5?
8          Answer:  I checked the meat that was
9  closest to the grill to be cooked.
10         So he just says he checked it, correct?
11     A.  That's what he says, yes.
12     Q.  But that was the first thing he claimed to
13  have done, right?
14     A.  I don't understand what he meant by check.  He
15  did not report pulling any of it out, he didn't report
16  looking at it, inspecting it visually, tearing it apart,
17  he did not report any of that.  I don't know what he
18  meant when he said checked.
19     Q.  Okay.  So when he said checked, he could have
20  meant all of that, pulling it out, tearing it apart, all
21  of that stuff, it's just that it isn't specified in his
22  testimony, correct?
23     A.  In his testimony when he -- he did report
24  tearing meat patties apart in order to demonstrate that
25  he was doing a thorough investigation in his mind.  He

Page 148

1  did -- he described tearing them apart, smashing them,
2  when he was describing his investigation of the single
3  patty that he pulled from each of the pans.  I would
4  suspect that he -- if he had done that tearing apart,
5  smashing, whatever, of the product that was in the
6  reach-in, he would have described it in a similar
7  fashion.  He did not.
8      Q.  And that's based on your speculation on how he
9  should have behaved, correct?
10     A.  It -- it's stating how I'm interpreting his
11  own statements, how he did behave.
12     Q.  Okay.  Now, I think you told me earlier you
13  have not reviewed Ms. White's deposition testimony from
14  this case, correct?
15     A.  That's correct.
16     Q.  Okay.  Now, did you review the health
17  department inspection report from January 5th of 2018?
18     A.  Yes.
19         (Exhibit No. 14 marked.)
20     Q.  Okay.  And that's in front of you.  It's
21  Exhibit 14, it's a standalone exhibit.
22     A.  I have it.
23     Q.  Okay.  So you've seen these documents before?
24     A.  Yes.
25     Q.  Now, did these documents inform your opinion

ALARIS LITIGATION SERVICES
www.alaris.us                Phone: 1.800.280.3376                Fax: 314.644.1334

CATHERINE ADAMS HUTT, Ph.D.  3/19/2019

Page 149

1   in any way?
2       A.   Not particularly.
3       Q.   Why not?
4       A.   This is a report of an inspection taken a few
5   hours after the incident where the employee found the
6   maggots in the ground meat.  It's a standard inspection.
7   Inspections are snapshots in time.  It's a standard
8   inspection.  I don't know that there was any particular
9   effort made to investigate large amounts of raw product,
10  but clearly, a standard inspection is reported here.
11      Q.   Well, you understand that this was not just a
12  random inspection.  This was an inspection that was
13  caused by a report of maggots or worms in the meat on
14  that date, correct?
15      A.   Yes.
16      Q.   And so, is it your testimony that the fact the
17  St. Louis County Health Department came out and found
18  zero evidence of contamination is not at all relevant to
19  your opinion?
20      A.   It is not relevant to my opinion of finding
21  maggots in the ground meat patty that Ms. White had.
22      Q.   Okay.  So even knowing that the health
23  department found no evidence of contamination, that
24  doesn't change your opinion on whether or not
25  Ms. White's story was accurate?

Page 150

1       A.   My understanding is that the health
2   inspection -- correction, that the health department
3   representatives saw the ground meat patty with the
4   worms -- with the maggots in it.  I don't know if the
5   individual doing this inspection saw that patty or not.
6       Q.   Do you know that it wasn't even the same
7   health department?
8       A.   I do understand that there was a state and
9   also a county health department involved.  So I know
10  that there were multiple health departments involved.
11      Q.   That's not quite right.  Ms. White went to the
12  City of Florissant health department, but the department
13  coming out to Steak 'n Shake to perform the
14  investigation was the St. Louis County Health
15  Department.  Do you have any reason to dispute those
16  facts?
17      A.   No.
18      Q.   Okay.  And were you aware that when she went
19  to the Florissant -- the City of Florissant health
20  department, they told her that they don't do anything
21  with respect to food safety?
22      A.   I don't recall seeing that, no.
23      Q.   You mentioned earlier that one of the things
24  Frank Tardy should have done was begin a root cause
25  investigation of the contamination.  Do you recall that

Page 151

1   testimony?
2       A.   Yes.
3       Q.   Should he have done that when he had
4   absolutely no evidence that any contamination was
5   present?
6       A.   I believe he did have evidence that
7   contamination was present.
8       Q.   Ms. White's statement?
9       A.   No, the meat patty that had the maggot in it
10  that was observed by multiple employees in the
11  restaurant and pictures were taken.
12      Q.   Do you know what those other employees told
13  Frank Tardy when he spoke with them on that date?
14      A.   I have no knowledge.
15      Q.   Okay.  Do you know if any of those photos were
16  ever provided to Frank Tardy on that date?
17      A.   I don't know for certain.  I don't know.
18      Q.   Do you know if they were ever provided to him
19  directly?
20      A.   I don't know.
21      Q.   And what we do know is that he had a health
22  department inspection report saying that there's no
23  evidence of contamination in the food, correct?
24      A.   Well, one moment.  The health department
25  inspection report simply states that they didn't find

Page 152

1   any worms in product they inspected.
2           (Exhibit No. 40 marked.)
3       Q.   Okay.  Now, if you could pull out -- you
4   referenced earlier Exhibit 40, which is one of the
5   regulations or part of the Food Code?
6       A.   I have it.
7       Q.   Okay.  Now, can you describe in layman's terms
8   for the jury, just the basic steps in this regulation?
9       A.   You're limiting this to Exhibit 40, which is
10  3.101.11.
11      Q.   Yes.
12      A.   Okay.
13      Q.   For now.
14      A.   Sure.  This is part of the FDA Food Code, the
15  model food code from 2017 edition, which states the
16  requirement for food to be safe, unadulterated, and as
17  specified under a separate section of the Food Code, and
18  honestly presented.
19      Q.   And did this regulation help you in conducting
20  your analysis and/or preparing your expert report?
21      A.   Yes.
22      Q.   How so?
23      A.   Because it enabled me to understand that the
24  product was adulterated and there's a requirement that
25  it should not be adulterated, so it was a regulatory

38 (Pages 149 to 152)

CATHERINE ADAMS HUTT, Ph.D.  3/19/2019

Page 153

1    violation that was found in the Steak 'n Shake
2    restaurant on January 5th, 2018.
3        Q.  How did the -- how did the regulation help you
4    establish that the product was allegedly adulterated?
5        A.  I believe from the evidence that it was
6    adulterated, and this is a regulation forbidding it from
7    being adulterated.
8        Q.  Okay.  And the evidence being discussed that
9    we've already discussed in this deposition here today?
10       A.  Yes.
11       Q.  Does this regulation -- did you review it in
12   order to prepare for your deposition?
13       A.  Yes.
14       Q.  Okay.  And did it help you prepare for your
15   deposition?
16       A.  Yes.
17       Q.  How so?
18       A.  Again, it demonstrates, as the evidence, that
19   adulterated product is not to be served to customers.
20   That the product -- that Steak 'n Shake restaurant had
21   the requirement to sell safe, unadulterated, and
22   honestly presented food and failed to do so.
23       Q.  Well, you -- I think you said earlier, you
24   don't actually have any direct personal knowledge that
25   Steak 'n Shake sold any adulterated food to customers,

Page 154

1    correct?
2        A.  The meat patty that Melissa White had cooked
3    for her as part of her employee meal was available to be
4    sold to any customer.
5        Q.  But it wasn't, right?
6        A.  In this case, it was part of her employee
7    meal.
8        Q.  I should have asked you this before.  Have you
9    ever been to this Steak 'n Shake restaurant in
10   Florissant, Missouri?
11       A.  No.
12           (Exhibit No. 41 marked.)
13       Q.  Okay.  All right.  Looking at Exhibit 41,
14   please.
15       A.  I have it.
16       Q.  Okay.  Now, can you describe in layman's terms
17   the substance of this regulation or these regulations, I
18   should say?
19       A.  Well, there are a number of regulations,
20   again, coming from the 2017 edition of the FDA Food
21   Code, which isn't -- is in place as a Missouri
22   requirement.  Although, Missouri actually has modified
23   it somewhat.  But -- but these are requirements that are
24   effective in Missouri about preventing sale of
25   adulterated food, also reconditioning or dis- --

Page 155

1    correction -- or I should say dispositioning of
2    adulterated food, that there are requirements for
3    preventing contamination in stored food, and during food
4    preparation.
5        Q.  And did these regulations help you in
6    conducting your analysis and/or preparing your report?
7        A.  Yes.
8        Q.  How so?
9        A.  Again, they state regulatory requirements that
10   the premises be free from pests, that the product be
11   protected.  These are also -- well, there are also
12   similar requirements again from USDA, which is also
13   contained here, that pest control and -- pest control
14   and insanitary (sic) conditions -- or I should say pest
15   control must be in place in meat facilities, meat
16   processing facilities and -- and there's a -- forbidding
17   insanitary conditions which could lead to the presence
18   of larvae in processed meat products.
19       Q.  Did the regulations help you prepare for your
20   deposition today?
21       A.  Yes.
22       Q.  In what way?
23       A.  Again, they were evidence that what I already
24   knew is that the finding of a maggot in a meat product
25   available for sale to a customer is a violation of Food

Page 156

1    Code for a retail establishment, specifically, a food
2    service establishment, and also a violation of USDA
3    regulations relative to the processing plant where I
4    believe the source actually -- which was, I believe, the
5    source of the contamination.
6        Q.  Do you know what the processing plant or
7    facility was?
8        A.  No.
9        Q.  Now, your report also mentions that you
10   reviewed the website for the U.S. Department of
11   Agriculture Food Safety and Inspection Agency; is that
12   correct?
13       A.  Yes.
14       Q.  And what parts of the website did you review
15   in conducting your analysis or preparing your report?
16       A.  I believe I accessed the website in order to
17   understand the particular elements of 9 CFR, which were
18   the regulatory requirements.
19       Q.  Does that mean -- I don't want to put words in
20   your mouth, but are you basically saying you went to the
21   USDA's website to figure out which part of the code of
22   regulations you needed to go to?
23       A.  Yes.  I was trying to access -- I was trying
24   to find a particular section of the 9 CFR --
25       Q.  Okay.

39 (Pages 153 to 156)

CATHERINE ADAMS HUTT, Ph.D.  3/19/2019

Page 157

1    A.  -- that had the definition of adulteration,
2  that had the pest control facility management
3  requirements.  I believe I found that through accessing
4  it on the website.
5    Q.  Got it.  Are there other parts of the USDA
6  website that you reviewed in preparing your report or
7  conducting your analysis?
8    A.  I don't recall.
9    Q.  And just so I'm clear, because I think I was a
10  little confused earlier, the regulations that we have,
11  Exhibits 41 and 40, those are part of the 2017 Food Code
12  for the FDA?
13    A.  That is correct.
14    Q.  Okay.  Did you review anything else?  I know
15  you said you reviewed these regulations in preparing for
16  your deposition.  Did you review anything else to
17  prepare for your deposition here today?
18    A.  I reviewed the Missouri Food Code.
19    Q.  How long is the Missouri Food Code?  Do you
20  know?
21    A.  Yes.  I can't tell you exactly how many pages
22  it is.  I reviewed it online, but I looked at several
23  sections that were relevant here for food, which is
24  Section 3 of the Food Code, and the contents of the
25  Missouri Food Code were nearly identical to the FDA Food

Page 158

1  Code 2017.  The sections that I was interested in were
2  identical in the Missouri Food Code as in the FDA Food
3  Code of 2017.
4    Q.  Okay.  So you just reviewed certain sections
5  of the Missouri Food Code?
6    A.  The relevant sections, I believe, to -- to my
7  opinion, yes.
8    Q.  Right.  And you said that you looked at
9  Section 3.  Do you recall any other sections reviewed?
10    A.  I looked at the sections that I had included
11  in the materials that form -- helped form my opinion.  I
12  believe I limited my search to those.
13    Q.  Okay.  So -- okay.  So are there any other
14  materials, documents, or items that you reviewed in
15  order to prepare for your deposition today?
16    A.  No.  May I -- may I clarify?  I did review,
17  again, the testimony from the hearing.  I reviewed
18  Melissa White's counterclaims.  I reviewed the
19  photographs.  I reviewed all the documents that I had in
20  my possession, which we discussed earlier.
21    Q.  And when did you -- sorry.  Didn't mean to cut
22  you off.  What was the last part?
23    A.  Which we discussed earlier.
24    Q.  Got it.  When did you do that re-review of the
25  documentation?

Page 159

1    A.  Yesterday.
2    Q.  I think I asked you this earlier, but let me
3  just make sure.  Have you been asked to provide any
4  additional opinions in this case?
5    A.  Subsequent to my written statement of opinion?
6    Q.  Correct.
7    A.  No.
8    Q.  Do you have any intention of performing any
9  additional expert services in this case?
10    A.  I will do what's requested.  I have no
11  expectation that that request will be made.
12    Q.  And at this point in time, has any such
13  request been made?
14    A.  No.
15    Q.  Are the opinions that you've expressed through
16  your expert report and in this deposition today, are
17  they complete and accurate?
18    A.  As I said earlier today, the definition by the
19  Missouri Food Code of adulteration would have been
20  included in my report had I looked at that earlier, but
21  that's the only element that -- that would be, quote,
22  unquote, incomplete, if you will.
23    Q.  Okay.  So other than that one piece, is it
24  your testimony that the opinions in your expert report
25  and in your deposition testimony today are complete and

Page 160

1  accurate?
2    A.  Yes.
3    Q.  I don't think I asked you this, do you have
4  any sort of training in entomology?
5    A.  As part of a food science program, we're
6  trained in a variety of different disciplines, biology
7  is certainly one of them.  Entomology is part of
8  biology.
9    Q.  So what is the extent of your training in
10  entomology?
11    A.  My training is in biology that includes bugs
12  of various nature.
13    Q.  I mean, was it -- was it one course in
14  undergrad?  Was it part of a course?  Did you take more
15  than one course?  You know, was it grad school?  I guess
16  that's -- I'm trying to get at what's the extent of
17  education in entomology.
18    A.  The -- my recollection is that it would be
19  part of several food science courses taken as an
20  undergraduate.  Also, I had ServSafe training which
21  includes, again, identification of various contaminants
22  in food.  I seem to recall that contaminants, including
23  foreign material, bugs, is part of that ServSafe course.
24    Q.  And when was the ServSafe course?
25    A.  I've taken it probably a couple of times.  I

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

CATHERINE ADAMS HUTT, Ph.D.  3/19/2019

## Page 161

1    actually help teach it, but as part of work in food
2    service, you are certified to ServSafe, and so I would
3    have done that as part of my work with Yum! Brands and
4    then also with McDonald's.
5            And the National Restaurant Association
6    actually -- the National Restaurant Association
7    Education Foundation actually owns and executes
8    ServSafe. And I worked with the NAR, National
9    Restaurant Association, for some period of time and
10   helped evolve the ServSafe course for food safety
11   elements.
12       Q.   And when was the last time you taught a food
13   safe course?
14       A.   I would say probably eight years ago, maybe
15   six years ago.
16       Q.   Okay. I have no further questions. My
17   opposing counsel has the opportunity to ask questions if
18   he wishes.
19               EXAMINATION
20   BY MR. HENDERSON:
21       Q.   This is Sam Henderson. I have -- can you turn
22   to plaintiff's Exhibit 14, Dr. Hutt.
23       A.   I have it.
24       Q.   Okay. Can you look on that second page of --
25   page of the Exhibit 14. Would you agree that this is a

## Page 162

1    statement of the district manager telling the inspector
2    that there was no contamination at the restaurant?
3            MS. WILLIAMS:  I'll object to the extent
4    it mischaracterizes the document which speaks for itself
5    and is the best evidence of its terms. You can answer.
6        A.   The document states the district manager --
7    conversation with the district manager regarding the
8    complaint, the district manager inspected all of the
9    beef patties that were remaining and found no worms.
10   The district manager inspected the beef patties from the
11   walk-in, and no worms were observed. During the
12   investigation, beef patties were inspected from the
13   walk-in cooler and the cook's line and no worms were
14   observed. I don't know if that's referring to the
15   inspector's investigation or the district manager's
16   investigation.
17           The cooks from this morning and during the
18   investigation observed no worms, that would have been
19   reported from the cook, could have been -- could have
20   come through the district manager's statement.
21       Q.   So it's possible that this is just a
22   narrative, what the district manager told the health
23   inspector?
24           MS. WILLIAMS:  Same objection.
25           You can answer.

## Page 163

1        A.   It's possible. It's hard to understand from
2    this statement, but clearly, the statement includes
3    many -- this document includes many statements that are
4    coming directly from the district manager.
5        Q.   Okay. Thank you. And, Dr. Hutt, earlier you
6    testified that there was other employees that saw the
7    worms, that the police were called to the scene, and
8    there's people from the health department. Were you
9    referring to the allegations in -- in our counterclaim
10   that's marked as Plaintiff's Exhibit 36?
11       A.   I don't remember exactly where I saw all of
12   those statements. I'll pull out 36, please.
13       Q.   Okay.
14       A.   If -- one moment, sorry.
15       Q.   Okay.
16       A.   I believe that it was Melissa White's
17   narrative that she described showing the meat patty to
18   the health department and also to the police department,
19   the police who came to --
20       Q.   Okay.
21       A.   -- the restaurant.
22       Q.   Okay. So it wasn't just that transcript
23   that's marked as Exhibit -- so just to be -- for
24   clarity, it wasn't Exhibit 35? You know, I don't want
25   you to go through all of them, but -- I tell you what,

## Page 164

1    let's do this -- withdraw.
2            Would you agree that at the hearing that
3    there was testimony in regards to the meat being taken
4    to the health department and that the police were called
5    to the scene. Will you agree with that statement?
6        A.   I do recall reading that in the testimony,
7    yes.
8        Q.   Okay. So when you testified earlier about
9    that there was the -- other employees that saw the meat,
10   that didn't necessarily come from -- from Exhibit 35,
11   rather, it came from Exhibit 36; is that correct?
12       A.   I don't recall.
13           MS. WILLIAMS:  I'll object to the
14   question.
15       A.   I don't recall.
16           MS. WILLIAMS:  I'm sorry. I'm going to
17   just put my objection on the record. The objection
18   was -- or the question was compound and vague.
19           MR. HENDERSON:  Okay.
20           MS. WILLIAMS:  You can answer if you
21   understand.
22           MR. HENDERSON:  I'll withdraw the
23   question.
24       Q.   Where did you get the information that other
25   employees saw the worm, that the health department was

41 (Pages 161 to 164)

CATHERINE ADAMS HUTT, Ph.D.  3/19/2019

## Page 165

1  contacted, and that the police arrived at the scene?
2      A.  As I recall, it's described in both the
3  testimony and also in the counterclaim documents.  I'd
4  have to go to the particular page to find it, but as I
5  recall --
6      Q.  Okay.
7      A.  -- I saw that in both of those documents.
8      Q.  Okay.  Earlier there were statements about
9  that Ms. White did not show the patty to Mr. Frank
10  Tardy.  As a hypothetical, if Mr. Frank Tardy told
11  Ms. White when he arrived, do not talk about the patty,
12  do not show the patty to anyone, is it reasonable for
13  Ms. White not to give the patty to Mr. Nicholson when he
14  asked for it?
15          MS. WILLIAMS:  Object, it's an improper
16  hypothetical.
17          You can answer.
18      A.  I wasn't there, so I don't know, but -- but
19  clearly, she was instructed not to speak with anybody
20  or -- or show the meat patty to anyone.  And I think
21  it's reasonable that she would have interpreted that to
22  include Mr. Nicholson when he asked.
23      Q.  And I think earlier before you testified that
24  when a meat is adulterated with maggots or fly larvae,
25  it can -- it can contaminate other meat as well.  Is --

## Page 166

1  was that your testimony?
2      A.  My testimony was that it's probably not an
3  isolated event, that if there is one -- if there's
4  evidence of a fly larvae in processed meat, there's
5  probably more.
6      Q.  So there's a possibility that there could have
7  been meat that just was not examined by Mr. Frank Tardy
8  that contained larvae, fly larvae?
9      A.  Yes.
10      Q.  And that meat could have been sold to
11  consumers?
12      A.  It could have been.  It would have been
13  available for sale because I saw no evidence that it
14  was -- it was restricted.
15      Q.  You are -- you know, have you seen maggots and
16  fly larvae in meat before -- before this case?
17      A.  Regrettably, yes.
18      Q.  Okay.  In what capacity?
19      A.  I believe one of the capacities is when I was
20  senior official in the Food Safety Inspection Service.
21  I don't recall specifically seeing that as part of my
22  experience within McDonald's or Yum! Brands.  I believe
23  I did see some as part of my experience in the -- or
24  correction, manufacturing realm, having incoming meat
25  that was contaminated with fly larvae, maggots.  I

## Page 167

1  definitely know I saw it as part of my work with the
2  regulatory agency when investigating a regulatory
3  violation.
4      Q.  Okay.  And earlier when you talked about there
5  was testimony about the quality control in regards to
6  whether or not they adhere to a standard, was that to
7  your standard or is that based on what's the community
8  standard as well in this industry?
9      A.  Can you repeat the question or rephrase it,
10  perhaps?
11      Q.  I'm sorry.  Earlier there was some reference
12  to that there was -- it was according to your standard.
13  My question is, is your standard consistent with the
14  community standard of practice?
15      A.  Right.  I might have said something about my
16  expectations relative to the standard.  It is a
17  community standard.  Again, as I was describing earlier,
18  the quality professional community is -- is very
19  consistent, if you will.  Again, we spend a lot of time
20  benchmarking best practices, standard practices, we try
21  to be consistent when it comes to food safety to protect
22  everybody.  Nobody wants a food safety adverse event in
23  a restaurant because it tarnishes the rest of the
24  industry.
25          So again, we try to be very consistent,

## Page 168

1  but the standard of practice is well known, even
2  documented, and we train on it on a routine basis within
3  the food service community.
4          MR. HENDERSON:  Okay.  Thank you.  No
5  further questions.
6          MS. WILLIAMS:  I just have one follow-up.
7              EXAMINATION
8  BY MS. WILLIAMS:
9      Q.  You just mentioned that this community
10  standard has been documented.  Can you tell us where?
11      A.  It would be documented in procedure manuals
12  within companies.  For example, Yum! Brands has a very
13  thorough quality manual for food safety practices,
14  McDonald's has the same.  It's used in training for
15  restaurant personnel.  And although they are different
16  documents by -- for each respective company, if you
17  will, they are very strongly similar.
18          So my experience, the Yum! Brands quality
19  manual documenting these standard practices is very
20  consistent, along with the Yum! Brand training manual
21  for operators, is very consistent with that which I know
22  is part of McDonald's.  So, again, they're very similar.
23      Q.  Are you aware of this -- this community
24  standard being documented in anything that's publicly
25  accessible?

