## Page 1

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

STEAK N SHAKE, INC.,    )
                        )
     Plaintiff,         )
                        ) Case No.
VS.                     ) 4:18-CV-00072-RWS
                        )
MELISSA WHITE,          )
                        )
     Defendant.         )

ORAL AND VIDEOTAPED DEPOSITION OF
CATHERINE ADAMS HUTT, Ph.D.
MARCH 19, 2019

ORAL AND VIDEOTAPED DEPOSITION OF CATHERINE ADAMS HUTT, Ph.D., produced as a witness at the instance of the PLAINTIFF, and duly sworn, was taken in the above-styled and numbered cause on the 19th of March, 2019, from 9:00 a.m. to 1:14 p.m., before STEFANIE COX, CSR in and for the State of Texas, reported by machine shorthand, at the law offices of Ogletree, Deakins, Nash, Smoak & Stewart, P.C., Preston Commons West, 8117 Preston Road, Suite 500, Dallas, Texas 75225.

## Page 2

**APPEARANCES**

FOR THE PLAINTIFF:
  Ms. Erin E. Williams (Via Videoconference)
  OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
  7700 Bonhomme Avenue
  Suite 650
  St. Louis, Missouri 63105
  (314) 802-3935
  (314) 802-3936 Fax
  Erin.williams@ogletree.com

FOR THE DEFENDANT:

  Mr. Samuel Henderson (Via Videoconference)
  HENDERSON LAW FIRM
  1027 S. Vandeventer Avenue
  6th Floor
  St. Louis, Missouri 63110
  (314) 399-8266
  Hendersa85@hotmail.com

ALSO PRESENT:
  Chase Huddleston, Videographer

## Page 3

INDEX
                                          PAGE
Appearances                                 2
CATHERINE ADAMS HUTT, Ph.D.
    Examination by Ms. Williams             4
    Examination by Mr. Henderson          161
    Examination by Ms. Williams          168


EXHIBITS

NO.  DESCRIPTION                         PAGE

14   1/5/18 Health Department Inspection Report  148

28   Tomberlin Report                    133

33   Curriculum Vitae                      8

34   Legal Case List                     72

35   Unemployment Hearing Transcript     86

36   Counterclaims                       91

37   Expert Report                       97

39   Photograph Copies                  124

40   Food Code Excerpt                  152

41   FDA Food Code 2017 Edition Excerpts  154

## Page 4

P R O C E E D I N G S

    THE VIDEOGRAPHER: We are now on the record for the video deposition of Catherine Adams Hutt. The date is March 19th, 2019. The time is 9:00 a.m. Will counsel please state their appearance for the record.

    MS. WILLIAMS: Erin Williams on behalf of the plaintiff.

    MR. HENDERSON: Sam Henderson on behalf of defendant Melissa White.

    CATHERINE ADAMS HUTT, Ph.D., having been first duly sworn, testified as follows:

EXAMINATION

BY MS. WILLIAMS:

    Q. Good morning.

    A. Good morning.

    Q. Can you please state your full name for the record?

    A. Catherine Adams Hutt.

    Q. Have you ever gone by any other names or nicknames?

    A. My maiden name is Catherine Adams.

    Q. I am Erin Williams, I am one of the attorneys representing Steak 'n Shake in this case. Do you understand that?

Page 77

1  Q. When was it that he finally asked you, okay, I
2  want you to go ahead and do an analysis and prepare a
3  report for this case?
4  A. Towards the end of last year, as I recall.
5  Q. And just so the record is clear, that would be
6  towards the end of 2018?
7  A. Correct, 2018.
8  Q. Now, when Mr. Henderson first contacted you,
9  did he indicate what his role was in the case or who he
10 represented?
11 A. Yes. He did brief me on the details of the
12 case, yes.
13 Q. And so what -- what did he tell you to brief
14 you on those details?
15 A. He told me that this was primarily an
16 employment case, but that there is a significant portion
17 of it that is relevant to standard industry practice in
18 a restaurant business.
19 Q. Did he explain how it would be relevant to
20 standard industry practice?
21 A. I don't know if he explained it or I simply
22 understood it, but, clearly, the issue was about a -- an
23 employee who found a food safety -- food safety risk
24 and -- and again, the -- the purpose of my -- retaining
25 me was to -- was to consider the investigation done by

