**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

STEAK N SHAKE, INC.                    )
                                       )      Case No. 4:18-cv-00072-SRC
         Plaintiff,                    )
                                       )
v.                                     )
                                       )
MELISSA WHITE,                         )
                                       )
         Defendant.                    )

**DEFENDANT MELISSA WHITE'S AMENDED RESPONSES TO PLAINTIFF'S**
**STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF ITS MOTION**
**FOR SUMMARY JUDGMENT**

1.   During the relevant term of employment at Plaintiff/Counter-Defendant Steak N Shake,

Inc. ("SNS"), Defendant/Counter-Plaintiff Melissa White ("White") was employed from July

2016 to January 5, 2018.  Deposition of Melissa White on Sept. 19, 2018 ("White 2018 Dep.")

38:24-39:1, 151:11-19, attached hereto.

**Response:** Admit.

2.   White's final position at SNS was Service Trainer at Store 176 located at 1955 N.

Lindbergh, Florissant, Missouri ("Store 176 or "the Florissant store").  White 2018 Dep. 42:4-

43:20; Declaration of Frank Tardy ("Tardy Decl.") ¶ 5, attached hereto as Exhibit 47.

**Response:** Admit.  This statement is immaterial to whether SNS is entitled to summary

judgment.

3.   On January 5, 2018, around 10:30 a.m., White asked permission of the person she

believed to be manager on duty to take a meal break, and was told that she could. White 2018

Dep. 104:3-3-22, 106:12-21.

**Response:** Admit.  This statement is immaterial to whether SNS is entitled to summary judgment.

4.   White went back to the grill to have a hamburger made, and believed the meat by the grill had a strange odor and color. White 2018 Dep. 108:1-23.

**Response:**  Admit.  White testified the meat stunk and was brown.

5.   She went to the walk-in cooler and retrieved a single hamburger patty for herself from a a pan of meat.  White 2018 Dep. 110:21-111:23.

**Response:**  Admit.

6.   White returned to the grill, began cooking the patty, and then noticed what she believed to be something moving in the patty.  She described it as a worm. White 2018 Dep. 112:2-113:24; Deposition of Pamela Unger June 27, 2019 ("Unger Dep.") 50:8-12.

**Response:**  Deny because the cited evidence does not support the statement.  White did not describe it as a single worm.  Instead, she described the event as worms crawling out of the meat. White 2018 Dep. 113:19-20, 114:8-12.

7.   White removed the patty from the grill and placed it in a chili-mac to-go container. White 2018 Dep. 117:5-119:13; Unger Dep. 27:4-7.

**Response:**  Admit.

8.   White and coworkers Theresa Mann and/or Pamela Unger began trying to reach the store's General Manager George Nicholson and his supervisor, District Manager Tardy. White 2018 Dep. 117:5-119:13.

**Response:**  Deny in part because the cited evidence does not support the statement.  White admit that she and others called management.  However, Theresa Mann did not call anyone; she instructed employees to keep calling to reach Tardy.  White 2918 Dep. 118:25-119:4.

9.   White attempted to call Tardy and did not initially get an answer. White 2018 Dep. 119:5-13.

**Response:**  Admit.

10. At the time White called, Tardy was participating in a training at another store in his district in the north St. Louis County area.  Tardy Decl. ¶ 6; Transcript from Unemployment Hearing ("Unemp. Tr.") 11, attached hereto as Ex. 35.

**Response:**  Insufficient information to either admit or deny.  White 2018 Dep. 119:14-18.  This statement is immaterial to whether SNS is entitled to summary judgment.

11. White then texted Tardy that she believed there were worms in the meat, and he called her back immediately.  White 2018 Dep. 119:23-120:6; Tardy Decl. ¶ 8; Unemp. Tr. 12.

**Response:** Deny in part because the cited evidence does not support the statement.  There was no testimony that Tardy call her back immediately.  White testified that Tardy called back after about four minutes after she attempted at least three times to contact him.  White 2018 Dep. 119:8-120:6.

12. Tardy informed White he was on his way to the Florissant store and would be there as soon as he could.  White 2018 Dep. 120:8-19; Tardy Decl. ¶ 9; Unemp. Tr. 13.

**Response:** Admit.

13. White asked whether they should call the health department, and Tardy told her not to do anything until he got there and could do an inspection himself, and he would call the health department if he needed to do so.  White 2018 Dep. 149:10-22; Tardy Decl. ¶ 10.

