**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| STEAK N SHAKE INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:18-cv-00072-SRC |
| | ) | |
| MELISSA WHITE, | ) | |
| | ) | |
| Defendant. | ) | |

<u>**MEMORANDUM AND ORDER**</u>

This matter comes before the Court on several pending motions. Plaintiff Steak N Shake moves to exclude the testimony of Dr. Catherine Hutt [77] and Dr. Jeffrey Tomberlin [79], two experts offered by Defendant Melissa White. Steak N Shake separately moves for summary judgment [94] on all of White's counterclaims. Steak N Shake has also filed a Partial Motion to Strike [116] White's amended responses to Steak N Shake's Statement of Undisputed Material Facts. Finally, White moves for leave to file a sur-reply [118] in opposition to Steak N Shake's Motion for Summary Judgment.

## I.    FACTS AND BACKGROUND

White worked for Steak N Shake from July 2016 to January 2018. This case arises from the events leading up to and immediately following the termination of White's employment.

Steak N Shake initiated this action on January 17, 2018 asserting a defamation claim against White. The gravamen of Steak N Shake's Complaint is that White falsely posted to Facebook that Steak N Shake sold customers meat contaminated with live worms. White countersued, asserting claims against Steak N Shake for wrongful termination, sex discrimination, and intentional infliction of emotional distress. White's counterclaim for

wrongful termination alleges that Steak N Shake fired her for reporting the presence of contaminated meat to her supervisors.

Except where otherwise indicated, the following facts are undisputed[1] for purposes of Steak N Shake's Motion for Summary Judgment on White's counterclaims:

White's employment with Steak N Shake ended on January 5, 2018. At the time of her termination, White's position at Steak N Shake was service trainer at the Steak n Shake store located at 1955 N. Lindbergh, Florissant, Missouri. As service trainer, White helped with the day-to-day operations of the restaurant and trained other staff members. White's general manager, Mr. George Nicholson, described White as one of his top servers. White's co-workers described her as friendly, kind, and a hard worker.

### A. Discovery of the Allegedly-Contaminated Meat

On January 5, 2018, at around 10:30 a.m., White was working at the Steak N Shake store and took a sanctioned meal break. She went to the grill at the back of the store to have a hamburger made. As White approached the grill, she perceived the meat by the grill to have a strange odor and color. White testified that the meat "stunk and was brown" and "smelled rotten."[2] White entered the store's walk-in cooler and retrieved a single hamburger patty for herself from a pan of meat. White returned to the grill, began cooking the patty, and then noticed what she perceived to be something moving in the patty. White testified that she saw worms

---

[1] In support of its Motion for Summary Judgment, Steak N Shake submitted a Statement of Uncontroverted Material Facts, Doc. 96, as required by Fed. R. Civ. P. 56(c)(1). White submitted a Response to Steak N Shake's Statement of Uncontroverted Material Facts, noting those facts asserted by Steak N Shake that White admits for purposes of this Motion. Doc. 114. White has also submitted an Additional Statement of Material Facts, with citations to the record. Doc. 105. Steak N Shake has submitted a response to Plaintiffs' Additional Statement of Material Facts, Doc. 110, noting those additional facts asserted by White that Steak N Shake admits for purposes of this Motion.
[2] Doc. 96-4 at 108:15-17, 109:1-3.

crawling out of the patty.[3]  White removed the patty from the grill and placed it in a to-go container.

White first showed the meat to manager Rashad Lambert.  White also showed the patty to operations supervisor Theresa Mann.  White attempted to call general manager Nicholson, who was not at the store.  After Nicholson did not answer the phone on multiple attempts, White attempted to contact district manager Frank Tardy.  After White sent Tardy a text message describing worms in the meat, Tardy called her back.  Tardy informed White that he was on the way to the store and would be there as soon as he could.  White asked Tardy whether they should contact the health department, and Tardy told her not do anything until he got there and could do an inspection himself, and that he would call the health department if he needed to do so.

### B.      Inspection by District Manager Frank Tardy

Tardy arrived at the store and approached the grill to inspect the area.  Tardy did not open up or manipulate any of the meat on the grill.  White approached Tardy at the grill area to show him the patty that she still had in a to-go container.  She attempted three times to give Tardy the patty.  Tardy did not want to look at the hamburger patty at that time.  White testified that Tardy told her "I'll ask for the patty when I want the patty."[4]  According to Tardy, he told White to wait because he did not want his investigation to be influenced by discussion with White or any other Steak N Shake employees at the store.[5]  White admits that she did not know anything about the protocol Tardy needed to follow in inspecting the meat for possible contamination.  General manager Nicholson arrived at the store some time after Tardy arrived.

---

[3] *Id.* at 113:15-21.
[4] *Id.* at 133:12-16.
[5] Doc. 96-13, ¶ 15.

Continuing his inspection, Tardy entered the walk-in cooler with Lambert. Tardy took one patty from each pan of meat in the cooler for inspection. When he was ready, Tardy asked Nicholson to retrieve the suspect patty from White. White refused to give the patty to Nicholson. When Tardy asked White why she had not turned the patty over to Nicholson, she replied "You told me not to talk to anyone about it," or words to that effect. When Tardy asked White directly to turn over the patty, she told him it was gone and that she was taking it to the health department. White admits that she refused to turn over the patty to Tardy when he asked for it.

### C. White's Termination

White testified that Tardy involuntarily terminated her employment. Doc. 96-4 at 14; 140:22-141:21. Steak N Shake disputes that characterization, and has offered a statement from Tardy asserting that White told him she was "clocking out and never coming back." Doc. 96-13 at ¶ 28. Both Parties agree that, during their conversation in which White refused to turn over the patty, Tardy asked her to leave the store more than once and acquiesced to the idea of White never returning to the store. White clocked out at 11:31 a.m. on January 5, 2018, but did not immediately leave the store. White testified that she was crying and asking why she had been fired. She told customers that she was crying because she had just been fired for reporting worms in the meat. Tardy called the police to have White removed from the store, and she ultimately left voluntarily after police arrived. After she left the store, White went to the Florissant Health Department and reported her belief that Steak N Shake had contaminated meat. White took the hamburger patty with her when she left the Steak N Shake store.

### D. Health Department Inspection

An inspector from the St. Louis County Health Department arrived at the store at approximately 2:50 pm. on January 5, 2018 and spent over an hour inspecting the food in the

store.  At the end of the inspection, the health inspector provided Tardy with a copy of the

written inspection report.  The report provides in relevant part:

> Complaint: Worms in the ground beef
>
> Spoke with District Manager regarding complaint and was aware of the complaint.  District Manager stated that the situation occurred this morning and that it appeared to be fat particles.  District Manager inspected all of the beef patties (approximately 9) that were remaining in the pan at the cook's line, and found no worms inside of the beef patties.  The beef patties from this morning were discarded and not available.  District Manager also inspected the beef patties from the walk-in cooler and freezer, and no worms were observed.  During the investigation, beef patties were inspected from the walk-in cooler and the cook's line, and no worms were observed.  The cooks from this morning and during the investigation observed no worms.  No violations observed.  No further action taken.

Doc. 96-11.

