IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| STEAK N SHAKE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:18-cv-0072-SRC |
| | ) | |
| MELISSA WHITE, | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFF'S TRIAL BRIEF

Plaintiff Steak N Shake, Inc. ("Plaintiff" or "SNS") has provided its famous steak burgers to customers and patrons of its restaurants since 1934. SNS maintained a store located at 1955 N. Lindbergh, Florissant, MO 63132 (Store No. 176). Defendant Melissa White ("Defendant" or "White") worked at that SNS location as a server trainer from July 2016 to January 5, 2018. White's employment ended on January 5, 2018, when White refused to cooperate in a company investigation that she initiated. While preparing a hamburger patty for her own employee meal, White alleges that she saw worms in the patty after she put it on the grill and smashed a portion of it down with a spatula. White was wrong; there were no worms in the patty. Rather, fat from the hamburger patty rose to the surface of the meat when White applied pressure to the patty in cooking it. There were no worms in the meat on January 5, 2018.

Following the district manager's immediate investigation of the allegation, in which he found no evidence of worms in any of the hamburger patties he inspected, White remained uncooperative, creating a disturbance at the store, necessitating a call to the Florissant Police Department. Within an hour of being asked to leave the restaurant that morning, White posted defamatory statements on Facebook about SNS, which resulted in tens of thousands of shares, and multiple instances of individuals saying they would never eat at SNS again. SNS attempted

to address the Facebook post through the lesser action of a cease and desist letter. When White failed to respond, SNS had no choice but to file this defamation action against White.

## I.   WHITE SHOULD BE FOUND LIABILE FOR DEFAMATION (LIBEL)

Defamation is a common law claim designed to protect the reputation and identity of not only an individual, but also a corporation. Missouri law recognizes two categories of defamation: libel and slander. In this case, the appropriate category is libel because SNS's claim is based on a *written* publication (a public Facebook post). Additionally, defamation claims are further delineated by the classification of the filing party as either a public figure or private figure. "To prevail on a defamation claim, both public-figure and private-figure plaintiffs must prove 1) publication, 2) of a defamatory statement, 3) that identifies the plaintiff, 4) that is false, 5) that is published with the requisite degree of fault, and 6) damages the plaintiff's reputation." *Smith v. Human Society of the United States*, 519 S.W.3d 789, 798 (Mo. banc 2017) (internal citations omitted).

### A.  Publication

It is an undisputed fact that White made the requisite publication when she posted to Facebook at 12:23 p.m. on January 5, 2018, the following:

> **#SHARESHARESHARE** JUST GOT FIRED FROM STEAK N SHAKE ON FLORRISANT AND LINBERGH ROAD BECAUSE I FOUND LIVE WORMS WHILE COOKING A STEAKPATTY MOVING INSIDE OF IT AND REFUSED TO SELL THAT MEAT ……WELL RIGHT NOW **#RIGHT NOW** THEY ARE STILL SELLING SAME MEAT **#NOONEEVENCHECKEDIT**. I JUST DON'T WANT EVERYONE GETTING SICK. I JUST GOT FIRED FOR NOTHING I HAVE A FAMILY THIS SHIT IS NOT RIGHT I DID NOTHING WRONG **#FOX2 #ELLIOT** WAY

The parties have stipulated to this fact. White published this statement on a social media site intended for public view, and it was in fact viewed by the public. She clearly intended for this posting to be communicated to as many people as possible as evidenced by her

"#SHARESHARESHARE" statement at the very beginning of the post. In fact, by January 22, 2018, White's publication was shared at least 36,654 times and "liked" by at least 7,400 other individuals. This is does not take into account the presumably thousands of others who saw, read, or heard about White's post who are not quantified by Facebook's simple page metrics. There is no doubt that White's posting is a publication, satisfying the first element of defamation.

**B.  Defamatory Statement**

It is also abundantly clear from White's publication that the statements she made against SNS were defamatory. Her statements cast negative light upon SNS, its food service, and its reputation as a purveyor of food and drink. "A communication is defamatory if it tends to so harm the reputation of another as to lower him in the estimation of the community to deter third persons from associating or dealing with him." *Henry v. Halliburton*, 690 S.W.2d 775, 779 (Mo. 1985). In determining whether a publication is defamatory in meaning, the court should apply two standards: (1) the alleged defamatory words "be stripped of any pleaded innuendo … and construed in the most innocent way"; and (2) "the words must be considered in context, giving them plain and ordinarily understood meaning." *Sterling v. Rust Communications*, 113 S.W.3d 279, 282 (Mo. App. S.D. 2003) (*citing Nazeri v. Missouri Valley College*, 860 S.W.2d 303, 311 (Mo. banc 1993)).