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

CATHERINE ADAMS HUTT, Ph.D.  3/19/2019

Page 169

1    A.  I don't know that it's publicly accessible.  I
2  know that part of my work with the National Restaurant
3  Association, we did document, again, as part of
4  training, sharing best practices.  It was accessible to
5  members of the National Restaurant Association.  I can't
6  declare that that's accessible to the rest of the
7  public.
8    Q.  Right.  So I guess if I were going to go try
9  to Google, you know, standard of practice for conducting
10  food safety inspection at a restaurant, are you aware of
11  anything that is out there that's published that would
12  express this community standard that you've established
13  today?
14    A.  Yes.  I believe if you searched for standard
15  of practice for inspection, you will find something
16  that's probably documented by state inspection
17  organizations, departments of health, as well as FDA
18  probably.  I don't know because I haven't actually
19  Google searched that, but I do know that they publish
20  inspection procedures.
21    Also, the Food Safety Inspection Service
22  documents inspection practices as tools to educate and
23  to train their personnel, so there are procedures
24  available publicly that come from state health
25  inspection organizations, federal health inspection

Page 170

1  organizations, FSIS in particular, meant to train
2  personnel and to implement consistent practices.
3    Q.  Did you review any of those documents in
4  forming your opinions?
5    A.  I have reviewed them fairly recently,
6  actually, for other cases, but I -- I'm familiar with
7  them based on my experience, and I generated some of
8  them when I was in the regulatory agencies.
9    Q.  But my question was, actually, did you review
10  any of them in forming your opinion, in this case I'll
11  specify?
12    A.  They're part of my knowledge base, but I did
13  not seek any particular document out to review for this
14  case.
15    Q.  Okay.  And when you say you reviewed them
16  recently for other cases, what time frame are we talking
17  about?
18    A.  Within the last month.
19    Q.  Okay.  So you wrote your expert report more
20  than a month ago, right?
21    A.  Yes.  Again, as I said, it's part of my
22  knowledge base.  I routinely see them.  Again, I wrote
23  some of them when I was in the agency, the Food Safety
24  Inspection Service.  I know that they exist.  I have
25  worked with them on other cases which predate my -- my

Page 171

1  testimony, my written expert opinion.  I'm familiar with
2  them.  I know they exist, and, again, I recently
3  reviewed them for a particular case.
4    Q.  Got it.  So just -- I think you testified you
5  did not specifically seek any of them out or review them
6  in forming your opinions in this case; is that right?
7    A.  Not specifically.  I used my experience and my
8  knowledge base.
9    Q.  Right.  Got it.
10    MS. WILLIAMS:  All right.  No further
11  questions.
12    MR. HENDERSON:  No further questions.
13    COURT REPORTER:  May I get your orders
14  for the record, please.
15    MS. WILLIAMS:  Yes.  I would like just
16  electronic transcript is fine and scanned copies of the
17  exhibits, please.
18    COURT REPORTER:  What about the video?
19    MS. WILLIAMS:  Oh, yes, please, and go
20  ahead and sync the video.
21    COURT REPORTER:  Mr. Henderson?
22    MR. HENDERSON:  No order at this time.
23    COURT REPORTER:  Will the witness read
24  and sign?
25    THE WITNESS:  Are you asking me or --

Page 172

1    MS. WILLIAMS:  It's up to her.
2    THE WITNESS:  I would like to read and
3  sign, yes.
4    MR. HENDERSON:  Yes.
5    THE VIDEOGRAPHER:  We are now off the
6  record.  The time is 1:14 p.m.
7    (Deposition concludes at 1:14 p.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

43 (Pages 169 to 172)

CATHERINE ADAMS HUTT, Ph.D.  3/19/2019

## Page 173

1  STATE OF TEXAS   )
2      I, STEFANIE COX, Certified Shorthand Reporter in
   and for the State of Texas, hereby certify to the
3
   following:
4
5      That the witness, CATHERINE ADAMS HUTT, Ph.D., was
6  duly sworn by the officer and that the transcript of the
7  oral deposition is a true record of the testimony given
8  by the witness;
9      That the time used by counsel for the parties is as
10 follows:
11     Ms. Erin E. Williams - 03 Hours:46 Minutes
12     Mr. Samuel Henderson - 00 Hours:10 Minutes
13     Further, I am not a relative or employee of any
14 attorney of record in this cause, nor am I financially
15 or otherwise interested in the outcome of the action.
16     CERTIFIED by me on this the 29th day of March,
17 2019.
18
19     _____
       STEFANIE COX, Texas CSR 5384
20     Expiration Date:  12/31/19
21     Alaris Litigation Services
22
23
24
25

## Page 174

1          ALARIS LITIGATION SERVICES
2
3  April 3, 2019
4
5  CATHERINE ADAMS HUTT, Ph.D.
   24 S. Fairfax Street
6  Alexandria, VA 23314
   cadams@rdrsol.com
7
8  IN RE: STEAK N SHAKE, INC. v. MELISSA WHITE
9
10 Dear Dr. Hutt:
11
12 Please find enclosed a complimentary copy of your
   deposition taken on March 19, 2019 in the
13 above-referenced case. Also enclosed is the original
   signature page and errata sheets.
14
15 Please read your copy of the transcript, indicate any
   changes and/or corrections desired on the errata
16 sheets, and sign the signature page before a notary
   public.
17
   Please return the errata sheets and notarized
18 signature page within 30 days to our office at 711 N
   11th Street, St. Louis, MO 63101 for filing.
19
20 Sincerely,
21
22
23 STEFANIE COX
24
25 Enclosures

## Page 175

1              ERRATA SHEET
2  Witness Name: CATHERINE ADAMS HUTT, Ph.D.
   Case Name: STEAK N SHAKE, INC. v. MELISSA WHITE
3  Date Taken: MARCH 19, 2019
4
5  Page #_____   Line #_____
6  Should read: _____
7  Reason for change: _____
8
9  Page #_____   Line #_____
10 Should read: _____
11 Reason for change: _____
12
13 Page #_____   Line #_____
14 Should read: _____
15 Reason for change: _____
16
17 Page #_____   Line #_____
18 Should read: _____
19 Reason for change: _____
20
21 Page #_____   Line #_____
22 Should read: _____
23 Reason for change: _____
24
25 Witness Signature: _____

## Page 176

1  STATE OF _____)
2
3  COUNTY OF _____)
4
5  I, CATHERINE ADAMS HUTT, Ph.D., do hereby certify:
6      That I have read the foregoing deposition;
7      That I have made such changes in form
8  and/or substance to the within deposition as might
9  be necessary to render the same true and correct;
10     That having made such changes thereon, I
11 hereby subscribe my name to the deposition.
12     I declare under penalty of perjury that the
13 foregoing is true and correct.
14     Executed this _____ day of _____,
15 20____, at _____.
16
17
18
19 _____
20     CATHERINE ADAMS HUTT, Ph.D.
21
22 _____
23         NOTARY PUBLIC
24 My Commission Expires:
25

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

CATHERINE ADAMS HUTT, Ph.D.  3/19/2019

**A**

A&M 133:11
a.m 1:21 4:4
  74:6,7,7,9
ability 7:11,13
  61:18 97:3
able 51:18,21
  67:8 68:3
  87:23 97:19
above-refere...
  174:13
above-styled
  1:20
abrupt 93:18
  132:8
abruptly 53:1
  94:1
abruptness 94:1
  94:23
absolutely
  73:25 126:1
  151:4
accept 92:4,8,11
access 65:22
  84:16 85:18
  97:2 116:4
  156:23
accessed
  156:16
accessible
  168:25 169:1,4
  169:6
accessing 157:3
accidentally
  5:22
accounted 75:5
accounting
  88:7
accounts 75:2
  75:6
accumulate
  60:3
accurate 10:4
  40:6 92:9
  98:16,18
  100:23 149:25

159:17 160:1
acknowledges
  59:11
acronym 13:12
act 17:8,9 50:7
  53:2
acting 111:10
action 49:11,21
  49:22 50:1
  117:1 173:15
actions 84:19
  93:12,18 96:9
  111:21 127:3,4
  127:18 141:10
  141:13,17
activated 28:16
active 25:7
actively 34:8,10
actual 23:4
  51:12 60:13
  61:22 66:17
  66:24 67:1,14
  83:18 86:18
  88:25 97:19
  97:25 99:11
  122:21 130:8
  133:16 142:9
Adams 1:10,17
  3:4 4:3,11,19
  4:22 173:5
  174:5 175:2
  176:5,20
add 23:25
  73:16 100:11
addition 13:2
additional 99:9
  117:1 120:12
  159:4,9
address 7:19
adhere 167:6
adipose 47:12
Administration
  14:3,13 54:5
administrator
  13:6,7 14:24
adopters 21:3
adulterated

99:3,23 100:1
  106:9 143:3
  152:24,25
  153:4,6,7,19
  153:25 154:25
  155:2 165:24
adulteration
  99:2,21 100:5
  100:9 125:11
  157:1 159:19
advancing
  33:20
advantage
  114:9
adverse 117:9
  167:22
advice 56:3
advise 55:14,17
advisor 50:11
Advisory 14:10
affect 17:17
  28:11
affirmatively
  123:19
afternoon 63:8
agencies 170:8
agency 13:4,7
  14:23 15:6,16
  15:16,19,22
  156:11 167:2
  170:23
agent 12:20,23
  15:5
agents 12:17
  115:24
ago 8:10 66:2
  70:25 161:14
  161:15 170:20
agree 66:15
  78:17 94:11,21
  97:1 131:12,15
  161:25 164:2,5
Agriculture 11:6
  11:19 12:13 13:1
  14:4,12,16,18
  14:19 17:10
  54:6 156:11

Ah 142:23
ahead 37:5
  77:2 171:20
air 137:4
Alaris 173:21
  174:1
alarm 65:12
Alexandria
  174:6
alike 114:7
Alimentarius
  14:9
allegations
  85:9 92:4,13
  94:16 95:13
  163:9
alleged 82:10
  93:23
allegedly 83:11
  133:2 153:4
allergens 50:9
allergic 70:2
Allergy 50:6
allow 97:2
  102:2
allowed 138:6
  141:19
allowing 68:11
amalgamate
  60:5
America 17:11,15
  18:17 32:10,16
  32:20 36:7
  38:4
ammoniated
  47:9,14
amounts 149:9
analysis 13:14
  65:5 77:2
  86:15 87:7
  98:15,19
  118:12 152:20
  155:6 156:15
  157:7
and/or 9:14
  73:10 152:20
  155:6 174:15

176:8
Angerame
  70:17,18,18
animal 15:20,22
  16:1,3,17,18,24
annual 115:21
answer 5:10,21
  6:3,14 10:14
  76:18 81:14
  89:2 94:12
  102:17 144:4
  144:15 147:8
  162:5,25
  164:20 165:17
answered 140:1
  144:3,14
answering
  144:8
anticipate 6:10
  13:19
Antonio 26:9
  27:11
anybody 98:20
  165:19
apart 51:1 107:19
  112:22 127:24
  138:25 143:4
  143:9,16,20
  144:5,6,17,21
  146:24 147:16
  147:20,24
  148:1,4
Appeals 91:11
appear 61:17
appearance 4:5
Appearances
  3:3
appeared
  92:25 93:8,18
appears 73:1
appreciate 9:8
  40:17
approach 21:8
  28:14 31:11
  89:14 144:25
appropriate
  83:2 146:7

appropriately 28:23 144:1,12
approval 22:25
approved 46:21 48:21
approximately 36:20 41:13 61:25 69:2 71:6 74:19 98:15 145:14
April 174:3
architect 54:19
area 11:23 12:4 38:1 51:21 57:20
arising 34:12
arm 39:17,19
arose 27:12
arranged 44:8
arrival 88:11 94:23
arrive 82:4
arrived 87:13 89:6 90:25 93:8,11 94:11 108:15 136:19 142:6 147:6 165:1,11
art 40:1 42:17 43:8
articles 60:4
aside 44:17
asked 26:21 36:12 45:9 67:4 73:8 75:15,23 77:1 78:21 83:10 84:18 108:11 109:14,18 119:7 129:23 130:1 139:25 142:5 144:2,13 154:8 159:2,3 160:3 165:14,22
asking 5:9 65:17,25 84:14 88:8,9

130:3,15 131:1 171:25
asks 73:6
aspect 25:14 28:25 29:3
aspects 32:17 56:21 58:8
assess 15:23 16:7,17 23:2 55:19,24 107:9
assessed 22:4 23:19
assessing 44:25 55:11 62:6,9
assessment 22:7 133:16
assigned 62:20
assist 98:20
assistant 13:6,7 133:11
association 11:8 11:11 17:16,17 18:3,9,13 19:13 41:23 43:14 115:17 116:3,20 161:5,6,9 169:3,5
assume 5:18 57:1 75:24 95:4 97:1 124:5
assuming 119:11
assumption 122:24
assurance 115:20 116:8,8
attempted 87:12
attended 17:24
attending 60:2
attitude 127:1 129:21
attorney 8:8 81:8 173:14
attorneys 4:23

76:21 78:23
Aubrey 7:20
audio 5:23
audit 29:4 114:2 114:3,13
audits 23:14 113:23,24 115:9
automatically 83:15
automobile 21:11,14 24:6
automotive 21:2
autonomy 32:7
available 51:25 80:1 102:15 103:1 104:16 105:25 116:6 154:3 155:25 166:13 169:24
Avenue 2:4,9
average 131:20
avoid 6:2,7 114:22
aware 91:4,9 134:20,22 135:5,13,15,18 150:18 168:23 169:10

## B

bachelor 10:8
back 27:2,7 36:16 38:20 51:11,21 64:1 74:8 80:9 88:16 90:7 92:23 105:4 116:22 121:23 126:11,18 128:8,17 136:17 140:22 142:12,19 146:6
background 58:17 60:13 104:6

bacteria 53:21
bad 53:24 54:9
ballpark 76:20
bank 75:2
barrel 5:24
base 126:21 170:12,22 171:8
based 19:24,25 26:2,4 27:20 27:22 31:15 36:25 37:1 55:20 62:16 79:17 80:1 91:7 92:11 102:12 104:5,17 108:25 122:24 123:19 128:6 129:8 131:13 133:16 135:4 136:4 137:7 142:7 148:8 167:7 170:7
basic 11:13 12:13 35:5 50:2 152:8
basically 5:9 15:6,11 20:4 22:19 23:7,16 28:7 32:3 38:14 45:6,11 45:21 46:5,10 46:22,24 47:4 48:3 54:19 55:11 56:17 58:22 62:8 64:17 75:2 111:24 113:25 130:24 156:20
basing 124:3,5
basis 14:5 17:4 17:5 29:8 37:8 118:23 130:17 168:2
Bass 34:4 36:2
becoming 16:9 52:19 57:14

beef 45:15,22 45:23,25 46:3 46:13,15,18,20 46:22,22 47:1 47:22 48:18 80:3 82:25 84:12,21 89:17 99:22 100:19 101:8 102:14 102:22 103:10 103:14,14 104:15 105:2 105:11 106:1 109:4,16 112:13 112:14 124:24 127:5 136:24 137:4 138:17 162:9,10,12
beer 35:16,20
began 38:22
behalf 4:7,9
behave 148:11
behaved 148:9
behaving 130:19
behavior 132:7
believe 5:3 12:19 17:21,22 21:1 22:12,18 24:2 29:1 31:25 33:1 42:11 47:9 48:22 49:7,17 54:16 58:18 59:24 60:17 61:19 70:23 71:1 72:14 74:21 76:23 85:18 86:16 90:10,20,21 90:22 91:1 98:14 99:13 101:4 102:22 103:11,16 106:16 108:23 109:7 114:20

115:10 116:18
116:25 119:8
119:10,20
121:6,13 122:2
123:8,17
124:18 125:12
126:25 128:13
129:20 130:11
130:19 139:10
139:14 142:1,4
144:6,22
146:13 151:6
153:5 156:4,4
156:16 157:3
158:6,12
163:16 166:19
166:22 169:14
**believed** 20:16
48:13
**Bell** 61:10
**benchmark**
114:17
**benchmarking**
114:17,21
167:20
**benefits** 90:14
**best** 8:12,14
10:3 21:9
56:25 98:17
103:22 114:2
115:23,25
116:4,13
127:25 162:5
167:20 169:4
**better** 67:18,19
83:8
**beyond** 94:4
**big** 32:11 86:18
116:2
**bigger** 68:11
**billing** 74:14,17
**biology** 160:6,8
160:11
**birth** 7:21
**bit** 10:7 37:12
57:15 96:12
99:4 126:10

132:25
**blocked** 126:15
**blocks** 47:9,10
**blueprint** 20:7
21:22 54:17
**board** 19:1
**body** 22:5
**bold** 132:25
**bone** 67:3,5
**Bonhomme** 2:4
**boots** 41:11,14
62:14
**boots-on-the-...**
58:3
**borders** 61:12
**born** 26:23
27:3
**boss** 14:23 45:7
48:1 49:2,4
**bother** 61:4
**bottom** 7:20
47:6 86:19
88:19 94:9
124:20,21
125:3 142:25
147:2
**box** 114:19 137:1
**boxes** 137:2
**BPI** 47:2
**brand** 26:1
28:12 30:19
43:23 48:10,11
48:13 53:2
58:5 83:3
84:4 95:1
106:6 110:19
110:24 111:4,9
112:24 113:12
115:2 116:24
117:12,21
168:20
**brands** 25:23
26:8,11 27:12
27:21 29:2,6
31:6,16 61:8,9
62:3,4,12
114:16 132:3

161:3 166:22
168:12,18
**break** 6:11,12,14
73:23 74:11
132:15 138:3
**brewing** 33:22
34:2,4,22
35:2,5,10
36:2 38:10,13
38:17
**brief** 77:11,13
**bring** 49:20
56:22 58:8,11
**bringing** 15:4
38:10 42:17
46:5
**broad** 58:7
59:14
**broken** 65:24
65:25
**Brook** 39:2,7
**brought** 14:9
21:16,20 34:15
35:25 52:24
53:2 57:14
66:21 67:7
68:2 115:23
**brushed** 88:8
**bugs** 160:11,23
**Burger** 48:19
**business** 12:2
21:15 24:4
28:4 36:4
38:13,17 40:14
55:17 56:4,25
61:3 77:18
78:3 97:10
109:12 130:20
**businesses**
55:17
**busy** 117:7
**bypassing**
127:4
**byproducts**
38:12

**C**

**C** 2:1 4:1
**cadams@rdrs...**
174:6
**caliber** 21:22
**call** 12:8 20:20
63:6 65:10
114:17 116:1,1
**called** 18:8
19:25 21:4
45:14 46:8
47:1,19 75:15
100:14 116:8
121:19 163:7
164:4
**calling** 122:5
**Camden** 26:5
**Campbell** 19:18
19:21 20:22
25:11 32:19
**Campbell's**
20:20,20,20
21:25 22:6,10
22:15 23:17
23:24 24:8,15
24:25 25:3,19
25:20 26:3,16
27:11 34:12
**capable** 59:12
**capacities**
166:19
**capacity** 166:18
**care** 106:12
**career** 52:4
65:8
**carefully** 5:15
**Cargill** 47:2
**Cargills** 18:21
**caring** 106:5
109:22 110:15
110:16 111:3
122:18
**case** 1:4 3:13
4:24 9:11,23
20:10 23:17
43:24 44:6,6
44:13,20,22
49:15 50:17