Page 78

1  the district manager in this case for Steak 'n Shake and
2  to consider whether or not that was within industry
3  standards for the restaurant business.
4  Q. What else did -- whether it was on the first
5  contact or -- or a subsequent time you spoke to him,
6  what else has Mr. Henderson told you about just the
7  underlying facts of the case?
8  A. I'm not sure what he told me. He did produce
9  some documents for me to review, which included Melissa
10 White's counterclaims, transcript of a hearing with
11 Mr. Tardy and Ms. White present. Again, he's told me
12 that there are other issues as part of this case that
13 I'm not involved with, but that he wanted my opinion
14 relative to the event and to the inspection and
15 investigation conducted by Steak 'n Shake in this
16 particular case.
17 Q. Got it. Now, did you agree to provide an
18 opinion for him before or after you discussed the
19 financial terms of your engagement?
20 A. Again, I don't recall. I would imagine that
21 he asked for the financial terms before providing me
22 with the documents, but I honestly cannot recall because
23 in some cases -- in some cases attorneys provide
24 documents because of timeliness without -- without
25 investigating fees.

Page 79

1  Q. Got it. Now, you've mentioned a couple types
2  of -- or a couple of different categories of documents
3  that he gave you. Do you recall anything else that was
4  given to you by Ms. White or Mr. Henderson?
5  A. Yes. There was a report from a
6  Dr. Tomberlin --
7  Q. Uh-huh.
8  A. -- which was provided to me. There were
9  photographs which were provided to me as well.
10 Q. Okay.
11 A. And I believe that is about it.
12 Q. Okay. And how much time were you given to
13 review those documentary materials and then prepare your
14 opinion?
15 A. I don't remember a time frame that he gave me.
16 I know that I prepared this over a period of about 10
17 days or so based on the documents that were provided. I
18 think he needed the opinion at the end of the -- of the
19 year 2018, so I worked to make sure that I had all the
20 documents that were needed and -- and then develop my
21 opinion.
22 Q. Okay. And who -- how did you determine what
23 documents were needed to develop your opinion?
24 A. Well, I needed to understand the circumstances
25 of the event, and also any information that was

Page 80

1  available based on what Mr. Tardy did when he
2  investigated the finding, the reported finding of worms
3  in ground beef patty.
4  Q. Got it. Did you -- I guess, did you speak to
5  anyone besides Mr. Henderson about the facts of the
6  case?
7  A. No.
8  Q. Okay. Did you discuss -- well, actually let
9  me back up.
10      Have you had any conversations with
11 Ms. Melissa White about the facts of the case or about
12 your opinions --
13 A. No.
14 Q. -- that you're offering?
15 A. No.
16 Q. Okay. Have you had -- I'm sorry. I didn't
17 mean to cut you off.
18      Have you had any discussions with Melissa
19 White at all?
20 A. No.
21 Q. What about written communications with
22 Ms. White, have you had any?
23 A. No.
24 Q. Okay. So is Mr. Henderson, then, the only
25 person you've talked to about the facts of the case or

Page 81

1   your investigation and conclusions?
2       A.   Yes.
3       Q.   Okay.  Now, did you discuss your conclusion or
4   opinion with Mr. Henderson before preparing the final
5   report?
6       A.   I -- I'm -- I'm almost certain I did.  That's
7   my method I use routinely.  I will develop my opinions
8   and then document them for the attorney, my client.
9       Q.   Got it.  Do you have any such documentation to
10  Mr. Henderson that, you know, preceded your final
11  report?
12      A.   Your question is about documentation?
13      Q.   Yes.
14      A.   The answer is no.
15      Q.   Okay.  Did you review all of the materials he
16  provided to you in formulating your opinions?
17      A.   Yes.
18      Q.   There's nothing you decided I don't really
19  think I need to look at that?
20      A.   There were portions of the hearing testimony
21  that, frankly --
22      Q.   Uh-huh.
23      A.   -- I did skim, because it clearly dealt with
24  employment issues that I was not involved with.
25      Q.   Right.  Got it.  Now, your expert report is