**Response:** Admit.

14. Tardy arrived at the store concerned about public safety, and with the intention of

immediately conducting an investigation of the meat product in the store.  Tardy Decl. ¶ 11; Unemp. Tr. 13-14; Unger Dep. 47:19-25.

**Response:** Deny.  Statement concerning Tardy is self-serving, and White has no sufficient information whether Tardy was concerned about public safety.  Instead, White has offered evidence showing that Tardy failed to conduct an investigation.  Tardy refused to look at the contaminated meat and placed his hands in White's face while telling her to go away and not to show the meat to anyone.  White 2018 Depo. 133:2-16, 160:3-11.

15. When Tardy walked in the door, he immediately went back to the grill area and began inspecting the meat around the grill.  White 2018 Dep. 131:7-132:20; Tardy Decl. ¶ 12; Unemp. Tr. 13-14; Unger Dep. 47:16-25.

**Response:**  Deny.  Tardy was just observed doing a walk-by near the grill.  He did not open up or manipulate any of the meat on the grill.  Mann Dep. 31:23-32:18.

16. White came to the back of the house and attempted to show him the hamburger patty. White 2018 Dep. 131:25-133:22; Tardy Decl. ¶ 13.

**Response:** Deny in part because the cited evidence does not support the statement.  White did not approach in the back of the house, but she immediately approached him at the grill area to show Tardy the meat.  White 2018 Dep. 131:16-132:8.

17. Tardy told her that he needed to conduct his investigation in the appropriate manner, and he would ask for the patty and talk to her when he was ready to do so.  White 2018 Dep. 133:11-16, 137:18-25; Tardy Decl. ¶ 14.

**Response:** Deny in part because the cited evidence does not support the statement.  Tardy did not tell White he will talk to her when he was ready to do so.  Instead, Tardy immediately put his

hands in her face in a threatening manner and told her to go away and to stop talking about the meat and stop showing the meat.  White 2018 Dep. 133:2-134:1.

18. Tardy did not want his investigation to be influenced or tainted by discussion with White or other employees, and wanted to be methodical about the way he inspected the food at the restaurant.  Tardy Decl. ¶ 15; Unemp. Tr. 14; Unger Depo. 21:22-22:5.

**Response:**  Deny.  Statement concerning Tardy is self-serving, and Unger's testimony does not provide any information regarding the methods of Tardy's purported investigation.  Unger admitted that she did not know what procedure Tardy was required to conduct for any investigation.  Unger Dep. 22:16-24.

19. White did not know anything about the protocol Tardy needed to follow in inspecting the meat for possible contamination.  White 2018 Dep. 134:24-135:1, 136:2-5, 160:12-16.

**Response:**  Admit.

20. White went back to the front of house, crying loudly, and complaining to Mann and Unger about the way she felt Tardy had treated her.  White 2018 Dep. 133:17-134:19, 136:11-24.

**Response:** Deny.  White was not crying loudly and was not creating a disturbance at the restaurant.  White 2018 Dep. 133:17-22, 137:6-11; Nicholson Dep. 83:2-5, 84:3-8; Unger Dep. 57:3-6; Mann Dep. 35:11-36:8, 37:18-24; Exhibit 6, White Declaration, ¶¶ 12-13.

21. Tardy continued conducting his investigation, including inspecting meat from each pan in in the walk-in cooler.  He tore through the meat he inspected to make sure he did not see any worms or other contamination.  Tardy Decl. ¶¶ 17-18; Unemp. Tr. 15-16.

**Response:** Deny. Tardy did not tear apart the meat, did not smash the meat and did not examine every pan of meat in the walk-in.  Lambert Dep. 78:12-80:3.

22. When he was ready, Tardy asked General Manager Nicholson to retrieve the suspect

patty from White.  White 2018 Dep. 144:25-145:2; Tardy Decl. ¶ 19; Unemp. Tr. 17.

**Response:**  Admit.

23. White refused to give Nicholson the patty.  White 2018 Dep. 144:25-145:5; Tardy Decl.

¶ 20; Unemp. Tr. 17; Unger Dep. 22:6-9.  Deposition of George Nicholson ("Nicolson Dep.")

136:3-6; attached hereto.

**Response:** Deny in part because White was following instructions of Tardy when she refused to

give Nicholson the patty.  Tardy told her to stop talking about the meat and do not show anyone

else the meat.  White 2018 Dep. 133:12-16, 144:25-145:5; Unemp. Tr. 52-53.