### E.      White's Facebook Post

Within an hour after she clocked out on January 5, 2018, White posted the following

statement on Facebook:

> #SHARESHARESHARE JUST GOT FIRED FROM STEAK N SHAKE IN FLORISSANT ON FLORISSANT AND LINDBERGH ROAD BECAUSE I FOUND LIVE WORMS WHILE COOKING A STEAKPATTY MOVING INSIDE OF IT AND REFUSED TO SELL THAT MEAT … WELL RIGHT NOW #RIGHT NOW THEY ARE STILL SELLING SAME MEAT #NOONEEVENCHECKEDIT.  I JUST DON'T WANT EVERYONE GETTING SICK.  I JUST GOT FIRED FOR NOTHING I HAVE A FAMILY THIS SHIT IS NOT RIGHT I DID NOTHING WRONG #FOX2 #ELLIOT WYA

Doc. 96-8.  White's Facebook post was liked 7,400 times and shared 36,654 times by January

22, 2018.

### F.      Steak N Shake Company Investigation Policy

The Steak N Shake Associate Handbook contains the following policy:

> Cooperation with Company Investigations: There may be times when Steak N Shake needs to investigate matters such as Associate or customer complaints.  Steak N Shake expects and requires all Associates to cooperate fully and completely in such investigations. … Failure to cooperate fully and completely

with a Steak N Shake investigation is grounds for disciplinary action up to and
including termination of employment.

Doc. 96-6, pg. 6.  White admits that she received and was familiar with the Steak N Shake

Associate Handbook during her employment.

### G.      Prior Complaints Regarding Cleanliness and Food Safety

January 5, 2018 was not the first time White had raised concerns with Tardy or Nicholson

regarding cleanliness or food safety.  For several months before White's employment ended,

Tardy was White's district manager, and Nicholson was White's general manager.  During that

time, White previously raised multiple complaints to them, including complaints about bugs in

the restaurant, people leaving food out uncovered, and other cleanliness concerns.  White admits

that Tardy did not express anger with her for these prior complaints.

### H.      Other Steak N Shake Employees

White was not the only employee who raised safety or cleanliness concerns at the Steak

N Shake store before January 5, 2018.  Other employees who raised such concerns included

Lambert, Mann, Dennis Holbrook, and Jane Still.  Further, White was not the only employee at

the Steak n Shake store on January 5, 2018 who discussed the alleged contamination in the

hamburger patty or suggested that the staff should call the health department.  White testified

that (in addition to herself) both Mann and employee Elmo Green told the managers that the

health department should be contacted.  White, Green and employee Pamela Unger all took

photos of the allegedly contaminated patty.  Both White and Green told management that they

were going to contact the health department.

Green, Unger, and Mann each remained employed by Steak N Shake for months after

January 5, 2018.  According to White's own testimony, she was the only employee who was

involuntarily terminated on January 5, 2018.  Green, Unger, and Mann did not refuse to

cooperate with the company investigation that Tardy conducted on January 4, 2018.  Green, Unger, and Mann did not have control over the allegedly-contaminated patty and did not refuse to turn it over to Nicholson or Tardy.

> ### I.     Allegations of Sex Discrimination

White admits that, during the conversation when Tardy allegedly terminated her employment, Tardy made no comments regarding her race or sex.  White did not identify any statement made by Tardy during her employment that related to her race or sex.  White identified one statement by Nicholson that she believes was harassing based on her sex.  On or about December 10, 2017, Nicholson told her "All you do is bitch and eat donuts all day."  Nicholson testified that he did not intend "bitch" as a gendered term, but rather as a synonym for "complain."  White admits that Nicholson apologized and that she felt like they were able to move forward after this incident.  White also admits that she was not privy to every discussion Nicholson had with male employees.

## II.     LEGAL STANDARD

> ### A.     Motion to Exclude Expert Testimony

Federal Rule of Evidence 702, which governs the admission of expert testimony in federal court, provides in relevant part:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Under Rule 702, district courts act as gatekeepers, ensuring that expert testimony is "not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) (quoting *Daubert*, 509 U.S. at 597). The reliability requirement means "the party offering the expert testimony must show by a preponderance of the evidence both that the expert is qualified to render the opinion and that the methodology underlying his conclusions is scientifically valid," while the relevance requirement demands "the proponent must show that the expert's reasoning or methodology was applied properly to the facts at issue." *Barrett v. Rhodia, Inc.*, 606 F.3d 975, 980 (8th Cir. 2010) (quoting *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 757 (8th Cir. 2006)).

The Eighth Circuit Court of Appeals has stated that proposed expert testimony must meet three criteria to be admissible under Rule 702. "First, evidence based on scientific, technical, or other specialized knowledge must be useful to the finder of fact in deciding the ultimate issue of fact." *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001). "Second, the proposed witness must be qualified to assist the finder of fact." *Id.* "Third, the proposed evidence must be reliable or trustworthy in an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires." *Id.* (internal quotation marks omitted). To meet the third requirement, the testimony must be "based on sufficient facts or data" and be "the product of reliable principles and methods," and the expert must have "reliably applied the principles and methods to the facts of the case." *Id.*; Fed. R. Evid. 702(b)-(d).

The Eighth Circuit has admonished district courts "not to weigh or assess the correctness of competing expert opinions." *Johnson v. Mead Johnson & Co., LLC*, 754 F.3d 557, 562 (8th Cir. 2014). "As long as the expert's scientific testimony rests upon 'good grounds, based on what is known' it should be tested by the adversary process with competing expert testimony and cross–

examination, rather than excluded by the court at the outset." *Id.* (quoting *Daubert*, 509 U.S. at 590, 596). "Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." *First Union Nat. Bank v. Benham*, 423 F.3d 855, 862 (8th Cir. 2005). "Courts should resolve doubts regarding the usefulness of an expert's testimony in favor of admissibility." *Marmo*, 457 F.3d at 758.

### B.     Summary Judgment

Summary judgment is proper if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Cordry v. Vanderbilt Mortg. & Fin., Inc.*, 445 F.3d 1106, 1109 (8th Cir. 2006) (quoting *Bockelman v. MCI Worldcom, Inc.*, 403 F.3d 528, 531 (8th Cir. 2005)). The proponent of a motion for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The proponent need not, however, negate the opponent's claims or defenses. *Id.* at 324–25.

In response to the proponent's showing, the opponent must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). A "genuine" dispute of material fact is more than "some metaphysical doubt as to the material facts." *Id.* at 586. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249

(1986). "If the evidence is merely colorable...or is not significantly probative...summary judgment may be granted." *Id.* at 249–50 (citations omitted).

## III. DISCUSSION

The Court first considers Steak N Shake's motions to exclude White's experts. Steak N Shake filed separate motions, Docs. 77, 79, to exclude the reports, opinions, and testimony of both White's proffered experts, Dr. Catherine Hutt and Dr. Jeffrey Tomberlin. White asked Dr. Tomberlin to provide an opinion as to whether the hamburger patty that White took from the Steak N Shake store on January 5, 2018 contained worms or insects. White asked Dr. Hutt to provide opinions regarding Tardy's investigation and the extent to which that investigation conformed to food industry standards. The parties have fully briefed both motions to exclude. The Court has taken into consideration the parties' arguments, the experts' deposition segments submitted, and the experts' reports in making these determinations. For the reasons set forth below, the Court denies Steak N Shake's motion to exclude the opinions of Dr. Tomberlin. The Court grants, in part, and denies, in part, Steak N Shake's motion to exclude the opinions of Dr. Hutt.

### A. Motion to Exclude Testimony of Dr. Jeffrey Tomberlin

Steak N Shake argues that the report and opinions of Dr. Tomberlin should be excluded for three reasons. First, Steak N Shake argues that Dr. Tomberlin's opinions do not satisfy the requirements of Federal Rule of Evidence 702 because they will not "help the trier of fact to understand the evidence or determine a fact in issue." Fed. R. Evid. 702(a). Second, Steak N Shake argues that Dr. Tomberlin based his opinions on unreliable facts and data. Fed. R. Evid. 702(b). Finally, Steak N Shake argues that Dr. Tomberlin's opinions should be excluded under

Federal Rule of Evidence 403 because any probative value of his opinion is outweighed by the danger of unfair prejudice to Steak N Shake.