White's statements clearly are targeted as SNS. Furthermore, it is clear that White statements are intended to defame, disparage, and sully SNS's reputation as a food service provider. Her comments indicate that SNS has worms in its hamburger patties and is knowingly selling tainted meat.  White's statements were defamatory and intended to be defamatory, as she identifies Plaintiff almost immediately in her posting. Moreover, she implies that SNS wrongfully "fired" her, directly implying that SNS's actions were inappropriate. This is further

evidenced by her statements that "I just got fired for nothing" and "this shit is not right." Her statements in her Facebook post not only lowered SNS's reputation in the community, but also deterred third persons from patronizing SNS, as evidenced by the comments made in response to White's posting. Clearly, White's statements as contained in her post are defamatory.

### C.  Identifies the Plaintiff

Again, there is no question that White identifies SNS directly in her defamatory statements. In the first line of her posting, she identifies "Steak N Shake." Not only does she identify Plaintiff, she specifically identifies the store on "Florrisant and Lindbergh Road." This statement is not in dispute – White has stipulated to it. Therefore, Defendant identifies Plaintiff in her defamatory Facebook post, satisfying this element.

### D.  The Statement is False

In analyzing a defamatory statement's falsity, the court "must determine whether the 'gist' or 'sting' of the statements was false." *Cockram v. Genesco, Inc.*, 680 F.3d 1046, 1051 (8th Cir. 2012). In determining the "gist" or "sting" of the statements, the court must look "at the highlight of the broadcast, the pertinent angle of it, and not to the items of secondary importance which are inoffensive details, immaterial to the truth of the defamatory statement." *Lundell Mfg. Co. v. American Broadcasting Companies, Inc.*, 98 F.3d 351, 360 (8th Cir. 1996). Moreover, determining the literal falsity of a statement requires an examination of the statement in full context. *Others First Inc. v. Better Business Bureau of Great St. Louis, Inc.*, 105 F.Supp.3d 923, 930 (E.D. Mo. 2015) (stating "[t]he alleged defamatory words must also be considered in context, and the words are given their plain an ordinarily understood meaning"); *see also Process Controls Intern., Inc. v. Emerson Process Management*, 753 F.Supp.2d 912, 929 (E.D.

Mo. 2010) (interpreting falsity of claims and statements under the Lanham Act's prohibition of making false or misleading representations of fact in commercial advertisements).

White's statements are riddled with falsehoods, but more importantly, the "gist" or "sting" of White's statements is certainly false. The primary gist of her statements is that SNS was serving worm-infested meat, without regard for consumer safety. This is certainly not true, but the falsity of this publication becomes more evident when White's statements are analyzed individually as part of the whole publication. Parsing those statements reveals several falsities, each of which alone satisfies the element of falsehood for defamation claims. Together, they demonstrate a more egregious defamation of SNS's operations and integrity as a food service corporation and corporate citizen.

First, White immediately declared that she was fired from her job. This is false, as White quit in the heat of anger when she left her position and did not return. Second, White wrote she was fired because she "found live worms while cooking a steak patty moving inside of it and refused to sell that meat." However, White was not fired for this at all; rather, she quit. Even assuming she was fired when she was told to leave, the reason for that was because of her failure to cooperate in SNS's investigation, as she refused management's multiple requests to see the actual hamburger patty she alleged had worms in it.

Third, and still focusing on this worm statement, White did not find worms in the hamburger patty. What she actually saw was fat particles coming to the surface when she spatted (or smashed) the corner of the patty.[1] There were no worms in this patty. Thus, her statement is wholly false. Moreover, White never confirmed that what she saw was a worm at all. In fact, it took her more than eleven months after January 5, 2018, to get any *qualified* opinion on what

---

[1] This is a simply physics lesson, whereby force applied to one portion of a solid has an equal, but opposite reaction to the other portions. Here, she smashed on corner of the patty, so the contents of the steak patty (meat and fat) pushed up to compensate for the pressure of her smashing the corner down.

was in the steak patty, and that opinion is limited specifically to the moment when the patty was inspected. Moreover, the opinion at the time of inspection is that the patty contained three fly larvae; no worms were ever identified. White can offer no competent or definitive evidence to establish there were worms in that steak patty on January 5, 2018.