57:2 58:15,19
60:15 61:14,18
66:5 67:2
69:13,21,24
69:25 70:5
71:14,21 73:8,9
74:14,20 75:17
76:14,23,24
76:24 77:3,9
77:12,16 78:1,7
78:12,16 80:6
80:11,25 82:8
82:25 83:19
86:2 90:9
95:1 98:25
102:2 103:13
115:13 116:17
125:14 130:16
130:21 145:5,7
145:17,20
148:14 154:6
159:4,9 166:16
170:10,14 171:3
171:6 174:13
175:2
**cases** 9:4,13,18
9:19,21 43:21
43:21 57:14
65:8 69:2
70:15 71:18,23
72:23 73:1,11
73:18,19 75:19
76:10,10,21
78:23,23
170:6,16,25
**casual** 24:21
116:11
**categories** 79:2
**Catherine** 1:10
1:17 3:4 4:3,11
4:19,22 173:5
174:5 175:2
176:5,20
**cause** 1:20
100:7 117:9,11
118:3,11 120:1
150:24 173:14

caused 14:15
19:10 30:25
33:15 45:5
68:23 83:16
118:12 120:6
149:13
ceiling 65:19
ceilings 64:14
cell 52:2 124:4
124:5
center 27:20
28:6,21 34:5
35:25 36:5
39:3
centers 36:5
centralized
29:22
centrifuge
46:25 47:4,6
CEO 49:2
52:25 53:2
56:6
CEOs 19:1
certain 59:24
68:10 81:6
102:8 151:17
158:4
certainly 60:16
90:3 96:21
106:5 109:19
111:4 115:7
117:24 118:11
121:16 132:2
135:7 160:7
certification
22:2,5,11
certified 59:10
59:23 161:2
173:2,16
certify 173:3
176:5
cetera 59:4
96:20 116:21
117:11
CFR 156:17,24
chain 39:20
48:8,9 49:7

70:13
chair 14:10
challenges
34:20 35:5,14
37:19,24
Champaign 11:1
change 14:23
15:1,5 27:18
31:3 34:15
50:7 73:24
99:16 100:11
149:24 175:7
175:11,15,19,23
changes 45:7
174:15 176:7
176:10
characterize
31:21 84:3
characterizing
99:7
charge 35:6,8
37:4,6 39:11
39:23 97:10
130:13
Chase 2:13
check 62:8
75:8 146:20
147:14
checked 66:24
147:8,10,18,19
checklist 43:9
checklists 43:1
66:11
cheese 59:4
63:12,14,18
67:9
chemical 53:23
chemicals 37:11
37:16
chemistry 59:6
Chicago 39:2,3
chicken 47:22
chief 33:23 34:1
36:17 39:12
45:10 52:21
54:25 55:10
choice 88:14

choking 54:1
choose 51:18,23
56:12
chose 97:6,8
chronic 138:6
Circle 7:20
circuit 17:4
circumstance
129:13,14
circumstances
79:24 138:9
CIS 20:20
21:25 22:10
23:7,23 26:8
26:17,17
City 150:12,19
claim 6:25
claimed 147:12
claims 123:6
143:4
clarify 158:16
clarity 163:24
Clayton 14:20
clean 37:8,11
139:7
cleaning 37:16
37:19,20,21,21
clear 49:25
77:5 102:7
157:9
clearly 68:17
77:22 81:23
93:14 107:7
110:6 117:8
122:4,7
123:22 124:19
128:11 132:6
137:4,8 138:7
139:10 140:5
140:11 144:24
146:6 149:10
163:2 165:19
client 73:6 81:8
clients 52:1
55:14 56:3,22
57:17
clocked 87:1

close 65:24
closed 65:23
closely 14:18
28:22 44:23
90:20
closest 147:9
code 3:18,19
99:5,17,18,20
100:4,5,8
125:11,13,16,16
125:24 126:6
126:8 152:5,14
152:15,17
154:21 156:1
156:21 157:11
157:18,19,24
157:25 158:1,2
158:3,5 159:19
Codex 14:8
coin 96:10
coli 114:20
collaborative
113:24
colleagues 14:1
14:8 113:21
collect 129:7,23
130:3
collegial 21:8
Colorado 36:25
37:1
column 124:21
combination
56:23
come 34:12
48:16 57:17
63:8 68:21
90:7 115:9
117:10 136:24
162:20 164:10
169:24
comes 167:21
coming 28:12
64:5 137:8
150:13 154:20
163:4
Commission
176:24

committee
14:10,21 17:21
17:22
committees
17:19,19,23
commodities
59:3
Commons 1:24
communication
44:12 92:19
communicatio...
80:21
communities
60:22
community
56:20 115:1
167:7,14,17,18
168:3,9,23
169:12
commute 51:24
companies
18:19,23 19:2
24:14,20 47:1
48:19 55:16
62:23 63:5,6
71:14 113:23
113:25 114:12
114:14 115:8
116:10 168:12
companies'
114:18
company 19:18
19:21 20:22
24:9,10 25:11
25:21 28:5
32:11 33:22
34:2,4,23
35:5 36:2
45:8 47:24
49:3 50:19
52:24 55:11
56:1,10 58:6
63:18 67:9,9
70:4,11,12 86:1
113:13 114:12
114:23 115:12
119:22 168:16

CATHERINE ADAMS HUTT, Ph.D. 3/19/2019

compensation 70:24
competent 59:12
competitive 114:8
complain 63:7
complained 48:4,8 113:5
complaining 48:12
complaint 28:21 47:17 65:3 85:23 88:12 110:3 120:12 126:20 127:1 129:12 145:21 162:8
complaints 28:12,22 41:10 44:24 113:1 117:10 127:11
complete 5:25 97:3 159:17 159:25
completed 106:2 142:8
completely 122:19
compliance 22:4 23:13,15 54:4,4,7
complies 86:20
complimentary 174:12
component 47:5
components 23:1,8
compound 164:18
compre- 122:19
comprehensive 105:19 106:4 122:18
comprehensi... 64:14

comprised 15:2 19:1
comprises 54:7
con- 82:11
concept 20:24
concepts 62:5
concern 12:22 28:15 45:13 47:17 63:18 112:1,5 113:11 128:3
concerned 117:13
concerns 100:16 127:11
concert 14:7 29:19 31:12 32:16 41:25 43:6,15
concludes 172:7
conclusion 81:3 87:18 89:10 90:9 135:25
conclusions 81:1 87:8,22,24 89:13 95:14 95:24
condemn 96:17 96:24
condiments 24:23
condition 7:7 90:22
conditions 34:12 53:13 99:25 155:14 155:17
condone 96:14 96:17,25
conduct 108:19 109:12
conducted 78:15 82:18 84:7
conducting 95:15 141:23

152:19 155:6 156:15 157:7 169:9
conferences 11:16 17:24 20:13 60:2,3
confirmed 68:22 86:4 133:10 134:18
confused 125:1 157:10
connection 75:12
consider 40:8 57:19 77:25 78:2 112:21 127:7
considered 90:2 125:14 128:4,19
consistency 92:12
consistent 54:22 82:12 82:19 89:15 90:5 92:5,10 92:12,15 93:18 94:2,17,23 96:7,9,13 97:10 100:21 114:10 115:4,4 122:14 127:8 128:13,24 130:11,19 135:14,16 136:10 167:13 167:19,21,25 168:20,21 170:2
consists 55:8 145:13
consult 50:15
consultant 45:9 49:10,14,15,17 49:19 50:16 50:22 51:1,5 51:10,13 53:4

56:13 57:6 63:2,5,10,11 115:16
consulted 50:18
consulting 52:7 52:12,24 56:6 57:1 74:23,25
consumer 41:8 41:10 50:6 55:7 56:16 65:3
consumer-frie... 45:17
consumers 166:11
contact 30:11,14 37:21,22 76:21 78:5
contacted 28:17 76:14,17 77:8 165:1
contacts 28:16
contain 98:24
contained 120:3 155:13 166:8
containing 101:8 145:22
contam- 99:7
contaminant 103:9,10 146:25
contaminants 54:2 68:11,13 160:21,22
contaminate 165:25
contaminated 83:11,21 101:13 101:23 102:3 102:10,20 103:5 104:12 106:9 122:25 123:4 134:25 135:11 136:1,20 142:9 166:25
contamination

28:11 53:22 53:22 61:23 63:8 64:20 64:22 65:11 66:17,19,20 66:25 67:1,15 68:2,4,19,22 99:8,18,25 101:8 103:25 104:2,17,21 118:24 119:5,14 120:9 138:23 139:22 141:4 149:18,23 150:25 151:4,7 151:23 155:3 156:5 162:2
contents 157:24
continue 57:17 67:23,24
continued 109:7
continuing 59:17 60:1
control 13:15,16 16:6,9 22:22 22:24 23:4 64:11 103:15 137:13 138:4 155:13,13,15 157:2 167:5
convene 11:16
convened 20:12
conversation 93:15 94:24 108:22 117:5 162:7
conversations 80:10 108:21
cook 120:21 133:5 162:19
cook's 162:13
cooked 103:1 108:2 109:7 124:24 146:16 146:17 147:9 154:2

CATHERINE ADAMS HUTT, Ph.D.  3/19/2019

cooking 120:21
136:24
cooks 162:17
cooler 137:5
139:6 143:21
162:13
cooperate
89:24 146:12
146:14
Coors 33:22
34:2,6,22
35:10 36:22
38:1,8
copies 3:17
171:16
copy 8:9 86:13
174:12,14
corporate
25:25 27:20
34:5 36:5,5
38:7 39:3
117:24
Corporation
33:19
correct 10:10,11
10:21 11:2,3
13:21 17:11
19:21 20:25
23:22 24:9
32:24 33:8
34:24 36:20
38:20 49:13
51:3,6,7 52:8
52:9,22 55:2
56:7 66:18
67:12 72:1
73:14 74:12,15
74:16 77:7
82:13 85:6,7
86:5,6 87:15
88:12 89:24
90:14,19 91:6
93:23 94:19
94:20 95:2,3
97:20 101:24
101:25 104:6
104:13 108:5

108:15,19
109:16 111:14
119:5 121:20
123:1 131:9,10
131:17,20
132:22 133:13
133:23 134:7
134:25 135:4
135:11 136:14
138:19,23
144:1,12,25
145:15,22
146:17,21
147:10,22
148:9,14,15
149:14 151:23
154:1 156:12
157:13 159:6
164:11 176:9,13
corrected 138:7
correction 99:6
102:15 110:17
150:2 155:1
166:24
corrections
174:15
correctly 94:13
94:14 100:24
102:5 105:14
133:14 137:17
142:3 143:6
cost 112:23
counsel 4:5
56:3 73:22
98:12 132:11
140:15 161:17
173:9
count 62:2 65:1
65:7
counterclaim
85:6 91:19,23
92:4,8,15
93:5 94:16
95:8 96:5
109:8 163:9
165:3
counterclaims

3:15 78:10
84:22 91:15
158:18
counties 12:18
countries 40:25
country 12:17
29:7
county 149:17
150:9,14 176:3
couple 13:25
14:17 66:1 79:1
79:2 137:11
160:25
course 122:13
131:8 160:13,14
160:15,23,24
161:10,13
courses 60:7,8
60:8 160:19
court 1:1 5:11
8:16,19 44:21
72:14 91:11
171:13,18,21,23
covered 116:21
COX 1:21 173:2
173:19 174:23
Crawford 14:24
create 32:13,19
created 9:10,23
14:23 22:10
23:16,16 28:7
28:9 29:21
32:20 34:18
50:19 73:7
113:23 120:12
138:9
creating 26:17
30:5,18
credentials
61:15
crisis 27:25
28:1,6,8,10,10
28:11,13,19
57:11
Criteria 14:11
critical 12:21
13:14

crosscutting
57:25
crushed 108:3
CSR 1:22 173:19
culture 64:15
cultures 61:12
curled 122:6
current 9:5,19
9:21 17:25
42:15 59:16
72:22 73:18
115:12
Curriculum 3:12
cursory 127:15
128:1
customer 24:18
28:4,4,21,22
44:24 63:7
117:8,10 154:4
155:25
customers
24:16,17,21
28:12 84:21
89:18 100:19
101:9,14,24
102:3,10,15,21
102:25 103:2
103:6 104:12
105:11 106:1,7
110:23 112:2,11
113:5 117:2,7
117:17 120:7
127:23 146:17
153:19,25
customers'
97:11 110:19
111:9 112:25
115:3 119:25
cut 5:22 80:17
144:17 158:21
CV 8:10,23 9:14
9:20 13:12
25:2,12 27:24
32:21,25 38:6
40:4 50:11
51:4 61:17 73:1
73:6 76:2

| | D |
|---|---|

D 4:1
D.C 51:19
daily 29:8
dairy 59:4
Dakota 47:2
Dallas 1:25
27:19,20,22
51:20
damage 117:11
damaging 113:1
danced 36:13
Darlene 70:15
data 129:3
database 29:22
30:1,6
date 4:4 7:21
8:12 9:21
72:23 82:3
84:15 98:16
101:14 135:6,7
138:16 149:14
151:13,16
173:20 175:3
dated 82:1
134:7,10
day 85:4 103:2
104:19 118:14
120:10 131:1
134:9 140:7
173:16 176:14
days 51:23 66:2
66:3 79:17
82:5 98:15
174:17
Deakins 1:23
2:3
deal 27:4 37:15
62:21
dealt 19:2 61:6
81:23
Dear 174:10
December 82:1
134:7 135:5
decide 42:9
82:17,23

decided 15:6 22:6 81:18
decision 48:18 91:10
decision-mak... 28:18
decision-maki... 28:18
declare 169:6 176:12
defend 43:22
defendant 1:7 2:7 4:10 71:11
defines 100:5
definitely 99:22 167:1
definition 99:2 99:2,18,21 100:9 157:1 159:18
definitions 99:8
degree 58:21 58:22 59:9 129:11
degrees 10:8
delay 5:23
deleterious 100:7
delineated 23:1
delivery 24:5 54:22
delve 37:16
delved 37:12
demeanor 128:2,12 131:13
demonstrate 112:1 147:24
demonstrated 112:4 127:1 129:21
demonstrates 153:18
department 3:10 11:6,19 12:13 13:1 14:4 14:12,12,16 17:10 54:5

96:20 118:8 118:20 119:13
148:17 149:17 149:23 150:2
150:7,9,12,12 150:15,20 151:22,24
156:10 163:8 163:18,18 164:4,25
departments 150:10 169:17
departure 90:23
depends 57:7,8 63:24 64:2
deposed 71:6 73:13 134:21
deposition 1:10 1:17 4:3 5:2 6:23 7:3,8 9:14 73:10 85:17 125:8 131:1 137:20 148:13 153:9 153:12,15 155:20 157:16 157:17 158:15 159:16,25 172:7 173:7 174:12 176:6,8 176:11
depositions 73:20
depth 60:21
Deputy 14:19
describe 23:6 84:18 93:13 96:8 107:15,19 107:20 115:14 121:18 152:7 154:16
described 91:23 93:25 94:22 96:4 108:13,16 111:6 128:11 145:11

148:1,6 163:17 165:2
describes 88:4 92:17 108:8
describing 23:17 144:19 148:2 167:17
description 3:9 85:4 93:12,24 95:20 109:8 111:6,20 126:22 127:23 128:21
design 16:8 19:17 32:6 42:24 43:5 56:24 57:10 58:1 114:2
designated 139:9 140:4
designed 39:25 44:18
designing 29:17 30:1 41:24 43:14 50:23 50:25 54:13 57:23
designs 13:16
desired 174:15
destroyed 112:22
detail 58:16 89:20
details 25:18 77:11,14 84:23
determine 28:14 65:12 67:8 79:22 83:20 131:12
determined 36:3,14
determining 84:6 101:2
develop 14:7 19:12,24 20:2 21:9,10 23:9 32:15 34:5

35:25 38:2,16 42:9 52:14 79:20,23 81:7
developed 20:19 21:4,6 27:25 29:10 30:10 36:6
developing 12:16,22 13:18 13:19 52:13
development 14:1 25:8 34:16 38:7 40:19
dictatorial 31:14
dietary 55:16 55:23
difference 9:2
differences 35:1
different 12:18 16:12 17:19 22:17,20 31:7 31:8,9,11 34:23 40:25 41:1 42:25 43:4 56:23,24 59:3 61:4 62:4 72:25 75:2 79:2 96:12 97:7,8 119:12 122:13 125:24 141:11 141:14,17 160:6 168:15
differently 112:4 129:25
difficult 131:12 140:8
diligence 106:12
diligent 106:4 122:19,20
diligently 39:14
dining 24:21 70:13 116:11
direct 48:4 101:7,12,16

153:24
directly 10:15 10:22 30:22 40:21 61:9 83:12 86:5 88:3 145:4 151:19 163:4
director 31:25 32:23 33:1,4
director's 32:2
directories 75:24
directors 18:17 19:3,4
dis- 154:25
disappeared 36:12
discipline 21:10
disciplines 60:23 160:6
discuss 50:2 80:8 81:3
discussed 61:16 78:18 101:1,4 116:17,18 127:17 128:7 128:10 153:8,9 158:20,23
discussions 80:18
disease 15:20 15:24 16:17 53:20 54:1
dismissing 129:10
dismissive 126:19 127:1,7 129:21
dispositioning 155:1
dispute 113:6 150:15
disruption 120:6
distancing 129:9
distinction

CATHERINE ADAMS HUTT, Ph.D.  3/19/2019

53:18
distribution
   54:21
district 1:1,1 76:7
   78:1 82:8
   100:16 105:8
   132:5 162:1,6
   162:7,8,10,15
   162:20,22
   163:4
disturbed
   65:20
diverse 52:12
diversity 51:16
   58:12 60:21
DIVISION 1:2
document 9:23
   23:10 72:19
   73:7 81:8
   104:7 162:4,6
   163:3 169:3
   170:13
documentary
   79:13
documentation
   81:9,12 158:25
documented
   23:11 28:16,19
   141:11,18 168:2
   168:10,11,24
   169:16
documenting
   82:5 168:19
documents
   78:9,22,24
   79:2,17,20,23
   84:16 148:23
   148:25 158:14
   158:19 165:3,7
   168:16 169:22
   170:3
doing 11:22
   20:9 23:18
   41:18 48:10
   50:14 54:25
   57:16,24 63:3
   67:17,19 71:6

84:10,11
   107:20 128:14
   129:2 147:25
   150:5
domain 44:15
domestic 46:7
door 64:5,6
   66:2 130:19
   131:6
doors 46:8
   47:20 65:22
   65:24
down 5:11 6:4
   132:25 137:11
   146:11
dozen-plus
   130:23
Dr 79:6 133:10
   133:12 134:4
   134:13,20,23
   135:9,18 136:9
   138:15 161:22
   163:5 174:10
drafting 134:15
   136:2
drew 87:24
   89:13
driving 104:9
drove 91:2
Drug 14:3,13
   54:4
duly 1:19 4:12
   173:6
duties 12:14

E

E 2:1,1,3 4:1,1
   114:20 173:11
earlier 83:12
   86:4 94:22
   98:14 113:20
   143:10 148:12
   150:23 152:4
   153:23 157:10
   158:20,23
   159:2,18,20
   163:5 164:8

165:8,23
   167:4,11,17
early 21:3
earthworm
   122:6
Eastern 1:1,2
   76:7
easy 121:16
edit 11:15
edition 3:19
   152:15 154:20
educate 20:13
   169:22
education 10:7
   35:18 37:14
   58:20 59:1,13
   59:17 60:1
   121:4 160:17
   161:7
educational
   58:17
effect 109:6
   118:25 119:9
effective 37:19
   154:4
effectively 38:3
   54:14 61:7
effectiveness
   37:10
efficiency 20:16
efficient 51:24
efficiently 54:14
effort 6:7 109:19
   149:9
eggs 121:12
   138:2
eight 26:7
   52:25 72:6
   161:14
eight-month
   26:9
either 61:16
   62:24 118:16
   119:6
electronic
   171:16
element 24:7