Page 82

1   dated December 21, 2018; does that sound right to you?
2       A.   Yes.
3       Q.   Okay.  Now, on what date did you actually
4   arrive at the opinions you expressed in that report?
5       A.   I would say a few days prior to documenting
6   it.
7       Q.   Okay.  Now, you're offering an opinion in this
8   case that Steak 'n Shake's district manager, Frank
9   Tardy, failed to perform an investigation into Melissa
10  White's report of alleged worms in a hamburger patty
11  that was con- -- failed to perform an investigation that
12  was consistent with standard practice in the food
13  service industry; is that correct?
14      A.   Yes.
15      Q.   Okay.  So as a preliminary matter, what issue
16  in this lawsuit is your opinion supposed to help the
17  jury decide?
18      A.   That the investigation conducted by Mr. Tardy
19  was not consistent with the nature and the scope of
20  investigation that one would expect relative to industry
21  practice and standard of practice.
22      Q.   Okay.  Is there any other issue that your
23  expert opinion is supposed to help the jury decide?
24      A.   I believe I can also opine on the source of a
25  worm, a maggot in this case, in ground beef and

Page 83

1   understand how that could happen, and then understand
2   also an appropriate response by someone responsible for
3   a brand in responding to and investigating that -- that
4   issue.
5       Q.   Okay.  Now, how that could happen is not
6   necessarily the same thing as how it did or could have
7   happened -- or -- well, strike that.  Let me ask you a
8   better question.
9           Well, let me ask you this:  Have you been
10  asked to provide an expert opinion on how the hamburger
11  patty allegedly became contaminated?
12      A.   No, not directly.  As I've testified earlier
13  to, I mean, part of my job is to understand the risks in
14  a food manufacturing or food service facility, and so I
15  automatically think about if I find something, I'm
16  thinking about how that could have been caused.  It's an
17  important thought process I have.
18      Q.   Got it.  Okay.  Have you done any actual
19  inspection or research in this particular case to
20  determine how the hamburger patty may have become
21  contaminated?
22      A.   No.
23      Q.   Okay.  So at this point in time, the only
24  opinion that you have been engaged to offer is that --
25  your opinion that Mr. Tardy's investigation did not meet

Page 84

1   industry standard?
2       A.   True.  And that it was, again, what I
3   characterize as an insufficient response to the
4   potential risk to the brand and to public health.
5       Q.   Okay.  So I'd like for you to identify for us
6   each source of information that you used in determining
7   the method by which Mr. Tardy conducted his
8   investigation at Steak 'n Shake on January 5th, 2018.
9       A.   My primary method used was my experience in
10  doing the very same sort of thing that Mr. Tardy was
11  doing on -- in response to the report of finding worms
12  in ground beef on January 5th, 2018.
13      Q.   Yeah.  Sorry.  I think we may have had a
14  miscommunication.  I'm asking you, how do you know what
15  Mr. Tardy's method was on that date?
16      A.   In reviewing the documents I've had access to,
17  which include Mr. Tardy's testimony.  As part of a
18  hearing, he was asked for his -- to describe his method,
19  what he did, who he engaged, what his actions were in
20  response to being told by an employee that there were
21  worms in ground beef being sold to customers.  Also, I
22  read the counterclaims for Ms. White, which has other
23  details of the event.
24      Q.   So you read the unemployment hearing
25  transcript, is that the transcript you're referring to?

Page 101

1  Q. Okay. And then have we discussed everything
2  that you relied upon in determining the manner of the
3  investigation that was performed?
4  A. I believe we have. We've discussed my
5  experience as well as the testimony by Mr. Tardy and
6  also Ms. White.
7  Q. Got it. Now, do you have any direct knowledge
8  of any ground beef containing worms or contamination
9  being sold or served to customers on January 5th of
10 2018?
11 A. I do not.
12 Q. Okay. Do you have any direct knowledge of any
13 contaminated meat or any other food being sold to Steak
14 'n Shake customers on any date?
15 A. I'm only relying on the testimony that I've
16 read. I have no direct knowledge --
17 Q. Got it.
18 A. -- which I would interpret as personal
19 experience -- personal knowledge or personal
20 observation. And, no, I have not had that.
21 Q. Yes. And that impact -- got it. And that is
22 how I meant that question. You have no personal
23 knowledge of any contaminated meat being sold or served
24 customers, correct?
25 A. That's correct.