24. When Nicholson told Tardy that White had refused to give him the patty, Tardy went to

the front of the house, to the service station, where White was standing, still crying and making a

scene.  White 2018 Dep. 145:15-146:11; Tardy Decl. ¶ 21; Unemp. Tr. 17-18.

**Response:** Deny.  White did not make a scene or create any disturbance.  Nicholson Dep. 83:2-5,

84:3-8; Unger Dep. 57:3-6; Mann Dep. 35:11-36:8, 37:18-24; Exhibit 6, White Declaration, ¶¶

12-13.

25. Tardy asked White why she had not turned the patty over to Nicholson.  White 2018 Dep.

145:17-146:11, 154:19-22; Tardy Decl. ¶ 22.

**Response:**  Admit.

26. White told him, "You told me not to talk to anyone about it," or words to that effect.

White 2018 Dep. 145:17-146:11; Tardy Decl. ¶ 23; Unemp. Tr. 17-18.

**Response:**  Admit.

27. She also said, "Oh, what, you have time to talk to me now?" in a sarcastic and

insubordinate manner.  Tardy Decl. ¶ 24; Unger Dep. 57:11-16.

**Response:** Deny. White did not act in any insubordinate manner.  Nicholson Dep. 83:2-5, 84:3-8; Unger Dep. 57:3-6; Mann Dep. 35:11-36:8, 37:18-24; Exhibit 6, White Declaration, ¶¶ 12-13.

28. Tardy told her to give him (Tardy) the patty, and she refused again.  White 2018 Dep. 146:1-2, 154:13-155:23; Tardy Decl. ¶ 25; Unemp. Tr. 18.

**Response:**  Deny in part.  White did refuse to give Tardy the patty later.  Tardy did not initially ask for the patty during the above encounter.  First, Tardy approached White and was yelling at her and she felt threatened.  Second, White wanted to take the patty to the health department because Tardy was not conducting an investigation.  White 2018 Dep. 146:1-2, 154:13-155:15; Exhibit 6, White Declaration, ¶ 11.

29. She told Tardy that the patty was gone, or that it was in the garbage, or it was going with her.  White 2018 Dep. 146:12-19; Tardy Decl. ¶ 26; Unger Dep. 25:8-9.

**Response:** Admit and deny.  White admit that she said the patty was gone and she was taking it to the health department.  She denies that she indicated it was in the garbage. White 2018 Dep. 146:12-19.

30. White claims she refused to turn over the patty to Tardy or Nicholson because she did not believe they would appropriate inspect or investigate it, even though Tardy had stopped what he was doing, came to Store 176 immediately, and asked her for the patty several times (both personally and through Nicholson).  White 2018 Dep. 158:16-160:1.

**Response:**  Admit that she refused to give the patty after she first offered the patty three times to Tardy.  White 2018 Dep. 154:13-155:15, 160:3-6.

31. During this conversation, White was heated, loud and was causing a disturbance in the front of the restaurant. Tardy Decl. ¶ 27; Unemp. Tr. 18.

**Response:** Deny.  Statements of Tardy is self-serving.  White deny she was loud and was causing a disturbance in front of the restaurant.  White 2018 Dep. 133:17-22, 137:6-11; Nicholson Dep. 83:2-5, 84:3-8; Unger Dep. 57:3-6; Mann Dep. 35:11-36:8, 37:18-24; Exhibit 6, White Declaration, ¶¶ 12-13.

32. Tardy maintains that White, in a moment of anger during this discussion, told him that she was clocking out and never coming back, to which he replied, "Well, we can agree on that," or words to that effect.  Tardy Decl. ¶ 28; White 2018 Dep. 314:7-14; Unemp. Tr. 18-19, 22-23, 32, 42.

**Response:**  Deny.  The proposed evidence of White's testimony does not establish the above genuine dispute.  White testified consistently that she was fired by Tardy.  White 2018 Dep. 74:20-21, 121:6-23, 122:6-8, 125:20-21, 138:13-23, 141:2-6, 151:13-14, 153:2-9, 170:6-13.

33. White alleges that Tardy involuntarily terminated her employment.  White 2018 Dep. 151:11-19; Deposition of Melissa White on June 19, 2019 (White 2019 Dep.") 447:23-448:6, attached hereto.