Steak N Shake does not challenge Dr. Tomberlin's credentials or qualifications (Doc. 96, pg. 2), and the Court finds that he is qualified. Dr. Tomberlin is a forensic entomologist with advanced degrees in entomology. Doc. 89-4 at 11:10-16; 12:3-9; 14:7-9. He is a tenured professor at Texas A&M University. *Id.* at 14:10-16. He has experience in verifying the presence of contamination in food products and has expertise in identifying larval contamination in meat. *Id.* at 16:6-13; 24-27. He has assisted in over 130 different investigations regarding entomological evidence and has previously testified in trials regarding entomological evidence. *Id.* at 28:2-11; 36:9-21. White asked Dr. Tomberlin to provide an opinion as to whether the hamburger patty that White took from the Steak N Shake store on January 5, 2018 contained worms or insects. Dr. Tomberlins's qualifications meet the requirements of Rule 702 and match the opinion he has provided.

On December 17, 2018, Dr. Tomberlin examined the hamburger patty and found that it contained three immature fly larvae (maggots). Doc. 80-2, pg. 2; Doc. 88-4 at 44:20-24; 66:2-7. From these findings, Dr. Tomberlin concluded that the patty "was infested with fly larvae." Doc. 80-2, pg. 2. Steak N Shake does not challenge Dr. Tomberlin's methodology, opinions, or conclusions. Doc. 96, pg. 2. Instead, Steak N Shake argues that Dr. Tomberlin's opinion will not help the jury understand the evidence or determine a fact in issue because Dr. Tomberlin does not opine on whether contamination was present in the hamburger patty on January 5, 2018. Doc. 80, pg. 4-5. In other words, Steak N Shake challenges the *relevance* of Dr. Tomberlin's opinion. *Lauzon*, 270 F.3d 681, 686 (8th Cir. 2001) (Expert testimony "must be useful to the finder of fact in deciding the ultimate issue of fact. This is the basic rule of relevancy.").

Based on the record before it, the Court finds that Dr. Tomberlin's report and testimony are relevant and will be useful to the jury in determining a fact in issue. Fed. R. Evid. 702(a). Steak N Shake's defamation claim alleges that White falsely represented that she found worms in her hamburger patty on January 5, 2018. Doc. 1 at ¶¶ 26-27. White's principal defense is that the statements were truthful. Doc. 6. Accordingly, the presence or absence of fly larvae in the hamburger patty on January 5, 2018 is a disputed question of fact in this case. Steak N Shake acknowledges that the parties dispute whether the patty was contaminated on January 5, 2018, but insists that Dr. Tomberlin's conclusion—i.e., that the patty contained fly larvae on December 17, 2018—has no bearing on that issue. The Court finds Steak N Shake's argument unpersuasive. Forensic examination always, necessarily, occurs some time after the events at issue. Courts routinely admit expert testimony based on such after-the-fact examination. *See, e.g., United States v. Gipson*, 383 F.3d 689, 697 (8th Cir. 2004) (DNA evidence admissible); *United States v. Hernandez*, 299 F.3d 984, 991 (8th Cir. 2002) (fingerprint evidence admissible).

Steak N Shake argues that Dr. Tomberlin bases his opinion on "unreliable data" because he has no knowledge of the chain of custody of the hamburger patty. Doc. 80, pg. 6-7. Dr. Tomberlin's report is narrow in scope. He determined that the hamburger patty was contaminated with fly larvae on December 17, 2018. The only "data" Dr. Tomberlin relied upon to make that determination was his own physical examination of the patty. Doc. 80-2. Thus, Streak N Shake's *Daubert* challenge based on Dr. Tomberlin's alleged reliance on insufficient facts or unreliable data, *see* Fed. R. Evid. 702(b), is unavailing. Dr. Tomberlin opines only that the patty he examined on December 17, 2018 was contaminated with fly larvae *on that date*. While a defect in the chain of custody would diminish the weight of that opinion, Dr. Tomberlin

didn't need to know where the patty came from to physically examine it and opine on whether it contained fly larvae on the date of his examination.

The Court finds that Steak N Shake's criticism regarding chain of custody goes to the foundation of Dr. Tomberlin's testimony, rather than the admissibility factors under Federal Rule of Evidence 702.[6] Unless White lays the proper foundation, the Court may ultimately determine that Dr. Tomberlin's opinion regarding the patty he examined on December 17, 2018 is not relevant to any fact at issue.[7] But the Federal Rules do not require an expert witness to provide the foundation for his own testimony. *See* Fed. R. Evid. 104(b) ("When the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist. The court may admit the proposed evidence on the condition that the proof be introduced later.").

Here, White has submitted an affidavit stating that she has "personal knowledge of the chain of custody of the beef patty at issue in this case." Doc. 88-1. She avers that "the beef patty in question was not tampered or changed in any manner" and that it "remained in [a] locked freezer and in [her] possession" until the date of Dr. Tomberlin's examination. *Id.* Evidence of the chain of custody "does not have to be perfect." *United States v. Johnson*, 688 F.3d 494, 505 (8th Cir. 2012). "All that is required is testimony that the evidence in question was the same as that involved in the offense and that it is substantially unchanged." *Id.*; *see also United States v. Scharon*, 187 F.3d 17, 22 (1st Cir. 1999) ("A possible defect in the chain of custody for a certain piece of evidence factors into the weight given to the evidence rather than its admissibility.").

---

[6] Generally, attacks on the foundation for an expert's opinion go to the weight rather than the admissibility of the expert's testimony. *Sphere Drake Ins. PLC v. Trisko*, 226 F.3d 951, 955 (8th Cir. 2000).

[7] For example, if at trial White cannot establish that the hamburger patty Dr. Tomberlin examined was the same patty White took home from the Steak N Shake store on January 5, 2018, then Dr. Tomberlin's report and opinions could be properly excluded as irrelevant. *See* Fed. R. Evid. 402.

For purposes of Steak N Shake's pre-trial motion to exclude, the Court finds that White has offered adequate evidence of the chain of custody, and sufficient foundation for the relevance of Dr. Tomberlin's testimony. Accordingly, the Court denies Steak N Shake's motion to exclude Dr. Tomberlin's opinions under Federal Rule of Evidence 702.

Steak N Shake also moves to exclude Dr. Tomberlin's testimony under Federal Rule of Evidence 403, asserting that "any value of Dr. Tomberlin's proposed report, opinions, and testimony is outweighed by the dangers of prejudice to Steak N Shake." Doc. 80, pg. 7. Rule 403 permits the exclusion of relevant evidence where "its probative value is *substantially outweighed*" by the danger of unfair prejudice. Fed. R. Evid. 403 (emphasis added). "Exclusion under [Rule] 403 is an extraordinary remedy and should be used sparingly." *Westcott v. Crinklaw*, 68 F.3d 1073, 1077–78 (8th Cir. 1995).