Fourth, White published that she refused to sell the contaminated meat. Again, this is false. The patty that White believed to be contaminated was intended for her own employee meal, not for sale to customers. The fact of the matter is that White was never asked to sell any of the meat, she never witnessed anyone sell any contaminated meat, or saw any other meat, other than the hamburger patty she prepared for herself, that contained any "worms" or any other contamination. This statement is false, and at best, White made this statement with reckless disregard as to the truth of it.

Fifth, White published that SNS "[was] still selling the same meat." This is undeniably false, as White has already admitted she only saw contamination in the single hamburger patty that she prepared for her employee meal. She never witnessed or observed SNS selling any other worm-infested (or otherwise contaminated) meat. She has no knowledge of whether any other patties contained worms or if those patties were sold. Moreover, White admits that, as of 12:23 p.m., the time of the Facebook post, White had left SNS and was never intending to return.  She could not possibly have personal knowledge of what was occurring at SNS (*i.e.*, whether they were "still selling" contaminated meat), because she *was not there*. There were no worms, and there were no contaminated patties sold. This is an unequivocally false statement.

Sixth, White declared "**#NOONEEVENCHECKEDIT**." This statement is false and problematic for several reasons. First, no one was able to check the patty she alleged had worms in it because White *refused to provide* the patty to anyone. On at least three occasions, SNS

management requested the patty from White, but she refused to turn it over or otherwise cooperate in management's investigation. Then, White took the patty with her when she left the premises, never allowing anyone at SNS to examine it or view it again. To this day, no one from SNS has, in person, seen the patty White alleges had worms in it. Second, Frank Tardy, the District Manager, conducted an investigation and examined the other meat in the restaurant, including patties in all of the pans in the walk-in cooler, from which the allegedly worm-filled patty came. White fails to mention this inspection in her Facebook post, instead giving the public the impression SNS failed to check any meat at all. In fact, she also fails to mention that she *refused* to let anyone check the patty. Her omissions are glaring and further reinforce the falsehoods contained in this statement.

Seventh, White wrote that "I GOT FIRED FOR NOTHING…I DID NOTHING WRONG." Again, White fails to mention her refusal to provide the allegedly contaminated patty to SNS, thereby failing to cooperate in SNS's investigation. This action is a terminable offense on its own. White's actions were inappropriate in that she refused to turn over the patty, just as her actions were inappropriate in creating a disturbance in the restaurant upon the arrival of the District Manager. White's claim that she did nothing wrong and was fired for nothing is a tremendous stretch of truth and reality. First, she was not fired. Second, she did do something wrong, actually several things, as noted above. These are falsehoods without question.

Without doubt, White's publication contained several falsehoods regarding the incident that occurred on January 5, 2018, and, more importantly, "the 'gist' or 'sting' of the statements was false." *Cockram*, 680 F.3d at 1051. Because of White's false statements against SNS, SNS suffered damage to its reputation and its financial health.

### E.  Published with the Requisite Degree of Fault

a.  <u>SNS is a Private Figure</u>

Determining the requisite degree of fault required for proving a defamation claim depends on the status of the figure filing the claim. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342-47 (1974). There exists three possible classifications for defamation plaintiffs:  private figure, public figure, and limited-public figure. *Id.*; *see also Cockram*, 680 F.3d at 1052-53. Entities and individuals are most commonly classified as public or limited public figures when they "thrust themselves to the forefront of public controversies in order to influence the resolution of these issues involved." *Gertz*, 418 U.S. at 345. Public figures invite attention and comment. *Id.* A limited public figure is one "who voluntarily injects himself or are drawn into a particular public controversy, and thereby becomes a public figure for a limited range of issues." *Lundell Mfg. Co.*, 98 F.3d at 362 (citing *Gertz*, 418 U.S. at 351).

Depending on the characterization of the party pursing the defamation claim, a different fault standard applies. *See Overcast v. Billings Mutual Ins. Co.*, 11 S.W.3d 62, 70 (Mo. banc 2000). For private figures, the requisite degree of fault is negligence. *Id.* For public figures, the requisite degree of fault is actual malice. *Bauer v. 7-Eleven, Inc.*, 391 S.W.3d 25, 28 (Mo. App. E.D. 2012) (citing *Glover v. Herald Co.*, 549 S.W.2d 858, 860-61 (Mo. banc 1977)).  The determination of a defamation plaintiff's status as a public or private figure is a threshold issue of law for the Court to decide. *Lundell Mfg. Co.*, 98 F.3d at 362 (citing *In re IBP Confidential Business Documents Litigation*, 797 F.2d 632, 644 (8th Cir. 1986)).