159:21
elements 22:20
   23:13,14,17,18
   24:12 42:21
   87:19,21
   156:17 161:11
eliminated
   45:10,11 48:3
   49:9,18
elimination 49:1
   49:22
Elizabeth 55:9
Elm 7:20
emanate 103:11
emergency
   28:6 30:13,13
emotion 92:25
emotional 93:17
   94:3 95:5
emotions 132:9
empathy 110:21
   111:3
emphasis
   115:24 116:2
emphasize
   68:2
employed 17:3
employee 37:3
   77:23 84:20
   103:1 106:18
   118:7 120:14
   120:22 123:15
   123:16 132:22
   133:2 145:20
   145:25 146:3
   146:8 149:5
   154:3,6 173:13
employees 15:4
   37:7 108:21,24
   118:14,19 119:5
   119:13 120:3,15
   120:18 121:6
   151:10,12
   163:6 164:9
   164:25
employers
   115:11

employment
   77:16 81:24
   90:17 126:23
enabled 152:23
enables 60:23
enclosed 174:12
   174:13
Enclosures
   174:25
encompasses
   54:3
ended 90:17
ends 64:1 75:4
engage 88:14
   98:20 132:1
engaged 70:3
   71:10,13 83:24
   84:19 98:25
   130:1
engagement
   78:19
engaging 47:18
   132:4,5
England 26:25
   34:4
English 36:2
enjoy 51:14,17
   56:20 57:16
enjoyed 37:15
enjoying 52:5
ensure 22:9
   23:15 30:19
   38:3 54:22
   117:1
entailed 25:3
   43:19 105:18
entails 55:6
entered 88:2
   127:4
entering 106:8
entire 17:1 29:1
   31:16 39:6
   48:9 125:6,6
entities 36:8
entity 27:19
entomology
   121:4 160:4,7

environment 37:22 103:15
environmental 35:6 64:9
environments 137:2
equipment 37:8 37:21 53:9 64:15
Erin 2:3 4:7,23 173:11
Erin.williams@... 2:6
errata 174:13,15 174:17 175:1
essential 129:18
establish 153:4
established 169:12
establishment 156:1,2
estimate 69:2
et 59:4 96:20 116:21 117:11
Europe 36:8
European 32:2 36:2
evenly 6:24
event 78:14 79:25 84:23 93:20 96:8 103:11 109:9 110:23 111:16 121:15,15 124:8 129:10,19 136:16 137:16 139:4 166:3 167:22
events 52:18 62:3 91:2,3,24 92:17,24 96:13,18 111:6 113:2,24 122:11 128:10,24 130:5 145:10 145:17
everybody

114:9 167:22
evidence 67:14 102:13,24 109:18 111:7 117:23 118:10 123:22 129:12 138:20 149:18 149:23 151:4,6 151:23 153:5,8 153:18 155:23 162:5 166:4,13
evolution 40:20
evolve 21:12 26:19 34:13 38:2 41:2 161:10
evolved 39:25 45:7 57:9
evolving 25:10 41:20,23,24 42:15 45:1 76:23
exactly 9:19 69:7 73:3 92:7 103:7 116:1 124:19 135:6 136:9 157:21 163:11
examination 3:4,5,5 4:13 145:21 161:19 168:7
examine 143:5 143:9
examined 135:11,20 141:1 146:16 166:7
example 22:22 24:18 44:25 45:20 55:22 103:12 168:12
excellent 11:20
exception 6:12
Excerpt 3:18
Excerpts 3:19
exciting 35:8,11
excrement

65:21
excuse 94:17
execute 114:11 115:5
Executed 176:14
executes 161:7
executive 52:21
exercise 61:23
exhibit 8:15,17 9:7 72:11,13 73:1,5,8,11 86:7,9 91:13 91:15 94:7 97:23,24 124:10,11 125:25 126:12 126:18 133:25 134:1 148:19,21 148:21 152:2,4 152:9 154:12 154:13 161:22 161:25 163:10 163:23,24 164:10,11
exhibits 3:8 157:11 171:17
exist 170:24 171:2
existed 42:7
exists 20:24 21:1
expand 5:21
expect 82:20 90:3 94:25 106:8 117:24 127:8 135:16 140:11
expectation 90:5 128:14 159:11
expectations 93:19 122:14 127:19 167:16
expected 117:22 128:4
experience 12:5 56:15

58:12 60:13,21 60:22 61:1,8 61:13 66:14 71:9 73:9 84:9 90:24 101:5,19 104:5,17 113:16 116:15 129:9 132:3,6 137:7 166:22,23 168:18 170:7 171:7
experienced 32:13 137:15
experiences 56:23 61:15 62:3
experiential 62:16
expert 3:16 43:20 57:2,13 57:15 69:1,17 71:5,9,24 72:8 75:24 81:25 82:23 83:10 97:25 98:2,6 98:8 99:4 100:11 102:18 105:4 113:9 116:22 119:23 126:18 132:21 134:9,13,19 135:25 136:8 136:17 152:20 159:9,16,24 170:19 171:1
Expiration 173:20
Expires 176:24
explain 15:11 25:14 29:5 31:24 35:22 37:5 38:8 42:21 46:19 53:17 55:6 58:21 60:12 72:21 73:3 77:19 87:22

87:24 89:12 92:14 93:16,17 137:24
explained 48:9 77:21
explaining 48:12
explanation 89:6
explicit 99:6,24 100:8
exposed 137:3 138:2,8
exposure 103:12,14,20 104:1
express 7:13 169:12
expressed 82:4 137:19 159:15
expressing 134:24 135:1
extended 43:24
extension 12:15 12:17,20,23 13:3
extensive 59:1 60:16,18,25 89:20
extent 29:1 87:22 89:9,11 90:18 98:24 99:9 160:9,16 162:3
external 22:2,7 22:11
extract 47:7
extracted 126:4 126:8
extrapolate 139:7
extrapolating 132:12
extremely 37:10 41:6 110:13
eye 25:9 107:18

CATHERINE ADAMS HUTT, Ph.D.  3/19/2019

**F**

facilities 155:15
  155:16
facility 16:23
  17:2 22:22
  66:16 67:17
  67:25 83:14
  137:14 156:7
  157:2
facing 40:11,12
  41:8,9
fact 64:21 98:2
  102:10,20
  122:25 126:19
  129:22 133:11
  134:1 149:16
factor 87:18
  89:10 90:1
factors 66:16,19
  66:21 67:11,14
facts 78:7 80:5
  80:11,25 86:1
  130:14 150:16
fad 55:12
fads 55:13
failed 82:9,11
  105:9 111:25
  128:2 153:22
failure 137:13
  138:3
fair 5:19 7:3,8
  25:4 57:3
  121:13 130:10
  135:24
Fairfax 174:5
fairly 170:5
FALCPA 50:7
fall 71:4
false 65:12
familiar 122:8
  131:21 135:22
  136:23 170:6
  171:1
far 69:16 74:20
  90:12
farm 18:15 51:19

fashion 148:7
fast-moving
  61:5
fast-paced 61:5
fat 46:23,23,24
  47:6,13 123:24
father 27:5
favorable 51:10
Fax 2:6
FDA 3:19 43:15
  125:11 152:14
  154:20 157:12
  157:25 158:2
  169:17
features 56:17
fed 47:10
federal 17:7,9
  44:9 99:8
  100:3 125:16
  169:25
fees 78:25
felt 67:22
fiction 55:23
field 11:25
  28:22 57:6
  59:11,18 113:17
fielded 28:6
figure 68:22
  156:21
file 124:19
filed 44:20
filing 174:18
filth 99:7,7,18
  99:25 100:9
final 81:4,10
finally 77:1
financial 78:19
  78:21
financially
  173:14
find 22:21 65:14
  65:15 66:21
  67:10 68:3,4,6
  68:7,8,8,16
  83:15 94:5
  107:5,5,6
  110:8 137:20

138:22 142:22
  151:25 156:24
  165:4 169:15
  174:12
finding 65:12
  66:14,16,17,25
  67:14 80:2,2
  84:11 100:18
  105:10 110:22
  120:14 133:10
  137:14 139:1
  149:20 155:24
findings 134:15
  134:17,18
  135:2
fine 70:13 74:4
  171:16
finely 45:15,21
  45:25 46:13
  46:20 48:18
finish 141:16
finished 30:3
  95:11
fired 45:11
firm 2:9 75:20
  136:7
firmly 24:2
first 4:12 11:5,8
  12:24 13:6
  25:25 30:21
  39:1 70:14
  75:17 76:13,16
  77:8 78:4
  87:13 105:6,21
  106:13 107:3
  108:15 110:3
  112:6 113:11
  114:15 126:19
  130:7 141:2,8
  142:6 146:11
  146:20 147:12
five 9:18 27:6
  59:24 72:23
  73:23 95:25
  145:14
fix 68:17
flies 64:12

103:18,19
  121:11 136:20
  137:6 138:6,8
flip 86:12
Floor 2:10
floors 64:14
Florissant 88:21
  105:13 118:17
  118:20 150:12
  150:19,19
  154:10
flow 30:17 34:17
  64:3,4
flows 47:7
fly 99:23 102:13
  102:23 103:10
  103:17 104:14
  104:15 107:10
  117:2 121:14,19
  123:22 132:22
  138:2,2,4,5
  140:12 165:24
  166:4,8,16,25
FMI 18:8
focus 38:17
  43:10 60:5
  90:16 143:8
focused 25:6
  93:14
folks 18:13
follow 29:19
  117:24,25
follow-up 117:22
  168:6
followed 122:12
  130:2
following 16:21
  100:15 173:4
follows 4:12
  100:15 173:10
food 3:18,19
  10:9,18,25
  11:16,25,25,25
  12:1,1,2,3,4,5
  12:6,7,10,16,21
  12:21 13:3,16
  14:3,11,13,13,14

14:25 15:2,10
  15:13,14,24
  16:6,9,13,14,16
  17:18,20 18:1,4
  18:6,8,14,15,18
  20:10,11,15,24
  21:20,20 22:9
  23:25 24:1,3,4
  24:8,10,11,13
  24:20,24,25
  25:3,5,7,21
  26:8,11 27:16
  27:25 28:1,10
  28:10 29:4,9
  29:13,14,17
  30:20 32:7,12
  35:2,4,5,12,13
  37:12,17,18,20
  37:21 38:7,11
  38:12,13,16
  39:13,15,16,19
  39:23,25
  40:23 41:2,15
  41:21 42:5,19
  42:23 43:1,8
  43:14,20 45:3
  45:3,8 46:9
  46:10 47:24
  50:6,23 52:7
  52:13,15,15
  53:6,14,18,19
  53:24,25 54:3
  54:4,12 55:12
  55:14,15,15
  56:1,1,4,15,18
  57:10,20 58:1
  58:2,11,21,23
  58:23,24,24
  58:25 59:1,2
  59:6,6,8,8,10
  59:12,14,15,23
  60:18,19 61:21
  62:7 63:7,9,11
  64:21 65:5
  66:18,24 67:1
  67:22 69:25
  70:1 77:23,23

82:12 83:14,14
97:11 99:5,17
99:17,20
100:4,5,8,22
101:13 102:3
102:10,20
103:5,9,23,24
104:12,21
106:8,9 110:2
110:2,17,18,22
110:23 111:10
113:5,10,11,22
114:1,5,5,8,10
114:13,18,20
115:19 116:10
116:19,19 117:6
117:6 118:2
125:11,13,16,16
125:24 126:6
126:8 127:9
129:14 130:12
130:20 131:23
137:15 150:21
151:23 152:5
152:14,15,16,17
153:22,25
154:20,25
155:2,3,3,25
156:1,11 157:11
157:18,19,23
157:24,25,25
158:2,2,5
159:19 160:5
160:19,22
161:1,10,12
166:20 167:21
167:22 168:3
168:13 169:10
169:21 170:23
**food-borne**
53:20 54:1
**foods** 14:6
52:22
**forbidding**
153:6 155:16
**force** 15:14,15
**foregoing** 176:6

176:13
**foreign** 160:23
**form** 60:2 158:11
158:11 176:7
**forming** 87:6,7
92:3 124:17
128:20 134:13
145:4 170:4,10
171:6
**formulating**
81:16 90:2
**forth** 51:21
128:8
**forward** 7:17
15:9 19:15
21:13 44:13
52:16 57:18
92:22 102:8
**found** 66:5,25
67:5,7,11
68:12 75:22
75:25 77:23
91:25 92:10
108:2 112:15
124:20 136:10
142:13,18
149:5,17,23
153:1 157:3
162:9
**foundation** 11:8
55:21 131:4
161:7
**foundations**
130:7,16
**four** 33:7 36:3
53:2 73:9,19
95:25
**four-month**
26:6
**fragments** 67:5
68:6
**frame** 79:15
170:16
**framework**
38:15 54:11
**frank** 52:16
82:8 85:22

87:13 91:20
93:7 105:8
106:22 112:3
116:23 119:21
140:24 150:24
151:13,16
165:9,10 166:7
**frankly** 31:3,12
36:10,16 38:17
52:4 59:25
60:4 81:21
145:6
**free** 155:10
**freedom** 51:15
**freezer** 137:1
**French** 47:21
**fries** 47:21
**front** 63:25
72:17 95:8
148:20
**frozen** 47:9
103:14,14
136:19,23,25
136:25 137:1,2
**fruits** 59:4
**FSIS** 170:1
**full** 4:17 5:25
7:3,7 98:24
112:10 119:3
120:2 145:21
**full-time** 17:5
**functions** 19:7
**further** 68:4
112:18 120:6,9
161:16 168:5
171:10,12
173:13
**future** 146:12

--- **G** ---

**G** 4:1
**general** 12:1
129:6
**generally** 18:25
44:19 59:20
64:3 68:15
100:6 131:23

138:5
**generate** 28:13
**generated**
30:10 170:7
**George** 87:14
88:20
**getting** 18:15
37:9 126:11
**give** 6:22 87:12
87:14 97:18
116:16 125:6
132:16 142:23
165:13
**given** 14:17 16:8
33:3 79:4,12
90:12 117:4
129:3,3 136:18
173:7
**giving** 7:3,7
**global** 26:1 34:5
35:25 36:11
**globally** 19:19
20:22 26:18
34:19
**GMA** 18:16
20:12
**go** 5:7 7:17
10:15,22 15:25
19:11 31:1 37:5
49:10 51:17,25
62:17 63:2
64:1,20 66:12
68:12 74:23
77:2 88:21
89:20 99:11
105:3 112:18
121:22 125:25
127:14 132:20
142:12,17,18,19
145:18 146:15
156:22 163:25
165:4 169:8
171:19
**goes** 20:4 47:6
54:20 66:7
120:13 133:9
**going** 5:7 6:2

11:24 21:12
33:25 41:17
45:22,22
49:10 52:15
55:19,25 62:8
62:10 63:18
64:5 72:12
85:12 89:19
102:8 107:12
107:25 108:6
110:12 111:13,17
116:22 125:1
126:18 131:1
136:17 142:17
142:19 164:16
169:8
**gold** 20:8 114:2
**Golden** 37:1
**good** 4:15,16
23:8 33:15
34:7,18 35:17
37:14 66:14
103:23 110:1
**Google** 169:9
169:19
**gotten** 51:11
69:16
**government**
11:21 14:2 15:3
**grad** 160:15
**grade** 27:2
**grand** 52:4
**great** 8:22
20:17 27:4
37:15 86:12
87:5 91:18
**grill** 120:21
133:5 141:1
146:15,21
147:9
**grinder** 47:11
**gristle** 107:10
123:24 124:1
125:1
**grocers** 18:7,10
24:13
**grocery** 12:7,8

CATHERINE ADAMS HUTT, Ph.D.  3/19/2019

17:10,15,16
18:2,6,17
48:23
ground 41:12,15
45:20,23
47:21 48:21
48:23 62:14
80:3 82:25
84:12,21 89:17
92:1 99:22
100:19 101:8
102:14,22
103:10 104:15
104:19 105:2
105:11 106:1
107:17 108:1
109:4 112:13,14
124:7,24
136:23 137:4
138:17 140:8,9
149:6,21 150:3
grounds 22:23
group 27:21
39:12,21 52:12
55:8,8 116:9,9
groups 41:20
119:12
grow 26:24
guess 16:21
49:25 66:23
80:4 89:21
107:2 112:3
121:22 126:11
128:17 129:8
131:11 139:20
140:25 142:16
160:15 169:8
Gulf 27:5
gun 66:6

**H**
HACCP 13:13
14:1 15:6 16:5
16:6,13,13,15
17:21 24:1
38:10,15
42:23 54:7

57:21
hair 65:21
hairs 65:2,4
half 51:16 144:18
halt 109:4,16
hamburger
82:10 83:10
83:20 89:23
96:15 97:4
103:4 122:21
122:25 130:9
131:5 135:20
138:16 139:6
141:1 142:5,13
hand 93:3 114:4
114:4 118:10
129:12
hands 62:13
hands-on 41:11
hang 94:5
142:23
happen 5:22
13:21,22
53:25 54:10
66:9,13 68:23
83:1,5
happened 63:9
65:9 83:7
85:4,10 110:8
141:11,17
happening 45:3
54:10
happens 64:6
hard 163:1
hatch 121:12
Hazard 13:14
hazards 13:17
54:2 64:9
head 6:3 14:21
36:10,12,13
health 3:10 25:4
25:14 35:6
58:8 84:4
96:19 97:11,11
100:7 106:7
110:19 111:5,9
112:1,5,25

115:3,3 118:8
118:20 119:13
119:25 148:16
149:17,22
150:1,2,7,9,10
150:12,14,19
151:21,24
162:22 163:8
163:18 164:4
164:25 169:17
169:24,25
hear 5:17 10:12
76:22
heard 33:24
hearing 3:14
78:10 81:20
84:18,24 85:3
90:12 92:6
93:10 94:7,18
96:1,3 109:1,15
119:2,16
126:23,24
128:11 136:4
145:14 146:20
147:1 158:17
164:2
heat 46:25 47:4
Heinz 18:23 31:1
31:18,22,25
32:9,11,15,17
32:20 33:2,6
33:11,16 34:9
34:10 36:19,21
114:15
held 13:2,10
115:22
help 23:23
55:18,24
82:16,23 116:6
116:12 152:19
153:3,14 155:5
155:19 161:1
helped 91:19
115:21 158:11
161:10
helpful 53:17
helping 43:10

43:22,23 45:2
Hendersa85...
2:11
Henderson 2:8
2:9 3:5 4:9,9
75:9,14 76:13
77:8 78:6
79:4 80:5,24
81:4,10 98:12
125:6,9
139:25 143:25
144:2,13
161:20,21
164:19,22
168:4 171:12,21
171:22 172:4
173:12
hey 63:6
high 21:22 53:11
high-level 42:5
high-quality
21:23
higher 31:2,22
highest 44:2
highly 140:14
Highway 105:12
hire 32:14
hired 49:15
history 9:4
48:14,16 73:7
hitting 54:13
holistic 57:22
home 7:19 8:5
42:18
honest 65:1
137:7
honestly 76:24
78:22 152:18
153:22
hour 74:15
hourly 121:6
hours 60:1,4,6,9
60:10 63:13,16
149:5
Hours:10 173:12
Hours:46 173:11
Huddleston

2:13
human 10:19
36:6 47:13
67:18 107:18
humanely 16:2
husband 8:4
51:19
Hut 25:25 27:18
61:10
Hutt 1:10,18 3:4
4:3,11,19
161:22 163:5
173:5 174:5,10
175:2 176:5
176:20
hypothetical
141:8,19
165:10,16

**I**
idea 125:19
131:19
ideal 26:12
identical 22:1,16
157:25 158:2
identification
160:21
identified 27:24
74:15 76:2
133:12
identify 15:20
84:5 116:12
121:25
ill 53:20
Illinois 11:1 39:7
imagine 78:20
111:8
immediate
116:25
immediately
61:7 127:23
impact 20:14
101:21
impeach 6:24
impetus 30:5
implement
19:15,18 20:6

22:3,7 23:23
41:1 42:10
53:3 115:6
116:6 170:2
**implementation**
40:20 42:12
42:24 43:6
54:8 58:2
**implemented**
20:21 21:25
34:19 38:3
40:2
**implementing**
15:1 26:7,17,18
29:18 42:6,15
**importance**
40:19 128:3
**important** 6:19
23:25 28:3
30:7 37:10,11
53:8 83:17
107:2 110:20
**improper** 165:15
**improve** 17:18
22:8
**improving** 53:7
53:12
**in-person** 60:8
**inadequate**
103:15
**incident** 106:23
117:18 149:5
**include** 12:6
73:12,19 84:17
99:17,22
100:9 106:13
117:2 145:20
165:22
**included** 17:20
78:9 85:4
92:24 102:23
104:4 105:20
112:13,15
120:21 124:8
158:10 159:20
**includes** 22:20
22:24 73:9

110:7 113:21
160:11,21
163:2,3
**including** 18:20
20:16 62:25
107:1 121:3
143:20 160:22
**inclusion** 99:24
**incoming**
166:24
**incomplete**
159:22
**inconsistent**
6:22 93:22
94:25 127:18
**incorporate**
99:17
**incorporated**
24:1
**INDEX** 3:1
**indicate** 77:9
104:11 137:12
174:14
**indicates** 87:11
87:12 137:15
**indication** 65:15
**individual** 73:6
120:24 150:5
**individuals**
29:19 31:13
53:10 62:24
117:15 118:6
120:11,23
121:2,24
**industries**
20:24
**industry** 12:1
17:17,23,25
18:7 19:11 20:11
20:25 21:2,2
21:11,14,21
23:25 24:6
25:21 39:19
41:22,25
42:17 43:13
51:12 58:23
58:25 59:8,15