Page 102

1  Q. So that is not part of the opinions you're
2  offering in this case, if Steak 'n Shake did allow
3  contaminated food to be sold to customers?
4  A. No. You read the scope of my opinion
5  correctly.
6  Q. Okay. Well, I just want to make sure that I'm
7  clear so I can, you know, make sure I ask or don't need
8  to ask certain questions going forward.
9     Are you offering an opinion that Steak 'n
10 Shake, in fact, sold contaminated food to customers in
11 January 2018?
12 A. Based on what I read and understand, there
13 were -- there was evidence of fly larvae, maggots, worms
14 in at least one ground beef patty that was prepared --
15 or correction, available for sale to customers on
16 January 5th, 2018.
17 Q. Okay. That didn't really answer my question,
18 though. Are you offering as part of your expert
19 opinion -- opinions, the opinion that Steak 'n Shake, in
20 fact, sold or provided, served contaminated food to
21 customers in January 2018?
22 A. I believe that the ground beef patty that
23 Ms. White had included fly larvae, maggots. Again, I
24 have no evidence that other product was served to
25 customers, but that product that she obtained, that she

Page 103

1  cooked for an employee meal, was available for sale to
2  customers on that day.
3  Q. Okay. So -- I got it. So other than that one
4  hamburger patty, you're not offering an opinion on
5  whether any other contaminated food was out there being
6  served, sold, or offered to customers?
7  A. Well, that's not exactly true because, again,
8  as I told you before, I understand the reason there can
9  be a contaminant in food, the source of that
10 contaminant. And fly larvae on ground beef, I don't
11 believe is an isolated event. It would emanate from
12 exposure in a manufacturing plant, for example. And in
13 this case, most likely in a manufacturing plant because
14 it was frozen beef, packaged frozen beef, but exposure
15 to the environment which had inadequate pest control.
16    And I believe that, again, one -- there's
17 not one fly in a manufacturing plant. There's not three
18 flies in a manufacturing plant. There are multiple
19 flies, if there are any, in a manufacturing plant, and
20 if there was exposure to meat, it could be in other
21 product.
22    And I would have -- and I think best
23 practice, good practice, standard practice for a food
24 safety, food service professional would be to understand
25 the nature of that potential contamination, how it could

Page 104

1  occur, and the potential exposure of other product to
2  the same contamination.
3  Q. Okay. But -- and that -- those statements you
4  just made, and they included the term "could be" more
5  than once, and they are based on past experience and
6  your background knowledge, correct?
7  A. Yes. And what I read in the document and
8  within the pictures that I've seen.
9  Q. Got it. Okay. But what I'm really driving at
10 here is you don't have any personal knowledge, you've
11 not seen anything to -- to indicate or prove that any
12 contaminated food went to customers at Steak 'n Shake on
13 January 5th, 2018, correct?
14 A. I've seen pictures of fly larvae and a report
15 that they were fly larvae from a ground beef patty that
16 was available for sale. And, again, report to you that,
17 based on my experience, contamination of this nature
18 would not be isolated. I have no personal knowledge of
19 any ground meat that was sold that day in the Steak 'n
20 Shake restaurant, but I do have personal knowledge of
21 how such contamination can be a part of a food product.
22    And, again, that would not be isolated, it
23 would be --
24 Q. Got it.
25 A. -- it would be part of other products in the