**Response:**  Admit.

34. Both parties agree that Tardy told White to leave more than once, and acquiesced to the idea of White never returning to Store 176.  White 2018 Dep. 151:11-14, 152:16-153:6; Tardy Decl. ¶ 30; Unemp. Tr. 34, 46.

**Response:**  Admit.

35. Tardy did so because White was refusing to cooperate in a company investigation, and she was causing a disturbance in the restaurant.  Tardy Decl. ¶ 31; Unemp. Tr. 18-19.

**Response:** Deny.  Tardy's statement is self-serving.  White did not refuse to cooperate in the investigation and was not causing a disturbance.  White 2018 Dep. 154:13-155:1; Nicholson

8

Dep. 83:2-5, 84:3-8; Unger Dep. 57:3-6; Mann Dep. 35:11-36:8, 37:18-24; Exhibit 6, White

Declaration, ¶¶ 12-13.

36. White did clock out at 11:31 a.m., but she did not immediately leave the restaurant.

White 2018 Dep. 151:25-153:19, 157:11-158:4, 166:14-167:11; Ex. 5, Tardy Decl. ¶ 32; Unemp.

Tr. 18-19.

**Response:** Admit

37. She told some customers that she was crying because she had just been fired for reporting

worms in the meat.  White 2018 Dep. 138:1-19, 158:5-12, Unemp. Tr. 19-20.

**Response:** Admit

38. She told at least two regular customers that SNS had worms in the meat, and to the best

of SNS's knowledge, those regular customers never returned.  White 2018 Dep. 138:1-19, 158:5-

12; Unger Dep. 45:12-46:2, 50:13-52:5.

**Response:**  Deny. Customers did return to the restaurant. White 2018 Dep. 241:24-242:7; Mann

Dep. 71:13-16, 122:3-123:3.

39. White also stayed in the front of the restaurant near the door so long that Tardy called the

Florissant police department to have her removed.  White 2018 Dep. 152:16-153:10, 157:11-

158:4; Tardy Decl. ¶ 34; Unemp. Tr. 19-20.

**Response:**  Deny.  White did not stay in the front so long.  She was waiting on the police since

Frank called the police.  White was around for approximately two minutes.  White 2018 Dep.

151:25-152:10, 155:24-156:16.

40. White ultimately left voluntarily after the police arrived.  White 2018 Dep. 168:2-18;

Tardy Decl. ¶ 35; Unemp. Tr. 20.

**Response:**  Admit.

41. After she left SNS Store 176 on January 5, 2018, White went to the Florissant Health Department, which was first report to any health department that she believed SNS had contaminated meat.  White 2018 Dep. 177:9-16.

**Response:** Admit.

42. White admitted she received and was familiar with the SNS Associate Handbook during her employment.  White 2018 Dep. 78:2-79:20, Ex. 3 (excerpts attached hereto).

**Response:**  Admit.

43. The Handbook contains the following policy:

> Cooperation with Company Investigation: There may be times when Steak N Shake needs to investigate matters such as Associate or customer complaints. Steak N Shake expects and requires all Associates to cooperate full and Completely in such investigation . . . . Failure to cooperate fully and completely with Steak N Shake investigation is grounds for disciplinary action up to and including termination of employment.

Ex. 3 p. 6; Tardy Decl. ¶ 36.

**Response:**  Insufficient information to deny or admit.

44. Tardy was aware of this policy when he instructed White to turn over the patty on January 5, 2018.  Indeed, the reason Tardy told White to leave was because she was directly violating this policy, refusing to cooperate in his investigation, and causing a disturbance in the restaurant.  Tardy Decl. ¶ 37-38

**Response:** Deny.  Tardy's statement is self-serving.  Further, insufficient information as to what Tardy knew at the time.  However, Tardy admitted that she was not let go for any disciplinary problem.  Other employees testified that she did not create any disturbance.  *See* Unemp. Tr. 38-39; White 2018 Dep. 154:13-155:1; Nicholson Dep. 83:2-5, 84:3-8; Unger Dep. 57:3-6; Mann Dep. 35:11-36:8, 37:18-24; Exhibit 6, White Declaration, ¶¶ 12-13.

45. In addition to conducting his own inspection on January 5, 2018, Tardy called the St. Louis County Health Department ("SLCHD") and asked them to come to Store 176 to conduct an inspection.  Tardy Decl. ¶ 39.

**Response:** Deny. No one at the restaurant contacted the health department.  The health department responded because outside party called the health department due to Ms. White's post.  Nicholson Depo. 141:5-13.