Steak N Shake argues that it would be unfairly prejudiced by "[t]he unreliable and speculative testimony of Dr. Tomberlin as to the source, origin, and appearance of the fly larvae in the hamburger patty he inspected." Doc. 80, pg. 8. The Court has already determined that Dr. Tomberlin did not base his report on insufficient or unreliable data, and Steak N Shake does not challenge the substance of Dr. Tomberlin's opinions or conclusions. Doc. 96, pg. 2. Further, Dr. Tomberlin's only opinion regarding the "source, origin, and appearance of the fly larvae" is that "[the presence of the larvae] would indicate the meat was potentially exposed for a long period of time outside of a refrigerator or freezer resulting in fly access and subsequent colonization." Doc. 80-2, pg. 2; Doc. 98-1 at 68:11-20. The Court finds this opinion probative of the issue of whether the hamburger patty was contaminated on January 5, 2018, and the Court finds the probative value of the evidence on that issue outweighs any danger of unfair prejudice to Steak N

Shake.  Accordingly, the Court denies Steak N Shake's motion to exclude Dr. Tomberlin's opinions under Federal Rule of Evidence 403.

> ### B.    Motion to Exclude Testimony of Dr. Catherine Hutt

Steak N Shake also moves to exclude the report, opinions, and testimony of Dr. Catherine Hutt.  As with Dr. Tomberlin, Steak N Shake contends that Dr. Hutt's report should be excluded under Federal Rule of Evidence 702 because it is irrelevant and will not help the jury determine a fact in issue and because Dr. Hutt bases her opinions on insufficient facts or data.  Fed. R. Evid. 702(a)-(b).  Steak N Shake also contends the danger of unfair prejudice to Steak N Shake outweighs any probative value in Dr. Hutt's report.  Fed. R. Evid. 403.

Steak N Shake does not dispute Dr. Hutt's credentials or qualifications, *see* Doc. 97, pg. 4, and the Court finds that Dr. Hutt is qualified.  Dr. Hutt has advanced degrees in food science. Doc. 89-2 at 10:18-11:3. She has testified at trial in other cases as a food safety expert.  *Id.* at 69:1-20.  And she has extensive experience conducting food safety inspections to assess and manage issues of food contamination.  *Id.* at 61:20-62:16. White asked Dr. Hutt to provide opinions regarding Tardy's investigation and the extent to which that investigation conformed to food industry standards.  Dr. Hutt's qualifications meet the requirements of Rule 702 and—with one exception detailed below—match the opinions she has provided.

Steak N Shake contends that Dr. Hutt's opinions will not help the jury understand the evidence or determine any fact in issue.  Fed. R. Evid. 702(a).  Specifically, Steak N Shake argues that "[w]hether an investigation occurred, properly, improperly or at all, is irrelevant to the claims and defenses in this action."  The Court disagrees.  Steak N Shake's defamation claim alleges that White falsely represented that she found worms in her hamburger patty and that Steak N Shake sold contaminated meat to customers.  Doc. 1 at ¶¶ 26-30.  Thus, to establish her

truth defense, White must prove, first, that the meat was contaminated and, second, that the meat was sold to customers.  As discussed above, Dr. Tomberlin's testimony is relevant to the first proposition.  The Court finds that Dr. Hutt's testimony is relevant to the issue of whether Steak N Shake sold contaminated meat to customers.

"Evidence is relevant if: a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."  Fed. R. Evid. 401; *see also Smith v. Tenet Healthsystem SL, Inc.*, 436 F.3d 879, 885 (8th Cir. 2006).  In light of the other evidence in the case, Dr. Hutt's testimony that Tardy's inspection was inadequate makes it more probable that Steak N Shake sold contaminated meat to customers.  White testified that she found worms in her hamburger patty.  Doc. 105-2 at 113:17-114:22.  Dr. Hutt opines that Tardy's "investigation on site was cursory.  His review of meat products ready to be cooked and served to customers was superficial."  Doc. 78-3, pg. 2.  If the jury finds that White's hamburger patty was contaminated and Tardy's investigation of the source of that contamination was inadequate, then it is more probable that Steak N Shake sold contaminated meat to customers.[8]  Accordingly, Dr. Hutt's opinions satisfy the requirements of Rule 702(a).

Steak N Shake also argues that Dr. Hutt based her opinions on insufficient facts or data.  *See* Fed. R. Evid. 702(b).  Dr. Hutt testified that she based her assessment of Tardy's investigation on her own experience, Tardy's testimony at White's unemployment hearing, White's testimony at White's unemployment hearing, and White's counterclaims.  Doc. 78-1 at

---

[8] Steak N Shake argues that Dr. Hutt's opinion regarding the adequacy of Tardy's investigation is irrelevant because all other examined witnesses "have testified that they have no direct knowledge of contaminated meat being sold on January 5, 2018."  Doc. 97, pg. 4.  Steak N Shake's argument goes to the weight, rather than the admissibility of Dr. Hutt's testimony.  *Hose v. Chicago Nw. Transp. Co.*, 70 F.3d 968, 974 (8th Cir. 1995) ("As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility[.]").

84:5-15; 87:5-88:15. Steak N Shake argues that these sources of data are insufficient because Dr. Hutt did not consider other available sources of information, such as White's deposition transcript, the St. Louis County Health Department inspection report, or a direct interview with Tardy.[9] "As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Hose v. Chicago Nw. Transp. Co.*, 70 F.3d 968, 974 (8th Cir. 1995) (quoting *Loudermill v. Dow Chem. Co.*, 863 F.2d 566, 570 (8th Cir. 1988)). "Only if an expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." *Id.* If Steak N Shake believes the factual predicate of Dr. Hutt's opinions is incomplete or unreliable, it will have the opportunity to cross-examine Dr. Hutt on that basis. The Court finds that Dr. Hutt's opinions regarding the adequacy of Tardy's investigation are not so "fundamentally unsupported" that they must be excluded.

However, the Court finds that Dr. Hutt based one section of her report on insufficient data. In the course of preparing her report, Dr. Hutt reviewed photographs of the allegedly contaminated hamburger patty and Dr. Tomberlin's report. Doc. 89-2 at 79:1-9; 124:11-25. Regarding the photographs, Dr. Hutt's report opines: "The worm shown in the picture taken by an employee is a maggot, or fly larvae. This finding was confirmed by Dr. Jeffrey K. Tomberin [sic], Assistant Professor at Texas A&M University." The Court grants Steak N Shake's motion to exclude Dr. Hutt's report as to these two sentences *only*. The Court finds that Dr. Hutt's

---

[9] Steak also N Shake argues Dr. Hutt's opinions "are not based in evidence" because Dr. Hutt "relied heavily upon White's counterclaims to form her opinions." Doc. 97, pg. 6. Dr. Hutt's deposition testimony belies Steak N Shake's assertion that Dr. Hutt "relied heavily" upon White's counterclaims. Dr. Hutt testified that Tardy's own testimony was the primary source of her conclusions about Tardy's investigation, and further stated that the allegations in White's counterclaims did not influence her opinion at all. Doc. 89-2 at 95:13-96:5. However, pleadings are not evidence. *See North Face Apparel Corp. v. Williams Pharmacy, Inc.*, No. 4:09CV2029RWS, 2010 WL 546318, at *1 (E.D. Mo. Feb. 9, 2010). To the extent Dr. Hutt based any specific portions of her report on unverified allegations in White's counterclaims, Steak N Shake may seek appropriate relief via *motion in limine*.

qualifications and credentials—as submitted by White—do not relate to the identification of insect larvae. Thus, White has not established that Dr. Hutt is independently qualified to opine that "the worm shown in the picture…is a maggot, or fly larvae." Further, Dr Tomberlin did not opine that the photographs depict insect larvae, because Tomberlin never reviewed any photographs. According to his deposition testimony, Dr. Tomberlin did not review any photographs in the course of preparing his report. Doc. 78-2 at 47:8-21. Dr. Tomberlin's report does not mention a photograph or opine that any photograph depicts fly larvae. *See* Doc. 80-2. Thus, Dr. Hutt's statement that Dr. Tomberlin "confirmed" the finding of fly larvae depicted in the photograph lacks a basis. Accordingly, the Court grants Steak n Shake's motion under to Rule 702 to exclude the two sentences identified above.