In this case, SNS is a private figure. SNS does not occupy any position of persuasive power or influence, deeming it a public figure, nor has it attained any role of prominence in the affairs of society to bestow on it the classification of public figure. *See Gertz*, 418 U.S. at 345. Furthermore, SNS did not thrust itself to the forefront of any controversy in order to influence

resolution of the issues. *See Lundell Mfg. Co.*, 98 F.3d at 363. The controversy in this case is, of course, White's defamatory Facebook post and the ensuing public backlash (as demonstrated, in part, by the comments to her post). Focusing on SNS's role in the controversy – which was none, it is abundantly clear that SNS is not a public or limited-public figure. *Id.* at 364 (holding that Lundell Manufacturing Co., a corporation, is a private figure for purposes of defamation because it did not inject itself into a controversy nor did it have access to the media to refute the defamatory report, as evidenced by defendant's denial of Lundell's request for a retraction). SNS took absolutely no public action (until filing this lawsuit) to debate White's Facebook post. It did not make a corporate comment to the post itself, or issue a press release or other public statement refuting her publication. To the contrary, it sent White a private letter asking that she remove the Facebook post. When she failed to do so, SNS took the legitimate and protected action of filing this defamation lawsuit. Like the plaintiff in *Lundell Mfg. Co.*, SNS cannot be classified as a public or limited-public figure. *Id.* at 363-64; *see also Bigfoot on the Strip, LLC v. Winchester*, No. 18-3155-CV-S-BP, 2019 WL 4144320, at *9 (W.D. Mo. Aug. 30, 2019). SNS is clearly a private figure, and therefore the requisite degree of fault applicable to this matter is negligence, not actual malice.

> b. White's Actions in Publishing the Facebook Post Were at Least Negligent

Because SNS is a private figure for purposes of this defamation claim, it must simply prove that White's actions in publishing the Facebook post were negligent. *Cockram*, 680 F.3d at 1053. White's statements, which are injuriously and unequivocally false, were certainly made negligently and without regard as to whether they were true or false.

White's statements, made shortly after she alleges she was "fired" from her job, clearly reflect White's failure to reasonably determine whether those statements were true before

publishing them to Facebook. White failed to do any investigation of her own to verify the claims she made in her post. In fact, it took her over eleven (11) months to actually obtain any qualified opinion on the contents of the hamburger patty she removed from SNS on January 5, 2018. White admits she did not have any education or training in entomology or other science that would qualify her to identify what she allegedly found in the patty. Moreover, she was not privy to, nor did she witness the district manager's investigation of her alleged complaint of worms in the patties. She did not verify with the St. Louis County Health Department, either, which made the determination after its own investigation the same day that there were no violations at SNS's Store No. 176. She merely made unverified, unsupported, and inflammatory claims against SNS. Considering the circumstances that unfolded immediately prior to her posting, it stands to reason that White's defamatory claims were made out of spite, malice, and anger with what she believed to be her termination.

White's actions in irresponsibly posting her salacious and injurious statements to Facebook were clearly negligent. She undertook no action whatsoever to verify or even corroborate the veracity of her claims before making them public through her Facebook post. Because she wanted immediate reaction and attention, White failed to take any reasonable measures to ascertain the truth of her claims. Thus, she was negligent in making them.

### F.  Damage to SNS's Reputation

Due to White's defamatory and incendiary statements, which were viewed by at least thirty thousand (30,000) people, and likely many thousands more, White damaged SNS's reputation (which was her primary purpose) by exposing SNS to the public's "hatred, contempt, or ridicule" and by "depriving [it] of the benefits of public confidence and social intercourse." *See Maxwell v. Express Scripts, Inc.*, No. 4:11CV1315 CDP, 2012 WL 996651, at \*6 (E.D. Mo.