61:5 77:17,20
78:2 82:13,20
84:1 89:16
100:22 106:10
110:2,17 113:11
113:24 114:11
116:12 167:8
167:24
**influence** 90:9
95:14,19 115:6
**influenced** 141:3
141:24
**inform** 91:19
148:25
**information** 9:3
17:25 30:2,7,8
30:10,18
79:25 84:6
95:18 110:12
129:3 141:22
164:24
**informed** 142:1
**ingredients**
30:2 55:23
64:4,5
**initial** 134:18
**initiate** 118:1
120:1
**initiated** 13:25
14:1 53:3,4
118:11
**initiative** 25:13
52:13
**initiatives** 53:5
**injury** 100:7
**input** 19:25
**inquiry** 118:1
145:20
**insanitary**
155:14,17
**insect** 68:6
**inside** 37:9
107:8
**inspect** 16:3
63:9 64:21
130:8 138:11
**inspected** 131:5

152:1 162:8,10
162:12
**inspecting** 88:11
91:20 147:16
**inspection** 3:10
13:4 14:25
15:15,22 17:8
17:9 61:22
63:22 64:19
65:11 67:22
78:14 83:19
95:16 129:24
135:4,7 148:17
149:4,6,8,10
149:12,12
150:2,5 151:22
151:25 156:11
166:20 169:10
169:15,16,20
169:21,22,25
169:25 170:24
**inspections**
62:18 63:22
66:10 149:7
**inspector** 162:1
162:23
**inspector's**
162:15
**install** 38:16
**installed** 42:20
**instance** 1:18
**instances** 67:21
73:12
**Institute** 18:8
**instructed**
165:19
**insufficient** 84:3
**integrate** 39:14
39:15
**integrated**
39:13 42:23
64:10
**intend** 98:25
**intended** 66:12
**intending** 95:4
**intention** 159:8
**intentionally**

108:17
**interacting**
110:11
**interaction**
128:21 129:17
**interactions**
128:16,19
**interactive**
106:3 109:22
109:23,24,25
**interest** 19:16
25:7 35:15
129:22
**interested** 12:2
26:10,10 88:2
158:1 173:15
**interesting** 35:8
35:21
**interior** 107:17
**internal** 20:19
22:8 23:14
**internally** 23:19
40:11
**international**
14:8 20:1,21
21:6,7 32:17
46:6 61:11
**interpret** 96:11
101:18 129:8
**interpreted**
96:11 165:21
**interpreting**
45:1 148:10
**interrupt** 73:23
132:13
**interview** 110:7
**intrigued** 12:4
**investigate**
127:20 138:25
149:9
**investigated**
80:2 139:15
**investigating**
78:25 83:3
89:17 106:12
106:14 110:3
129:18 138:16

138:21 167:2
**investigation**
65:6,16 77:25
78:15 81:1
82:9,11,18,20
83:25 84:8
85:23 88:13
88:15 89:14
90:19 91:1
92:23 93:19
95:21 97:3,6,6
97:7,9 100:18
100:20 101:3
105:10,18,20
105:21,24
106:2 107:4,16
108:8,20
109:12,21
110:7,16 111:25
112:12 120:1
122:16 127:9
127:15,21
128:13 139:3
140:13 141:23
142:4,8 143:19
144:7,19,20
145:1 146:6,8
147:25 148:2
150:14,25
162:12,15,16,18
**invited** 47:20
**inviting** 45:18
**involve** 88:11
**involved** 28:17
37:7 43:21,22
44:23 45:14
62:14 63:2
64:19 71:24
76:10 78:13
81:24 110:4
111:16 112:24
117:15 120:4
120:25 128:9
145:7 150:9,10
**involves** 37:9
37:20
**ISO** 19:25 20:1

20:6,11,13,23
21:3,5,5 22:1,3
22:3,11,14,16
22:16 23:7,12
26:7 32:18
38:10,15 54:16
**isolated** 103:11
104:18,22
121:15 137:16
139:4,22
166:3
**issue** 15:25
44:14,25
63:24 77:22
82:15,22 83:4
88:1 112:7
114:20,23
118:3
**issues** 13:19
14:22 19:14
35:13 37:23
38:11,12 61:6
78:12 81:24
113:5 117:11
127:11
**items** 158:14

---

**J**

**Jack** 114:19
**January** 38:22
84:8,12 89:7
91:21,25
100:19 101:9
102:11,16,21
104:13 105:11
111:11 113:3,6
121:25 123:1
134:25 136:1,11
136:14 138:12
147:7 148:17
153:2
**Jeffery** 133:10
**Jersey** 26:5,5
27:3
**job** 11:13 12:13
17:13 19:10,23
23:21,23 25:3

25:6,14 26:11
26:19 27:11,14
27:23,24
28:25 29:3
30:24 31:18
32:9,13 34:13
37:5,7 39:9
40:16 42:1
45:10,11 48:3
49:18 51:12
62:15 83:13
115:8,11 116:11
116:14
**jobs** 13:2 115:5
**joined** 13:3,5
**journal** 11:15,16
45:19,25 46:6
46:6,7,16,18
**judge** 44:9 76:6
94:10
**June** 7:22 51:5
**jury** 44:10 53:17
82:17,23
152:8

---

**K**

**K** 133:10
**keep** 9:5 23:3
44:16 59:15
**keeping** 37:7
**kept** 25:7,9
42:25 59:11
96:23 136:25
137:1
**key** 12:21
**KFC** 61:10
**killed** 114:21
**kind** 34:13,20
35:10 36:11
37:12 46:15
**King** 48:19
**knew** 30:3,14
135:6 155:24
**know** 5:23 6:12
9:20 12:1 13:21
18:15 21:24

22:14 24:18
25:9 26:19
32:1,24 39:19
41:8 42:9,16
43:25 44:4,17
44:25 46:18
48:16,25 50:4
51:9 52:18,19
53:7 54:9
57:12 58:2,4
58:10 61:11,13
61:25 64:8,11
64:24 65:2,9
65:20,23
66:3,6,8,8,9
67:2,7,8 68:7
68:8 69:7,9
70:20 72:3,4
75:9,14,22
76:6 77:21
79:16 81:10
84:14 93:13,16
94:3 95:10
97:5 102:7
106:20,21
107:6,11,23
108:6,20
109:17,25
110:9 111:2
115:25 117:17
120:17 121:2,14
126:12,14,15
127:10,21
131:17,20
132:5,14 133:2
135:7 139:7,9
140:3,10,10
141:15 142:11
144:16,24
146:10 147:17
149:8 150:4,6
150:9 151:12
151:15,17,17,18
151:20,21
156:6 157:14
157:20 160:15
162:14 163:24

165:18 166:15
167:1 168:21
169:1,2,9,18,19
170:24 171:2
**knowing** 149:22
**knowledge** 8:13
8:14 10:3
56:24 58:13
72:7 76:9,12
101:7,12,16,19
101:23 104:6
104:10,18,20
108:10 120:2
121:5 127:13
133:19,21
138:14 142:21
151:14 153:24
170:12,22
171:8
**knowledgeable**
59:14
**known** 168:1
**Kraft** 18:22,22

---

**L**

**labeling** 29:24
29:25 50:6,8
**lack** 129:21
**land** 52:1 138:2
**landed** 138:8
**Landes** 52:21
52:23 53:1
**large** 149:9
**largest** 39:18
**larvae** 99:23
102:13,23
103:10 104:14
104:15 107:10
117:2 121:13,19
123:22 132:22
138:2 140:12
155:18 165:24
166:4,8,8,16
166:25
**late** 20:11
**law** 1:23 2:9
16:22

lawsuit 82:16
   85:17
lay 121:12 138:2
layman's 152:7
   154:16
lead 32:22,25
   33:3 66:19
   113:22 155:17
leader 31:4
   34:14 130:20
leadership
   27:22 31:3,14
   36:9 40:17,25
   41:5 45:6 48:7
   48:9
leads 113:22
lean 46:13
learning 61:23
leave 11:18 14:15
   19:10 25:19
   30:25 33:15
   34:8,10 45:5
Leavitt 50:11,22
   52:6,11
led 25:12 28:1
   32:10 38:6
left 14:20,23,25
   22:10 25:20
   48:17 51:9
   65:23 118:21
   124:21 140:16
legal 3:13 9:4,18
   36:6 43:17,18
   43:21,23 44:3
   44:23 45:2
   49:11,15,21,21
   49:21 50:1,16
   57:12 70:15
   72:23,25 73:6
   73:8
legislation 15:21
legs 52:17
Lester 14:24
let's 164:1
level 18:25 19:2
   28:15 31:2,22
   44:3 54:13

58:4
levels 43:4
liability 113:13
   119:22 120:12
liberty 50:2
limit 58:20
limited 43:25
   62:7 158:12
limiting 152:9
line 35:13 52:2
   162:13 175:5,9
   175:13,17,21
linked 46:23
   90:20
list 3:13 9:11,16
   70:15 72:25
   73:2,4
listed 75:23
listen 5:15
literally 36:23
   63:13
litigation 43:18
   44:6,20 57:6
   173:21 174:1
little 33:7 37:12
   57:15 96:12
   99:4 126:10
   132:25 140:8
   157:10
live 51:18
lived 26:5 27:3
lives 51:19
lobbying 19:5
lobbyist 19:6
located 30:11,12
   31:19 38:25
   39:4 105:12
London 27:6
long 6:10 7:25
   11:10 28:24
   34:14 36:15
   44:1 45:6
   70:25 157:19
long-term 15:3
   55:18
longer 49:9
look 9:6 34:20

47:8 55:22
64:3,6,8,9,10
67:4 69:13
81:19 91:16
92:20 106:17
107:6,12,15,22
118:2 127:19
139:23 142:12
142:18 143:24
146:4 161:24
looked 97:8
   107:8,12 112:8
   122:3,7 125:12
   139:17 142:20
   143:23 144:1
   146:23 157:22
   158:8,10
   159:20
looking 13:17
   17:17 34:8,10
   43:9 55:18
   64:13 65:19
   65:20,22,22
   68:13 86:21
   88:3 94:24
   105:6 106:19
   116:23 122:1
   140:3 141:5,24
   142:2,23
   146:24 147:2
   147:16 154:13
looks 10:8 25:2
   33:7 47:12,13
   51:3,4 52:20
   54:24 86:13
   98:4 121:14
lot 29:9 35:15
   37:8,19 40:4
   40:12 43:12
   46:22 53:9
   57:10 91:2
   92:25 105:1
   112:12 113:21
   114:21 115:25
   121:9 143:3
   167:19
lots 139:10

140:3
loud 87:2 89:1
   95:9
Louis 2:5,10
   149:17 150:14
   174:18
lunch 48:20,21
luxury 52:4
lying 46:11

**M**

Ma'am 74:10
machine 1:22
maggot 82:25
   107:11,16
   121:14,19 122:3
   122:7 123:22
   124:2,25
   127:6 132:22
   137:14 145:22
   151:9 155:24
maggots 99:23
   102:13,23
   121:9,10
   123:20 133:12
   135:2 137:12
   137:21 138:10
   149:6,13,21
   150:4 165:24
   166:15,25
maiden 4:22
major 45:13
majority 40:21
   41:11 71:17
makers 40:15
makeup 46:3
making 42:14,17
   45:20 47:3
   53:19 54:9,21
   59:8 60:10
   116:3
manage 19:14
   62:10
managed 31:12
   39:21 61:7
management
   20:3,7 22:22

23:9 24:2,3
25:6 27:25
28:6,8 54:16
56:15 57:11
92:1 157:2
manager 48:5
   78:1 82:8
   87:15 89:16
   90:5 92:24
   94:25 97:10
   100:17 105:8
   108:23 129:6
   130:12 131:25
   132:6 162:1,6
   162:7,8,10,22
   163:4
manager's
   162:15,20
managers 18:18
   18:18 131:21,22
   132:2,4
managing 31:11
   54:15 132:6,7
manipulated
   107:22
manner 100:16
   101:2 128:2,12
   131:13
manual 23:16,16
   168:13,19,20
manuals 168:11
manufacturer
   35:2 52:10
manufacturers
   17:11,15,16 18:2
   18:6,17 52:15
   55:15 58:4
manufacturing
   12:3 16:14 18:6
   18:19 20:9
   23:4 24:10
   30:12 37:18
   52:23 60:19
   64:15 66:8
   83:14 103:12
   103:13,17,18,19
   116:19 166:24

CATHERINE ADAMS HUTT, Ph.D.  3/19/2019

March 1:11,20
4:4 173:16
174:12 175:3
marked 8:15
72:11 86:7
91:13 97:23
124:10 133:25
148:19 152:2
154:12 163:10
163:23
market 35:20
50:24 52:14
55:9 56:18
marketed 57:11
marketing 18:8
24:12,15 35:18
35:19 67:24
married 7:23,25
master's 10:16
10:18
material 160:23
materials 12:21
79:13 81:15
125:7,10 158:11
158:14
matter 50:2
52:16 60:24
60:25 62:12
82:15 98:3
113:3 127:9
McDonald's
24:18 33:18
33:24 36:16
38:19 39:1,6
39:10,18,22
40:2,12,15,19
40:23 41:4,6
42:1,4,10
43:22 44:3,7
44:15 45:5,18
45:23 46:9,10
47:18 48:17
49:12,18,22
50:10,15,16,18
51:9 61:10,11
62:6,12 69:21
114:17 132:3

161:4 166:22
168:14,22
McNuggets
47:22,22
meal 103:1
120:22 154:3
154:7
mean 5:24 15:11
18:3 33:2 42:8
44:4 48:11
50:15 53:24
65:4 66:3,15
67:18 73:1,16
80:17 83:13
85:19 106:14
110:7 115:7
121:10 122:10
156:19 158:21
160:13
means 108:7
137:1 144:24
meant 48:13
101:22 144:16
147:14,18,20
170:1
measures
105:25 109:3
meat 13:5 14:5
15:5,21 16:3
17:3,7,9 18:20
45:19,20
46:17,20 47:5
47:8 48:22,23
59:3 63:14,19
67:3,6 91:21
92:1 96:19,21
97:19,22
101:13,23
103:20 104:19
107:12,15,17
108:1,5,7
109:7,9,10,11
109:20 117:1
118:6,7,7,8,10
120:14,19,25
123:20,21,23
124:6,7

127:20 128:23
129:7 133:13
134:24 135:10
135:10,25
136:19,20
137:9,12,14,21
138:2,8,10,11
138:24 140:8
140:14 141:4
142:8,9,12
143:16,19
145:21 146:15
146:17,20,23
147:8,24
149:6,13,21
150:3 151:9
154:2 155:15
155:15,18,24
163:17 164:3,9
165:20,24,25
166:4,7,10,16
166:24
mechanical
65:24
media 44:12
45:9 117:11
123:10,13
medications 7:2
meet 83:25
meeting 115:21
mega-trend
55:25
Melissa 1:6 4:10
75:12 78:9
80:11,18 82:9
85:16 88:7
91:23 92:8
106:22 108:1
118:10 140:25
141:22 154:2
158:18 163:16
174:8 175:2
member 14:10
62:19
members 17:24
17:25 18:16,24
18:25 20:13

21:7 41:25
43:13 62:19
63:1 108:11
116:3,4 169:5
mental 7:6
mentioned 18:4
31:3 62:7
69:22 79:1
91:14 106:25
111:12 136:2
138:1 144:21
144:22 150:23
168:9
mentions 38:6
43:16 156:9
menu 29:25
merely 85:8,9
mesh 68:10
met 95:2
method 63:22
63:24 81:7
84:7,9,15,18
88:13 89:6
91:20 92:22
95:15 127:21
128:12
methodical
64:17 105:20
106:4 109:22
122:19 144:25
methodically
13:18
methodology
16:7
methods 95:25
mice 65:4
Michigan 10:19
microbial 53:23
Microbiological
14:11
microbiology
17:20 59:2
121:4
mind 95:5
96:13 114:7
122:7 147:25
minute 126:9

minutes 73:24
132:14 140:16
173:11,12
mischaracteri...
162:4
miscommunic...
84:14
misleading
33:5
misrepresenti...
46:1,2
missing 64:17
125:14
Missouri 1:1 2:5
2:10 69:10,11
76:7 91:11
99:5,17,20
100:8 105:13
125:13 154:10
154:21,22,24
157:18,19,25
158:2,5 159:19
misspeak 70:1
139:12
MO 174:18
mode 65:16
model 152:15
modeling 55:7
modified
154:22
mom's 47:20
moment 71:16
106:2 130:18
151:24 163:14
money 74:22
74:24
month 170:18
170:20
months 26:7
27:4 36:3,14
36:24 43:24
48:17 49:17
52:25,25
53:2
morning 4:15,16
108:12 118:17
147:7 162:17

morphed 18:24
mother 26:23
mothers 47:20
Mountains 35:9
mouth 156:20
move 19:15
   25:24 31:22
   34:7
moved 26:8
   27:4,7 39:2
   132:24
moving 126:17
multiple 8:24
   9:1 12:17 62:6
   67:5 75:6
   103:18 118:9
   120:15,17
   124:8 138:5
   150:10 151:10

**N**

n 1:3 2:1 4:1,24
   78:1,15 82:8
   84:8 85:25
   91:5 100:17
   101:14 102:2,9
   102:19 104:12
   104:19 105:9
   105:12 112:1
   117:25 118:17
   118:21 121:7,24
   135:20 138:12
   150:13 153:1
   153:20,25
   154:9 174:8,17
   175:2
Nabisco 18:23
name 4:17,22
   14:24 20:5
   70:14,14,17,18
   75:8 175:2,2
   176:11
names 4:20
NAR 161:8
narrative
   162:22 163:17
narrow 35:13,14

Nash 1:24 2:3
national 12:16
   12:22 14:10,21
   41:22 43:14
   115:17 116:2,20
   161:5,6,8
   169:2,5
nature 58:21
   64:2 67:19
   82:19 88:15
   90:18 103:25
   104:17 111:25
   118:1 129:19
   160:12
nearby 133:7
nearly 157:25
necessarily
   19:15 31:13
   83:6 107:25
   164:10
necessary
   99:13 176:9
need 5:21 6:11
   21:21 40:12
   51:25 52:1
   61:6 67:9
   73:17,20 81:19
   88:25 102:7
   132:15
needed 30:19
   41:3 67:12
   79:18,20,23
   79:24 156:22
needs 54:18
   107:18
negotiated 44:7
   44:16
negotiation
   44:8
Nestles 18:22
never 18:5
   73:12 86:5
   95:2 131:16,18
new 12:22 15:4
   26:5,5 27:3,21
   31:4 37:2 45:7
   48:1

Nicholson 87:14
   108:22 128:9
   128:17,19,22
   128:22 129:6
   129:23 165:13
   165:22
nicknames 4:21
nine 139:18
nodding 6:3
noncompliance
   100:2
nonfood 37:22
nonmeat 18:20
normal 7:11,14
   9:14
North 32:10,15
   32:20 36:7
   38:4 47:2
   105:12
notable 43:24
notarized 174:17
notary 174:15
   176:23
notice 13:12
   43:16
noticed 27:23
   29:4
notwithstandi...
   125:13
novel 24:5
   34:18 35:7
number 14:17
   17:18 42:25
   46:19 59:25
   59:25 60:3
   69:4 105:22
   106:25 127:20
   132:25 154:19
numbered 1:20
   20:4
numbers 86:18
nutrition 10:19
   11:8,15,17 12:3
   25:4,8,13,17
   29:22,24 30:1
   30:3,9 35:15
   56:16,20 58:8

115:18
nutritional
   25:10

**O**

O 4:1
Oak 39:2,7
oath 5:10 6:18
   74:11 119:17
object 162:3
   164:13 165:15
objection
   139:25 143:25
   144:2,13
   162:24 164:17
   164:17
objectives 115:2
observation
   101:20 112:17
observe 107:1,2
   128:18
observed
   120:15 151:10
   162:11,14,18
observing
   65:18 106:18
obtain 90:13
   128:23
obtained 11:5
   102:25
obviously 24:6
   25:16 34:22
   58:14 75:6
   92:19 115:9
occasions 62:1
   64:24 127:10
occupation 8:7
occur 57:23
   61:2 68:3
   104:1 118:12
occurred 45:12
   49:20 50:8
   68:19 91:3,24
   93:20 96:8
   106:23 113:2
   114:24 117:18
oddly 65:23

odor 47:15
offer 83:24
   98:25
offered 58:19
   92:21 93:24
   95:21 97:14
   103:6 146:11
offering 58:14
   60:15 80:14
   82:7 102:2,9
   102:18 103:4
   146:4
office 128:22
   174:17
officer 33:23
   34:2 36:18
   39:12 45:11
   52:21 55:1,10
   118:16 173:6
officers 118:9
offices 1:23
official 166:20
Ogletree 1:23
   2:3
oh 5:7 8:18 9:12
   22:14 31:8
   42:8 70:19
   72:3,16 171:19
Oil 27:5
okay 5:5,7,15
   8:4,16 9:15,25
   10:6,15,18,25
   11:4,10,13,23
   12:12,25 13:9
   15:10,18 16:22
   17:6,9,13 19:7
   19:20 20:23
   23:21 24:15
   25:12 27:7
   31:15,18,24
   32:5 33:6
   36:19 45:12,16
   47:16 50:10,21
   52:6,10 56:5
   57:5 58:14
   61:20,25
   64:24 68:20