**Page 105**

1  restaurant. It would be from the same lot and the same
2  supplier that -- as this ground beef patty.
3  Q. Got it. Okay. Now -- now, if you could go
4  back to the expert report, please, which is 37?
5  A. Yes.
6  Q. I'm looking at the first paragraph under
7  summary of opinion, and it starts, it is my professional
8  opinion that Mr. Frank Tardy, a district manager for
9  Steak 'n Shake restaurants, failed to perform a proper
10  investigation into the reported finding of worms in
11  ground beef sold to customers on January 5, 2018, in the
12  Steak 'n Shake restaurant located at 1955 North Highway
13  57, Florissant, Missouri.
14  Did I read that correctly?
15  A. Yes.
16  Q. Okay. So I really -- this is sort of where I
17  want to ask you, what would a, quote, unquote, proper
18  investigation have entailed?
19  A. It would have been a comprehensive, thorough,
20  methodical investigation which would have included,
21  first, the investigation of the problem itself; and
22  secondly, a number of questions for -- for the staff
23  working there in the restaurant at the time; a more
24  thorough investigation of -- of other product that was
25  available; taking measures that would have perhaps even

**Page 106**

1  suspended sale of the ground beef to customers at that
2  particular moment until the investigation was completed.
3  It would simply be much more interactive, more
4  methodical, more comprehensive, more diligent. And
5  certainly much more caring.
6  This person is responsible for a brand.
7  He's responsible for public health. Customers who are
8  entering that restaurant expect to be served safe food
9  and not contaminated or adulterated food.
10  The standard industry practice would be to
11  proceed with that sense of urgency and that sense of
12  care and diligence in investigating such a report.
13  Q. Okay. Now, you said it would include, first,
14  investigating the problem itself. What do you mean by
15  the phrase "the problem itself"?
16  A. I believe that standard practice would have
17  been to take a look at the patty and understand what
18  this employee was observing, and understand what
19  actually he was looking for in other product.
20  Q. And we know -- well, strike that.
21  Do you know anything about the preexisting
22  relationship between Melissa White and Frank Tardy
23  before this incident occurred?
24  A. No.
25  Q. Okay. So you mentioned a number of things

**Page 107**

1  that Mr. Tardy should have done, including observe -- I
2  guess, why would it be important for him to observe the
3  patty first?
4  A. Well, again, he proceeded on an investigation
5  to find something or not find something, but he didn't
6  even look at what he was trying to find. You know,
7  clearly, I would have wanted to see the patty with the
8  reported worm inside to see what it looked like and have
9  an opportunity to assess, in that patty, whether or not
10  it was gristle or whether or not it was a fly larvae, a
11  maggot. I would have also wanted to know what I was
12  going to look for in other meat product that I looked
13  at.
14  He proceeded to the reach-in to get -- to
15  look at other meat. He does not describe the
16  thoroughness of his investigation. A maggot on the
17  interior of a ground meat product, even thawed out,
18  would not be visible to the human eye. He needs to take
19  the product and tear it apart. He did not describe
20  doing that. At no time did anyone describe that he
21  pulled product from the reach-in and actually
22  manipulated it to open it up and to look at it.
23  You know, these are things that you
24  can't -- you can't just see it on the surface. It's not
25  necessarily going to be in the surface, it wasn't in the

**Page 108**

1  surface of the ground meat patty that Melissa White had
2  cooked for her, and she found it when it was being
3  crushed and smashed and opened up.
4  Q. Okay. Now, he did testify that he went
5  through several pieces of meat, correct?
6  A. He did. I don't know what going through
7  several pieces of meat means. And he at no time
8  describes the thoroughness of his investigation.
9  Q. Got it. Okay. So did -- got it.
10  Now, do you have any knowledge of whether
11  he actually asked questions of the other staff members
12  that were working that morning?
13  A. His own testimony described that he did not
14  ask questions of anyone.
15  Q. When he first arrived, correct?
16  A. The testimony that I read described him
17  walking into the restaurant and intentionally not
18  talking to anyone.
19  Q. Correct. And then proceeding to conduct a
20  physical investigation, but do you know if subsequently
21  he had conversations with other employees?
22  A. I read his conversation with Mr. Nicholson,
23  the manager, and I don't believe I recall him talking to
24  any other employees at that time.
25  Q. Okay. Based on his testimony at the