46. And inspector from the SLCHD arrived at approximately 2:50 p.m. and spent over an hour inspecting the food in the store. Tardy Decl. ¶ 40; Ex. 14; Unemp. Tr. 24-26.

**Response:** Insufficient information to either admit or deny.

47. At the end of their inspection, they provided a copy of their report to Tardy for SNS's official records.  Tardy Decl. ¶ 41; Ex. 14.

**Response:** Admit.

48. The report stated, in relevant part:

> Page 1, Box 12: "Food is in good condition, safe, unadulterated, and properly labeled."
>
> Page 1: "Follow-up Inspection Date:-------------"
>
> Page 2: "Spoke with District Manager regarding complaint and was aware of the complaint. District Manager stated that the situation occurred this morning and state that it appeared to be fat particles . . . During the investigation, beef patties were inspected from the walk-in cooler and the cook's line, and no worms were observed. The cooks from this morning and during the investigation observed no worms. No violations observed.  No further action taken."

Tardy Decl. ¶ 42; Ex. 14.

**Response:**  Objection.  The document speaks for itself.  White does not dispute what the

document provide in it.  However, White deny the statement if it is offered to dispute White's assertions the meat was contaminated.  White testified consistently that the meat at the restaurant before the inspector arrived was contaminated.  Exhibit 6, White Declaration, ¶ 8; White 2018 Dep. 129:1-3, 132:7-8, 144:15-24, 160:6-8, 183:17-25, 184:9-22, 215:23-216:2, 218:6-10, 229:17-18, 231:21-22, 233:10-15, 234:2-20, 267:16-20.

49. January 5, 2018, was not the first time White had raised concerns with Tardy and/or Nicholson regarding cleanliness or food safety at Store 176.  Tardy Decl. ¶ 43; Nicholson Dep. 62:11-20, 84:22-85:9; see also ¶ 52, *infra.*

**Response:** Admit.

50. White understood that if there was a safety or health problem, an employee should bring it up and report it immediately to a manager.  White 2018 Dep. 91:17-22.

**Response:** Admit.

51. Tardy was White's District Manager, and Nicholson was White's General Manager, for several months before her employment ended.  White 2018 Dep. 45:20-46:5, 54:4-6; Tardy Decl. ¶¶ 3-4.

**Response:** Admit.

52. White testified that during that time, she previously raised complaints to them, including complaints about: bugs/gnats/flies being present in the restaurant (including showing Tardy photos of gnats or flies in the restaurant), people leaving food out, people leaving food uncovered, food in the walk-in not being covered up, cleanliness, that other employees were bringing drugs into the restaurant, that the night shift employees were leaving meat on the counter or elsewhere without putting it away, food product being ruined, that the employee making shakes was sloppy and used his hands, that the trash area outside was dirty and had

12

animals, that the bathrooms smelled bad and were not being cleaned at night, that grill

employees left food under the grill, the food in the walk-in was not properly wrapped and they

had to discard products.  White 2018 Dep. 58:25-59:19, 62:1-5, 68:3-69:5, 70:21-71:23, 93:10-

95:12, 205:2-208:1.

**Response:** Admit

53. White conceded that Tardy never expressed anger with her about the prior complaints,

and even thanked her for raising them.  White 2018 Dep. 60:9-11, 80:6-16, 207:7-208:1, 218:16-

22, 370:24-371:4.

**Response:** Deny in part.  White admits that Tardy did not express anger for the prior complaints.

However, Tardy expressed anger after White reported the harassment from Nicholson.  Exhibit

6, White Declaration, ¶¶ 16-19; White 2018 Depo. 133:2-16, 160:3-11.

54. White testified that "the managers," including Tardy, Nicholson, Rashad Lambert and

Mann were responsible for the alleged contamination on January 5, 2018, because they were

responsible for checking on the food and food temperatures, and making sure everything was

meeting the food safety code.  White 2018 Dep. 264:9-265:12.

**Response:** Deny in part.  White admit that managers are responsible and in charge of food

safety.  However, Ms. White is not alleging that Nicholson and Mann are wrongdoers at it relates

to the meat contamination.  Nicholson was not in the building when contaminated food was

being served, and Mann told her to report the meat contamination and to do what is necessary to

protect the public.  Nicholson Dep. 82:17-19, 107:1-15; White 2018 Depo. 117:17-118:21; Mann

Dep. 67:21-68:11; *see also* Exhibit 6, White Declaration, ¶ 20.