Finally, Steak N Shake moves to exclude Dr. Hutt's report under Rule 403, arguing that "the dangers of prejudice to Steak N Shake" outweigh any value of Dr. Hutt's report. Doc. 78, pg. 9. Federal Rule of Evidence 403 permits the exclusion of relevant evidence where "its probative value is *substantially* outweighed" by the danger of "*unfair* prejudice". Fed. R. Evid. 403 (emphasis added). "Exclusion under [Rule] 403 is an extraordinary remedy and should be used sparingly." *Westcott*, 68 F.3d at 1077–78.

Here, the Court finds that the probative value of Dr. Hutt's testimony outweighs any danger of unfair prejudice to Steak N Shake. Steak N Shake argues that it will be prejudiced because Dr. Hutt's testimony is "unreliable and speculative." Doc. 78, pg. 9. The Court has already determined that Dr. Hutt based her report (except for the two sentences identified above) on sufficient data. Steak N Shake may further probe the factual basis of Dr. Hutt's testimony on cross-examination. *See Hose*, 70 F.3d at 974. Steak N Shake also argues that it will be unfairly prejudiced by Dr. Hutt's testimony because her opinions "provide no conclusive or scientific

evidence to support White's defense of truth". Doc. 78, pg. 9. Evidence need not be "conclusive" to be probative. Fed. R. Evid. 401; *see also Smith*, 436 F.3d at 885 ("Evidence is relevant if it merely has any tendency to make a fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence"). And expert testimony need not be "scientific" to be admissible. *See Kumho Tire Co.*, 526 U.S. at 147 (holding that *Daubert* analysis applies to all expert testimony, and not only to "scientific" testimony). The Court finds that Dr. Hutt's report and testimony are probative of White's defense of truth, and that the probative value outweighs any danger of unfair prejudice to Steak N Shake. Accordingly, the Court denies Steak N Shake's motion to exclude Dr. Hutt's testimony under Rule 403.

### C.     Motion for Summary Judgment on White's Counterclaims

The Court now turns to Steak N Shake's Motion for Summary Judgment on White's counterclaims. White asserts three counterclaims against Steak N Shake. First, White brings a claim for wrongful termination in violation of public policy. Doc. 18 at Count I. White alleges that Steak N Shake fired her because of and in retaliation for her reporting violations of the Missouri Food Code. *Id.* Second, White brings an employment discrimination claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.*[10] White alleges that Steak N Shake discriminated against her on the basis of her race or gender. Finally, White asserts a claim against Steak N Shake for intentional infliction of emotional distress. Doc. 18 at Count III. Steak N Shake moves for summary judgment on all of White's counterclaims.

---

[10] White first asserted her Title VII claim as a separate cause of action. *See* Case No. 4:19-cv-00343, Doc. 1. The Court consolidated that case with the present matter on March 8, 2019. Doc. 64.

### 1. Whistleblower Protection Act Claim

In her claim for wrongful termination in violation of public policy, White alleges that Steak N Shake involuntarily terminated her employment because she reported violations of the Missouri Food Code. Doc. 18 at Count I. The Missouri Whistleblower's Protection Act provides:

> It shall be an unlawful employment practice for an employer to discharge an individual defined as a protected person in this section because of that person's status as a protected person.

Mo. Rev. Stat. § 285.575. The Act defines a "protected person" as:

> an employee of an employer who has reported to the proper authorities an unlawful act of his or her employer; an employee of an employer who reports to his or her employer serious misconduct of the employer that violates a clear mandate of public policy as articulated in a constitutional provision, statute, or regulation promulgated under statute; or an employee of an employer who has refused to carry out a directive issued by his or her employer that if completed would be a violation of the law.

*Id.* However, the Act specifies that "[a]n employee of an employer is not a protected person if":

> (b) The proper authority or person to whom the employee makes his or her report is the person whom the employee claims to have committed the unlawful act or violation of a clear mandate of public policy.

*Id.* Further, the Act provides that an employee's discharge is "because of" their status as a protected person only when the employee's status as a protected person was the "motivating factor" for the discharge. *Id.* "Motivating factor" means "the employee's protected classification actually played a role in the adverse decision and had a determinative influence on the adverse decision or action." *Id.* To summarize, the elements of a wrongful termination claim under the Act are: 1) the employee is a protected person as defined by the statute, 2) the employer discharged the employee, and 3) the employee's status as a protected person was the motivating factor for the discharge. *Id.*

Steak N Shake argues that White has failed to establish two of the three elements of a wrongful termination claim. First, Steak N Shake argues that White is not a protected person under the statute. Doc. 95, pg. 12-14. Alternatively, Steak N Shake argues that—even if White is a protected person—her status as a protected person was not a motivating factor in her termination.

After careful review of the record, the Court finds that White is not a protected person under Missouri's Whistleblower's Protection Act. The Act specifically provides that an employee is *not* a "protected person" if

> (b) The proper authority[11] or person to whom the employee makes his or her report is the person whom the employee claims to have committed the unlawful act or violation of a clear mandate of public policy.

Mo. Rev. Stat. § 285.575. Here, the record shows that White reported the allegedly contaminated meat to manager Rashad Lambert, operations supervisor Theresa Mann, general manager George Nicholson, and district manager Frank Tardy. Doc. 96-4 at 116:7-13; 117:5-25; 119:5-25. White's opposition brief identifies the same four individuals. Doc. 102, pg. 18 ("Ms. White is alleging that she reported contaminated meat to management that includes Rashad Lambert, Theresa Mann, George Nicholson, and Frank Tardy."). According to White's own testimony, these are the same individuals who she claims were responsible for the contaminated meat. Doc. 96-4 at 264:9-265:12. Per the unambiguous language of the statute, White is not a protected person because the individuals to whom she made her report are the same people who she claims "committed the unlawful act or violation of a clear mandate of public policy." Mo. Rev. Stat. § 285.575.

---

[11] The Act defines "proper authorities" as "a governmental or law enforcement agency, an officer of an employee's employer, the employee's supervisor employed by the employer, or the employee's human resources representative employed by the employer". Mo. Rev. Stat. § 285.575.

White argues that she is a "protected person" under the holding of *Boyle v. Vista Eyewear, Inc.*, 700 S.W.2d 859, 878 (Mo. Ct. App. 1985). The *Boyle* decision predates the Missouri Whistleblower's Protection Act by more than thirty years. To the extent the holding of *Boyle* conflicts with the unambiguous language of the Act, this Court is bound by the latter. Mo. Rev. Stat. § 1.010 ("[N]o act of the general assembly or law of this state shall be held to be invalid, or limited in its scope or effect by the courts of this state, for the reason that it is in derogation of, or in conflict with, the common law"). However, the Act, by its express terms, "is intended to codify the existing common law exceptions to the at-will employment doctrine and to limit their future expansion by the courts." Mo. Rev. Stat. § 285.575. Thus, the Court may consider *Boyle* to the extent that case sheds light on "the existing common law exceptions to the at-will employment doctrine" at the time the legislature enacted the Act. *Id.*

*Boyle* was one of the first Missouri appellate decisions to recognize the "public policy" exception to at-will employment. 700 S.W.2d at 871 (public policy exception provides "that an at-will employee who has been discharged by an employer in violation of a clear mandate of public policy has a cause of action against the employer for wrongful discharge"). In *Boyle*, the Court of Appeals found that the plaintiff stated a cause of action under the public-policy exception where she alleged that her employers "fired her for threatening to report their activities and practices to the Food and Drug Administration." *Id.* at 878.