March 22, 2012). SNS suffered damages based not only on White's negligence, but also on the malice of her posting.

  a. <u>Actual Damages</u>

  "To demonstrate actual damages [in Missouri], plaintiffs must show that defamatory statements caused a quantifiable professional or personal injury, such as interference with job performance, psychological or emotional distress, or depression." *Cockram*, 680 F.3d at 1054 (citing *Arthaud v. Mutual of Omaha Ins. Co.*, 170 F.3d 860, 862 (8th Cir. 1999)). SNS suffered quantifiable professional injury in the form of lost revenue. SNS will demonstrate its losses through Mike Conner, Senior Director Operating Controls and SNS's damages expert, who has calculated the lost revenue and sales in the St. Louis market (at specific stores, including Store No. 176) following White's defamatory Facebook post. In addition, the comments published in response to White's Facebook post, including many instances of individuals declaring they would never eat at SNS again, also demonstrate reputational damage to SNS. In fact, the comments alone establish the reputational loss suffered by SNS as a direct result of White's defamatory statements on Facebook.

  It is without question that SNS suffered reputational loss because of White's statements, which she posted with the clear intent to disparage and defame SNS, especially Store No. 176.

  b. <u>Punitive Damages</u>

  In order to establish an award of punitive damages, the plaintiff must demonstrate, through clear and convincing evidence, that the defendant made the defamatory statements with actual malice. *Gertz*, 418 U.S. at 323; *Englezos v. Newspress and Gazette Co.*, 980 S.W.2d 25, 30 (Mo. App. W.D. 1998). In Missouri,

  In order to recover punitive damages, or overcome a qualified privilege, [a private figure] plaintiff was required to prove that the statements were made with knowledge that

they were false or with reckless disregard for whether they were true or false at the time when defendant had serious doubts as to whether they were true.

*Id.* at 33 (citing *Carter v. Willert Home Products, Inc.*, 714 S.W.2d 506, 512 (Mo. banc 1996)).

Furthermore, the U.S. Supreme Court defines "reckless disregard" as follows:

> Reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of the publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice.

*Id.* (citing *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968)). This is the standard Missouri courts apply to determine malice.

White's statements were certainly made with reckless disregard for their truth. It is evident from the formatting of her Facebook post that she prioritizes the "fired" allegation, demonstrating that this post was delivered with vengeance and retribution in mind, rather than public concern. She admittedly has no professional or specialized understanding of entomology that would allow her to make a determination of whether there was a worm in the hamburger or not. She did not have the hamburger patty tested before publishing her statements. She was no longer present at the restaurant to be able to say whether SNS was selling contaminated meat to customers. And, she did not remove her post, even when she saw the detrimental affect it was having on SNS's reputation (through the thousands of shares, like, and comments). Her actions demonstrate malice, as they were designed primarily to injure SNS in retaliation for what she believed to be her firing.

White's statements were not only negligent, but made with actual malice. Because of her malicious publication, SNS is entitled to punitive damages as well.

## II.   THE PROCEDURE OF THE TRIAL

Pursuant to the most recent Case Management Order (Doc. #67, dated April 18, 2019), trial is scheduled to begin on Monday, February 10, 2020. SNS anticipates 3-4 days for this trial. SNS anticipates presenting its case in chief from Monday afternoon (following empanelment and opening statements) through end of day Tuesday or Wednesday morning. SNS will be prepared to conduct a jury instruction conference, as well as argue any necessary motions or deal with other trial matters, at the Court's convenience.

SNS will be represented at trial through its corporate representative Mike Conner, as well as its counsel Erin Williams and Tom Chibnall, and paralegal Susan Horneker.

## III.   CONCLUSION

Plaintiff submits that it is a victim of Defendant's defamatory statements, published through the very public form of Facebook and viewed by tens of thousands of people, resulting in reputational and economic damage to SNS, both at Store No. 176 and the surrounding stores, and to SNS's overall brand and image. After a trial on the merits, SNS is confident it will secure a judgment in its favor.

Respectfully submitted,

**OGLETREE, DEAKINS, NASH, SMOAK
& STEWART, P.C.**

*/s/ Erin E. Williams*
Erin E. Williams, MO #60935
Thomas R. Chibnall,  #
7700 Bonhomme Avenue, Suite 650
St. Louis, MO  63105
Telephone:  314-802-3935
Facsimile:  314-802-3936
erin.williams@ogletree.com

Attorneys for Plaintiff  Steak N Shake, Inc.

## CERTIFICATE OF SERVICE

The undersigned certifies that on January 21, 2020, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system which sent notification to all counsel of record.

*/s/ Erin E. Williams*
Attorneys for Plaintiff  Steak N Shake, Inc.

41472360.1