68:20 69:1,16
69:24 70:3,7
70:16,19,25
71:3,5,9,13,20
72:12 73:15
74:14 75:11
77:1 79:10,12
79:22 80:8,16
80:24 81:3,15
82:3,7,15,22
83:5,18,23
84:5 85:2,12
85:19,22 86:8
86:12,17,21,25
87:5,10,17
88:16,24 89:4
89:12 90:7,11
90:16,21 91:14
91:18 92:7,14
93:6,7 94:5,9
94:15 95:4,7
95:23 96:6
97:18 98:2,5,8
99:11,15
100:10,13 101:1
101:12 102:6
102:17 103:3
104:3,9 105:3
105:16 106:13
106:25 108:4
108:9,25
109:3 111:19,23
113:18 116:22
117:3 118:23
119:11,21 123:5
123:11,18
124:13,16,23
125:2,19,22
126:3,17,25
131:16 132:10
132:16,18,20
133:1,2,6,9,19
134:1,23
136:17 137:19
140:17 141:9
142:22 143:8
143:15,22

144:8 147:19
148:12,16,20
148:23 149:22
150:18 151:15
152:3,7,12
153:8,14
154:13,16
156:25 157:14
158:4,13,13
159:23 161:16
161:24 163:5
163:13,15,20
163:22 164:8
164:19 165:6,8
166:18 167:4
168:4 170:15
170:19
old 53:9
on-site 16:23
16:25 63:16
127:15
once 42:9 65:11
68:21 104:5
111:13
one-off 115:4
online 60:7,9
157:22
open 46:8
47:19 65:23
65:24 107:22
opened 108:3
operate 53:11
operation 16:12
16:24 17:1
54:14 63:14,15
operations
29:14,15,20
42:11 43:6
45:19 63:1
operator 56:1
63:12
operators 43:3
55:15 168:21
opine 82:24
95:5
opinion 60:14
78:13,18 79:14

79:18,21,23
81:4 82:7,16
82:23 83:10
83:24,25 90:1
90:2 96:6
99:4,10 100:11
100:15,16
102:4,9,19,19
103:4 105:7,8
122:16 123:25
124:1,17
128:20 130:7
130:16,18,24
131:4,7 134:19
134:24 135:1
135:19 136:3,3
136:6,8
137:20,22,25
139:2 143:14
145:5 148:25
149:19,20,24
158:7,11 159:5
170:10 171:1
opinions 58:14
58:18 60:14
60:24 61:18
80:12 81:7,16
82:4 92:3
98:24 102:1,19
115:13 116:16
126:13 159:4
159:15,24
170:4 171:6
opportunity
11:20 19:11,12
19:17 25:23
27:11 31:1
33:17,21 34:5
107:9 127:5
145:3 146:7
161:17
opposed 35:2
42:6 51:12
61:23 62:15
90:18
opposing 161:17
optimal 56:25

oral 1:10,17 173:7
order 23:15
25:20 30:19
56:24 59:8,13
89:15 109:11
110:25 114:2,11
115:5 125:7
134:14 147:24
153:12 156:16
158:15 171:22
orders 171:13
organization
15:2 18:8 19:8
20:1,17 21:6
27:18 30:22
organizations
12:10 52:15
116:19,20
169:17,25
170:1
oriented 41:6
42:12,12
original 66:23
174:13
originally 26:14
26:22
outcome 44:7
70:20 141:25
173:15
outside 8:5
39:3
overall 46:2
69:3 130:16
131:17,19
overhear 117:7
overheard 117:8
120:7
overlap 73:2
overlook 141:3
oversaw 43:5
44:10
oversee 41:2
owners 53:1
owns 161:7

——————
P
——————
P 2:1,1 4:1

P.C 1:24 2:3
p.m 1:21 140:20
140:21,21,23
172:6,7
Pace 26:8
paced 61:5
packaged
103:14 136:25
packaging
67:24
page 3:2,9 9:10
9:22,24 73:7
86:17,22 87:1
88:16,17,20
89:2,3 94:6
94:10 100:13
126:16 132:24
142:24 147:3,4
147:5 161:24
161:25 165:4
174:13,15,17
175:5,9,13,17
175:21
pages 94:4
95:25 145:14
157:21
paid 75:7,9
pan 112:20
139:6,19,19,23
panel 47:20
panned 139:15
pans 143:2,13
148:3
papers 10:13
paragraph 93:4
93:6,23 105:6
126:17 136:18
142:25 143:1
paragraphs
95:8,14
paraphrasing
87:11
Pardon 8:2
126:7 141:12
part 9:14 13:5
14:8 15:7,14
16:5 20:12

22:20 23:5,12
23:12,13 24:1
24:5 25:8
28:3,19,20
30:8,17 34:6
35:10,19 36:1
36:15 37:14
39:17,20
40:10 41:20
43:1,13 48:7
50:1 56:2
58:24 59:6
59:22 61:22
66:13 73:5
78:12 83:13
84:17 85:15
87:6,7 98:12
99:9 100:3
102:1,18
104:21,25
130:17,24
131:4,7 132:2
141:20 143:18
152:5,14 154:3
154:6 156:21
157:11 158:22
160:5,7,14,19
160:23 161:1,3
166:21,23
167:1 168:22
169:2,3 170:12
170:21
partially 124:24
particular 11:23
28:24 37:25
46:15,17 52:10
76:24 78:16
83:19 87:17
97:3,4 106:2
117:25 124:22
140:10 141:5
149:8 156:17
156:24 165:4
170:1,13 171:3
particularly 6:4
53:10 116:16
125:2 127:3

149:2
parties 70:7
96:11 173:9
Partners 50:12
50:22 52:6,12
parts 42:1 65:4
146:5 156:14
157:5
party 58:9
path 15:9 97:7,9
patties 112:13
127:20,24
129:23 136:24
137:4 138:18
139:7,14 140:5
140:14 143:4,9
143:19 144:5,6
144:20 145:1
147:24 162:9
162:10,12
patty 80:3
82:10 83:11,20
87:12 88:3,9
89:17,23 90:4
92:21,25 93:2
96:15,19,22
96:23 97:2,4
97:13 99:22
102:14,22
103:4 104:15
105:2 106:17
107:3,7,9
108:1 112:8,8
112:14,20 118:7
118:8,10,21
120:21,25
122:21,25
123:2,6,21
124:7,25
127:5 128:23
129:7 130:3,9
131:5 133:13,16
135:20 136:5
138:16 139:6
139:12,18,23
140:4,11,12
141:1 142:5,13

142:18,20
143:1,4,12
145:21 146:1,4
148:3 149:21
150:3,5 151:9
154:2 163:17
165:9,11,12,13
165:20
pause 140:18
peers 59:12
penalty 6:18
176:12
pending 6:13
76:11
Penn 10:9
people 13:8
29:7 31:11
32:14 53:25
54:1 56:10,19
62:25 63:3
64:15 65:18
66:3 68:12
96:22 110:4,8
110:9,9 111:1
114:21 117:16
118:9,24 119:12
121:10 122:7
123:8,8 124:8
131:23,24,25
132:1,7 163:8
people-people
131:24
percent 41:16,18
41:18 45:24
47:11 57:9
percentage
41:13 45:23
47:11 57:5
perform 82:9,11
98:19 105:9
150:13
performance
20:15 21:15,23
22:9 23:2,5
53:7,9,15
54:13,18
performed

23:14 61:21
90:6 98:15
100:17,20
101:3 129:25
135:5
performing
86:14 159:8
period 26:9
48:24 50:23
54:25 65:18
76:22 79:16
161:9
periodic 11:15
perjury 6:18,25
176:12
persist 138:6
person 53:19
70:3,5 76:13
80:25 95:1
106:6 110:1
111:8 129:16
131:25
personal 75:12
101:18,19,19
101:22 104:10
104:18,20
129:15 153:24
personality
131:17,20
personally
61:20 62:17
64:18 74:22
98:19,22
129:13
personnel
168:15 169:23
170:2
persons 131:24
pertains 111:20
pest 22:22
64:11,19,22
65:10 103:15
137:13 138:3
155:13,13,14
157:2
pests 155:10
pet 38:13

Ph.D 1:10,18 3:4
4:11 10:23,25
11:4,5 173:5
174:5 175:2
176:5,20
pharmaceutical
55:16
Philadelphia
26:4
phone 52:3
124:4,5
photo 125:3
133:3
photograph
3:17 124:3,6
133:17
photographs
79:9 85:14
118:5 133:20
158:19
photos 123:19
124:13,16
126:13,16
151:15
phrase 106:15
physical 53:22
108:20
physically
38:25
picked 114:1
picture 123:16
123:16,21
132:21 136:5
pictures 104:8
104:14 117:6
120:22 122:4
123:2,5,9,15
124:8,19 136:11
136:13,15
151:11
piece 9:22 41:7
41:8 97:4,19
97:22 110:15
137:21 159:23
pieces 108:5,7
138:24
pink 45:17 47:13

Pittsburgh 27:9
31:20 33:11,13
Pizza 25:25
27:17 61:9
place 39:5,7
51:5 53:14
54:22 75:4
96:24 154:21
155:15
places 68:6
117:7 121:11
placing 24:15
plaintiff 1:4,19
2:2 4:8 70:5
70:10 71:11,21
plaintiff's 161:22
163:10
plan 13:18,19
28:9,19
planned 28:16
planning 42:24
54:9 57:11
142:11
plans 99:11
plant 16:14,15
20:10 63:13,16
103:12,13,17,18
103:19 138:4
156:3,6
plants 16:15 17:3
19:19 20:22
26:18 30:12
46:7 66:8
plastic 68:7
please 4:5,17
5:17,23 8:17
35:24 72:13
86:9,13,17
97:24 105:4
124:11 132:23
141:16 154:14
163:12 171:14
171:17,19
174:12,14,17
point 6:11 13:15
26:19 33:19
73:13 83:23

91:11 94:15
96:22 98:23
121:1 130:4
159:12
pointed 45:7,13
poisoning
69:25 114:20
poisonous
100:6
police 96:20
118:8,16 119:12
163:7,18,19
164:4 165:1
policy 11:21,24
14:13 17:17
40:15,19,20
40:20 41:21
45:3 60:19,20
62:15
pool 47:14
populate 32:14
portfolio 9:5
portion 40:16
77:16 85:16
87:25 89:9
portions 81:20
92:15 125:16
poses 58:5
position 31:2
49:1,8,23 91:5
139:1
positioned 29:7
positive 20:14
34:15
possession
158:20
possibility 137:8
166:6
possible 63:7
64:19 65:10
112:25 138:1
141:3,4,22
162:21 163:1
possibly 6:24
146:10
posted 123:9,12
123:15

potential 15:24
64:9,11 84:4
103:25 104:1
poultry 13:5
14:5 15:5,21
17:3 18:20,21
59:3
practice 47:18
48:6 77:17,20
82:12,21,21
89:16 100:21
103:23,23,23
106:10,16
113:10,14
116:13 128:4
145:19,19
167:14 168:1
169:9,15
practices 29:17
41:2,21 42:15
42:16 43:1,7
59:7 114:10
115:6,23,25
116:5,5,13
167:20,20
168:13,19
169:4,22
170:2
preceded 81:10
92:19
preceding
98:16
precisely 97:14
precluded 72:8
predate 170:25
predict 141:10,13
141:16
predictive 55:7
preexisting
106:21
preliminary
82:15
premise 38:9
44:13
premises
155:10
prepackaged

12:6
preparation
155:4
prepare 77:2
79:13 153:12
153:14 155:19
157:17 158:15
prepared 79:16
98:3,9,11
102:14
preparing 81:4
126:13 152:20
155:6 156:15
157:6,15
presence
137:12 155:17
present 2:12
13:18 16:18
73:8 78:11
119:3 138:12
151:5,7
presented
15:23 16:2
130:13 136:15
152:18 153:22
presenting
48:11
president 33:22
49:6 56:6
president's
32:3 33:4
36:17
presidents
18:18 19:3
Preston 1:24,25
pretty 35:13,14
66:14 75:5
136:7
prevent 7:3,7
13:20 16:8
57:24
preventing
54:10 99:6
154:24 155:3
previous 31:5
previously
38:18 57:11

primarily 15:3
16:14 17:23
19:3 42:24
44:23 56:18
68:24,24
77:15 115:19
primary 15:15
18:9 35:1 84:9
90:13 95:17
95:24
principles 21:24
22:15 38:15
prior 41:5 75:11
82:5 98:5
115:11 127:10
134:17
private 43:25
44:2,4,8,18
50:1
proactively
43:18
probably 39:18
40:16 53:16
57:7,8 73:18
160:25 161:14
166:2,5 169:16
169:18
problem 60:10
62:9,9 64:3
105:21 106:14
106:15 129:5
129:22 130:2
138:6
problems 13:20
16:10 56:25
57:23 58:4
61:1,3 63:2
111:1
procedure 5:8
168:11
procedures
37:10 66:10
169:20,23
proceed 106:11
proceeded
44:9,10 88:5
92:22 107:4

CATHERINE ADAMS HUTT, Ph.D.  3/19/2019

107:14 146:5
proceeding
94:1 108:19
110:10
process 16:1
18:15 23:4,4,6
33:19 34:17
44:7,19 45:25
46:25 48:5
83:17 98:21
113:19
processed
46:13 155:18
166:4
processes
54:22
processing
16:15 17:3 46:7
64:7 136:21
137:14 155:16
156:3,6
processor 63:19
produce 78:8
110:12 125:7
produced 1:18
125:20
product 25:8
30:17,18 34:16
35:13 45:14
45:23 46:19
47:3,8,21
48:19 53:21
64:5,10,21
66:18 67:1,3,6
68:13 99:24
102:24,25
103:21 104:1
104:21 105:24
106:19 107:12
107:17,19,21
112:9,16,23
120:2,10
127:22 129:16
135:3 139:10
139:15,17
142:10 143:20
146:9 148:5

149:9 152:1,24
153:4,19,20
155:10,24
products 18:20
18:21 24:16,22
24:22,24 30:3
30:15 32:8
41:10 47:2
58:23,25
59:15 64:4
65:5 99:3
104:25 117:1
142:9,12
155:18
professional
20:9 56:20
103:24 105:7
110:2,3 113:10
128:5 129:2,14
130:12 137:15
167:18
professionals
54:17 63:25
100:21 110:18
110:18 113:22
114:5,6,25
115:22 116:9
professor 133:11
profile 30:4
program 10:16
10:23 12:16,23
13:15,24 14:7
16:5,8 22:25
27:25 28:7,9
30:9 32:19
34:14 37:15
46:8 47:19
48:20 50:24
52:18 54:12
114:2,3 160:5
programs 13:17
16:16 19:13
22:12 25:9
29:5,9,10
38:2,7,16
39:25 40:1
41:23,24 42:6

42:10,20,22
43:5,15 53:3,5
53:13 64:11
114:1,1,18
115:18,19,20
118:2
project 26:6
projects 56:13
114:13
promote 116:12
promotion
31:22 34:1
proper 105:9,17
114:23 146:7
properly 32:14
property 51:20
51:20
propped 66:2
protect 30:19
113:13 115:2,2
117:21 119:22
119:25 167:21
protected
155:11
protecting
53:21
Protection 50:7
protein 47:5
prove 104:11
provide 56:2
78:17,23 83:10
86:22 89:24
159:3
provided 8:9
52:7 79:8,9,17
81:16 102:20
135:2 151:16,18
providing 78:21
public 40:5,9,12
40:13 41:8
44:11,15 45:8
45:8 47:19
67:23,24 84:4
97:11 106:7
109:20 110:17
111:5 112:1,5
115:3 169:7

174:16 176:23
publicly 168:24
169:1,24
publish 169:19
published
169:11
Publishing 60:4
pull 8:16,17
72:12 86:8
97:24 124:11
134:2 152:3
163:12
pulled 107:21
139:12 148:3
pulling 112:20
146:23 147:15
147:20
purchased 34:3
34:4
purchasing
39:17,18,21
purpose 75:16
77:24 90:13
110:13
purposes 22:8
pursue 6:24
22:2,11
put 15:6 32:25
113:25 144:23
156:19 164:17
putrid 99:25
putting 48:18

_____

**Q**

Q9000 21:4,13
qual- 68:10
qualifications
121:7
qualified 115:13
116:15,16
121:25
qualifies 58:18
60:13 61:13
100:1
qualify 89:15
99:1
quality 19:16,17

19:24 20:2,3,7
20:9,15,15,17
21:15 22:8
23:5,8 24:2,3
25:6 27:17,17
27:20 29:14
32:10,12,15,22
32:25 33:3,23
34:2,6 35:9
36:1,5,7,11,12
36:13,17 37:20
39:11,12,15,16
39:21 40:23
45:10 52:8
53:6,7,8,15,18
54:11,12,13,16
54:17,18 56:15
58:1 59:2
63:25 67:23
113:22,25
114:4,6,18,25
115:20,22
116:7,8,9 118:2
167:5,18
168:13,18
question 6:13,14
58:20 60:12
66:1,23 81:12
83:8 85:15
86:22,23
88:19 91:18
92:7 94:9
97:20,22
101:22 102:17
130:9 141:6,21
142:15 144:9
146:9 147:5
164:14,18,23
167:9,13 170:9
questioning
110:7
questions 5:10
5:16 65:17
88:8 102:8
105:22 108:11
108:14 110:4,5
110:8 130:1,25

141:20 161:16
161:17 168:5
171:11,12
quick 24:20
116:10
quickly 5:8
146:16
quit 91:6
quite 16:12
46:14 60:17
72:22 93:18
94:2 96:13
150:11
quote 90:25
105:17 116:4
159:21

R

R 2:1 4:1
rain 121:12
raised 47:17
127:2,11
ran 17:19,23
27:16
ranch 51:20
random 149:12
range 32:7
110:5
rate 74:17
rates 74:14
raw 137:9 149:9
RdR 50:19 51:1
56:6 74:23,25
rdrsolutions.c...
76:5
re-review
158:24
reach 135:25
reach-in 107:14
107:21 112:16
127:22 139:11
143:20 148:6
reaction 70:2,4
70:6 117:9
read 43:17
84:22,24
85:16,19,21

86:25 87:2,2
87:5 88:24,25
89:1,3 91:8
94:13,14 95:9
95:10,14 96:1
100:23 101:16
102:4,12 104:7
105:14 108:16
108:22 111:24
118:25 119:19
123:10 128:18
128:23 133:14
133:22 137:17
143:6 145:16
171:23 172:2
174:14 175:6
175:10,14,18
175:22 176:6
reading 87:4
89:3 91:4 94:4
95:12 119:16
132:23 164:6
ready 26:20
146:16
real 21:3
reality 52:19
realized 111:13
really 6:6 11:21
20:17 21:12,14
21:21 25:6,6
25:18 30:16
34:1 35:17
36:11 40:17,23
42:1 53:6
54:17 56:19
57:25 59:5
62:13 69:14
73:17 81:18
90:17 102:17
104:9 105:16
126:10,16
realm 37:17
166:24
reason 7:10,13
7:16 51:8,11
68:13 103:8
113:6 145:6,8

146:13 150:15
175:7,11,15,19
175:23
reasonable
122:2 165:12
165:21
reasonably 9:21
reasons 33:20
51:14 68:3,16
recall 8:10
25:18 38:14
63:19 67:10
74:24 75:9,23
76:16,18,20
76:25 77:4
78:20,22 79:3
93:9 108:23
126:14,16
133:8 135:6
150:22,25
157:8 158:9
160:22 164:6
164:12,15
165:2,5 166:21
receive 74:22
125:23,23
received 70:23
74:19,21,24
125:9,22
136:3
receiving 134:17
136:8
Recess 74:7
140:21
recognize 8:22
58:4 72:19
121:16 124:25
recognized
46:20 59:12
recognizing
57:23
recollection
72:1 98:17
123:14 133:4
160:18
reconditioning
154:25

record 4:3,6,18
74:5,9 77:5
89:1 140:20
140:23 164:17
171:14 172:6
173:7,14
recorded 5:12
recordkeeping
23:11 29:17
records 42:25
recounting
91:24
recruited 33:18
recruiter 33:24
recruiting 36:17
38:20
recruitment
33:19
reference 167:11
referenced
152:4
referring 84:25
124:13 162:14
163:9
reflect 128:3
refusal 90:8
96:14 97:18
refuse 146:12,14
refused 87:14
89:23
refusing 97:1
refute 119:6
regarding 162:7
regards 164:3
167:5
regions 41:1
regrets 131:24
Regrettably
166:17
regulated 14:6
regulating 15:5
regulation 15:21
152:8,19 153:3
153:6,11 154:17
regulations
45:2,4 50:7
54:5 125:11,22

152:5 154:17
154:19 155:5
155:19 156:3
156:22 157:10
157:15
regulators
43:10
regulatory 13:4
14:2,3 15:16
22:21 23:13
54:3,7,8 55:1
55:10 60:20
99:2 100:1
115:24 137:13
152:25 155:9
156:18 167:2,2
170:8
related 28:1
30:9 41:21
50:6
relates 59:3
140:4
relating 37:2
86:1
relationship
106:22
relative 14:14
50:8 51:15
78:14 82:20
111:9 156:3
167:16 173:13
relayed 17:24
relevant 77:17
77:19 88:1
110:13 149:18
149:20 157:23
158:6
relied 101:2
relocated 27:5
rely 135:24
relying 101:15
remain 36:7
remained 27:21
remaining
162:9
remains 14:4
remember 7:11