Page 121

1  that -- at that point.
2     Q.  Do you know if any of these individuals,
3  including Ms. White, have had any sort of training or
4  education in entomology or microbiology?
5     A.  I have no knowledge.
6     Q.  What makes you believe that hourly employees
7  at Steak 'n Shake have any qualifications to say whether
8  what they saw was a worm or not?
9     A.  Well, I've seen a lot of maggots, and I
10 think -- I think people see maggots.  I mean, these are
11 on the sidewalk, they're in various places where flies
12 lay their eggs and they hatch in the rain and you see --
13 you see larvae.  I think that it's fair to believe that
14 they know what a fly maggot looks like.  I don't think
15 that's un -- an isolated event or unique event.
16 Certainly they're -- they're easy to recognize when you
17 see -- when you see them.
18    Q.  Well, Ms. White didn't even describe it as a
19 fly larvae or a maggot, right?  She called it a worm;
20 isn't that correct?
21    A.  Yes.
22    Q.  All right.  So what -- again, I guess I go
23 back to what makes you think that any of these
24 individuals who were working at Steak 'n Shake on
25 January 5th were qualified to identify what they were

Page 122

1  looking at?
2     A.  I think it's reasonable to believe that
3  they've seen a maggot before and that's what it looked
4  like from the pictures.  And clearly, they were
5  responding -- they were calling it a worm, but -- but it
6  wasn't an earthworm.  It was white and curled and,
7  clearly, in my mind, looked like a maggot that people
8  would be familiar with.
9     Q.  And when you say that this report should have
10 been taken seriously, what does that mean?
11    A.  The sequence of events when Mr. Tardy walked
12 into the restaurant, I think, should have followed a
13 very different course.  He, again, did things that are
14 not consistent with my expectations.  And in that sense,
15 whether or not he was taking seriously or not -- again,
16 a serious investigation, in my opinion, did not
17 transpire by Mr. Tardy, and it would have been more
18 thorough, more comprehensive, more caring, and
19 completely more compre- -- more diligent, methodical and
20 diligent.
21    Q.  Now, have you seen the actual hamburger patty
22 itself?
23    A.  No.
24    Q.  And your report is based on the assumption
25 that the hamburger patty was, in fact, contaminated on

Page 123

1  January 5th of 2018, correct?
2     A.  I've seen pictures of the patty that was taken
3  at -- in the restaurant at the time, and it was -- it
4  was contaminated.
5     Q.  Okay.  Well, you've seen pictures that
6  Ms. White claims were taken of the patty at the time,
7  right?
8     A.  I believe that other people -- people other
9  than Ms. White took the pictures and actually posted it
10 on social media, but that's what I've read.
11    Q.  Now, Ms. White did it -- okay.  You don't
12 understand that it was Ms. White who posted it on social
13 media?
14    A.  My recollection is that there's another
15 employee who also posted pictures, but it was another
16 employee who took the picture, and that's the picture
17 that I believe we're -- we're all seeing.
18    Q.  Okay.  And are -- is it your testimony you
19 can't affirmatively say, based on those photos alone,
20 that what -- that there is maggots in that meat?
21    A.  The picture that I've seen of that meat patty
22 clearly shows to me evidence of a fly larvae, a maggot,
23 in the meat.
24    Q.  And there is no way it could be gristle or fat
25 or anything else, in your opinion?

Page 124

1     A.  In my opinion, that is not gristle, that is a
2  maggot.
3     Q.  And you're basing that off a photograph taken
4  with a cell phone?
5     A.  I assume it was a cell phone.  I'm basing it
6  off a photograph that is reported to be that meat --
7  ground meat patty that Ms. White had.  And I should say,
8  multiple pictures of the event, which included people in
9  the restaurant at the time.
10       (Exhibit No. 39 marked.)
11    Q.  If you could pull up Exhibit 39, please.
12    A.  I have it.
13    Q.  Okay.  Are these the photos you're referring
14 to?
15    A.  Yes.
16    Q.  Okay.  Are there any other photos you reviewed
17 in forming your opinion?
18    A.  I believe there might have been.  I can't
19 remember the file exactly.  But clearly, the pictures I
20 found most useful were the -- on the bottom right
21 column, and the top left, the bottom right in
22 particular --
23    Q.  Okay.
24    A.  -- which shows a partially cooked ground beef
25 patty with what I recognize to be a maggot in it, which