55. White also testified that Tardy was responsible for the meat contamination because on

January 5, 2018, he refused to accept the suspect patty when she offered it to him and refused to talk to her when he first arrived at Store 176.  White 2018 Dep. 265:2-12.

**Response:** Admit.

56. White was not the only employee raising safety or cleanliness concerns before January 5, 2018 – others included Theresa Mann, Pamela Unger, Rashad Lambert, Dennis Holbrook, and Jane Still.  White 2018 Dep. 95:13-96:6, 256:18-257:1; Tardy Decl. ¶ 46; Deposition of Rashad Lambert ("Lambert Dep.") 70:6-71:19; attached hereto.

**Response:**   Admit.  This statement is immaterial to whether SNS is entitled to summary judgment.

57. White also testified she was not the only employee on January 5, 2018, who was discussing that alleged contamination in the hamburger patty, or suggesting the staff should call the health department.  White 2018 Dep. 270:7-271:15; White 2019 Dep. 450:8-451:3, 481:11-23. *See also* Lambert Dep. 78:4-11.

**Response:**  Admit.  This statement is immaterial to whether SNS is entitled to summary judgment.

58. White testified that many of the employees working that morning were talking about it, and definitely at least Elmo Green, Theresa Mann and Pamela Unger.  White 2018 Dep. 109:8-17, 117:5-119:13, 130:12-131:6, 270:7-271:15; *see also* ¶ 8, *supra*.

**Response:**  Objection to vagueness.  Not sure how the above statement establishes a genuine dispute. This statement is immaterial to whether SNS is entitled to summary judgment.   Deny if a response is necessary.  Neither Mann nor Unger testified that they said they were going to report the meat contamination to the health department.  White 2018 Dep. 270:20-23; Exhibit 6, White Declaration, ¶ 7; Unger Dep. 64:20-23.

59. White also noted that Green and Unger both also took photos of the hamburger patty she attempted to cook for herself.  White 2018 Dep. 130:12-131:6, 221:18-223:5; White 2019 Dep. 449:8-12; Unger Dep. 19:5-16.

**Response:**  Admit.

60. Green, Unger, and Mann each remained employed by SNS for months after January 5, 2018. White 2018 Dep. 309:5-18; White 2019 Dep. 452:2-454:7, 459:14-25, 500:12-20; Tardy Decl. ¶ 48; Unger Dep. 39:20-23.

**Response:**  Admit.

61. According to White's own testimony, she was the only employee who was involuntarily terminated on January 5, 2018.  White 2018 Dep. 256:13-257:1, 309:5-18; White 2019 Dep. 452:2-453:1; 459:14-25, 481:11-23; Tardy Decl. ¶ 49; Nicholson Dep. 133:22-134:4.

**Response:** Admit.

62. Green, Unger and Mann did not refuse to participate in the company investigation conducted by Tardy on January 5, 2018.  Tardy Decl. ¶ 50; White 2019 Dep. 452:2-9.

**Response:**  Admit.  Also, White did not refuse to participate in the investigation.  *See* Exhibit 6, White Declaration, ¶ 11, White 2018 Dep. 144:15-24, 154:15-155:15, 158:20-159:8, 160:4-25; Unemp. Tr. 12, 38-39, 49.

63. Green, Unger and Mann did not have control over the patty and never refused to provide it to Nicholson or Tardy.  Tardy Decl. ¶ 51; White 2019 Dep. 451:4-19.

**Response:**  Admit.

64. Within an hour of clocking out on January 5, 2018, White posted the following statement on Facebook:

> **#SHARESHARESHARE** JUST GOT FIRED FROM STEAK N SHAKE IN
> FLORISSANT ON FLORISSANT AND LINDBERGH ROAD BECAUSE I

FOUND LIVE WORMS WHILE COOKING A STEAKPATTY MOVING
INSIDE OF IT AND REFUSED TO SELL THAT MEAT . . . . . WELL
RIGHT NOW **# RIGHT NOW** THEY  ARE STILL SELLING SAME MEAT
**#NOONEEVENCHECKEDIT.** I JUST DON'T WANT EVERYONE
GETTNG SICK. I JUST GOT FIRED FOR NOTHING I HAVE A FAMILY
THIS SHIT IS NOT RIGHT I DID NOTHING WRONG **#FOX2#ELLIOT**
WYA

White 2018 Dep. 215:11-217:23, Ex. 9.