Citing *Boyle*, White argues that her own "warnings to management are sufficient to state a claim under the [Act]." Doc. 102, pg. 19. To the extent *Boyle's* holding actually supports White's argument,[12] it is in direct conflict with the language of the Act. Further, such a holding

---

[12] The clearest and most-frequently cited statement of the public-policy exception in *Boyle* is as follows:

> Accordingly, where an employer has discharged an at-will employee because that employee refused to violate the law or any well established and clear mandate of public policy as expressed in the constitution, statutes and regulations promulgated pursuant to statute, or because the

also conflicts with more recent precedent of the Missouri Court of Appeals. In *Drummond v. Land Learning Found.*, 358 S.W.3d 167, 171 (Mo. Ct. App. 2011), the Court of Appeals affirmed summary judgment for an employer where the "whistleblower" employee only reported his suspicions of tax fraud to the company owners whom he suspected were engaging in the fraud. The Court held that this "report of wrongdoing to the wrongdoers" did not constitute whistleblowing because it did not expose the owners or their wrongdoing "in such a way as to remedy the wrong." *Id.* Thus, *Drummond* aligns with the Act's requirement that a whistleblower must report the violation to someone other than "the person whom the employee claims to have committed the unlawful act or violation" to qualify as a "protected person" under the Act.[13] Mo. Rev. Stat. § 285.575. Accordingly, under the clear language of the statute, White is not a "protected person" under the Missouri Whistleblower's Protection Act. The common law that the Act intended to codify buttresses this conclusion. *Drummond*, 358 S.W.3d at 171. The Court grants summary judgment for Steak N Shake on White's counterclaim for wrongful termination in violation of public policy.[14]

---

> employee reported to his superiors or to public authorities serious misconduct that constitutes violations of the law and of such well established and clearly mandated public policy, the employee has a cause of action in tort for damages for wrongful discharge.

700 S.W.2d at 878. Notably, this formulation does not suggest that merely warning the employer of an intent to notify other authorities of their wrongdoing gives rise to a wrongful discharge claim. *Id.*

[13] *Drummond* includes one additional holding instructive here. The plaintiff in *Drummond* reported the suspected tax fraud to the IRS *after* his employer fired him. 358 S.W.3d at 172. The Court determined that these reports did not qualify him as a whistleblower because "they did not occur until after his employment ended." *Id.* Here, White's post-termination report of the allegedly contaminated meat to the health department likewise does not qualify her as a whistleblower.

[14] Because the Court finds White's status as a protected person dispositive of this claim, it need not reach Steak N Shake's alternative argument that White's complaints to management were not a motivating factor for her termination.

## 2.    Title VII Claim – Employment Discrimination

White asserts a claim against Steak n Shake for employment discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.*  The statute provides, in relevant part:

> It shall be an unlawful employment practice for an employer--
>
> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin

42 U.S.C. § 2000e-2(a).  To establish a prima facie case for discrimination under Title VII, a plaintiff must show that "(1) he is a member of a protected class, (2) he met his employer's legitimate expectations, (3) he suffered an adverse employment action, and (4) the circumstances give rise to an inference of discrimination (for example, similarly situated employees outside the protected class were treated differently)."  *Lake v. Yellow Transp., Inc.*, 596 F.3d 871, 874 (8th Cir. 2010).  If the plaintiff establishes a prima facie case, a presumption of discrimination is established and the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973).  The defendant need not persuade the court that the articulated reason was the basis of the employer's action; rather, it must simply provide some evidence of a non-discriminatory reason or reasons for its action.  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510-11 (1993) (citing *McDonnell Douglas Corp*, 411 U.S. at 254).

Upon the proffer of such evidence, the burden shifts back to the plaintiff to prove that the reason articulated by the employer was really a pretext for discrimination.  *Aucutt v. Six Flags Over Mid-America, Inc.*, 85 F.3d 1311, 1316 (8th Cir. 1995).  A rejection of the employer's proffered non-discriminatory reason by itself or combined with elements of the prima facie case

may be enough to establish, but does not compel, an inference of intentional discrimination. *St. Mary's Honor Ctr.*, 509 U.S. at 511.

Steak N Shake argues that White has failed to make even a prima facie showing of race or sex discrimination under Title VII. Doc. 95, pg. 3-5. As discussed above, the elements of a prima facie case are (1) plaintiff is a member of a protected class, (2) she met his employer's legitimate expectations, (3) she suffered an adverse employment action, and (4) the circumstances give rise to an inference of discrimination. *Lake*, 596 F.3d at 874. As to the first element, Steak N Shake concedes that White is a member of a protected class as to race and sex. Doc. 95, pg. 3.

White has shown that she was meeting Steak N Shake's legitimate expectations at the time of her termination. The evidence shows that White's manager considered her one of his top servers. Steak N Shake argues that White was not meeting legitimate expectations because she refused to turn over the allegedly-contaminated patty when Tardy asked her for it. Doc. 95, pg. 3-4. However, Steak N Shake also asserts that White's refusal to turn over the patty was the reason Tardy fired her. *Id.* pg. 5-6 ("Tardy told White to leave [the store] because she was refusing to turn over the patty, refusing to cooperate in his investigation, and causing a disturbance."). White is not required to disprove Steak N Shake's reason for firing her at this stage of the analysis. *Lake*, 596 F.3d at 874. White establishes her prima facie case "if, setting aside [Steak N Shake]'s reason for firing [her], [s]he was *otherwise* meeting expectations or *otherwise* qualified." *Id.* (emphasis in original); *see also Davenport v. Riverview Gardens Sch. Dist.*, 30 F.3d 940, 944 (8th Cir. 1994) ("[B]y requiring plaintiff to disprove the alleged conduct violations in order to establish his prima facie case, the district court essentially required plaintiff, at the outset, to disprove defendant's alleged business reasons for its adverse

employment action—in other words, to prove pretext and the ultimate issue of intentional discrimination.").  Steak N Shake identifies no other "legitimate expectation" that White allegedly failed to meet.  Accordingly, White has established the second element of her prima facie case.

The third element of a prima facie case is an adverse employment action.  White testified that Tardy fired her.  Although Steak N Shake disputes this characterization of White's termination, the Court must view all contested facts in the light most favorable to White. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011).  Involuntary termination is an adverse employment action.  *Spears v. Missouri Dep't of Corr. & Human Res.*, 210 F.3d 850, 853 (8th Cir. 2000).  Accordingly, White has established the third element of the prima facie case for employment discrimination under Title VII.

The final element of the prima facie case is circumstances that give rise to an inference of discrimination.  *Lake*, 596 F.3d at 874.  White can establish this element of the prima facie case by showing that Steak N Shake treated similarly-situated employees outside the protected classes differently.  *Id.*  White argues that Elmo Green is a similarly-situated employee who engaged in the same or similar behavior but was treated differently.  Doc. 102, pg. 9-10.  Steak N Shake does not dispute that Green is outside White's protected classes,[15] but argues that he is not similarly-situated in the relevant respects.  Doc. 109, pg. 7-9.  Assuming White could establish that Green is similarly-situated, the burden would then shift to Steak N Shake to articulate a "non-discriminatory, legitimate justification for its conduct, which rebuts the employee's prima facie case." *Rodgers v. U.S. Bank, N.A.*, 417 F.3d 845, 850 (8th Cir. 2005) (quoting *Sprenger v.*

---

[15] Melissa White is a white female.  Elmo Green is an African-American male.  Doc. 106-6 at ¶ 1, 6.