24:23 25:16
59:25 69:14
69:15 70:14
79:15 124:19
146:22 163:11
render 46:24
58:18 60:14,14
60:24 61:18
99:10 115:12
115:13 116:15
176:9
renew 59:23
renovate 21:14
repeat 5:17
142:14 167:9
rephrase 5:18
167:9
report 3:10,11,16
77:3 79:5 81:5
81:11,25 82:4
82:10 84:11
89:17 92:11
97:16,25 98:3
98:6,9,16,23
99:12,16
100:11,14
104:14,16
105:4 106:12
109:10,17,19
110:22 111:23
113:9 116:22
119:23 120:13
120:13 122:9
122:24 126:18
132:21 133:9
133:23 134:4,9
134:13,13,15
135:8,10,12,14
135:17,25
136:3,18
142:22,24
145:18 146:23
147:15,15,17
147:23 148:17
149:4,13
151:22,25
152:20 155:6

156:9,15 157:6
159:16,20,24
170:19
reported 1:22
80:2 91:3 92:1
100:18 105:10
107:8 119:24
124:6 136:5
138:17,25
145:17 149:10
162:19
reporter 5:11
8:17,19 72:14
171:13,18,21,23
173:2
reporting 119:19
reports 65:2
118:4 135:2
145:10
representation
40:14
representative
112:21 140:2
143:12,14
representatives
150:3
represented
77:10
representing
4:24
Republican
14:21
reputation
112:25 113:12
116:24 117:21
request 90:4
96:15 159:11
159:13
requested
99:14 159:10
requesting
92:25
required 16:25
41:4 43:2 65:5
requirement
152:16,24
153:21 154:22

requirements
22:21 23:12
59:17,21,22
137:13 154:23
155:2,9,12
156:18 157:3
requires 15:22
16:22 58:22
59:5
research 83:19
99:4
researchers
55:9
resides 54:12
resigned 53:1
resources 36:7
respect 31:12
150:21
respective 19:2
113:23 168:16
respond 28:23
141:7
responding
41:10 83:3
96:18 122:5
145:10
response 28:15
83:2 84:3,11
84:20 91:1
114:23
responses 5:25
28:1
responsibilities
11:14 17:13
19:23 27:15
27:24 28:2
29:5 32:9
39:10 115:8,11
responsibility
29:15 32:7
128:15
responsible
41:9 48:25
83:2 95:1
106:6,7 110:18
111:8,9
rest 167:23

169:6
restaurant
24:16,17 27:16
27:17 28:3
29:4,11 30:22
40:14 41:6,15
41:22,23
42:18 43:14
61:3,21 62:8
62:18,23 63:6
70:1,2,4,11,12
70:12 71:14,18
71:22,25 77:18
78:3 88:2,11
90:6,25 91:21
92:2,18,20
93:8,11,25
104:20 105:1
105:12,23
106:8 108:17
110:10 111:11,18
111:21 115:17
116:2,20 117:5
117:18 120:11
120:24 122:12
123:3 124:9
127:4 128:5
130:1,13 131:25
136:19,24
137:5 146:3
151:11 153:2
153:20 154:9
161:5,6,9
162:2 163:21
167:23 168:15
169:2,5,10
restaurants 12:7
12:11 24:21
29:8,16 39:24
40:2,11,22,24
41:3,4,12 42:2
42:20 43:3
46:4 58:3 61:1
61:2 66:9
71:17,24 105:9
116:11 117:7
131:22,23

132:7
restricted
166:14
result 53:21
resume 10:1,6
32:21 43:16
60:17 73:5,17
retail 12:9 18:3
24:8,11 156:1
retailers 18:9
retain 75:15
96:21
retained 49:16
retaining 77:24
retract 139:13
return 27:1
174:17
review 17:1 23:2
67:1 78:9
79:13 81:15
97:19 128:18
134:12 144:11
148:16 153:11
156:14 157:14
157:16 158:16
170:3,9,13
171:5
reviewed 10:3
60:17 85:5,13
86:14 90:12
124:16 125:7
125:17 126:13
133:20 134:5
140:25 142:13
144:10,11
148:13 156:10
157:6,15,18,22
158:4,9,14,17
158:18,19
170:5,15 171:3
reviewing 40:4
84:16 91:14
revise 99:12,15
right 6:17 8:9
8:22 9:25
10:20 11:6
27:10 31:8

32:25 37:3
38:9 39:9
43:9,10 46:12
46:14 50:13
58:6 68:25
70:18 73:4
74:2 76:4
81:25 82:1
85:10 86:8
89:19 94:6,15
97:13 111:13,24
121:19,22
123:7 124:20
124:21 125:3
126:10 127:14
130:22 131:6
134:10,16
136:17 146:3
147:13 150:11
154:5,13 158:8
167:15 169:8
170:20 171:6,9
171:10
**rigorous** 38:7
**risk** 45:8,9
47:24 48:10
48:13 58:5
64:16 66:16,19
66:21 67:11,14
77:23 84:4
**risks** 13:17 16:7
16:9 64:8,11
83:13
**road** 1:25 5:8
**roadmap** 20:7
**robust** 36:4
**Rocky** 35:9
**rodent** 65:2,3
65:21
**rodents** 64:12
**Rodney** 76:6
**role** 12:24 13:3
13:23 15:8,18
18:14 19:5,6,14
20:12 25:11
32:4 34:6
35:7,21 36:3,11

36:17 37:12,19
38:1 39:12
40:5,8,19,21
40:23 41:5
42:4,8,18
44:19 50:25
50:25 51:1,5
52:24 55:4
62:23 63:10
68:21,24 77:9
115:17 116:19
128:15 129:15
**roles** 12:25
13:10
**room** 6:5 21:10
**root** 118:3,11
120:1 150:24
**routine** 37:8
66:13 168:2
**routinely** 22:18
43:21 45:22
54:14 61:2
65:8 81:7
170:22
**rules** 5:8
**run** 29:16
**rustling** 10:13

——— S ———

**S** 2:1,9 4:1 174:5
**safe** 16:2 37:7
106:8 114:9
115:6 152:16
153:21 161:13
**safeguard**
113:12 116:24
117:21
**safety** 11:16,25
12:16,21,21
13:3,16 14:14
14:25 15:15,24
16:6,9,16 17:18
17:20 18:1,4
20:15 22:9
24:1,4 25:3,5
25:7 27:16,25
28:1,10 29:4,9

29:13,14,17
30:20 32:12
35:3,4,6,7,12
35:14 37:3,3,6
37:9,12,14,17
37:20 38:1,7,11
38:12,16 39:13
39:15,16,24
39:25 40:5,9
40:23 41:2,15
41:21 42:5,19
42:23 43:1,8
43:14,20 45:8
45:13 50:24
52:7,13 53:6
53:14,18,19,24
54:3,12 56:15
56:18 57:10
57:20 58:1,2
58:11 61:21
62:7 77:23,23
97:11 103:24
110:2,18,23
111:10 113:12
113:22 114:1,5
114:8,18 115:19
118:2 127:9
129:14 130:12
130:20 150:21
156:11 161:10
166:20 167:21
167:22 168:13
169:10,21
170:23
**sale** 102:15
103:1 104:16
106:1 109:4,11
109:16,20
112:9 120:1
154:24 155:25
166:13
**Sam** 4:9 161:21
**sample** 112:21
140:2 143:12
143:14
**samples** 143:16
143:23,24

144:10,11
**Samuel** 2:8
173:12
**San** 26:9 27:10
**saw** 40:23
89:21 110:9
118:6,9,24
119:5,13
120:18 121:8
136:5,7,11
145:6,8 150:3
150:5 163:6,11
164:9,25
165:7 166:13
167:1
**saying** 97:16
131:3 139:21
151:22 156:20
**says** 25:12
29:21 32:21
87:1 89:25
113:9 119:14
147:10,11
**scanned** 171:16
**scenario** 16:8
**scene** 163:7
164:5 165:1
**school** 48:20,21
160:15
**science** 10:9,9
10:18,25 55:1
55:10,21 58:21
59:5 160:5,19
**scientist** 59:10
59:13,23
**scope** 53:24
59:14 82:19
100:14 102:4
125:6
**screen** 68:9
**search** 158:12
**searched** 76:1
169:14,19
**second** 142:23
142:24 161:24
**secondly**
105:22

**Secretary** 14:18
14:19,20
**section** 87:5,10
87:17 89:4
100:14 116:23
152:17 156:24
157:24 158:9
**sections** 98:8,11
157:23 158:1,4
158:6,9,10
**sector** 12:8,9
60:18,19,19,20
**see** 40:12 44:15
47:12,21
60:23 64:21
68:20 86:23
88:9,22 90:3
97:7,13,16,22
107:7,8,24
109:10,18
110:6 111:3,5,7
112:17 118:3
121:10,12,13,17
121:17 127:5
142:5 166:23
170:22
**seeing** 120:25
123:17 142:9
150:22 166:21
**seek** 170:13
171:5
**seen** 96:22
104:8,11,14
121:9 122:3,21
123:2,5,21
130:4 148:23
166:15
**sees** 56:20
**segments**
125:10
**selected** 44:11
138:24
**sell** 153:21
**send** 129:5
**sending** 128:22
**senior** 18:18,25
18:25 19:3

49:6 50:11
166:20
sense 5:25 6:8
6:15 42:13
43:10 44:12
106:11,11 111:4
111:18 122:14
128:3 129:9
sent 129:15
sentence 111:24
113:9
sentences
137:11
separate 36:8,9
47:5 51:1 67:13
152:17
separating
55:12
September 71:1
sequence 91:24
92:17,24 96:9
96:12,18
122:11 128:10
128:24
series 5:9
serious 112:7
118:11 122:16
seriously 120:16
122:10,15
serve 55:10
served 89:18
101:9,23
102:20,24
103:6 106:8
112:11 117:2
127:22 153:19
service 12:4,5
12:10,15 13:4
14:25 15:15
24:11,14,20,20
24:24,25
25:21 26:11
28:4 52:15
55:15 56:1
60:18 63:12
82:13 83:14
100:22 103:24

113:11 114:5
116:10,10,19
156:2 161:2
166:20 168:3
169:21 170:24
services 159:9
173:21 174:1
serving 67:23
ServSafe
160:20,23,24
161:2,8,10
set 91:2 113:1,18
129:3 130:14
sets 129:3
setting 6:5 42:5
44:17
seven 29:7
51:23 72:6
115:16
seven-concept
13:16
seven-point
13:15
Shake 1:3 4:24
78:1,15 84:8
86:1 100:17
101:14 102:2
102:10,19
104:12,20
105:9,12 112:2
117:25 118:17
118:21 121:7,24
135:21 138:12
150:13 153:1
153:20,25
154:9 174:8
175:2
Shake's 82:8
91:5
shaking 6:2
share 29:13
shared 29:15
115:23,24
sharing 169:4
SHEET 175:1
sheets 174:13,15
174:17

shelf 15:6
short 60:9
shorthand 1:23
173:2
shortly 48:3
142:5
show 45:24
46:7,8 92:21
111:17 113:11
128:11 146:5
165:9,12,20
showed 65:5
96:20
showing 46:9
163:17
shown 118:7,8
120:23 132:21
shows 123:22
124:24
sic 70:15 155:14
sick 53:25 54:1
side 12:3,4,6
18:3 71:25
sides 96:10,10
sidewalk 121:11
sieve 68:9
sign 171:24
172:3 174:15
signature 174:13
174:15,17
175:25
significance
48:2
significant 15:1
34:1,16 35:22
45:1,8 47:24
59:6 77:16
89:11
signs 65:20,22
similar 32:19
37:23 60:12
114:15,16 115:1
138:8 148:6
155:12 168:17
168:22
similarly 115:1
simply 36:4

50:19 77:21
94:15 106:3
110:11 113:2
119:14 129:22
131:13 141:21
144:19 151:25
sincere 6:6
19:16
Sincerely
174:20
single 138:5,16
143:1 148:2
Sippel 76:6
situation 93:1
114:22
six 27:4 48:17
72:6 161:15
size 68:9,10
skim 81:23
Skipping 137:11
slacking 139:16
143:13
slaughter 15:23
16:1,15,23 17:2
slaughtered
16:4,19,25
slight 5:23
slime 45:18
slippages 65:15
Sloan 55:1,7,9,11
small 40:10,16
41:7 55:8
70:13
smashed 108:3
144:22
smashing
138:17 148:1,5
smells 47:13
Smoak 1:24 2:3
smoking 66:5
snapshots
149:7
social 117:11
123:10,12
sold 24:21,23
38:13 46:3
48:23 58:24

84:21 100:19
101:9,13,23
102:3,10,20
103:6 104:19
105:11 109:9
110:23 120:10
153:25 154:4
166:10
solutions 50:19
51:2 56:6,25
62:14
solve 61:3 63:2
solving 61:1
somebody 66:1
129:11,15 130:3
someone's
131:13
somewhat 33:5
43:25 154:23
soon 111:16
sorry 10:12,13
21:18,19 26:15
31:8,9 33:12
36:22 69:6
70:1,10 71:17
73:17,22
80:16 84:13
85:12 132:13
132:24 147:4
158:21 163:14
164:16 167:11
sort 7:2,6 19:5
28:15 31:22
49:11,21 53:5
55:23 56:12
66:5 84:10
105:16 113:5
113:19 121:3
160:4
sorts 34:11
sound 60:11
82:1
sounds 71:23
143:24
soup 19:18,21
20:22 24:22
25:11 32:19

source 82:24
  84:6 95:17,24
  103:9 156:4,5
space 56:19
speak 50:5
  60:2 80:4
  135:23 145:4
  145:25 146:3
  165:19
speakers 115:23
speaking 40:13
  59:20 64:3
speaks 162:4
special 13:6
specialty 58:12
specific 70:9
specifically 9:4
  9:10 38:4
  40:15 44:18
  60:25 61:10
  99:20 115:12
  156:1 166:21
  171:5,7
specified 147:21
  152:17
specify 170:11
specifying
  54:23
speculation
  148:8
spend 75:3
  167:19
spent 41:14
split 144:18
spoke 78:5
  151:13
spoken 85:22
  86:5 112:7
  131:16,18
spring 35:9
St 2:5,10 149:17
  150:14 174:18
stabilize 53:12
stack 91:16
  134:2
staff 43:3
  105:22 108:11

stage 52:4
stalled 33:20
stand 120:5
standalone
  148:21
standard 20:3,3
  20:8,19,21
  21:4,6,10,13
  22:5,20 23:1
  23:15 77:17,20
  82:12,21 84:1
  89:16 100:21
  103:23 106:10
  106:16 113:10
  113:14,18 114:3
  116:5,12 128:4
  145:19,19
  149:6,7,10
  167:6,7,8,12,13
  167:14,16,17
  167:20 168:1
  168:10,19,24
  169:9,12,14
standards 20:1
  20:2 21:9
  23:3,5,20
  78:3
standing 133:7
standpoint
  25:10
stands 13:13
start 64:4
started 11:5,7
  12:15 35:22
  39:1,11 49:16
  90:25 114:14
  146:8,9
starting 86:21
  88:17
starts 54:19
  63:25 88:20
  93:7 94:10
  105:7
state 1:22 4:5,17
  10:9,19 40:1
  42:16 43:8
  93:17 94:4

111:24 126:18
  133:9 137:12
  150:8 155:9
  169:16,24
  173:1,3 176:1
stated 92:8
  135:19
statement 40:6
  49:13 118:24
  126:21 128:1
  131:14 151:8
  159:5 162:1,20
  163:2,2 164:5
statements
  104:3 148:11
  163:3,12 165:8
states 1:1 12:19
  14:9 33:1 54:6
  95:5 100:15
  135:9 136:18
  143:1 144:5
  147:6 151:25
  152:15 162:6
stating 93:7
  148:10
staying 26:10
  42:16
Steak 1:3 4:24
  78:1,15 82:8
  84:8 85:25
  91:5 100:17
  101:13 102:2,9
  102:19 104:12
  104:19 105:9
  105:12 112:1
  117:25 118:17
  118:21 121:7,24
  135:20 138:12
  150:13 153:1
  153:20,25
  154:9 174:8
  175:2
STEFANIE 1:21
  173:2,19
  174:23
steps 109:15
  152:8

Stewart 1:24
  2:3
stick 10:6 55:12
  55:20 130:25
stint 52:21
stipulations 17:7
stop 45:24
  48:18 68:16
  76:19 109:9,15
  109:19 119:3
  120:1
stopped 112:9
store 87:14
  88:21 89:7
  94:12 129:6
  141:2 147:6
stored 155:3
stores 12:7
  48:24
story 45:6
  149:25
strategic 25:13
  42:8,13,14
strategy 42:5,9
  55:18
stream 45:21
  47:10
Street 174:5,18
strength 55:20
  57:25
stress 7:6
strike 83:7
  87:23 106:20
  137:10
stringent 99:21
strong 32:12
  47:15 61:13
strongly 168:17
structure 27:19
study 116:8
stuff 147:21
style 31:14
stymied 97:2,5
subject 50:2
subparts 20:4
subscribe 176:11
subsequent

9:19 78:5 91:2
  159:5
subsequently
  108:20
subspecialty
  57:20,21
  58:10
substance
  100:6 154:17
  176:8
substantial 15:9
  110:23
sufficient 59:13
  67:23 89:15
  134:14 139:5
  139:23 142:4
  144:18
suggested
  93:12
suggestive
  132:8
Suite 1:25 2:4
summary 72:22
  105:7
summoned
  63:15
superseded
  52:18
supervisor 48:5
supplement
  55:17
supplements
  55:23
supplier 22:25
  27:17 45:20
  105:2 118:1
  137:9 143:3
suppliers 22:25
  23:2 30:8,11
  39:22 42:13
  42:14 54:20
suppliers' 45:19
supply 39:20
  48:8,9 49:6
support 28:4
  49:15 61:17
  71:18 115:18,19

115:21
supported 29:9
43:18 96:2
116:7
supporting
43:17
supports 116:3
supposed 68:9
82:16,23
145:24
supposedly
120:18
supposition
139:1
sure 5:16 10:1
13:22 16:1
24:8 30:17
32:23 40:1
42:14,17 43:7
53:13,19,24
54:9,21 66:15
66:23 67:17
69:9 72:3
73:25 75:1,7
78:8 79:19
102:6,7 116:4
117:14 120:6,8
126:1 141:6
152:14 159:3
surface 107:24
107:25 108:1
112:17
surfaces 37:21
37:22
surrounded
90:23
suspect 139:10
139:17 140:14
148:4
suspected
143:2
suspended
106:1 109:11,11
swimming 47:14
switch 140:18
sworn 1:19 4:12
173:6

sympathy 110:21
sync 171:20
system 13:16,24
19:24 20:8
23:9 24:2,3
29:18 30:15
52:8 54:15
57:12 58:6
systems 13:17
19:17,17 32:6
32:15 37:20
58:1

—————
**T**
table 18:15 114:1
tables 117:17
Taco 61:10
take 6:12,14 9:6
33:25 46:24
47:25 49:11
52:17 56:13
60:2,9 73:23
106:17 107:18
109:23 131:1
139:5 140:17
160:14
taken 1:19 5:2
6:4 85:17
109:4 116:25
118:5 120:3,16
120:23 122:10
123:2,6 124:3
129:15 132:21
136:11,14 143:11
149:4 151:11
160:19,25
164:3 174:12
175:3
talk 10:7 58:15
87:21 88:5
120:4,5 129:16
130:9 165:11
talked 80:25
85:25 88:20
118:13,16,19
131:5 140:25
167:4

talking 6:7 44:1
88:3,4 108:18
108:23 117:5
117:15,16,16
125:24 133:3
136:6 170:16
tape 132:15
140:18
tapes 73:24
Tardy 78:11 80:1
82:9,18 84:7
84:10 85:22
87:13 88:2,10
90:24 92:6,18
93:7,9 94:11
94:12 95:2,15
96:15 97:2
101:5 105:8
106:22 107:1
109:14 111:6
112:3 116:23
119:2,4,21
122:11,17
126:19,22
129:17,20
130:8 131:16,18
132:5 138:17
138:22 140:24
143:1 145:4,11
146:19 150:24
151:13,16
165:10,10
166:7
Tardy's 83:25
84:15,17 89:5
89:14 90:18
91:20 92:10,12
92:16 94:18
95:21,24
128:25 145:13
tarnishes
167:23
tasks 43:17
taught 161:12
teach 161:1
team 25:17
29:6,14,14