Page 153

1  violation that was found in the Steak 'n Shake
2  restaurant on January 5th, 2018.
3      Q.  How did the -- how did the regulation help you
4  establish that the product was allegedly adulterated?
5      A.  I believe from the evidence that it was
6  adulterated, and this is a regulation forbidding it from
7  being adulterated.
8      Q.  Okay.  And the evidence being discussed that
9  we've already discussed in this deposition here today?
10     A.  Yes.
11     Q.  Does this regulation -- did you review it in
12 order to prepare for your deposition?
13     A.  Yes.
14     Q.  Okay.  And did it help you prepare for your
15 deposition?
16     A.  Yes.
17     Q.  How so?
18     A.  Again, it demonstrates, as the evidence, that
19 adulterated product is not to be served to customers.
20 That the product -- that Steak 'n Shake restaurant had
21 the requirement to sell safe, unadulterated, and
22 honestly presented food and failed to do so.
23     Q.  Well, you -- I think you said earlier, you
24 don't actually have any direct personal knowledge that
25 Steak 'n Shake sold any adulterated food to customers,

Page 154

1  correct?
2      A.  The meat patty that Melissa White had cooked
3  for her as part of her employee meal was available to be
4  sold to any customer.
5      Q.  But it wasn't, right?
6      A.  In this case, it was part of her employee
7  meal.
8      Q.  I should have asked you this before.  Have you
9  ever been to this Steak 'n Shake restaurant in
10 Florissant, Missouri?
11     A.  No.
12        (Exhibit No. 41 marked.)
13     Q.  Okay.  All right.  Looking at Exhibit 41,
14 please.
15     A.  I have it.
16     Q.  Okay.  Now, can you describe in layman's terms
17 the substance of this regulation or these regulations, I
18 should say?
19     A.  Well, there are a number of regulations,
20 again, coming from the 2017 edition of the FDA Food
21 Code, which isn't -- is in place as a Missouri
22 requirement.  Although, Missouri actually has modified
23 it somewhat.  But -- but these are requirements that are
24 effective in Missouri about preventing sale of
25 adulterated food, also reconditioning or dis- --

Page 155

1  correction -- or I should say dispositioning of
2  adulterated food, that there are requirements for
3  preventing contamination in stored food, and during food
4  preparation.
5      Q.  And did these regulations help you in
6  conducting your analysis and/or preparing your report?
7      A.  Yes.
8      Q.  How so?
9      A.  Again, they state regulatory requirements that
10 the premises be free from pests, that the product be
11 protected.  These are also -- well, there are also
12 similar requirements again from USDA, which is also
13 contained here, that pest control and -- pest control
14 and insanitary (sic) conditions -- or I should say pest
15 control must be in place in meat facilities, meat
16 processing facilities and -- and there's a -- forbidding
17 insanitary conditions which could lead to the presence
18 of larvae in processed meat products.
19     Q.  Did the regulations help you prepare for your
20 deposition today?
21     A.  Yes.
22     Q.  In what way?
23     A.  Again, they were evidence that what I already
24 knew is that the finding of a maggot in a meat product
25 available for sale to a customer is a violation of Food

Page 156

1  Code for a retail establishment, specifically, a food
2  service establishment, and also a violation of USDA
3  regulations relative to the processing plant where I
4  believe the source actually -- which was, I believe, the
5  source of the contamination.
6      Q.  Do you know what the processing plant or
7  facility was?
8      A.  No.
9      Q.  Now, your report also mentions that you
10 reviewed the website for the U.S. Department of
11 Agriculture Food Safety and Inspection Agency; is that
12 correct?
13     A.  Yes.
14     Q.  And what parts of the website did you review
15 in conducting your analysis or preparing your report?
16     A.  I believe I accessed the website in order to
17 understand the particular elements of 9 CFR, which were
18 the regulatory requirements.
19     Q.  Does that mean -- I don't want to put words in
20 your mouth, but are you basically saying you went to the
21 USDA's website to figure out which part of the code of
22 regulations you needed to go to?
23     A.  Yes.  I was trying to access -- I was trying
24 to find a particular section of the 9 CFR --
25     Q.  Okay.