**Response:**  Admit.

65. White admitted that she had no direct knowledge of SNS serving any contaminated meat to any customers on January 5, 2018, or on any other date.  White 2018 Dep. 124:6-19, 181:25-182:8, 184:1-185:6, 220:1-5, 234:2-9.

**Response:**  Deny.  White consistently testified that there was contaminated meat at the restaurant and the serving of contaminated meat continued to the point where she had to intervene. Exhibit 6, White Declaration, ¶ 8; White 2018 Dep. 128:11-130:5, 132:7-8, 144:15-24, 160:6-8, 183:17-25, 184:9-22, 215:23-216:2, 218:6-10, 229:17-18, 231:21-22, 233:10-15, 234:2-20, 267:16-20.

66. White acknowledged that she was never returning to work, so she would have no ability to update her Facebook post when the meat in the restaurant had been cleared to be served to the public.  White 2018 Dep. 229:15-230:1.

**Response:**  Admit.  This statement is immaterial to whether SNS is entitled to summary judgment.

67. White's Facebook post went "viral," and was liked by 7.4k times and shared 36,654 times within the first couple weeks, or by January 22, 2018.  White 2018 Dep. 223:6-225:7, Ex. 9.

**Response:** Admit.

68. Numerous individuals, including many she does not know personally, commented on

White's post that they would never eat SNS again.  White 2018 Dep. 234:24-245:3, Ex. 10.

**Response:** Objection to vagueness and it does not establish a genuine material fact in dispute.

Further, this statement is immaterial to whether SNS is entitled to summary judgment.  Deny if

the above statement is asserting customers did not return to the restaurant, then White presented

facts that customers did return.  *See* White 2018 Dep. 241:24-242:7; Mann Dep. 71:13-16, 122:3-

123:3.

69. SNS became aware of the post, and again requested that White allow SNS to inspect the

patty, via letter from SNS's then-Vice President and Counsel Barry Paige:

> Although you refused our request to allow us to preserve the beef for inspection that
> you alleged was contaminated, and instead you left the unit with the beef, please
> accept this letter as our request that you preserve the beef you took so that we can
> arrange an independent inspection as quickly as possible. . . Please refrigerate the
> beef you took, in an isolated position, until we can arrange to retrieve the beef for
> inspection.  Please call me at [xxx-xx-xxxx] as soon as possible to coordinate the
> inspection.

Declaration of James Valentino ("Valentino Decl.") ¶ 4, attached hereto as Exhibit 48; Paige

Letter, attached hereto as Exhibit 13.

**Response:**  Admit that letter from Paige was sent to White.  This statement is immaterial to

whether SNS is entitled to summary judgment.

70. SNS also caused its attorney Patricia Martin to send White a letter on January 12, 2018,

stating in part:

> Your Facebook post contains false statements about Steak 'n Shake and its business,
> and constitutes defamation under Missouri law.  On January 5th, you voluntarily clocked
> out before the end of your scheduled shift and stated to Steak 'n Shake management that
> you were never returning to the store.  At no point did anyone at Steak 'n Shake tell you
> that you were being fired.  Further, no one at Steak 'n Shake ever instructed you to "sell"
> any meat to customers that had worms inside of it.  There is no evidence that any con-
> taminated meat was ever served to Steak 'n Shake customers at the Florissant store . . .
> We demand that you remove this post from your Facebook account within 24 hours of
> receipt of this letter.  If you don not remove the post within this time period, Steak 'n
> Shake will pursue all available legal action against you.

Valentino Decl. ¶ 5; Martin Letter, attached hereto as Exhibit 49.

**Response:**  Admit that letter from Martin was sent to White.  This statement is immaterial to whether SNS is entitled to summary judgment.

71. White did not remove the post by January 17, 2018, the date SNS filed its defamation action against her.  White 2018 Dep. 223:6-23; *see also* ¶ 67, *supra*.

**Response:**  Admit.  This statement is immaterial to whether SNS is entitled to summary judgment.

72. In filing and pursuing its defamation action against White, SNS was attempting to protect its band name and reputation in the market.  Valentino Decl. ¶ 6.

**Response:**  Insufficient knowledge as to deny or admit as to SNS' motive.  This statement is immaterial to whether SNS is entitled to summary judgment.

73. In filing and pursuing its defamation action against White, SNS was also attempting to protect itself for significant loss of sales at Store 176 and several other nearby stores.  Valentino Decl. ¶ 7.