*Fed. Home Loan Bank of Des Moines*, 253 F.3d 1106, 1111 (8th Cir. 2001)). "This burden is not onerous." *Bone v. G4S Youth Servs., LLC*, 686 F.3d 948, 954 (8th Cir. 2012).

Setting aside the question of whether White has established the final element of her prima facie case, the Court finds that Steak N Shake has articulated a non-discriminatory, legitimate justification for White's termination. Steak N Shake has offered evidence that Tardy fired White after she refused to turn over the allegedly-contaminated patty, in direct violation of Steak N Shake policy regarding cooperation with company investigations. Insubordination and violation of company policy are legitimate reasons for termination. *See Putnam v Unity Health System*, 348 F.3d 732, 736 (8th Cir. 2003). Accordingly, the burden shifts back to White to prove that Steak N Shake's proffered explanation was really a pretext for discrimination. *Aucutt*, 85 F.3d at 1316.

Assuming without deciding that White could show Green is similarly-situated for purposes of her prima facie case, the Court finds that Green is not similarly-situated for purposes of the pretext analysis.[16] "At the pretext stage, the test for determining whether employees are similarly situated to a plaintiff is a rigorous one." *Bone*, 686 F.3d at 956. (internal quotation marks omitted). "[T]he individuals used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." *Id.* (quoting *Clark v. Runyon*, 218 F.3d 915, 918 (8th Cir. 2000)).

---

[16] "The test to determine if one is similarly situated varies at each stage of a *McDonnell Douglas* analysis. At the prima-facie stage it is "not onerous." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1047 (8th Cir. 2011). However, at the pretext stage the standard is "rigorous." *Id.* at 1051. Further, the Eighth Circuit has recognized two conflicting lines of authority regarding the appropriate test to be applied at the prima facie stage. *See Chappell v. Bilco Co.*, 675 F.3d 1110, 1118 (8th Cir. 2012) ("[T]wo lines of cases in our Circuit have developed two standards for determining whether other employees are 'similarly situated.' One requires that the employees are involved in or accused of the same or similar conduct and are disciplined in different ways, while the other requires that the employees be similarly situated in all respects.") (internal citations and quotation marks omitted)."

Applying this standard, the Court finds that Green is not similarly-situated. He did not "engage in the same conduct without any mitigating or distinguishing circumstances." White argues that Green is similarly-situated because he also took pictures of the contaminated meat and told management that he would report it to the health department. However, White does not dispute that she is the only employee who refused to turn over the contaminated patty to Tardy. In this critical respect, White has failed to show that *any* other employee was similarly-situated. White has offered no other evidence that Steak N Shake's stated reason for her termination, i.e., that she refused to cooperate with Tardy's investigation by turning over the patty, was pretextual. The Court grants summary judgment for Steak N Shake on White's Title VII counterclaim for employment discrimination.

### 3.    Title VII Claim – Sexual Harassment

White also asserts a Title VII claim for sexual harassment. As discussed above, Title VII prohibits discrimination on the basis of sex. 42 U.S.C. § 2000e-2(a). That prohibition includes discrimination in the form of sex-based harassment that creates a hostile work environment.[17] *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 73 (1986); s*ee also Vajdl v. Mesabi Acad. of KidsPeace, Inc.*, 484 F.3d 546, 549 (8th Cir. 2007) ("Sexual discrimination that creates a hostile or abusive work environment is a violation of Title VII of the Civil Rights Act of 1964.") (quoting *Hall v. Gus Constr. Co., Inc.*, 842 F.2d 1010, 1013 (8th Cir. 1988)).

To prove a hostile work environment claim, White must establish that "(1) she is a member of a protected group, (2) she was subjected to unwelcome sexual harassment, (3) the

---

[17] "A claim of sexual discrimination in violation of Title VII may be based on two types of conduct. First, *quid pro quo* sexual harassment, which occurs when submission to sexual conduct is made a condition of concrete employment benefits. The second type, called hostile work environment, exists when sexual conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." *Jones v. Wesco Investments, Inc.*, 846 F.2d 1154, 1156 (8th Cir. 1988) (internal citations and quotation marks omitted). Here, White has neither alleged nor offered any evidence of *quid pro quo* sexual harassment.

harassment was based on sex, and (4) the harassment affected a term, condition, or privilege of her employment." *Alvarez v. Des Moines Bolt Supply, Inc.*, 626 F.3d 410, 419 (8th Cir. 2010). Steak N Shake argues that White cannot prove either the second or fourth factors, i.e., she cannot show she was subjected to any harassment based on her sex and she cannot show that any such harassment "affected a term, condition, or privilege of her employment." Doc. 95, pg. 9-11.

White has identified only one incident of alleged sexual harassment. She testified that George Nicholson, her general manager, told her on or about December 10, 2017 "all you do is bitch" and "all [you] girls do is eat donuts." Doc. 96-4 at 61:18-25. Steak N Shake argues that this statement does not constitute harassment based on sex because Nicholson did not intend the term "bitch" as a gendered insult, but rather as a synonym for "complain."

Assuming without deciding that this incident qualifies as sex-based harassment, the Court finds that it does not satisfy the fourth element of a hostile work environment claim. White has failed to show that this single incident affected a term, condition, or privilege of her employment. To satisfy this element, White must demonstrate that the harassment was "sufficiently severe or pervasive as to affect a term, condition, or privilege of employment by creating an objectively hostile or abusive environment." *Alvarez*, 626 F.3d at 420 (quoting *Meriwether v. Caraustar Packaging Co.*, 326 F.3d 990, 993 (8th Cir. 2003)). "The standards for a hostile environment are demanding, and 'conduct must be extreme and not merely rude or unpleasant to affect the terms and conditions of employment.'" *Id.* (quoting *Alagna v. Smithville R–II Sch. Dist.*, 324 F.3d 975, 980 (8th Cir. 2003). To clear the high threshold of actionable harm, White must "show that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult.'" *Duncan v. Gen. Motors Corp.*, 300 F.3d 928, 934 (8th Cir. 2002) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S.

17 (1993)).  "More than a few isolated incidents are required."  *Scusa v. Nestle U.S.A. Co.*, 181

F.3d 958, 967 (8th Cir. 1999).

In *Scusa*, the Eighth Circuit upheld the district court's grant of summary judgment to the

employer, even where plaintiff complained to her employer about nine incidents involving

unpleasant conduct and rude comments.  *Id.*  In *Duncan*, the Eighth Circuit reversed a jury

verdict and held as a matter of law that plaintiff could not establish a prima facie case of hostile

work environment.  300 F.3d at 933-34.  The *Duncan* plaintiff was propositioned by a

supervisor, touched on the hand on five occasions, requested to sketch a vulgar planter, and

subjected to jokes about being a "Man Hater." *Id.* at 931-32.  Despite this, the Eighth Circuit

concluded that "the alleged harassment was not so severe or pervasive as to alter a term,

condition, or privilege of Duncan's employment." *Id.* at 934.  Moreover, the court noted that

"[n]umerous cases have rejected hostile work environment claims premised upon facts equally or

more egregious that the conduct at issue here." *Id.* at 934-35 (collecting cases).

White has not identified any case in which a plaintiff established a hostile work

environment claim based on a single isolated incident of sex-based harassment.  The Court finds

that White has failed to demonstrate that the alleged sexual harassment (if it is that) affected a

term, condition, or privilege of her employment.  Accordingly, the Court grants Steak N Shake's

motion for summary judgment on White's Title VII sexual harassment counterclaim.