32:10,12,13
35:19 39:16,16
39:20,24
40:17,25 41:12
43:6,17,18,23
44:24 45:2
48:7,9 62:19
63:1 92:2
teams 29:20
42:2 43:13
62:11
tear 107:19
138:25
tearing 143:16
146:24 147:16
147:20,24
148:1,4
technologists
15:2,10,14
technology
34:17
tell 6:19 9:7
13:13 19:23
22:15 23:8
27:14 28:2
29:22 39:9
43:19 66:4
70:7 77:13
86:13 157:21
163:25 168:10
telling 47:23
162:1
tells 54:18
temporarily
109:5
temporary
52:21
ten 139:18
tenure 29:2
term 44:5 45:17
104:4 115:25
termination
90:23
terms 35:12
42:4,19 43:8
51:10 78:19,21
92:3 117:10

143:15,23
144:10 152:7
154:16 162:5
terribly 6:10
Terry's 70:12
testified 4:12
83:12 93:21
138:22 163:6
164:8 165:23
171:4
testify 69:17
94:3 108:4
109:6 111:12
119:4 146:19
testifying 72:8
73:13 93:9
testimony 6:22
6:23,23 81:20
84:17 85:17
87:10,18,20
87:25 89:10
89:21 90:11
92:5,16 94:18
95:22,23,25
96:3 101:5,15
108:13,16,25
118:25 119:6
119:16 120:20
123:18 126:22
126:25 128:11
128:25,25
133:4 135:13
135:15,16,22
136:4 142:7
143:22 145:11
145:12,13,16
146:2,22
147:22,23
148:13 149:16
151:1 158:17
159:24,25
164:3,6 165:3
166:1,2 167:5
171:1 173:7
Texas 1:22,25
7:20 25:24
26:10,14,21

CATHERINE ADAMS HUTT, Ph.D. 3/19/2019

31:16 33:10
51:20 63:20
133:11 173:1,3
173:19
textured 45:15
45:21,25
46:20 48:18
thank 10:15
33:12 54:24
70:19 72:16
94:10 95:13
163:5 168:4
Thanks 8:4
89:4 132:19
thawed 107:17
thawing 137:4
139:16
thereon 176:10
thing 20:17
50:11 58:6
66:17 83:6
84:10 99:16
110:4 112:6
119:24 130:7
141:5 142:6
146:20 147:12
things 14:17
18:23 19:15,15
22:21 25:9
28:7 33:18
38:14 43:9,11
44:24 53:25
54:10 56:14,18
64:12,17 66:4
66:9,12 67:4,6
67:11,18,19
88:5,10 96:6
106:25 107:23
115:5,10,15
116:14 117:8,14
122:13 125:12
125:24 141:20
150:23
think 5:22 7:16
12:18 23:24
26:15,18 31:12
34:3 40:18,22

42:1 44:22
48:2 51:14,17
52:3 53:16
56:6,22 57:13
57:21,25 58:11
60:1,23 61:12
61:17 62:7
65:12 66:4,15
70:17 71:16
76:18 79:18
81:19 83:15
84:13 85:14
86:4 88:1
89:11 94:1
96:17,18,24
97:9 103:22
109:3 111:15
112:6 114:7
116:15,21 117:4
120:24 121:10
121:10,13,14,23
122:2,12
126:15 127:3
127:25 128:8
129:13,18
142:16,19
144:9,23 146:7
146:14 148:12
153:23 157:9
159:2 160:3
165:20,23
171:4
thinking 83:16
thorough
105:19,24
112:11 122:18
127:9 139:2
140:13 144:7
144:20 147:25
168:13
thoroughly
60:17
thoroughness
107:16 108:8
thought 15:8
18:5 33:4,23
37:13 47:23

48:10 83:17
thoughts 134:18
threat 49:21
61:22 110:24
three 62:4,4
66:3 73:19
103:17 133:12
135:2
three-minute
132:17
three-year
25:13
tied 30:16
tiered 28:14
tiles 65:19
time 4:4 5:5 6:11
10:7 12:19 15:1
16:18,23 18:22
21:5 22:2,6,17
23:19 24:11
25:5 28:5,9
30:21 31:16
32:1,11 33:10
33:13,21 34:3
34:11,14,18,20
36:15 39:6,13
41:14,19 42:11
44:1 45:18
48:1,24 50:5
50:23 54:25
57:10 62:4,5
63:23 65:18
67:20 74:6,9
76:22 78:5
79:12,15
83:23 90:6
93:17 97:12
98:23 105:23
107:20 108:7
108:24 109:6
109:10 110:14
123:3,6 124:9
128:15 129:2
132:9 134:12
134:14 135:11
140:20,23
146:11 149:7

159:12 161:9
161:12 167:19
170:16 171:22
172:6 173:9
timeliness
78:24
times 62:6
69:19 71:5,8
71:10,11 130:23
160:25
timing 90:4
111:15
tissue 46:23
47:7,12
title 31:25 32:3
32:3,22 33:4
33:4 49:5,6
titles 32:2
today 6:23 7:4
7:8,11,14,17
14:5 22:12
61:4,16 62:21
71:7 89:21
153:9 155:20
157:17 158:15
159:16,18,25
169:13
told 49:9,14,18
50:4 66:1
71:14 77:15
78:6,8,11
84:20 103:8
113:4 136:13
138:15 148:12
150:20 151:12
162:22 165:10
tolerated 42:1
Tom- 136:9
Tomberlin 3:11
79:6 133:10,12
133:15 134:4
134:20,23
135:9,18 136:9
138:15
Tomberlin's
133:22 134:13

tool 14:2,3,12
16:6 19:25
20:6 21:12,13
23:10 24:1,4
30:10 32:18
34:16,17,17
42:24 50:24
52:11,14,17
54:8,16
tools 16:16
21:22 23:7
38:10 169:22
top 47:7 100:14
124:21
tore 112:22
127:24 143:4,8
144:5,6,17,21
torn 143:19
tortilla 52:23
total 133:12
touched 115:10
toxicology
17:22 59:2
Tracing 140:8
trade 11:7,10
14:22 17:16
18:3,9,13 19:13
41:20
traditional 35:12
train 12:16
116:12 132:2,4
168:2 169:23
170:1
trained 29:10,11
32:12,15 53:10
110:25 115:1
160:6
trainers 29:11,12
training 12:20
12:23 29:4,10
29:10,16,18
43:2,5 53:8,8
56:14 64:15
66:11 111:16
116:5 121:3
160:4,9,11,20
168:14,20

169:4
trans- 93:1
transcript 3:14
  6:4 78:10
  84:25,25 85:1
  86:10,18 87:6
  88:17 89:5
  91:5 92:6,13
  94:7 96:3
  147:2 163:22
  171:16 173:6
  174:14
transparent
  33:21
transpire 122:17
  130:5 141:18
transpired
  49:19 93:1
  96:19
transportation
  137:3
travel 51:21
trend 55:19
trends 55:1,7,11
  55:12,12,12,18
  56:16
trial 6:21 9:13
  43:25 44:2,4
  44:9,10,11 50:1
  69:17 70:20
  72:9 73:10,13
tried 109:9 141:1
trim 46:22
trimmings 46:21
true 10:3 57:4
  84:2 85:21
  92:4,9 103:7
  119:8,9,10
  173:7 176:9,13
truth 6:19 46:1
  47:23 55:24
try 6:6 9:5
  53:12 89:22
  93:16 130:25
  167:20,25
  169:8
trying 68:1

107:6 126:11
127:8 139:20
156:23,23
160:16
turn 45:21 86:17
  88:16 90:8
  93:4 94:6
  96:15 100:13
  125:5,10
  145:25 147:1
  161:21
turned 26:6,7
  46:15 125:15
  127:12 146:11
turnover 53:11
  53:12
Twice 69:20,21
twist 24:5
two 11:12 13:2,9
  28:7 29:2
  30:25 33:17
  36:5,8,8 47:1
  47:3 51:14,16
  96:9,10,11
  125:24 140:16
type 21:8 67:25
  127:21
types 37:23
  54:2 79:1
typical 28:5
typically 12:8
  45:22 62:21
  65:14 73:5

**U**

U.S 11:6 14:2,4
  27:1,2,8 36:1
  36:10,12,13
  54:5 156:10
Uh-huh 18:12
  39:8 68:25
  79:7 81:22
ultimate 87:18
  89:10 90:9
  141:24
ultimately 41:9

89:22
un 121:15
unadulterated
  152:16 153:21
undergrad
  10:16 160:14
undergraduate
  160:20
underlying 78:7
understand
  4:25 5:12,16
  5:17 6:17,21
  6:25 23:22
  35:19 45:3
  48:2 51:8
  58:17,23 59:5
  59:7 74:10
  79:24 83:1,1,13
  85:1,8,9,11
  90:11,16 96:21
  96:23 99:5
  102:12 103:8
  103:24 106:17
  106:18 111:1,1
  112:7,23 114:6
  114:22 120:20
  123:12 130:22
  130:22,24
  131:3 133:15
  134:14,23
  141:6,7 142:3
  142:14 143:22
  144:9 147:14
  149:11 150:8
  152:23 156:17
  163:1 164:21
understanding
  33:25 87:16
  90:15 91:7,12
  91:20,22
  97:21 112:10
  125:21 133:18
  142:7 150:1
understood
  5:18 35:18
  40:18 77:22
  93:20 111:17

136:9
unemployment
  3:14 84:24
  85:3 86:9
  87:6 90:14
  93:10 94:6,18
  96:1 109:1,15
  126:23 145:14
  146:19 147:1
Unilevers 18:22
unique 121:15
uniquely 115:13
United 1:1 12:18
  14:9 33:1 54:6
University 11:1
  133:11
unquote 91:1
  105:17 116:4
  159:22
up 8:12 23:3
  26:24 35:21
  42:16 46:25
  47:4 59:11
  65:5 66:3
  72:22 75:4
  80:9 91:10
  107:22 108:3
  111:17 115:9
  117:24,25
  124:11 128:17
  139:16 141:2
  172:1
up-to-date 9:7
  9:9 10:1 17:25
  42:15
update 9:3,3,4
  14:13 73:17,20
updated 9:20
  10:2 22:18
upheld 91:10
upkeep 22:23
upset 93:8,10
  93:13,22 94:2
  94:12,24
Urbana 11:1
urgency 106:11
  111:4,12,20

urgent 110:19
USDA 11:9 13:5
  46:20 155:12
  156:2 157:5
USDA's 125:11
  156:21
use 12:20 16:13
  20:18 22:12
  48:21 53:14
  63:25 81:7
  110:1
useful 124:20
usual 109:13
usually 17:4
  66:20
utilize 21:12
utilized 32:18

**V**

v 174:8 175:2
VA 174:6
vague 164:18
value 40:22
values 31:7,9
Vandeventer
  2:9
variety 18:19
  24:22 44:24
  56:3,14,17
  114:14 160:6
various 43:3
  64:12 95:5
  116:10 121:11
  143:13 160:12
  160:21
vegetables
  59:4
vendor 139:9
  140:5,6
verbally 6:3
verified 120:15
  120:18
version 9:8,9
  10:1 22:18,19
versions 8:24
  8:25 9:1 22:17
  98:5

CATHERINE ADAMS HUTT, Ph.D.  3/19/2019

veterinarian 15:23 16:18,20 16:22

veterinarian's 16:10

veterinarians 15:3,11,17,18 15:25 16:17 17:2

vice 18:18 19:3 32:3 33:3,22 36:17 49:6

video 4:3 5:12 171:18,20

Videoconfere... 2:3,8

Videographer 2:13 4:2 73:22 74:1,5,8 132:11 132:13,18 140:15,19,22 172:5

VIDEOTAPED 1:10,17

violation 153:1 155:25 156:2 167:3

virus 53:21

visible 107:18

visual 112:17

visually 147:16

Vitae 3:12

VS 1:5

**W**

Waco 26:23

wait 120:5

walk 92:22

walk-in 112:20 139:11,12 162:11,13

walked 92:18 92:20 111:10 122:11 129:25 130:18 131:6 146:2

walking 93:2

93:25 108:17 110:10

walls 64:14

want 5:24 8:19 10:7 15:7 22:2 22:7 32:23 44:15 46:17 58:16 67:13 74:1 77:2 90:3 95:9 97:7,13 102:6 105:17 109:22 130:25 132:4 134:2 143:8 156:19 163:24

wanted 11:21 22:7 36:15 42:2 50:24 52:14 53:11 62:13 78:13 96:21 97:16 107:7,11 132:14 141:15

wants 167:22

warehousing 54:21

warning 132:17

Washington 51:19

wasn't 27:3 33:3 34:10 35:15 48:12 67:10,22 94:24 107:25 109:10 119:7 122:6 125:19 142:6,11,19 150:6 154:5 163:22,24 165:18

water 35:9,9

way 15:4 16:2 27:3 42:14 44:16 54:20 60:5 64:17 96:9 123:24 149:1 155:22

we'll 6:12

we're 6:5 54:9 62:10 71:6 110:25 115:1 123:17,17 136:6 160:5

we've 60:17 63:7 90:12 101:4 116:18,21 127:17 132:14 140:15 153:9

website 75:25 76:2,4 156:10 156:14,16,21 157:4,6

week 5:6 51:23 134:21

weeks 8:10 41:5

welcome 8:20

wellness 56:16 56:16 58:8

went 11:8 15:7 17:10 19:20 22:10 27:8 29:8 44:13 50:15 88:13 104:12 108:4 111:21 146:6 150:11,18 156:20

weren't 33:20 35:4 46:9 53:10 119:8 120:9

West 1:24

white 1:6 4:10 75:12 78:11 79:4 80:11,19 80:22 84:22 86:5 87:11,12 88:3 89:23 90:13,23 91:6 93:15,22 96:4 97:15 98:12 101:6 102:23 106:22 108:1 112:8,14

118:20 119:1,14 121:3,18 122:6 123:6,9,11,12 124:7 127:2,11 128:23 129:7 129:18 130:1,9 131:6 140:25 141:22 142:13 142:18 145:12 149:21 150:11 154:2 165:9,11 165:13 174:8 175:2

White's 78:10 82:10 85:5,16 85:23 88:7 90:8,17 91:15 91:23 94:17 96:14 109:8 118:10 120:22 128:25 148:13 149:25 151:8 158:18 163:16

wide 18:19 24:22 32:7 51:15 56:3,14 56:17

Williams 2:3 3:4 3:5 4:7,7,14 4:23 73:25 74:3,10 132:16 132:19 140:17 140:24 162:3 162:24 164:13 164:16,20 165:15 168:6,8 171:10,15,19 172:1 173:11

wish 35:23

wishes 161:18

withdraw 164:1 164:22

witness 1:18 8:18 57:2,13 57:15 69:1,17 71:5,10,24 72:8,16 75:24

86:20 87:4 89:3 95:12 171:23,25 172:2 173:5,8 175:2,25

woman's 70:14

word 109:25 110:1

words 144:23 146:22 156:19

work 8:4 11:20 11:21,24 12:9 15:14,15 19:13 25:17,20,21 25:24 29:25 30:17 32:8 34:17 37:2 39:6,8 43:12 43:23,23 44:3 49:9 51:16,17 51:22,22 52:3 57:1,5,11,16,17 57:21 58:3 60:13,16,18 62:3,21 63:21 66:2 68:15 71:17 74:20 110:25 111:2 113:12,20,21 114:12,15,16 115:1 116:20 141:20 161:1,3 167:1 169:2

worked 14:7,18 18:14 25:24 27:5 28:21 29:1 30:21 31:13 39:14,17 41:4,22 44:23 50:20 62:25 67:3 69:3 71:21 79:19 114:4,15 115:16 116:24 161:8 170:25

worker 35:7 37:3,6,14 38:1

CATHERINE ADAMS HUTT, Ph.D.  3/19/2019

53:12
working 11:5,7
  11:24 13:23
  14:22 25:17
  26:3,11 27:11
  28:24 35:2
  38:9,22 39:1
  40:21,25 41:12
  41:15 42:2,13
  51:18 56:10
  61:9 62:11
  105:23 108:12
  118:14 121:24
world 11:17 41:1
worldwide 40:3
worm 82:25
  91:25 96:23
  97:8 107:8
  118:4 121:8,19
  122:5 127:6
  132:21 164:25
worms 80:2
  82:10 84:11,21
  89:17 99:23
  100:18 101:8
  102:13 105:10
  110:22 112:15
  117:6,6 118:6
  120:14,19
  149:13 150:4
  152:1 162:9,11
  162:13,18
  163:7
worse 7:11,14
wouldn't 24:17
  139:5,22
  140:11
writing 62:15
  99:3
written 80:21
  131:13 134:18
  135:16 159:5
  171:1
wrong 23:22
  51:4
wrote 170:19,22

_____ X _____

_____ Y _____
yeah 36:23
  64:13 67:13
  68:24 73:25
  74:3 84:13
  119:4 133:24
  139:20 141:15
  142:16
year 27:16,22
  36:20 49:17
  57:8,8 71:1
  77:4 79:19
  114:19
years 8:1,3 9:18
  11:12 27:6
  29:2 30:25
  33:7 51:16
  52:2 59:24
  72:23 73:9
  113:16 114:6
  115:16 161:14
  161:15
Yesterday 159:1
Yeutter 14:20
Yum 25:22,23
  26:1,11 27:12
  27:21 29:2,6
  31:6,7,16 61:8
  62:3,12 114:16
  132:3 161:3
  166:22 168:12
  168:18,20

_____ Z _____
zero 149:18

_____ 0 _____
00 173:12
03 173:11

_____ 1 _____
1 132:25
1/5/18 3:10
1:14 1:21 172:6,7
10 8:1,3 49:17

52:2 71:8
  79:16 98:15
  132:14
10:33 74:6,7
10:43 74:7,9
100 19:18 20:21
  26:18
1027 2:9
11 71:8
11:31 87:1
11th 174:18
12 36:23 49:17
12/31/19 173:20
12:21 140:20,21
12:29 140:21,23
124 3:17
13 88:17 147:3,4
  147:5
133 3:11
14 3:10 148:19,21
  161:22,25
148 3:10
15 45:24 47:11
152 3:18
154 3:19
161 3:5
168 3:5
17 135:5
18 89:2,3
19 1:11 174:12
  175:3
1955 105:12
1957 7:22
1979 10:9
1981 10:19
1986 11:1
1987 22:19
1991 14:16
19th 1:20 4:4

_____ 2 _____
2 3:3 100:13
  132:24
2,500 74:21
20 22:19 23:17
  23:18 41:18
  176:15

20-pound 47:10
2003 114:20
2004 38:23
  46:21
2006 50:8
2008 51:6 56:5
2017 3:19 125:11
  125:16,23
  152:15 154:20
  157:11 158:1,3
2018 77:6,7
  79:19 82:1
  84:8,12 89:7
  91:21,25
  100:19 101:10
  102:11,16,21
  104:13 105:11
  111:11 113:3,6
  123:1 134:7,25
  135:5 136:1,12
  136:14 138:12
  148:17 153:2
2019 1:11,21 4:4
  173:17 174:3,12
  175:3
20th 134:7
21 82:1
22 69:4,7
23314 174:6
24 63:16 174:5
24/7 51:23
25 69:4,4,7
26 113:24
26th 7:22
28 3:11 133:25
  134:1
29 94:6
29th 173:16

_____ 3 _____
3 142:24 157:24
  158:9 174:3
3,500 12:18
3.101.11 152:10
30 113:16 174:17
31 93:4,6,23
  95:9

314 2:5,6,11
33 3:12 8:15,17
  9:7 73:1,8
34 3:13 72:11,13
  73:5,11
35 3:14 86:7,9
  94:7 147:2
  163:24 164:10
36 3:15 91:13,15
  163:10,12
  164:11
37 3:16 97:23
  97:24 105:4
  126:18
39 3:17 124:10,11
  126:12
399-8266 2:11

_____ 4 _____
4 3:4
4:18-CV-0007...
  1:5
40 3:18 126:2
  152:2,4,9
  157:11
41 3:19 126:2
  154:12,13
  157:11
43 95:9
4568 7:20
49 86:18

_____ 5 _____
5 100:19 105:11
  136:1 147:7
50 57:9 87:1
  116:9
50-50 71:12
500 1:25 74:15
5384 173:19
57 105:13
5th 27:2 84:8
  84:12 89:7
  91:21,25 101:9
  102:16 104:13
  111:11 113:3,6
  121:25 123:1

CATHERINE ADAMS HUTT, Ph.D.  3/19/2019

134:25 136:11
136:14 138:12
148:17 153:2

**6**

**60** 116:9
**63101** 174:18
**63105** 2:5
**63110** 2:10
**650** 2:4
**6th** 2:10

**7**

**7** 9:22,24 73:7
**7,500** 13:8
**711** 174:17
**72** 3:13
**75** 60:1
**75225** 1:25
**76227** 7:20
**7700** 2:4

**8**

**8** 3:12
**80** 41:16,18
**802-3935** 2:5
**802-3936** 2:6
**8117** 1:24
**86** 3:14

**9**

**9** 156:17,24
**9:00** 1:21 4:4
**9000** 20:1,4,5,6
     20:11,14,21,23
     21:3,5,25 22:1
     22:3,3,10,12
     22:15,16,17
     23:7,7,12,14
     23:23 26:7,8
     26:17,17 32:18
     38:10,15 54:16
**913** 3:15
**97** 3:16