**Response:** Insufficient knowledge as to deny or admit as to SNS' motive.  This statement is immaterial to whether SNS is entitled to summary judgment.

74. White admits that in "terminating" her employment, Tardy made no comments regarding her race or sex.  White 2019 Dep. 463:7-464:1; Tardy Decl. ¶ 54.

**Response:**  Admit.  This statement is immaterial to whether SNS is entitled to summary judgment. White has not alleged direct evidence of discrimination.  However, White alleges inference of unlawful discrimination under the burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973).  White alleges that she was treated differently

from a similarly situated individual who was not in her protected class who engaged in the same conduct and was punished.  *See* Exhibit 6, White Declaration, ¶¶ 4-6,15.

75. In fact, White could not identify a single statement by Tardy during her employment that related to her race or sex.

**Response:**  Admit.  This statement is immaterial to whether SNS is entitled to summary judgment. White has not alleged direct evidence of discrimination.  However, White alleges inference of unlawful discrimination under the burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973).  White alleges that she was treated differently from a similarly situated individual who was not in her protected class who engaged in the same conduct and was punished.  *See* Exhibit 6, White Declaration, ¶¶ 4-6,15.

76. Tardy had absolutely no animus toward White because of her sex or race, and never intended to take any adverse action against her based on her sex or race.  Tardy Decl. ¶ 55.

**Response:**  Deny.  This statement is immaterial to whether SNS is entitled to summary judgment. White has not alleged direct evidence of discrimination.  However, White alleges inference of unlawful discrimination under the burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973).  White alleges that she was treated differently from a similarly situated individual who was not in her protected class who engaged in the same conduct and was punished.  *See* Exhibit 6, White Declaration, ¶¶ 4-6,15.

77. White only identified *one* statement by Nicholson that she believes was harassing based on her sex: she claims that, on or about December 10, 2017, Nicholson told her, "All you do is bitch and eat donut all day."  White 2018 Dep. 61:15-63:10; White 2019 Dep. 434:14-435:17.

**Response:**  Admit.  Also, Nicholson referred to her sex when he made the statement all she does is bitch and "us girls" eat donuts.  *See* White 2018 Dep. 61:18-25, Exhibit 6, White Declaration, ¶ 16.

78. Nicholson testified that what actually happened was that he walked in the door one morning and, "I was bombarded with 'This ain't right.  This isn't right.  This person is not right,' and I was just like, 'Give me a minute.'  And I may have went to the office and she may have followed me with it.  I'm 'Hey, look.  Stop bitching at me.  Give me a minute to get settled,' and things like that."  Nicholson Dep. 90:9-91:16.

**Response:**  Admit that the above is what Nicholson testified to.

79. White argues that the use of the term "bitch" in such a statement is gendered and that it constituted sex-based harassment because Nicholson did not make such comments to male employees. White 2019 Dep. 438:10-440:10.

**Response:**  Admit.  Also, Nicholson referred to her sex when he made the statement all she does is bitch and "us girls" eat donuts.  *See* White 2018 Dep. 61:18-25, Exhibit 6, White Declaration, ¶ 16.

80. Nicholson testified that he did not mean "bitching" as a gendered term, but rather as a synonym for "complaining."  Nicholson Dep. 96:12-97:12.

**Response:**  Admit that the above is what Nicholson testified to.

81. White admits that she was not privy to every discussion Nicholson had with male employees.

**Response:** Admit. This statement is immaterial to whether SNS is entitled to summary judgment.

82. White also concedes that Nicholson apologized and she felt like they moved forward and

were okay after that incident.

**Response:**  Admit.  This statement is immaterial to whether SNS is entitled to summary

judgment.

    83. Nicholson specifically denies engaging in any discrimination at SNS.  Nicholson Dep.

97:2-8, 98:16-22, 101:3-8.

**Response:**  Admit.


                                        Respectfully Submitted

                                        HENDERSON LAW FIRM

                                        /s/ Samuel Henderson
                                        Samuel Henderson, Mo. Bar 56330
                                        Hendersa85@hotmail.com
                                        1027 South Vandeventer Ave., 6th Fl
                                        Saint Louis, Missouri 63110
                                        Phone: (314) 399-8266
                                        Fax: (314) 399-8265



                      **CERTIFICATE OF SERVICE**

    I hereby certify that on the 4th of October, 2019 a true and correct copy of the

foregoing document was filed on the Court's electronic filing system upon attorneys on record.


                                        /s/ Samuel Henderson