### 4.    Intentional Infliction of Emotional Distress

White last counterclaims against Steak N Shake for intentional infliction of emotional

distress.  "In Missouri, to state a claim of intentional infliction of emotional distress, a plaintiff

must plead: (1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was

extreme and outrageous; and (3) the conduct caused severe emotional distress resulting in bodily

harm." *Diehl v. Fred Weber, Inc.*, 309 S.W.3d 309, 321 (Mo. Ct. App. 2010) (citing *Gibson v Brewer*, 952 S.W.2d 239, 249 (Mo. banc 1997)). White argues that her wrongful termination by Tardy constituted intentional infliction of emotional distress. Doc. 102, pg. 22.[18] White testified that her termination from Steak N Shake caused her severe stress. Doc. 105-2 at 279:8-24. She testified that she spoke to her physician on more than one occasion about stress and depression related to her termination. *Id.* at 279:5-281:18.

Steak N Shake argues that White's intentional infliction of emotional distress claim fails as a matter of law because the Missouri Worker's Compensation Law supplants White's common law claim. The exclusivity provision of the Missouri Workers' Compensation Law provides as follows:

> [t]he rights and remedies herein granted to an employee shall exclude all other rights and remedies of the employee ... at common law or otherwise, on account of such accidental injury or death, except such rights and remedies as are not provided for by this chapter.

Mo. Rev. Stat. § 287.120.2.

The Missouri Supreme Court has determined that Missouri's "workers' compensation law is substitutional; it supplants all other common-law rights of an employee if the act is applicable." *State ex rel. McDonnell Douglas Corp. v. Ryan*, 745 S.W.2d 152, 153 (Mo. banc 1988); *see also Waldermeyer v. ITT Consumer Financial Corp.*, 767 F. Supp. 989, 993 (E.D. Mo. 1991) ("[The] Missouri's Workers' Compensation Law provides the exclusive remedy for emotional distress inflicted during the course of employment"). However, in *Kientzy v.*

---

[18] In her counterclaim (Doc. 18), White also alleged that Steak N Shake's filing of the present defamation action against her constituted intentional infliction of emotional distress. *Id.* at ¶ 110. White has offered no evidence that intent to inflict emotional distress was even a partial, much less the only, reason why Steak N Shake asserted its defamation claim. Further, White has not responded, in either her reply or sur-reply, to Steak N Shake's motion for summary judgment as to those allegations. Thus, the Court deems this specific claim abandoned and grants summary judgment for Steak N Shake. *Satcher v. Univ. of Ark. at Pine Bluff Bd. of Trustees*, 558 F.3d 731, 735 (8th Cir. 2009) ("[F]ailure to oppose a basis for summary judgment constitutes waiver of that argument.").

*McDonnell Douglas Corp.*, 990 F.2d 1051 (8th Cir. 1993), the Eighth Circuit recognized an

exception to the Workers' Compensation exclusivity provision.  In that case, the plaintiff claimed

that her emotional distress injury resulted from her unemployment following the discriminatory

discharge.  The Court found that because such injury did not arise "out of and in the course of ...

employment," Mo. Rev. Stat. § 287.120, the Workers' Compensation Law did not apply and,

therefore, the exclusivity provision did not bar the plaintiff's claim.  *Kientzy*, 990 F.2d at 1060-

61.  As in *Kientzy*, White's alleged emotional distress injury resulted from the act of allegedly-

wrongful discharge.  White testified regarding stress and depression that occurred after and were

related to her involuntary termination.  Thus, the alleged injury did not arise out of and in the

course of her employment and White's claim is not barred by the exclusivity provision of the

Missouri Worker's Compensation Law.  *Kientzy*, 990 F.2d at 1060.

       Steak N Shake also argues that White's intentional infliction of emotional distress claim

fails because White has failed to show that Steak N Shake's motivation in firing her was to

inflict emotional distress.  Doc. 95, pg. 17-18.  To support a claim for intentional infliction of

emotional distress, "[t]he conduct must have been so outrageous in character, and so extreme in

degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and

utterly intolerable in a civilized community."  *Gibson*, 952 S.W.2d at 249 (internal quotation

marks omitted).  Further, the conduct "must be 'intended *only* to cause extreme distress to the

victim."  *Id.* (quoting *K.G. v. R.T.R.*, 918 S.W.2d 795, 799 (Mo. banc 1996)) (emphasis added);

*see also Geran v. Xerox Educ. Servs., Inc.*, 469 S.W.3d 459, 468 (Mo. Ct. App. 2015) ("[T]he

plaintiff must demonstrate that the sole intent in acting was to cause emotional distress.").

       In *Geran*, the Missouri Court of Appeals affirmed summary judgment on a claim of

intentional infliction of emotional distress where the plaintiff could not prove that defendant's

sole motivation was to cause emotional distress. *Id.* The defendant offered evidence of a

legitimate reason for the conduct and the plaintiff failed to rebut it. *Id.*; *see also Thomas v.

Special Olympics Mo., Inc.*, 31 S.W.3d 442, 449 (Mo. App. W.D. 2000) (where defendants set

forth evidence that their actions were driven at least partially by legitimate reasons, and plaintiffs

failed to contravene that evidence, plaintiffs failed to establish that defendants acted with the sole

motivation to cause emotional distress, and summary judgment in favor of defendants was

proper). As in *Geran* and *Thomas*, Steak N Shake has offered evidence that it had legitimate

reasons for terminating White's employment. Steak N Shake policy requires employees to fully

cooperate with company investigations. By her own admission, White refused to turn over the

allegedly-contaminated patty to Tardy when he asked her for it. Thus, White has failed to

establish that Steak N Shake's sole motivation in firing her was to cause emotional distress.

Accordingly, the Court grants summary judgment for Steak N Shake on White's counterclaim

for intentional infliction of emotional distress.

### C.       Miscellaneous Motions

Finally, the Court considers two ancillary motions filed in connection with Steak N

Shake's Motion for Summary Judgment on White's counterclaims. First, Steak N Shake filed a

Partial Motion to Strike, Doc. 116, White's amended responses to Steak N Shake's Statement of

Undisputed Material Facts, Doc. 114. The Court denies[19] the Motion to Strike, Doc. 116.

Similarly, Steak N Shake opposed, Doc. 119, White's Motion for Leave to File Sur-

Reply to Steak N Shake's Reply in Support of its Motion for Summary Judgment, Doc. 118.

The Court grants White's Motion for Leave to File a Sur-Reply.

---

[19] In ruling on Steak N Shake's Motion for Summary Judgment, the Court has considered White's responses to Steak N Shake's Statement of Undisputed Material Facts *as amended*, and nevertheless grants Steak N Shake's Motion for Summary Judgment on all of White's counterclaims. Steak N Shake's Motion to Strike is, therefore, moot.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff Steak N Shake's Motion to Exclude the report, opinions, and testimony of Dr. Catherine Hutt, Doc. 77, is GRANTED, in part, and DENIED, in part, as set forth above.

**IT IS FURTHER ORDERED** that Steak N Shake's Motion to Exclude to report, opinions, and testimony of Dr. Jeffrey Tomberlin, Doc. 79, is DENIED.

**IT IS FURTHER ORDERED** that Plaintiff Steak N Shake's Motion for Summary Judgment on Defendant's Counterclaims, Doc. 94, is GRANTED.

**IT IS FURTHER ORDERED** that Defendant Melissa White's Motion for Leave to File Sur-Reply, Doc. 118, is GRANTED.

**IT IS FURTHER ORDERED** that Steak N Shake's Partial Motion to Strike, Doc. 116, is DENIED as moot.

So Ordered this 7th day of January, 2020.

**STEPHEN R. CLARK**
**UNITED STATES DISTRICT JUDGE**