UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

STEAK N SHAKE, INC.,          )
                              )
        Plaintiff,            )
                              )
        v.                    )   No. 4:18-CV-00072-SRC
                              )
MELISSA WHITE,                )
                              )
        Defendant.            )


JURY TRIAL - VOLUME 1
FRANK TARDY EXCERPT

BEFORE THE HONORABLE STEPHEN R. CLARK
UNITED STATES DISTRICT JUDGE


JUNE 14, 2021


APPEARANCES:
For Plaintiff:        Erin E. Williams, Esq.
                      Thomas R. Chibnall, Esq.
                      OGLETREE DEAKINS - ST. LOUIS
                      7700 Bonhomme Ave., Suite 650
                      St. Louis, MO 63105


For Defendant:        Samuel Henderson, Esq.
                      ARCH CITY DEFENDERS
                      440 N. 4th Street, Suite 390
                      St. Louis, MO 63102


REPORTED BY:          REAGAN A. FIORINO, RMR, CRR, CSR, CRC, CCR
                      Official Court Reporter
                      United States District Court
                      111 South Tenth Street, Third Floor
                      St. Louis, MO 63102 | (314)244-7989

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
PRODUCED BY COURT REPORTER COMPUTER-AIDED TRANSCRIPTION

*Steak N Shake, Inc. v. Melissa White | 4:18-CV-00072*

1                              INDEX

2   PLAINTIFF'S EVIDENCE

3           FRANK TARDY

4       Direct Examination By Mr. Chibnall . . . . . . . . 3

5       Cross-Examination By Mr. Henderson . . . . . . . .94

6       Redirect Examination By Mr. Chibnall . . . . . . 118

7   Reporter's Certificate  . . . . . . . . . . . . . . 120

8

9                              *   *   *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Steak N Shake, Inc. v. Melissa White | 4:18-CV-00072*

1                          <u>**FRANK TARDY,**</u>

2    having been first duly sworn in by the clerk, testified:

3          **THE COURT:**  Mr. Tardy, go ahead and remove your

4    mask, please.

5          **THE WITNESS:**  Thank you.

6          **MR. CHIBNALL:**  Your Honor, before I begin, we've got

7    exhibit binders prepared for the witness box, and I believe

8    for yourself as well, to help be as expeditious as possible in

9    this proceeding.  Can we provide those to you?

10         **THE COURT:**  Any objection?

11         **MR. HENDERSON:**  No, Your Honor.

12         **THE COURT:**  Are you going to be displaying them on

13   the projector as well?

14         **MR. CHIBNALL:**  Correct.  These are for convenience

15   purposes.

16         **THE COURT:**  Okay.  Thank you.

17                      **DIRECT EXAMINATION**

18   BY MR. CHIBNALL:

19   Q.   Good afternoon, Mr. Tardy.

20   A.   Good afternoon.

21   Q.   Would you mind, for the jury's sake, please, stating your

22   full name for the record.

23   A.   Frank Tardy.

24   Q.   And, Mr. Tardy, are you currently employed?

25   A.   Yes.

1   Q.   And who is your current employer?

2   A.   HOA Brands.

3   Q.   Can you explain to us who is HOA Brands?

4   A.   They are Hooters and they are doing a spin-off of

5   themselves called Hoots Wings.  I oversee that division.

6   Q.   Did you previously work for Steak N Shake?

7   A.   Yes.

8   Q.   And about how many years ago today did you work at Steak

9   N Shake?

10  A.   About three years ago.

11  Q.   And for about how long did you work for Steak N Shake?

12  A.   Two and a half years.

13  Q.   And while you were employed by Steak N Shake, what

14  positions did you hold?

15  A.   District manager.

16  Q.   Okay.  And since your employment ended at Steak N Shake,

17  have you held other jobs between the HOA job and the job at

18  Steak N Shake?

19  A.   Yes.

20  Q.   And what were those jobs?

21  A.   Wing Stop, I was director of operations for the Atlanta

22  market.  And then I went to KFC, as a senior area -- company

23  operations.

24  Q.   And as district manager for Steak N Shake, do you recall

25  what your job duties and responsibilities were?

*Steak N Shake, Inc. v. Melissa White | 4:18-CV-00072*

1   A.   Yes.

2   Q.   And what were those?

3   A.   I oversaw the day-to-day operations of anywhere from 8 to

4   13 restaurants.  At the time I left Steak N Shake, I had 13

5   restaurants.

6   Q.   And did that oversight and that management duties, did

7   those include food safety?

8   A.   Yes.

9   Q.   Did those duties include disciplining other employees?

10  A.   Yes.

11  Q.   To whom did you report while you were working for Steak N

12  Shake?

13  A.   Our division president.  Her name was Lucy Laton.

14  Q.   And how long did you interact with Ms. Laton?

15  A.   It differentiated, but on an ongoing basis we talked

16  every Wednesday; so once a week.

17  Q.   So fair to say you talked to her pretty frequently then?

18  A.   Yes.

19  Q.   And while you were the district manager, who reported to

20  you directly?

21  A.   The general managers of the restaurants.

22  Q.   And you previously just said that you had about 8 to 14

23  restaurants; is that right?

24  A.   Yes.

25  Q.   And did that fluctuate for a period of time while you

*Steak N Shake, Inc. v. Melissa White | 4:18-CV-00072*

```
 1   were there?
 2   A.   It fluctuated from season to season, yes.
 3   Q.   So at any given time you would have 8 to 14 direct
 4   reports?
 5   A.   Yes.
 6   Q.   And what territory did you cover while you were working
 7   for Steak N Shake?
 8   A.   Predominantly North County into the city.
 9   Q.   Just for clarification, we are talking North County
10   St. Louis; is that right?
11   A.   Yes.
12   Q.   Prior to working at Steak N Shake, had you had any food
13   service experience or experience working in the food industry?
14   A.   Yes.  I've been in the industry since I was 15 years old.
15   Q.   And where did you get your start at?
16   A.   Taco Bell as a front counter cashier.
17   Q.   How long did you work for Taco Bell?
18   A.   Twelve years.
19   Q.   And did you work various jobs at Taco Bell or were you a
20   cashier the whole time?
21   A.   No, I started as a cashier.  When I left Taco Bell, I was
22   an area coach.  I was a district manager.
23   Q.   And after Taco Bell did you go anywhere else before you
24   ended up at Steak N Shake?
25   A.   Yes.
```

*Steak N Shake, Inc. v. Melissa White | 4:18-CV-00072*

1   Q.   And where did you go?

2   A.   Krystals.

3   Q.   And can you -- for those of us who aren't -- maybe not

4   familiar with the southern delicacy of fast food, could you

5   tell us a little bit about what Krystal is?

6   A.   It's White Castle.

7   Q.   And in that position at Krystal, can you say, again, what

8   was your role?

9   A.   District manager.

10  Q.   And so if you don't mind me asking, Mr. Tardy, how old

11  are you currently?

12  A.   Thirty-two.

13  Q.   So from the time you were 15 to 32, you've been working

14  in fast food restaurants?

15  A.   Yes.

16  Q.   So if my math is good, that would be 17 years; correct?

17  A.   Yes.

18  Q.   And in those 17 years, you've held just about every

19  position you can possibly think of in those fast food chains;

20  right?

21  A.   Up to a director, yes.

22  Q.   Have you ever had to perform an inspection on food

23  products before in any of those roles?

24  A.   Yes.

25  Q.   Is that something that you would have received training

1    on?

2    A.    Yes.

3    Q.    And where would you have received that training?

4    A.    By the company, the employer.  So generally when you are

5    hired by an employer, you go through whatever they consider to

6    be their training background.  Also, I am ServSafe certified

7    as a proctor and an instructor.

8    Q.    And would you have received that training, whether it be

9    ServSafe or by company policy and standards, for each company

10   that you worked with?

11   A.    Yes.

12   Q.    And would you have had various training managers during

13   that time?

14   A.    Yes.

15   Q.    In terms of general food safety and inspection, was there

16   a sort of procedure that was ubiquitous against all of the

17   restaurants you worked at, whether it be KFC, Taco Bell,

18   Krystal or Steak N Shake in this matter?  Was there a

19   procedure for food safety that was sort of ubiquitous for all

20   of them?

21   A.    ServSafe certification.

22   Q.    And ServSafe was something that was used by Steak N

23   Shake; is that correct?

24   A.    Yes.

25   Q.    For what reasons would you conduct an inspection on food

1   product?

2   A.   For just a regular routine visit, a complaint, something

3   might not be out of order.  But most of the time, it was just

4   a regular routine visit.

5   Q.   So this is something that was sort of perfunctory for

6   you?  Anytime you showed up, you would perform a food safety

7   inspection?

8   A.   Yes.

9   Q.   And that was part of your duties as general manager?

10  A.   With Steak N Shake, your first 30 minutes was a food

11  safety walk.

12  Q.   Is that something you did every time you went into a

13  store?

14  A.   Yes.

15  Q.   Is that something that you did before you started working

16  at Steak N Shake?

17  A.   Yes.

18  Q.   And when you say "food safety walk," can you tell us what

19  that means, please.

20  A.   You generally walk the path of food and make sure all the

21  foods are safe and within compliance.

22  Q.   And when you say "path of food," can you describe what

23  that means?

24  A.   If food goes there, you look at it.

25  Q.   So for instance if the food was at the grill, you would

*Steak N Shake, Inc. v. Melissa White | 4:18-CV-00072*

1  go to the grill?

2  A.   Yes.

3  Q.   If the food was in the walk-in cooler, you would go to

4  the walk-in cooler?

5  A.   Yes.

6  Q.   If you had a steak burger, would you go check out the

7  milkshake machine?

8  A.   Yes, I would go check it out.

9  Q.   So you were doing sort of a comprehensive sweep of the

10 restaurant?

11 A.   Yes.

12 Q.   Had you ever had to do a food inspection for possible

13 contamination of worms?

14 A.   Up until then, no.

15 Q.   So prior to January 5, 2018, you never done any -- you

16 never had reason to do a food inspection for contamination of

17 worms or maggots?

18 A.   That is correct.

19 Q.   Was there anything different about your inspection --

20 would there be anything different about your inspection if it

21 had contained -- if there was an allegation of worms or

22 maggots or any other contaminant?

23 A.   No.

24 Q.   What would you have done if there was an allegation of

25 worms or maggots in meat?

Steak N Shake, Inc. v. Melissa White | 4:18-CV-00072

1   A.    I would have did exactly what I did on January 5th.

2   Q.    So the same thing you do on the first 30 minutes of your

3   walk-through; is that right?

4   A.    Yes.

5   Q.    You mentioned this concept called ServSafe; is that

6   right?

7   A.    Uh-huh.

8   Q.    And how long have you been ServSafe certified?

9   A.    Fifteen years.

10  Q.    And for those of us who don't quite understand that or

11  are not as familiar with it, what exactly is ServSafe?

12  A.    ServSafe is a national food database company that

13  certifies different individuals in ServSafe.  Not just in

14  restaurants -- well, in restaurants, but chefs go through it.

15  Different operation level will go through it just to make sure

16  you are well versed in food knowledge.

17  Q.    So ServSafe is not something that's just specific to

18  Steak N Shake, is it?

19  A.    No.

20  Q.    Is it something that's specific to KFC?

21  A.    No.

22  Q.    So it's practiced by everybody in the industry?

23  A.    Yes.

24  Q.    You say you've been ServSafe certified for approximately

25  15 years.  Are you also a ServSafe instructor as well?

*Steak N Shake, Inc. v. Melissa White | 4:18-CV-00072*

1    A.    Yes.

2    Q.    How long have you been a ServSafe instructor?

3    A.    About seven years now.

4    Q.    What does your role as a ServSafe instructor entail?

5    A.    I teach other people how to facilitate classes.

6    Q.    And those classes are in food safety analysis, food

7    safety inspections?

8    A.    Yes.

9    Q.    As a district manager, whether it was Steak N Shake or

10   any other company that you worked for, what is the most

11   important aspect of your job?

12   A.    Food safety and people.

13   Q.    And when you say "people," can you explain to us a little

14   bit what you mean there.

15   A.    I have to have people to follow the food safety

16   protocols.

17   Q.    Food safety is something that you took very seriously; is

18   that right?

19   A.    Yes.

20   Q.    In your opinion, why is food safety the most important

21   part of food service or restaurant industries?

22   A.    Because if you don't serve safe food, you don't get the

23   chance to take any money you make off of it to the bottom

24   line.  So your EBITDA is not going to be there.

25   Q.    And you would agree that restaurants are in the business

1    of purveying food; right?

2    A.    Yes.

3              (Court reporter clarification.)

4              **THE COURT:**  Slow down a little bit, Mr. Chibnall.

5              **MR. CHIBNALL:**  Sure.  I will take my time.

6    Q.    (By Mr. Chibnall)  So is food safety more important in

7    the restaurant business than revenue or profit?

8    A.    Yes.

9    Q.    Is it fair to say you can't have any revenue or profit

10   unless your food is safe?

11   A.    This is correct.

12   Q.    For a business like Steak N Shake, which is a restaurant,

13   and its reputation is a purveying of safe, clean and

14   good-to-eat food, is that important to Steak N Shake?

15   A.    Yes.

16   Q.    Is it something that Steak N Shake takes great pride in?

17   A.    Yes.

18   Q.    Something that Steak N Shake closely guards and watches

19   through its policies, procedures and systems?

20   A.    Yeah.  Yes, it is.

21   Q.    Did Steak N Shake ever use other vendors or third-party

22   entities to conduct food safety inspections?

23   A.    Yes, Steak N Shake did.  Not only did the district

24   managers turn in food safety report on a quarterly basis, they

25   used a third-party company -- EcoSure and Steritech -- once a

*Steak N Shake, Inc. v. Melissa White | 4:18–CV–00072*

1  quarter to conduct unannounced visits to the restaurant.

2  Q.   You said EcoSure and Steritech; is that correct?

3  A.   Yes, sir.

4  Q.   Those are third-party vendors?

5  A.   Yes.

6  Q.   Did they have any affiliation with Steak N Shake

7  whatsoever?

8  A.   Not at all.

9  Q.   Would they do inspections on the same day?

10  A.   Yes.  No, I'm sorry.  I apologize.  I didn't understand

11  your question.

12  Q.   Sorry.  Maybe I should rephrase that.

13        Would EcoSure and Steritech do inspections on the

14  same day, not necessarily Steak N Shake and one of those?

15  A.   They could do them on the same day.  They just couldn't

16  be in the building at the same time.

17  Q.   And why you think -- what was the reason for that?

18  A.   Independent investigation.

19  Q.   Do you know the defendant in this case, Ms. Melissa

20  White?

21  A.   I do.

22  Q.   And did you previously work with her while you were a

23  district manager at Steak N Shake?

24  A.   I did.

25  Q.   And in what capacity did you work with her?  What was her

 1  role?

 2  A.   She was a crew trainer.

 3  Q.   At which store?

 4  A.   Florissant restaurant.

 5  Q.   Did she work at any other stores that you knew of?

 6  A.   Not while I had Florissant.  She only worked in

 7  Florissant.

 8  Q.   And have you ever had any prior conversations with

 9  Ms. White prior to the incidents that happened on January 5,

10  2018?

11  A.   I've had plenty of conversations with Ms. White, yes.

12  Q.   And when you say "plenty of conversations," what kind of

13  conversations were those?

14  A.   Those are just conversations.  She felt there were

15  different issues going on around the restaurant when I had a

16  previous GM there named Mike Lemko [sp].  She would call me

17  and tell me different things she didn't agree with or she

18  didn't like.  Things around time attendance, servers not

19  rolling silverware.  Just different concerns that she had

20  around the restaurant.

21  Q.   Would you characterize any of those conversations as

22  complaints to you?

23  A.   Some of them, yes.

24  Q.   Are you aware of Ms. White ever taking those complaints

25  above you to your boss, Ms. Laton?

*Steak N Shake, Inc. v. Melissa White | 4:18-CV-00072*

1    A.    Yes.  She did it quite frequently.  Before I took over

2    New Florissant, that's how she knew Lucy, because she would

3    reach out to Lucy before I took over that restaurant.

4    Q.    How would you know that Ms. White had reached out to

5    Ms. Laton?

6    A.    Sometimes Lucy would send me a screenshot of the text

7    message if I didn't respond to Ms. White in enough time or

8    Lucy would just call me and tell me to respond to her.

9    Q.    So would that -- in your opinion, would that be going

10   outside the chain of command?

11   A.    Yes.

12   Q.    How would you describe the working relationship you had

13   with Ms. White while she was employed at Steak N Shake?

14   A.    I was able to -- a professional relationship.  I talked

15   to Ms. White.  She would come to me with things that were

16   valid at times, which is one of the reasons why we made

17   changes at the Florissant restaurant.  There were other times

18   she would come to me and I would have to say, "Hey, no, we're

19   not gonna do it that way."

20   Q.    So when she came to you with any concerns she had, you

21   took those seriously?

22   A.    Yes.

23   Q.    It sounds like there were certain times where she did

24   have concerns that you validated and implemented changes; is

25   that correct?

1    A.    That is correct.

2    Q.    So prior to January 5, 2018, did she ever make any

3    complaints to you that there was something wrong with the food

4    at Steak N Shake?

5    A.    No.

6    Q.    Had Ms. White ever made any other complaints to you other

7    than the ones you had mentioned, whether it be about the

8    former general manager or about time issues or anything like

9    that?

10    A.    No.

11    Q.    Any time that Ms. White made a complaint or any time that

12    Ms. White reached out to you, would you talk to her?  Would

13    that be in person?  Would that be over the phone?

14    A.    If she called me and I -- it could be both.  So a lot of

15    times it got to the point where Melissa would just wait until

16    she knew I was going to come to the restaurant and she would

17    talk to me in the restaurant.  So a lot of our conversations

18    were face-to-face, but we did have several conversations

19    through text messages and over the phone.

20    Q.    Did Ms. White contact you more than other employees?

21    A.    Yes.

22    Q.    Much more than other employees?

23    A.    Much more.

24    Q.    Do you think you got to know Ms. White a little bit

25    better than, say, the average person who is working at a Steak

*Steak N Shake, Inc. v. Melissa White | 4:18-CV-00072*

```
 1   N Shake?
 2   A.   Yes.  Steak N Shake, the typical restaurant had 50
 3   employees in the restaurant.  I talked to Ms. White quite
 4   often.  I remember her.
 5   Q.   So I want to shift to that January 5th date, now that we
 6   are there.  Do you remember where you were the morning of
 7   January 5, 2018?
 8   A.   Yes.
 9   Q.   And where were you?
10   A.   I was at my training restaurant off of St. Charles Rock
11   Road.
12   Q.   And when you say "training restaurant," what does that
13   mean?
14   A.   It was a certified training restaurant.  So when we hire
15   managers off the street, they would go through a ten-week
16   training course at this training restaurant.
17   Q.   When you started at Steak N Shake, did you go through a
18   training program of that sort?
19   A.   I did, in Festus.
20   Q.   On this day, January 5, you said you were at the
21   St. Charles Rock Road location?
22   A.   Yes.
23   Q.   Do you recall who you were training that day?  Was it --
24   let me rephrase.  Was it a group of people or was it just one
25   person?
```

*Steak N Shake, Inc. v. Melissa White | 4:18–CV–00072*

1    A.    It was just one person I was following up with, yes.

2    Q.    And do you remember what time of the day you were there?

3    A.    I think -- I believe I got there about 9:30.

4    Q.    At some point during that training procedure, did you get

5    a call from Ms. White?

6    A.    I got several calls from Ms. White.

7    Q.    Do you remember about what time she called you?

8    A.    About anywhere between 10:30 and 10:45 in the morning.

9    Q.    So was this during the middle of your training exercises,

10   your training program?

11   A.    Yes.

12   Q.    Did you answer that call right away?

13   A.    No, I did not.

14   Q.    And why didn't you answer the call?

15   A.    Melissa calls me all the time.  And so I just texted her

16   and told her to text me what she needed and I would get back

17   to her.

18   Q.    So did you ever talk to her on the phone that day, before

19   you left the St. Charles Rock Road location?

20   A.    Yes, I did.

21   Q.    And after you said you texted her, what did you text her?

22   A.    I just texted "text me."

23   Q.    And she texted you back?

24   A.    Yes.  She told me it was an emergency.

25   Q.    Okay.  Mr. Tardy, I'm going to show you what's been

```
 1   marked as Plaintiff's Exhibit 26.
 2            MR. CHIBNALL:  Amber, if you wouldn't mind putting
 3   that up there for Mr. Tardy and for the Court.
 4   Q.   (By Mr. Chibnall)  Mr. Tardy, do you see an image in
 5   front of you in the witness box there?
 6   A.   Yes.
 7   Q.   Do you recognize this image?
 8   A.   Yes.
 9   Q.   Is this the message you received from Ms. White on
10   January 5 at about 10:45 a.m.?
11   A.   Yes.
12   Q.   So are you the other person that's participating in this
13   text exchange?
14   A.   Yes.
15            MR. CHIBNALL:  Your Honor, I would like to move to
16   admit Plaintiff's Exhibit 26 into evidence.
17            THE COURT:  Any objection?
18            MR. HENDERSON:  No objection.
19            THE COURT:  The Court receives Plaintiff's
20   Exhibit 26.
21   Q.   (By Mr. Chibnall)  In looking at Plaintiff's Exhibit 26,
22   how long did you wait to respond to Ms. White?  It looks like
23   she texted you at 10:44.  Or it looks like you texted her at
24   10:44 and she texted you back at 10:45.  Is that correct?
25   A.   Yes.
```

Steak N Shake, Inc. v. Melissa White | 4:18-CV-00072

1  Q.   So did you respond to her as fast as you possibly could?

2  A.   I called her.

3  Q.   And what did you understand 911 to mean?

4  A.   Emergency.

5  Q.   And had you ever been texted 911 by Ms. White before?

6  A.   Yes.

7  Q.   Do you remember those situations at all?

8  A.   Whatever she wanted to talk to me about.  I can't say one

9  over another.

10 Q.   Did you believe that other instances in which she used

11 911 were actually emergencies?

12 A.   No.

13 Q.   When you called Ms. White, what did you discuss with her?

14 A.   I asked her what the emergency was.

15 Q.   And what did she tell you?

16 A.   She told me that there were worms in the meat.

17 Q.   And when she told you there were worms in the meat, did

18 you understand that to mean a single patty or all of the meat?

19 What was your understanding of that?

20 A.   All the meat, multiple pieces of meat.

21 Q.   Okay.

22      MR. CHIBNALL:  Amber, if you don't mind, there's a

23 second page to this exhibit I would like to show Mr. Tardy

24 here.

25 Q.   (By Mr. Chibnall)  If you look at the second page here on

1    this exhibit, did Ms. White tell you that, quote, "worms

2    moving in patties"?

3    A.    Yes.

4    Q.    And when you see that, you are seeing that as more than

5    one worm; is that correct?

6    A.    Yes.

7    Q.    And more than one patty; correct?

8    A.    Yes.

9    Q.    And so what did you do after you talked to Ms. White over

10   the phone?

11   A.    I told -- I texted her and told her I was on my way.

12   After I talked to George.  I'm sorry.  I called the general

13   manager of the restaurant, George Nicholson.

14   Q.    So after you -- so if I understand this correctly, you

15   called Ms. White back.  She told you what was going on.

16   A.    Yes.

17   Q.    You called Mr. Nicholson.

18   A.    Yes.

19   Q.    Told him what was going on and you left.

20   A.    Yes, I got in my car.

21   Q.    Okay.  Did you ask her if she had called Mr. Nicholson,

22   the general manager?

23   A.    Yes.

24   Q.    And did she say that she was able to get ahold of him?

25   A.    I actually was led to believe he hadn't been there all

1    morning.

2    Q.    And did you come to find out where he was?

3    A.    At the bank for the store.

4    Q.    And just so that we have a better understanding of why he

5    was at the bank, is that a common procedure in the mornings

6    for general managers to take money to the bank?

7    A.    It's a daily procedure, yes.  They take the previous

8    day's money to the bank and get change to last them for that

9    day's business.

10    Q.    Did you ask Ms. White to text you a photo of that

11    hamburger?

12    A.    Yes.

13    Q.    And did she send that photo?

14    A.    Yes.

15          **MR. CHIBNALL:**  I'm sorry.  John, would you -- thank

16    you.

17    Q.    (By Mr. Chibnall)  So in looking at Plaintiff's

18    Exhibit 26, does that appear to be the photo that you received

19    at 10:45 that morning, the picture of that hamburger?

20    A.    Yes.

21    Q.    And what was your reaction to that?

22    A.    I was looking for the worms.

23    Q.    I'm sorry.  Can you say that again?

24    A.    I was looking for the worms.

25    Q.    You were looking for the worms?

*Steak N Shake, Inc. v. Melissa White | 4:18–CV–00072*

1   A.   Yes.

2   Q.   And did you see any?

3   A.   No.

4   Q.   Why didn't you think there were any worms in that patty?

5   A.   Looking at the patty, I just -- it didn't look like

6   worms.  What I immediately drew attention to was the fat

7   particles that are in the meat.

8          **MR. CHIBNALL:**  Amber, if you wouldn't mind

9   highlighting that piece there for me, would you.

10  Q.   (By Mr. Chibnall)  Mr. Tardy, Ms. Hunsaker has just

11  highlighted that little circular piece in the patty.  Is that

12  the piece of fat you are talking about?

13  A.   Yes.

14  Q.   Okay.  We've heard the term "spatting" come up before.

15  What is spatting exactly?

16  A.   When you flatten a piece of the meat on the grill, the

17  steak burger on the grill.

18  Q.   And so this is a method of cooking it; is that correct?

19  A.   Yes.

20  Q.   So when you flatten the patty or you spat it, do you spat

21  the entire patty?  I mean, do you slam it down completely or

22  is it sides?

23  A.   It's sides, left to right.

24  Q.   So if you smash down the left side, what happens to the

25  right side?

 1   A.   It will pop up.

 2   Q.   And that seems sort of logical; correct?

 3   A.   Yes.

 4   Q.   And then once the left side has been spatted down and

 5   cooked a little bit, what do you do to the right side?

 6   A.   You pat it down, do the same, follow the same procedure.

 7   Q.   And is that how you get that characteristically thin

 8   steak burger patty?

 9   A.   Yes.

10   Q.   So when you spat a burger, fat particles that might not

11   have been visible in the bigger's first iteration, or obvious

12   to somebody, might come up when you spat a burger; is that

13   right?

14   A.   That is correct.

15   Q.   Had you seen fat particles look like this before in a

16   patty?

17   A.   Yes.

18   Q.   How often?

19   A.   Almost every day.

20   Q.   And as a part of the product, the steak burger patty,

21   there's a component of fat to it; correct?

22   A.   Yes.

23   Q.   Some of us would say that's where it gets some of its

24   flavor?

25   A.   Yes.

1  Q.   In looking at the photo in Exhibit 26, are those fat

2  particles in that photo?

3  A.   Yes.

4  Q.   Were you certain that this picture did not show worms?

5  A.   Yes.

6  Q.   Despite your certainty, did you still go to the store to

7  examine the patties yourself?

8  A.   Yes, I did.

9  Q.   On your way to the store, did you talk to anybody?

10  A.   Yes.  I talked to George and Lucy.

11  Q.   Before you left the St. Charles Rock Road location, did

12  you speak with anybody there?

13  A.   Yes.  I spoke to the general manager of that restaurant.

14  Q.   And what did you tell the general manager?

15  A.   I asked him what did he see in this photo.

16  Q.   And when you looked at that photo, what was your

17  impression?

18  A.   That it was the fat, the gristle.

19  Q.   Did he share that impression?

20  A.   Yes.

21  Q.   And did that inform your behavior as you went forward?

22  A.   Yes.

23  Q.   When you left the store, you said you left -- or when you

24  left the St. Charles Rock Road store, you said you also spoke

25  with Mr. Nicholson?

*Steak N Shake, Inc. v. Melissa White | 4:18-CV-00072*

1    A.    Yes.

2    Q.    And do you recall about when you spoke with him or what

3    you spoke with him about?

4    A.    I spoke to him about what me and Melissa just spoke

5    about.

6    Q.    And did you have any other phone conversations with

7    Mr. Nicholson before you arrived at the store?

8    A.    No.

9    Q.    Did you talk to Ms. White between the time you left

10   St. Charles Rock Road and the time you entered the store?

11   A.    No.

12   Q.    Do you recall what Mr. Nicholson had to say regarding --

13   during your conversation?

14   A.    There was no possible way.  I just left.

15   Q.    And "no possible way" for what?

16   A.    For there to be worms in the pucks.  He was telling me he

17   had just did his food safety walk.  He did his food safety

18   walk before he went to the bank.  There was no way that there

19   was worms in his burgers.

20   Q.    Did you talk to anybody else?  Did you talk to

21   Ms. Theresa Mann?

22   A.    I did talk to Theresa.

23   Q.    How did you come to talk to Ms. Mann?

24   A.    She called me.

25   Q.    And what did Ms. Mann want to tell you?

1  A.    Exactly what Melissa was -- the accusation that Melissa

2  was making about the worms and that we were refusing service

3  to other guests and telling guests that there was worms in our

4  pucks.  I'm sorry, maggots.  At that time, that's when the

5  "maggots" came out.  There were maggots in our pucks.

6  Q.    So it started off at worms and then developed into

7  maggots?

8  A.    Yes.

9  Q.    Any other calls you had before you got to the store?

10  A.    Not that I recall.

11  Q.    Were you able to reach Ms. Laton?

12  A.    No.

13  Q.    About how long did it take you to get to the store?

14  A.    Twenty-five minutes, roughly.

15  Q.    So you were coming from St. Charles Rock Road, and you

16  were going out to Lindbergh in the Florissant area; is that

17  right?

18  A.    Yes.

19  Q.    Do you remember about what time you arrived at that

20  store?

21  A.    11:15ish.

22  Q.    So it took you about 25, 30 minutes to get there?

23  A.    Yes.

24  Q.    Do you know if there's security cameras that record video

25  at that store?

1    A.    There are.

2    Q.    Is that something that's employed by all the Steak N

3    Shake restaurants that you managed?

4    A.    Yes.

5    Q.    Do you happen to know where those cameras are located in

6    each store?

7    A.    Yes.

8    Q.    And would those cameras have been recording on January 5,

9    2018?

10    A.    Yes.

11    Q.    And that security footage, that's a record that Steak N

12    Shake keeps as part of its business?

13    A.    Yes.

14    Q.    Mr. Tardy, I'm going to show you some video clips

15    regarding the events of January 5, 2018.

16            **MR. CHIBNALL:**  Amber, would you mind pulling up

17    Plaintiff's Exhibit 29.

18            This is going to be the first video clip I'm going

19    to show you.

20            This has already been stipulated to and entered into

21    evidence, per the instructions this morning.

22            Your Honor, I can go ahead and move to admit it, if

23    you would like.  I don't think there's going to be any

24    objection.  I think we have already stipulated to these

25    exhibits this morning, but --

*Steak N Shake, Inc. v. Melissa White | 4:18–CV–00072*

1          **MR. HENDERSON:**  No objection, Your Honor.

2          **THE COURT:**  What exhibit is this?

3          **MR. CHIBNALL:**  This is Plaintiff's Exhibit 29.

4          **THE COURT:**  Court receives Plaintiff's Exhibit 29.

5          **MR. CHIBNALL:**  Amber, would you mind pressing play

6     one more time so Mr. Tardy can see this.

7          (Plaintiff's Exhibit 29 was played in open court.)

8     Q.   (By Mr. Chibnall)  Mr. Tardy, does this appear to be

9     video footage from one of the cameras in Steak N Shake at the

10    Florissant restaurant?

11    A.   Yes.

12    Q.   And did you -- is that you entering the front door there?

13    A.   Yes.

14    Q.   And what is the time stamp on this video?

15    A.   11:15 a.m.

16    Q.   So your memory that day is pretty accurate?

17    A.   Yes.

18    Q.   You testified earlier that you thought you got there

19    about 11:15.  And is that the time you got there?

20    A.   Yes, sir.

21    Q.   Where was George Nicholson when you arrived?

22    A.   Walking up to the back door.

23    Q.   And when you walked in there, did you speak with anyone?

24    A.   I said "Hi" to everyone I walked past, yes.

25    Q.   And if you recall, who was that -- who is the young woman

1  who was standing at the counter there?

2  A.    That's Theresa.

3  Q.    Theresa Mann?

4  A.    Yes.

5  Q.    Other than saying hello, did you have any other further

6  conversations with anyone at that time?

7  A.    No.

8  Q.    Mr. Tardy, I'm going to show you another video clip here,

9  another short video clip.  And this is going to be Plaintiff's

10  Exhibit 30.

11          **MR. CHIBNALL:**  Amber, would you mind pulling that up

12  for me.

13          Your Honor, similarly, I would like to move that

14  this be admitted into evidence to the extent it hasn't

15  already.

16          **MR. HENDERSON:**  No objection, Your Honor.

17          **THE COURT:**  Court receives Exhibit 30.

18          (Plaintiff's Exhibit 30 was played in open court.)

19  Q.    (By Mr. Chibnall)  Does this appear to be video footage

20  as well from the Florissant store?

21  A.    Yes.

22  Q.    And just like Exhibit 29, this is just recording a

23  different portion of the store; is that correct?

24  A.    Yes.

25  Q.    Did you speak with anyone when you got to the grill?

1   A.    Melissa.

2   Q.    And what did you say to her?

3   A.    Melissa walked up to me from the back when I was looking

4   at the pucks that were in the puck station, and I told her

5   that I would talk to her after I completed my investigation.

6           **MR. CHIBNALL:**  Amber, would you mind playing this

7   one more time for us.  It's a short clip, so hopefully we can

8   play it one more time in its entirety.

9           (Plaintiff's Exhibit 30 was played in open court.)

10  Q.    (By Mr. Chibnall)  Mr. Tardy, is that you in the hooded

11  sweatshirt?

12  A.    Yes.

13  Q.    What are you doing there?

14  A.    Looking at the meat on the line, the pucks on the line.

15  Q.    Okay.  Is that you talking to Ms. White?

16  A.    Yes.

17  Q.    And is there any -- is there any meat that you see on the

18  grill itself?

19  A.    No.

20  Q.    And you can see right here, is Ms. White holding

21  something in her hand?

22  A.    Yes.

23  Q.    And what is she holding in her hand?

24  A.    She's holding the plastic container with the meat puck in

25  it.

1    Q.    And your first instinct was to go to that grill area.

2    Why is that?

3    A.    Because that was the meat that was in production.  So if

4    that was meat that was contaminated, that would have been the

5    meat most contaminated.

6    Q.    So at what point did you -- what point do you believe you

7    began your inspection or your investigation of that meat, of

8    that allegation?

9    A.    When I was standing right there looking through it.

10   Q.    So as soon as you walked in the door?

11   A.    Yes.

12   Q.    And do you know where Ms. White was when you entered the

13   building that day?

14   A.    I did not see her when I walked into the building, but I

15   did see her on the line.

16   Q.    Is that video clip an accurate reflection of the meeting

17   as you remember it?

18   A.    Yes.

19   Q.    So you said the first thing you did when you walked in

20   was went to the line?

21   A.    Uh-huh.

22   Q.    And that's reflected in this video; correct?

23   A.    Yes.

24   Q.    And when you went to the line and looked at the meat, did

25   you talk to anyone else other than Ms. White?

Steak N Shake, Inc. v. Melissa White | 4:18-CV-00072

1    A.    No.

2    Q.    In the video clip we just saw, did Ms. White immediately

3    come to you when you arrived at the grill?

4    A.    Yes.

5    Q.    And why did you put your hand up as you did?

6    A.    Ms. White -- I didn't have any space to do anything else

7    besides tell her, "Just back up and let me complete my

8    investigation and I will sit down and talk with you about what

9    you think you saw."

10         **MR. CHIBNALL:**   Amber, would you mind playing it one

11   more time so we can see that incident.

12              (Plaintiff's Exhibit 30 was played in open court.)

13   Q.    (By Mr. Chibnall)  At that point are you putting your

14   hand in Ms. White's face?

15   A.    Not at all.

16   Q.    Are you yelling at her in any way?

17   A.    Not at all.

18   Q.    Have you made any contact with her in any way?

19   A.    No.

20   Q.    Why did you not want to see the patty at that moment?

21   A.    Because I wanted to make sure that the accusation that

22   she made in which -- was the right accusation.  Right.  So in

23   food service, right, the idea is to stop further contamination

24   if there was a contaminant in that restaurant.  And I did not

25   want her to impede with what I was investigating at that time.

*Steak N Shake, Inc. v. Melissa White | 4:18-CV-00072*

1    Q.    All right.  So you felt talking to Ms. White in that
2    moment might impede your investigation?
3    A.    Yes.
4    Q.    And did you want to remain unbiased and objective during
5    that investigation?
6    A.    Yes.
7    Q.    Did Ms. White offer to show you the hamburger patty at
8    that moment?
9    A.    Yes.
10   Q.    But you didn't want to see it yet?
11   A.    That is correct.
12   Q.    Were you concerned about the other meat at that point?
13   A.    Yes.
14   Q.    Is this -- is this in line with the protocols and the
15   training that you had received previously?
16   A.    Yes.
17   Q.    Did you see any other meat on the grill when you went to
18   look at that portion of the restaurant?
19   A.    No.
20   Q.    To your knowledge, did any meat get served during the
21   time you were inspecting the meat in the cooler and the
22   freezer?
23   A.    Not to my knowledge, no.
24   Q.    Was Ms. White's burger being served to any customers?
25   A.    No.

*Steak N Shake, Inc. v. Melissa White | 4:18-CV-00072*

1   Q.   As far as you know, was that burger even in circulation
2   at that point?
3   A.   No, it wasn't.
4   Q.   To your knowledge was Ms. White's burger ever sold or
5   even offered for sale to any customer?
6   A.   No.
7   Q.   So your focus was on the remaining meat in the
8   restaurant?
9   A.   That is correct.
10  Q.   Ms. White alleges you violently and inappropriately put
11  your hand in her face when she tried to show you the meat.  Is
12  that an accurate statement?
13  A.   No, it's not.
14  Q.   What actually happened instead?
15  A.   I told Ms. White that -- "Let me finish my investigation,
16  and you and I will sit down and talk about what you think you
17  saw."
18  Q.   Other than that did you say anything to her at that
19  moment?
20  A.   No.
21  Q.   Did she say anything to you?
22  A.   She kept trying to talk to me about the meat that she had
23  in her hand and I walked away and I kept going with my path of
24  food.
25  Q.   And following the path of food, that's what we had talked

1   about previously with your training; correct?

2   A.   Yes.

3   Q.   Did you treat her disrespectfully in any way?

4   A.   Not at all.

5   Q.   Did she follow you as you conducted your inspection?

6   A.   No.

7   Q.   Did you see any burgers in the pan that day?

8   A.   Yes.

9   Q.   Did any of those burgers look contaminated?

10  A.   No.

11  Q.   Did you see anything on the line that caused you to think

12  that there were worms in the meat?

13  A.   No, not at all.

14  Q.   Did you believe you had spent sufficient amount of time

15  at that grill examining that area?

16  A.   Yes.

17  Q.   Now, Mr. Tardy, when we looked at it, that wasn't a very

18  long clip.  It didn't seem like you spent a whole lot of time

19  there.  But you thought it was sufficient, nonetheless?

20  A.   Yes.

21  Q.   And why did you think it was sufficient?

22  A.   Her accusation was "worms" and then I heard of "maggots,"

23  meaning I would have saw things moving.  I would have saw a

24  line that was broken down.  Meaning where the pucks were, it

25  wouldn't have been making temp.  There would have been several

1   different things I would have saw that would have indicated to

2   me something is wrong here.

3   Q.   And were there a lot of pucks or any pucks really on the

4   grill that day or in the pans?

5   A.   No.

6   Q.   Do you maintain your ServSafe training?

7   A.   Yes.

8   Q.   And did your actions in conducting your inspection on

9   January 5, 2018 follow that training?

10   A.   Yes, it did.

11   Q.   So after you examined the line, where else did you go?

12   A.   I went to the walk-in cooler.

13   Q.   And why would you go to the walk-in cooler?

14   A.   That is the next place where you think of traveling

15   pucks, where pucks travel from, that was the next place.

16   Q.   So I'm going to show you another very short video clip,

17   and this is going to be Plaintiff's Exhibit 31.

18           **MR. CHIBNALL:**   And per stipulation, I ask that this

19   be admitted into evidence as well.

20           **MR. HENDERSON:**   No objection, Your Honor.

21           **THE COURT:**   The Court receives Plaintiff's

22   Exhibit 31.

23           (Plaintiff's Exhibit 31 was played in open court.)

24   Q.   (By Mr. Chibnall)  As I told you, Mr. Tardy, it's a very

25   short clip.  Not much there.  But I do want to ask:  Was that

1   you who is walking past the gentleman in the apron there?

2   A.   Yes.

3   Q.   And where are you going?

4   A.   Towards the walk-in cooler.

5   Q.   So if you don't mind orienting us a little bit, I would

6   appreciate that.  Where are you coming from, first of all?

7   A.   The line.

8   Q.   So the line is off to the right of the screen; is that

9   correct?

10   A.   Yes, sir.

11   Q.   And then off to the left, where you are headed, that's

12   where the walk-in cooler and the freezer are?

13   A.   Yes.

14   Q.   What is this hallway where the gentleman appears to be

15   washing dishes?

16   A.   That is the shake station.

17   Q.   The shake station.  So where you make milkshakes?

18   A.   Yes.

19   Q.   Okay.  After you go through -- after you walk past here

20   and go to the walk-in cooler, what do you do?

21   A.   I open up -- well, the first thing I saw, when I first

22   walked in, I quickly identified that there was a pan of meat

23   that had been tampered with.  So I examined that box as well.

24   And then I started examining other meat that was already

25   pre-panned up, ready to be used in production.

*Steak N Shake, Inc. v. Melissa White | 4:18-CV-00072*

1   Q.   So you said there was a pan that was tampered with.  What
2   did you mean by that?
3   A.   The aluminum foil that was on top of it -- I'm sorry, not
4   the aluminum foil.  The wrap that was on top of it was still
5   bubbled up a little bit, so I could tell that when it was
6   sealed someone reopened it back up.
7   Q.   Could you tell that a puck had been removed?
8   A.   Yes.  The very top puck.
9   Q.   Was it -- did you come to understand that that was the
10  puck that Ms. White had removed?
11  A.   Yes.
12  Q.   And did you eventually examine the meat product in that
13  pan?
14  A.   Yes.
15  Q.   So you went to the walk-in cooler and went to the
16  freezer.  Clearly different temperatures; correct?
17  A.   Yes.
18  Q.   The walk-in cooler, what is the meat doing in there?
19  A.   It's thawing.
20  Q.   And in the freezer, I'm assuming it's frozen?
21  A.   It's frozen, yes.
22  Q.   So you wanted to see what was in the walk-in because that
23  was where the rest of the meat was; correct?
24  A.   Correct.
25  Q.   And when you got to the walk-in and you saw the

Steak N Shake, Inc. v. Melissa White | 4:18-CV-00072

1  tampered-with pan, did you do anything else other than -- did

2  you do anything with those patties?

3  A.   I pulled patties out.  I removed the foil from on top of

4  the pan to make sure everything looked good in it.  I mean, it

5  was like a good looking pan of meat.

6  Q.   So you examined some of those patties?

7  A.   Yes.  I pulled several different patties out of that

8  particular pan.

9  Q.   Did you examine any other patties other than the ones in

10 that pan?

11 A.   Yes.

12 Q.   And how did you go about examining them?

13 A.   I pulled them out and broke them apart.

14 Q.   Is that something that you've been trained to do?

15 A.   Yes.

16 Q.   So when -- if you had an allegation of a contaminant in a

17 meat product, you've been trained to rip that meat patty

18 apart?

19 A.   Yes.

20 Q.   And when you ripped these meat patties apart, did you see

21 anything in them?

22 A.   Just the fat.

23 Q.   Mr. Tardy, I'm going to show you Plaintiff's Exhibit 19,

24 which is a picture of those burgers.  Do you recognize that

25 photo or can you see it yet?

Steak N Shake, Inc. v. Melissa White | 4:18-CV-00072

1  A.   Nothing has came up yet.  I do recognize.

2  Q.   Okay.  And are those the photos that you took as part of

3  your investigation?

4  A.   Yes.

5  Q.   Okay.

6       **MR. CHIBNALL:**  Your Honor, I would like to move to

7  admit Plaintiff's Exhibit 19 into evidence.

8       **MR. HENDERSON:**  No objection.

9       **THE COURT:**  Court receives Plaintiff's Exhibit 19.

10  Q.   (By Mr. Chibnall)  Mr. Tardy, what do these photos show

11  to you?

12  A.   Pucks that I smashed together, tore apart and put back

13  together.

14  Q.   So that little piece of pink meat that's kind of on the

15  bottom of the photo there, that's a piece of meat that you

16  tore off?

17  A.   Yes.

18  Q.   Did you tear these apart with your hands?  Did you do it

19  with a fork?

20  A.   Hands.

21  Q.   Okay.  Were these -- and you said these weren't the only

22  burgers you examined?

23  A.   No.

24  Q.   So there were others that you looked at as well?

25  A.   Yes.

*Steak N Shake, Inc. v. Melissa White | 4:18-CV-00072*

1    Q.    Did you see anything that looked like or was a maggot or

2    worm in any of those burgers?

3    A.    No, sir.

4    Q.    Did you see anything moving or suspicious in that meat?

5    A.    No.

6    Q.    And this meat is the meat that you took out of the same

7    pan that Ms. White took her puck?

8    A.    Yes.

9    Q.    Did you see any fat or marbling in that meat?

10   A.    Yes.  You can see it in the pictures.

11   Q.    When you say "you can see it in the pictures," are you

12   talking about the white spots in those hamburger patties?

13   A.    Sure.

14   Q.    Where did you conduct this inspection?  Where did you

15   tear these burgers apart?

16   A.    I was in the manager's office.

17   Q.    In the manager's office you said?

18   A.    Yes.

19   Q.    Sorry.  I just -- sometimes I don't quite hear as well,

20   as you are a little further away.  Sorry about that.

21          Was anyone present with you when you did that?

22   A.    Yes, the GM, George Nicholson.

23   Q.    Mr. Tardy, I'm going to show you another video clip.

24   It's a little bit longer.  But it's Plaintiff's Exhibit 32.

25   Let me know when you can see it.

1  A.    I can see it.

2          **MR. CHIBNALL:**  Your Honor, again, as part of our

3  discussion earlier, I believe this has been stipulated to, but

4  I ask that this be entered into evidence as Plaintiff's

5  Exhibit 32.

6          **MR. HENDERSON:**  No objection.

7          (Plaintiff's Exhibit 32 was played in open court.)

8  Q.    (By Mr. Chibnall)  Mr. Tardy, is this video footage of

9  you in the back office inspecting those burgers you just

10  mentioned?

11  A.    Yes.

12  Q.    And who is the gentleman who is crouching down, it looks

13  like on the phone and in a safe?

14  A.    That's George Nicholson.  That's the GM of the

15  restaurant.

16  Q.    Okay.  As we are looking at the video, is that you who is

17  handling these hamburger patties?

18  A.    Yes.

19          **THE COURT:**  Mr. Chibnall, for the record, the Court

20  receives Exhibit 32 into evidence.  You may proceed.

21          **MR. CHIBNALL:**  My apologies for moving too quickly,

22  Your Honor.  I will slow down.

23  Q.    (By Mr. Chibnall)  This is video footage from that

24  Florissant store; correct?

25  A.    Yes.

*Steak N Shake, Inc. v. Melissa White | 4:18-CV-00072*

```
1    Q.   And you said -- and where exactly is this again?

2    A.   This is the manager's office/dry storage area.

3    Q.   Is this behind the production line?

4    A.   Yes.  It's the back of the store.

5    Q.   Is there any video footage of you in the walk-in cooler?

6    A.   No.

7    Q.   Is there any video footage of you in the freezer?

8    A.   No.

9    Q.   And why not?

10   A.   There's no cameras in there.

11   Q.   No cameras at all in the walk-in freezer?

12   A.   Either of those rooms, no.

13   Q.   So was there a period of time during this inspection that

14   you may not have been on camera?

15   A.   Yes.

16   Q.   Were you anywhere other than the walk-in or the freezer,

17   from the time you left the grill to the time you entered that

18   back office?

19   A.   No.

20   Q.   Did you review any other burgers in the back office other

21   than those in the walk-in?

22   A.   Yes, I did.

23   Q.   Okay.  And the ones that we are looking at now in this

24   video, those are the ones from the walk-in; correct?

25   A.   Yes, sir.
```

1   Q.   Mr. Nicholson seems to be doing something else while you

2   are in there.  What was he doing?

3   A.   He is securing his money that he went to the bank to get.

4   Q.   He also appeared to be on the phone.  Do you happen to

5   know what that phone call was?

6   A.   I don't know.  When we were there, the OS brung us --

7   brung him the phone.

8   Q.   Okay.  But as you remember it, this is an accurate

9   depiction of part of your investigation?

10  A.   Yes.

11  Q.   Very good.  Mr. Tardy, I'm going to show you another

12  video clip here.  And this is Plaintiff's Exhibit 33.

13          **MR. CHIBNALL:**  Again, Your Honor, I move to admit

14  Plaintiff's Exhibit 33 into evidence based upon prior

15  stipulation.

16          **MR. HENDERSON:**  No objection, Your Honor.

17          **THE COURT:**  Court receives Exhibit 33.

18          (Plaintiff's Exhibit 33 was played in open court.)

19  Q.   (By Mr. Chibnall)  Mr. Tardy, what you are seeing now is

20  what we've marked as Plaintiff's Exhibit 33.  Can you tell me

21  exactly what Mr. Nicholson just brought in.

22  A.   I sent him to the freezer to grab a full case of frozen

23  pucks.

24  Q.   So these pucks are frozen; they are not from the walk-in?

25  A.   That is correct.

1    Q.    Why did you want to see the frozen pucks?

2    A.    I wanted to complete my investigation thoroughly.

3    Q.    Did you find any worms, bugs, maggots or any other insect

4    or larvae in those burgers?

5    A.    No, sir, I did not.

6    Q.    And you didn't find any in the walk-in cooler either?

7    A.    No, sir.

8    Q.    Is this the first time that Mr. Nicholson is actively

9    participating in your inspection?

10    A.    No.

11    Q.    Did he examine any other patties with you prior to this?

12    A.    The ones on the video prior, yes.

13    Q.    Okay.  Do you feel confident there were no worms or

14    maggots in any of those burgers?

15    A.    Yes, I do.

16    Q.    Explain to us why you feel so confident.

17    A.    In the way -- in the path of food from the pucks, it's

18    not possible for the flies to or maggots to grow into it.  It

19    comes -- when it comes to us, it comes off of a truck that's

20    20 degrees or colder.  It's in our freezers that's 20 degrees

21    or colder.  Flies, maggots can't survive in that atmosphere.

22    Q.    And are there temperature regulations that Steak N Shake

23    had, maybe even governmental regulations that require it to be

24    cold?

25    A.    There's both, yes.  So there's the freezer that has to be

Steak N Shake, Inc. v. Melissa White | 4:18-CV-00072

 1  below 20 degrees, plus or minus 10, when it comes to getting

 2  to 0 degrees.  And then the walk-in cooler cannot be any

 3  colder than 41 degrees.

 4  Q.   On the day in question on January 5, were you aware of

 5  any malfunctioning in the walk-in cooler or in the freezer?

 6  A.   There were none.

 7  Q.   So in your experience and opinion, those devices, the

 8  cooler and the freezer were working properly?

 9  A.   Yes.

10  Q.   When examining all the meat you went through that day,

11  both physically and visually, what conclusion did you draw

12  about the photo that Ms. White sent you of the hamburger

13  patty?

14  A.   Exactly what we talked about in the beginning.  She

15  patted the puck on the grill.  She saw something pop up and

16  she thought it was a maggot.  And that's what her and I was

17  going to talk about when we sat down and talked.

18  Q.   Have you ever seen fat pop up like that before when

19  cooking a burger?

20  A.   Yes.

21  Q.   Do you believe it unusual to happen?

22  A.   No.

23  Q.   Does it happen with a fair amount of frequency?

24  A.   Yes.

25  Q.   We saw that Mr. Nicholson was with you at one point while

*Steak N Shake, Inc. v. Melissa White | 4:18-CV-00072*

1  you were examining the meat; correct?

2  A.    Yes.

3  Q.    Was Ms. White present with you when you were inspecting

4  that meat?

5  A.    Not at all.

6  Q.    So she doesn't appear in that video at all; correct?

7  A.    No.

8  Q.    Any of those clips that we saw with you in the back

9  office?

10  A.    No.

11  Q.    Was Ms. Mann present while you were doing any of that

12  inspecting of the meat?

13  A.    No.

14  Q.    What about Ms. Pam Unger, was she present when you were

15  inspecting the meat?

16  A.    No.

17  Q.    Other than Mr. Nicholson, did any other Steak N Shake

18  employee witness what you did to inspect the meat that day?

19  A.    Besides when Mr. Rashad walked in to hand George the

20  phone, no.

21  Q.    And when you say "Rashad," you are talking about

22  Mr. Lambert; is that correct?

23  A.    Yes.

24  Q.    And did Mr. Nicholson assist you in any way in your

25  inspection other than bringing in the frozen meat patties and

*Steak N Shake, Inc. v. Melissa White | 4:18-CV-00072*

1   looking through the walk-in cooler with you?

2   A.    No.

3   Q.    Did you ask him to get frozen meat out of there for you

4   to review?

5   A.    Yes.

6   Q.    And did both of you examine that meat?

7   A.    Yes, we did.

8   Q.    And you didn't find any worms or maggots?

9   A.    No, I did not.

10  Q.    Did you ever get to examine the actual patty that

11  Ms. White alleged had worms in it?

12  A.    No, I did not.

13  Q.    Did you ever ask for it?

14  A.    Yes, I did.

15  Q.    Did you know if anyone else asked for it?

16  A.    I sent George to ask for it as well.

17  Q.    And why would you send Mr. Nicholson to ask for it?

18  A.    I stayed back there looking at the meat.  And I think at

19  this time when I was taking pictures, so I sent George to go

20  ask for the puck that was in question.

21  Q.    And as part of your job as district manager, would some

22  of that be delegating responsibility?

23  A.    Yes.

24  Q.    Do you believe that asking Mr. Nicholson to retrieve the

25  party from Ms. White was part of that general delegation

*Steak N Shake, Inc. v. Melissa White | 4:18-CV-00072*

1  duties that you have?

2  A.    Yes.

3  Q.    What was Ms. White's response to those requests?

4  A.    She told George "no."

5  Q.    So she refused?

6  A.    Yes.

7  Q.    Did you speak to her directly about the patty?

8  A.    After he came back and told me she said no, yes, I went

9  directly to her myself.

10  Q.    And then you went out to talk to her; is that correct?

11  A.    That is correct.

12  Q.    And do you remember where you were when you spoke to her?

13  A.    We were at the service station.

14  Q.    I'm going to show you another video clip here called

15  Plaintiff's Exhibit 34.

16        **MR. CHIBNALL:**   Again, I move to admit Plaintiff's

17  Exhibit 34 into evidence based on prior stipulation.

18        **MR. HENDERSON:**   No objection.

19        **THE COURT:**   The Court receives Exhibit 34.

20        (Plaintiff's Exhibit 34 was played in open court.)

21  Q.    (By Mr. Chibnall)   Mr. Tardy, does this appear to be the

22  footage of that encounter you just described to us?

23  A.    Yes.

24  Q.    And that's you right there with the hooded sweatshirt;

25  correct?

*Steak N Shake, Inc. v. Melissa White | 4:18-CV-00072*

1    A.    Yes.  With the jacket, yes.

2    Q.    And that's Ms. White with the apron on and the tie?

3    A.    Yes.

4    Q.    And is that Mr. Nicholson walking backwards with the

5    purple shirt?

6    A.    Yes.

7    Q.    Okay.  Does this video accurately depict your interaction

8    with Ms. White following your inspection?

9    A.    Yes.

10   Q.    Do you remember what she said to you when you came out to

11   talk to her?

12   A.    She can't talk about it.  So when I asked her for the

13   puck, she told me she couldn't talk about it.

14   Q.    And what was your response to that?

15   A.    "What do you mean you can't talk about it?"

16   Q.    And did you engage in a dialogue similar to that going

17   forward?

18   A.    Yes.

19   Q.    Did she say anything else to you other than saying she

20   couldn't talk about it?

21   A.    Yeah.  She pretty much told me that I was stopping --

22   that I was mad at her.  I can't remember the exact lingo, but

23   I was mad at her for refusing to sell a puck full of maggots

24   and she called me a fraud.

25   Q.    She called you a fraud; is that right?

1   A.   She flat-out called me a fraud.  She said, "Frank, you're
2   a fraud."
3   Q.   And what did you understand that to mean?
4   A.   Bad person, I'm a liar, I was asking her to do something
5   bad.
6   Q.   At any point during that conversation, did you raise your
7   voice with Ms. White?
8   A.   No, not -- no.
9   Q.   Did you act unprofessionally in any way?
10  A.   No.
11  Q.   Did you ask her for the patty?
12  A.   Yes.
13  Q.   And did you ask for it again after she refused?
14  A.   Yes.
15  Q.   Did you ever get that patty?
16  A.   No, I did not.
17  Q.   What was Ms. White doing at the stand while you were
18  talking to her there?
19  A.   When I walked up on her, she was on the clock-out screen.
20  She was clocking out.
21        **MR. CHIBNALL:**  Amber, would you mind playing that
22  one more time for me again, please.  I think you are going to
23  have to go back to the beginning.  Sorry.
24         (Plaintiff's Exhibit 34 was played in open court.)
25  Q.   (By Mr. Chibnall)  So I'm talking about this instance

Steak N Shake, Inc. v. Melissa White | 4:18-CV-00072

1   right here.  What is Ms. White doing at that computer?

2   A.    She is clocking out.

3   Q.    And what is that computer?

4   A.    That computer is for the servers, where they go and they

5   ring in all their orders for the tables and where they can

6   clock in and clock out at.

7   Q.    It's your understanding she was clocking out at that

8   point?

9   A.    Yes.

10  Q.    Did she tell you that she was clocking out?

11  A.    Yes, she told me she was clocking out.

12          (Court reporter clarification.)

13          **MR. CHIBNALL:**  Just yell at me.

14          **THE COURT:**  Mr. Tardy, I'm going to have you slow

15  down.  You speak quickly too.  The court reporter is taking

16  down everything.  It's awfully hard when you speak quickly.

17  So if you would slow down a little bit, that will help.

18          **THE WITNESS:**  Will do.  Sorry about that.

19          **THE COURT:**  Thank you.

20          **MR. CHIBNALL:**  Please stop me if you need to.

21          **COURT REPORTER:**  I'm trying.

22  Q.    (By Mr. Chibnall)  Mr. Tardy, I was asking what Ms. White

23  was doing at that kiosk at that moment.  Can you say that for

24  us again?

25  A.    She was clocking out.

*Steak N Shake, Inc. v. Melissa White | 4:18-CV-00072*

1   Q.    Did she tell you that she was clocking out?

2   A.    Yes.

3   Q.    Did she have anything else to say to you about leaving?

4   A.    She said, "Fuck this, I'm clocking out, I'm leaving."

5   Q.    And what was that in response to?

6   A.    Me asking her for the puck.

7   Q.    Did anyone -- did you talk to anyone else about that

8   exchange?

9   A.    No.

10  Q.    Did you call your manager?

11  A.    I called Lucy afterwards.  So after this exchange of me

12  walking away from her when I told her if that's how she's

13  going to act, then she is not welcome back.  Yes, I did.  I

14  reached out to the district manager that I knew my boss was

15  with to get ahold of her, yes.

16  Q.    And what reason would you have done that?

17  A.    It got -- I knew that because of what just happened, I

18  knew Melissa was getting ready to call Lucy.

19  Q.    Do you know where Ms. White went after that point, after

20  this -- it looks like she is walking back towards you.  Do you

21  know where she is going?

22  A.    She followed behind me and she was talking.  I don't

23  really recall 100 percent what she was saying, but she didn't

24  follow me all the way back to the dry storage office space.

25  She went back up to the service station.  And at this point,

1  she was causing a disruption.

2  Q.  So she went back to the front of the house?

3  A.  Yes.

4  Q.  Did you go back out to the front of the house at any

5  point to talk to her?

6  A.  Yes, I did.

7  Q.  And what did you tell her?

8  A.  I told her if she clocked out, she needed to leave and

9  get from behind the service station.

10  Q.  To your knowledge, was any of this captured on video that

11  you knew of?

12  A.  Not that I seen, no.

13  Q.  During this exchange, where was the hamburger patty?

14  A.  I don't know.

15  Q.  Do you recall if she was holding it?

16  A.  At this time, no, she was not holding it anywhere.

17  Q.  But you asked to see it that time?

18  A.  Yes.

19  Q.  You previously stated that you told Ms. White you would

20  talk to her when you finished your inspection and discuss with

21  her what she thought she saw.  Did you believe there was a

22  worm in the hamburger patty?

23  A.  No, I did not.

24  Q.  How were you going to confirm there wasn't a worm in that

25  hamburger patty?

*Steak N Shake, Inc. v. Melissa White | 4:18-CV-00072*

1  A.   Doing the investigation that I did.

2  Q.   Were you planning on looking at the actual hamburger

3  patty?

4  A.   Yes.

5  Q.   But you did not get that opportunity?

6  A.   That is correct.

7  Q.   To this day, have you ever physically seen the hamburger

8  patty she alleged had worms in it?

9  A.   Besides these pictures, no.

10  Q.   To your knowledge, did anyone at Steak N Shake ever get a

11  chance to examine Ms. White's patty?

12  A.   No.

13  Q.   Do you know if anyone at Steak N Shake other than

14  yourself and Mr. Nicholson ever asked for it?

15  A.   Yes.

16  Q.   Who else asked for it?

17  A.   Barry Paige, our legal officer, sent a certified letter

18  to her house a couple days later requesting it.

19  Q.   Did anyone else, to your knowledge, request to see the

20  patty?

21  A.   I believe through a text message chain that she had with

22  Lucy.  Lucy asked for it as well.

23  Q.   So as we sit here today, is that four opportunities that

24  you can think of that somebody asked to see the patty and was

25  denied?

*Steak N Shake, Inc. v. Melissa White | 4:18-CV-00072*

1    A.    Yes.

2    Q.    Other than Ms. White, did any other employee ever report

3    to you that there were worms in the burger meat?

4    A.    No.

5    Q.    What about at any other store that you covered?  You said

6    you had 14 of them.  Had any of the other stores ever reported

7    having worms in their meat?

8    A.    No.

9    Q.    How would you describe your demeanor throughout that

10   situation?

11   A.    I think I was very professional, until we got to the

12   service station.  And then I became a little agitated with her

13   because I just didn't understand why she would not give me the

14   puck, given the professional relationship that Melissa and I

15   had.

16   Q.    Do you believe that not giving you the puck was

17   obstructing your inspection?

18   A.    It was, yes.

19   Q.    Did you ever raise your voice to Ms. White?

20   A.    No.

21   Q.    Did you ever yell at her?

22   A.    No.

23   Q.    Were you rude to her in any way?

24   A.    Not at all.

25   Q.    Did you take her complaint and her allegations seriously?

*Steak N Shake, Inc. v. Melissa White | 4:18-CV-00072*

```
 1   A.    I think I took it very seriously.
 2   Q.    Is that why you showed up at the store when you did?
 3   A.    Yes.
 4   Q.    And why you left St. Charles Rock Road as soon as she
 5   said 911?
 6   A.    Yes.
 7   Q.    Did Ms. White yell at you, raise her voice or --
 8   A.    Yes, she did.
 9   Q.    Let me just finish real quick.  You're fine.
10         Did Ms. White yell at you, raise her voice or
11   disrespectfully talk to you at any point while you were at the
12   store on January 5, 2018?
13   A.    Yes, she did.
14   Q.    Did she treat you rudely that day?
15   A.    Yes.
16   Q.    And how so?
17   A.    She used vulgar language, she yelled, and she refused to
18   give me the puck in which I asked for.
19   Q.    Do you believe that her behavior was professional that
20   day?
21   A.    No, it wasn't.
22   Q.    Did you fire Ms. White?
23   A.    I did not.
24   Q.    Did her employment end that day?
25   A.    I believe so, based off of her words.
```

*Steak N Shake, Inc. v. Melissa White | 4:18-CV-00072*

1    Q.    And why do you believe it ended?

2    A.    In my -- when an employee says, "Fuck this, I'm leaving,"

3    they don't come back.  They walked out on their job.

4    Q.    You took that vulgar expression to be a sign of voluntary

5    resignation?

6    A.    That is correct.

7    Q.    Did she cooperate in your investigation?

8    A.    No, she did not.

9    Q.    Was her failure to cooperate a violation of any company

10   policy?

11   A.    It was.

12   Q.    Do you know what policy that was?

13   A.    In our associate handbook, yes.

14   Q.    Okay.  I'm going to show you what's been marked as

15   Plaintiff's Exhibit 2.  Mr. Tardy, do you see that on your

16   screen?

17   A.    I do.

18   Q.    Now, there are several pages to this.  We have

19   highlighted one particular page for you.  Is this the

20   associate handbook you just mentioned?

21   A.    Yes.

22   Q.    Is this a document that Steak N Shake maintains in the

23   regular course of its business?

24   A.    Yes.

25   Q.    And have you personally reviewed this associate handbook

*Steak N Shake, Inc. v. Melissa White | 4:18-CV-00072*

1  before?

2  A.    Yes.

3         **MR. CHIBNALL:**  Your Honor, Plaintiff moves for the

4  admission of Exhibit 2 into evidence.

5         **MR. HENDERSON:**  No objection.

6         **THE COURT:**  The Court receives Exhibit 2.

7  Q.    (By Mr. Chibnall)  Mr. Tardy, I want to direct your

8  attention to page 6 of the associate handbook.

9  A.    Okay.

10  Q.    Do you see a section in there entitled "Cooperation with

11  Company Investigations"?

12  A.    Yes.

13  Q.    And did Ms. White -- in looking at that last sentence

14  of -- in looking at the last sentence of that paragraph, what

15  does the handbook say is the possible penalty for failing to

16  cooperate with an investigation?

17  A.    "Disciplinary actions up to and including termination of

18  employment."

19  Q.    Do you believe that Ms. White fulfilled her obligations

20  under the handbook?

21  A.    She did not.

22  Q.    In what way did she not cooperate with you?

23  A.    When I asked for the puck, I did not receive it.

24  Q.    Had Ms. White not quit in your mind, do you believe you

25  would have grounds to fire her or end her employment

*Steak N Shake, Inc. v. Melissa White | 4:18–CV–00072*

1  involuntarily for violating that policy?

2  A.    Yes, I would have.

3  Q.    In regards to "termination," what does that word mean to

4  you?

5  A.    Whether the employee resigned or whether they were

6  involuntary or voluntarily terminated.

7          **MR. CHIBNALL:**  Amber, you can take that down if you

8  would like.

9  Q.    (By Mr. Chibnall)  How is the word used at Steak N Shake,

10 to the best of your memory?

11 A.    Both ways, an employee no longer works for us.

12 Q.    So it could mean you voluntarily resigned?

13 A.    Yes.

14 Q.    It could also mean that you involuntarily resigned?

15 A.    That is correct.

16 Q.    Can it mean you were fired?

17 A.    Yes.

18 Q.    Do you recall placing a 911 call on the day of January 5,

19 2018?

20 A.    Yes.

21 Q.    And do you remember why you made that call?

22 A.    I asked Melissa to leave behind the service station since

23 she had clocked out and left and she refused.

24 Q.    In your opinion, was she creating a disturbance in the

25 restaurant?

*Steak N Shake, Inc. v. Melissa White | 4:18-CV-00072*

```
1   A.    Yes.
2   Q.    Do you recall what you -- do you recall what you said to
3   the 911 dispatcher?
4   A.    I told him that I needed a cop to remove a terminated
5   employee.
6   Q.    So you said the word "terminated" to the 911 dispatcher?
7   A.    I did.
8   Q.    And did that mean that you had fired her?
9   A.    No.
10  Q.    Did you mean terminate as in her employment ended?
11  A.    Yes.
12  Q.    Did the dispatcher ask if you had fired her?
13  A.    No.
14  Q.    Did the police arrive at the store that day?
15  A.    They did.
16  Q.    Did Ms. White eventually leave?
17  A.    She left when the cop pulled up, yes.
18  Q.    Do you recall if the police officers ever asked you if
19  you fired her?
20  A.    They did not.
21  Q.    After Ms. White left the premises that day, did you
22  continue to conduct your inspection?
23  A.    I did.
24  Q.    So it just didn't end after Ms. White left?
25  A.    No, it did not.
```

*Steak N Shake, Inc. v. Melissa White | 4:18-CV-00072*

1    Q.    What else did you do as part of that inspection?

2    A.    At that point I talked to all of the employees that were

3    there that day and got them to write a statement.

4    Q.    And is that part of your procedure and protocol?

5    A.    Yes.

6    Q.    Did you speak with those employees?

7    A.    Yes.

8    Q.    Did any of them tell you that there were worms in the

9    patty that day?

10   A.    None of them told me that.

11   Q.    And who were the employees that you interviewed?

12   A.    George Nicholson, Rashad, Troi, Elmo -- I don't remember

13   their last names, I'm sorry.

14   Q.    That's quite all right.

15   A.    Pam and Theresa.

16   Q.    So those were quite a few of the people that were working

17   that day; is that right?

18   A.    Yes.

19   Q.    Did you ever contact the health department?

20   A.    When I was going to get the health department, she walked

21   in the door.

22   Q.    So you were getting on the phone and they walked in; is

23   that right?

24   A.    No, I was going to -- I couldn't get them on the phone,

25   so I was leaving the restaurant to go down to St. Louis County

*Steak N Shake, Inc. v. Melissa White | 4:18–CV–00072*

1   Health Department.

2   Q.    So you said you couldn't get them on the phone.  Were you

3   getting a busy tone?

4   A.    Yes.

5   Q.    Did you ever find out why you were getting a busy tone?

6   A.    Yes.  So when she came in the building she told me she

7   had a complaint and that she needed to conduct an -- an

8   investigation.  I asked her, "Did it have to do with the worms

9   in pucks," and she told me, "How did you know?"  And I told

10  her what just happened.  She told me there was about 30 or so

11  calls that came through from a post on social media.

12  Q.    So the health department showed up.  And were you present

13  for the entirety of that health department inspection?

14  A.    I was.

15  Q.    As district manager, were you representing Steak N Shake

16  during the inspection?

17  A.    Yes.

18  Q.    As you remember it, what did the health inspector do when

19  she first arrived?

20  A.    She did the same thing I did.  She inspected the path of

21  the pucks.

22  Q.    Let me go back real quick.  I may have jumped the gun.

23        Do you remember if the health inspector was a man or

24  a woman?

25  A.    A woman.

*Steak N Shake, Inc. v. Melissa White | 4:18-CV-00072*

1   Q.   You said the first thing she did was followed the path of

2   the puck; correct?

3   A.   Yes.

4   Q.   Did she ever check any other food products?

5   A.   No.

6   Q.   She didn't check any other meat in the coolers or in the

7   freezers?

8   A.   Well, she checked the pucks.  Yeah, she checked all the

9   meat in the restaurant, yes.

10  Q.   So it wasn't just thawed-out meat?

11  A.   No.

12  Q.   Do you recall receiving a report of any kind from the

13  health department?

14  A.   I did.

15  Q.   Was there anything about the health inspector's

16  inspection that was contrary to what you did?

17  A.   No.

18  Q.   And did you review that report from the health inspector?

19  A.   I did.

20  Q.   I'm going to show you what has been marked as Plaintiff's

21  Exhibit 11.  Do you see that document before you, Mr. Tardy?

22  A.   I do.

23  Q.   Do you recognize this document?

24  A.   I do.

25  Q.   And what is this?

1    A.    It's the food establishment inspection report.  This is

2    what you get when the health department shows up for an

3    unannounced visit.

4    Q.    Is this more than one page to this document?

5    A.    Yes.

6            **MR. CHIBNALL:**  Amber, would you mind scrolling to

7    the second page.

8    Q.    (By Mr. Chibnall)  And is this the second portion of that

9    document?

10    A.    Yes.

11    Q.    Okay.  Does Steak N Shake keep these reports in the

12    ordinary course of its business?

13    A.    Yes, it does.

14    Q.    Is that a document that you as a district manager would

15    keep in the ordinary course of business as part of your job

16    responsibilities?

17    A.    Yes.  I use it to follow up on visits.

18    Q.    And you were present when the county health inspector

19    conducted that inspection on January 5?

20    A.    Yes.

21    Q.    Did the health inspector give you this report directly?

22    A.    Yes.

23    Q.    So you had firsthand knowledge of the scope and

24    completion of this inspection?

25    A.    That is correct.

*Steak N Shake, Inc. v. Melissa White | 4:18-CV-00072*

1          **MR. CHIBNALL:**  Your Honor, Plaintiff moves for

2    admission of Exhibit 11 into evidence.

3          **MR. HENDERSON:**  No objection.

4          **THE COURT:**  The Court receives Exhibit 11.

5    Mr. Chibnall, about how much longer do you have?

6          **MR. CHIBNALL:**  Maybe 20 minutes.

7          **THE COURT:**  Do you have a natural break point before

8    then?

9          **MR. CHIBNALL:**  Not really, but I can make one for

10   you.

11         **THE COURT:**  Let's try to do that.

12         **MR. CHIBNALL:**  Okay.

13   Q.   (By Mr. Chibnall)  Mr. Tardy, what time did the health

14   inspector arrive that day?

15   A.   2:30, 3:00.

16   Q.   If you look at the document, is there an arrival time?

17   A.   2:50.

18   Q.   Okay.  And what time did she leave?

19   A.   4:00 p.m.

20   Q.   So she was there for over an hour?

21   A.   Yes.

22   Q.   I'm going to direct your attention to page 1 of

23   Exhibit 11 here.  Do you see the section entitled "Foodborne

24   Illness and Risk Factors and Public Health Interventions"?

25   A.   Yes.

*Steak N Shake, Inc. v. Melissa White | 4:18-CV-00072*

 1   Q.   It's the first darkened block in that report.  Do you see
 2   that?
 3   A.   Yes, I do.
 4   Q.   In this block it's got, it looks like it's got a legend
 5   of some sort.  It says IN, NO, OUT, NA, C, R.  Do you see
 6   those abbreviations?
 7   A.   Yes.
 8   Q.   What do you understand the abbreviation IN to mean?
 9   A.   In compliance.
10   Q.   So you meant that if that box was checked, then that
11   means the health inspector is saying Steak N Shake is in
12   compliance?
13   A.   That is correct.
14            **MR. CHIBNALL:**  Amber, would you mind moving down to
15   Line 12.
16   Q.   (By Mr. Chibnall)  So in Line 12 here, it states, "food
17   in good condition, safe, unadulterated and properly labeled."
18   What box did the health inspector check?
19   A.   IN.
20   Q.   And that meant in compliance?
21   A.   Yes, sir.
22   Q.   In looking at this document, did the health inspector
23   check any boxes that said Steak N Shake was out of compliance?
24   A.   No.
25   Q.   If you turn to the second page of the document of

*Steak N Shake, Inc. v. Melissa White | 4:18-CV-00072*

1    Exhibit 11, you say you recognize this page too; correct?

2    A.    Yes.

3    Q.    And what is that?

4    A.    This is a supplemental inspection report.  So this is

5    where the health inspector will put down corrective actions or

6    reason for visit, different things of that nature.

7    Q.    Okay.  And did you receive this page from the health

8    inspector?

9    A.    Yes.

10   Q.    And according to this document, what was the subject of

11   the complaint that the health inspector or health department

12   received?

13   A.    Worms in the beef, in ground beef.

14   Q.    And that's that area following the colon after complaint

15   and underlined; correct?

16   A.    Yes.

17   Q.    Did the health inspector examine the beef patties

18   herself?

19   A.    Yes.

20   Q.    What were her findings?

21   A.    She didn't find anything.

22   Q.    Did she talk to any other employees at Steak N Shake?

23   A.    She talked to all the cooks on the line, yes.

24   Q.    Did those interviews reveal that there were any worms in

25   the meat?

*Steak N Shake, Inc. v. Melissa White | 4:18-CV-00072*

| | |
|---|---|
| 1 | A.   No. |
| 2 | Q.   What was the health department's final conclusion? |
| 3 | A.   Safe. |
| 4 | Q.   And did you receive a grade from the health department |
| 5 | that day? |
| 6 | A.   Yes, we did. |
| 7 | Q.   What grade? |
| 8 | A.   We maintained our A status. |
| 9 | Q.   So you received an A grade? |
| 10 | A.   Yes. |
| 11 | Q.   And that's the A grade that gets posted on the front of |
| 12 | the restaurant; correct? |
| 13 | A.   That is correct. |
| 14 | Q.   Do you remember receiving documentation of that |
| 15 | conclusion? |
| 16 | A.   Yes. |
| 17 | Q.   I'm going to show you what's been marked Plaintiff's |
| 18 | Exhibit 23.  And do you recognize this document, Mr. Tardy? |
| 19 | A.   Yes, I do. |
| 20 | Q.   And what is this document? |
| 21 | A.   This is a food establishment inspection report.  It's |
| 22 | pretty much the same report, just what they leave behind in |
| 23 | the restaurant. |
| 24 | Q.   Okay.  Is that a document that the district manager would |
| 25 | keep in the ordinary course of business? |

1   A.   Yes.

2   Q.   And it's a document that you personally received?

3   A.   Yes.

4        **MR. CHIBNALL:**  Your Honor, I would like to move that

5   Plaintiff's Exhibit 23 be entered into evidence.

6        **MR. HENDERSON:**  No objection, Your Honor.

7        **THE COURT:**  The Court receives Exhibit 23.

8   Q.   (By Mr. Chibnall)  When is this document dated,

9   Mr. Tardy?

10  A.   January 5, 2018.

11  Q.   Does this document coincide with Exhibit 11?

12       **MS. WILLIAMS:**  John, can you publish, please.

13       **MR. CHIBNALL:**  Thank you.

14  Q.   (By Mr. Chibnall)  Mr. Tardy, does this document coincide

15  with Exhibit 11, which we just previously viewed?

16  A.   Yes.

17  Q.   And on the last page of this exhibit, did the health

18  department provide a letter grade?

19  A.   Yes.

20  Q.   What was that letter grade?

21  A.   An A.

22  Q.   And did the health department provide a score?

23  A.   Yes.

24  Q.   And what was that score?

25  A.   A 100 percent.

1   Q.   Are you aware there's a City of Florissant Health

2   Department?

3   A.   I am aware, yes.

4   Q.   Have you ever had any contact with the City of Florissant

5   Health Department?

6   A.   No.

7   Q.   City of Florissant Health Department never contacted you

8   regarding allegations of worms in Steak N Shake's meat?

9   A.   No.

10  Q.   And did anyone from the City of Florissant Health

11  Department arrive that day?

12  A.   No.

13          **MR. CHIBNALL:**  Your Honor, if you would like to take

14  a break, I think this would be a time for me to do so.

15          **THE COURT:**  Yes, let's do so.

16          Ladies and gentlemen of the jury, we are going to

17  take a 15-minute break.  So you may recall my instruction

18  earlier about do not discuss the case at all during the

19  recess.  That means amongst yourselves, talk with anyone else.

20  If anyone should try to talk with you about the case, advise

21  me immediately or soon thereafter as you possibly can.

22          Again, do not read, watch, listen to anything on the

23  radio or look at anything on the Internet or the like or on TV

24  and keep an open mind until all of the evidence has been

25  received and I have you retire to deliberate for the case.

*Steak N Shake, Inc. v. Melissa White | 4:18-CV-00072*

1          Thank you very much.

2          (The following proceedings were held in the

3   courtroom out of the presence of the jury:)

4          **THE COURT:**  So this is also for the folks who are

5   visitors in the gallery.  The jury is deliberating across the

6   hall.  I'm going to have you remain in the courtroom until I

7   know the jurors are over in the courtroom across the hall so

8   you don't bump into them incidentally out in the hallway.

9          So with that, we will take a break.

10          Mr. Tardy, during the break, you may not speak with

11  any of the lawyers or any others about this case, about your

12  testimony.

13          And then, folks, one other thing, couple other

14  things actually.  Both of you, I'm going to ask you to slow

15  down a bit.  Pump the brakes.  If you see me put my hand up

16  like that, I'm telling you to slow down, okay.  It's awfully

17  hard for Reagan to get everything down when you are going that

18  quickly.  And she's really good.  Because I speak really

19  quickly and she gets me down, but it's hard, especially when

20  it's a colloquy.

21          With respect to the video and other exhibits that

22  you've stipulated to, I don't need you to move for admission

23  each time.  I think if it's been admitted -- or not admitted.

24  If it's been stipulated to, then just when you are presenting

25  it say that to John and then after -- at a break point, we

*Steak N Shake, Inc. v. Melissa White | 4:18-CV-00072*

1   will go through and make sure -- and it's on you, the

2   examining lawyer to make sure that John and I both have a

3   record of what you've displayed and what has been admitted.

4           If there's an exhibit that has not been stipulated

5   to, then -- and if counsel inadvertently on either side says,

6   oh, it's been stipulated to, I certainly expect the other

7   counsel to stand up and say.  Okay?  But I want to keep this

8   moving.  And there's no need for us to keep going through that

9   on each and every exhibit that's already been taken care of.

10          And with the videos, you had one where you played it

11  three times.  Be careful how many times you are asking for the

12  video to be played.  I know some of them are really short

13  clips, but at one point we start to get to the point of

14  cumulative evidence.  So I didn't say anything about it that

15  time or I think the other one you had.  One of the others you

16  played twice, but I didn't find that it was excessive in

17  either of those situations.  But I'm certainly on the lookout

18  for that, so you are all aware of that.

19          That's all I have at this point.  Does anybody have

20  anything we need to address now?

21          **MR. CHIBNALL:**  No, Your Honor.

22          **MS. WILLIAMS:**  No, Your Honor.

23          **MR. HENDERSON:**  Yes, Your Honor.  I do.  It has to

24  do with the interrogatories you told us to confer.  If we are

25  going to do the cross-examination today, I would like to take

*Steak N Shake, Inc. v. Melissa White* | 4:18-CV-00072

1  care of that.

2          **THE COURT:**  So where are we on that?

3          **MR. HENDERSON:**  I haven't even spoken to counsel

4  yet.  I didn't know they were going to call Frank Tardy first,

5  I mean, Mr. Tardy first.  Because he is the first witness, I

6  am planning to use their -- some of their answers that has

7  objections to it.

8          **THE COURT:**  Okay.  How many do you have?  I mean,

9  how much time do you think it is going to take to talk with

10  counsel?

11          **MR. HENDERSON:**  It's not going to take that long.

12  It's two or three of them.  But I do have admissions there's

13  no objections to, so I would like to use those.

14          **THE COURT:**  Right.  No, and I understand on the ones

15  there are no objection.  I want you to meet and confer on the

16  ones where there are objections.  And when we resume, I will

17  have you come in here before the jury and tell me where we

18  are.  And if there are any objections I have to rule on, make

19  sure you have the documents for me that have the answer and

20  the objection so I can see them and make a ruling on them.

21          **MR. HENDERSON:**  Yes, Your Honor.

22          **THE COURT:**  If you have all worked it out, that's

23  fine with me.  But have that ready to go.

24          It's 2:39 right now.  Do you think 15 minutes is

25  enough to give you a break and then time to talk?

*Steak N Shake, Inc. v. Melissa White | 4:18–CV–00072*

1          **MR. HENDERSON:**  Yes, Your Honor.

2          **THE COURT:**  All right.  So do that.  Plan on being

3     back here at, we'll say 2:55.  I will give you an extra

4     minute.  I'm feeling extra generous right now.  All right.

5     Very good.  Thank you.

6               (Off the record.)

7          **MR. HENDERSON:**  Yes, Your Honor.  The defendant is

8     seeking to admit admissions 4, 6, 7 and 8.

9          **THE COURT:**  I don't have any of this in front of me,

10    just so you know.

11         **MS. WILLIAMS:**  May I approach.

12         **THE COURT:**  You may.  Just hand to John whatever you

13    need me to have.

14         **MS. WILLIAMS:**  On the request for admission, Your

15    Honor, Steak N Shake is not objecting to 7 or 8.  We object to

16    No. 6 because it's overly broad, vague and unclear.

17         **THE COURT:**  Okay.  So No. 6 I don't see an objection

18    lodged.  So you are now objecting?

19         **MS. WILLIAMS:**  I am now.

20         **THE COURT:**  Why have you not waived any objection?

21         **MS. WILLIAMS:**  Because, Your Honor, we -- obviously

22    what is discoverable is different from what is admissible at

23    trial.  There's a higher standard of admissibility and we

24    don't believe it meets the level of admissibility.

25         **THE COURT:**  But your objection is that it's vague

1   and overbroad?

2        **MS. WILLIAMS:**  Correct.

3        **THE COURT:**  Which would be a discovery objection?

4        **MS. WILLIAMS:**  That's correct.

5        **THE COURT:**  So what's your admissibility objection?

6        **MS. WILLIAMS:**  Because it is vague and overly broad,

7   it would be confusing to the jury.

8        **THE COURT:**  Overruled.

9        **MS. WILLIAMS:**  Okay.

10        Well, I would make the same argument with respect to

11   No. 4.  I assume that's going to be overruled as well.

12        **THE COURT:**  No. 4 you said?

13        **MS. WILLIAMS:**  That's right.

14        **THE COURT:**  Overruled.

15        **MR. HENDERSON:**  Are you looking for the next one?

16        **THE COURT:**  I am.

17        **MR. HENDERSON:**  I'm sorry.  The next one is -- we --

18   as far as, like, with 5, the admission, admit that the

19   employee, managers did not collect or preserve --

20        **THE COURT:**  Which number?

21        **MR. HENDERSON:**  No. 5, admission 5.

22        **MS. WILLIAMS:**  Five wasn't presented to me.

23        **MR. HENDERSON:**  It's -- talking about 4, 5, 6, 7, 8.

24        **MS. WILLIAMS:**  Are you saying you want to end at 5

25   now?

*Steak N Shake, Inc. v. Melissa White | 4:18-CV-00072*

1        **MR. HENDERSON:**  Yes.  Well, yes.

2        **MS. WILLIAMS:**  Okay.  We didn't talk about that one

3   before.

4        **MR. HENDERSON:**  Okay.  I thought that was the one --

5   we covered that.  We covered that language when we were

6   talking.

7        **THE COURT:**  What are you seeking to admit?  The

8   response?  What part?  Because the first sentence is an

9   objection.

10        **MR. HENDERSON:**  Okay.  There's -- I'm sorry.  Five,

11   I will withdraw that, Your Honor.  I'm sorry.

12        **THE COURT:**  All right.

13        **MR. HENDERSON:**  The next one is 6.

14        **THE COURT:**  We talked about 6.

15        **MR. HENDERSON:**  Okay.  Seven.

16        **THE COURT:**  Okay.

17        **MS. WILLIAMS:**  I already said I don't object to 7.

18        **THE COURT:**  We only need to deal with the ones to

19   which there is an objection.

20        **MR. HENDERSON:**  I believe 8.

21        **MS. WILLIAMS:**  I didn't object to 8.

22        **MR. HENDERSON:**  Well, then that's all that I have on

23   this one.  For the interrogatories that you have, there's one.

24   There's 20 that you are objecting to.

25        **MS. WILLIAMS:**  No, I agree with -- 20 is fine.  No

*Steak N Shake, Inc. v. Melissa White | 4:18–CV–00072*

 1   objection to 20.

 2          **MR. HENDERSON:**  Seventeen, Your Honor.

 3          **THE COURT:**  What's the objection?

 4          **MS. WILLIAMS:**  The reason stated in the

 5   interrogatory response yourself, Your Honor.  And furthermore

 6   I don't believe the jury should see the objections because

 7   that was subject of a motion *in limine*.  The discovery

 8   objections are not to come to the jury's attention.

 9          **THE COURT:**  Well, on the merits of the objections, I

10   overrule the objections.  In terms of the not seeing the

11   objections, how do you propose to deal with that,

12   Mr. Henderson?

13          **MR. HENDERSON:**  We can redact, white that out.

14          **THE COURT:**  All right.  That resolves that; right?

15          **MS. WILLIAMS:**  As I understand it, you are

16   overruling our objections on the merits.

17          **THE COURT:**  Overruling the merits of the objections,

18   correct.

19          **MS. WILLIAMS:**  Then if they are whited out, no, I

20   don't have any further.

21          **MR. HENDERSON:**  That's it, Your Honor.

22          **THE COURT:**  Okay.  Very good.  Do I need these for

23   any reason?

24          **MR. HENDERSON:**  No, Your Honor.  I just gave you a

25   copy.

*Steak N Shake, Inc. v. Melissa White | 4:18-CV-00072*

1          **THE COURT:** All right.

2          **MR. HENDERSON:** Thank you.  That's it, Your Honor.

3          **MS. WILLIAMS:** Thank you.

4          **THE COURT:** All right.  Very good.

5          (Counsel approached the bench and the following

6    proceedings were had:)

7          **THE COURT:** So the courthouse security officer

8    brought to my attention that during the break he observed

9    Mr. Tardy going into the counsel room or break room and put a

10   phone on a table or the like.  He doesn't know whether there

11   was any communications about the case, but I am going to ask

12   you to tell me, were there any communications with Mr. Tardy

13   about the case or his testimony?

14         **MS. WILLIAMS:** No, absolutely not.  We let him check

15   his work phone, and we let him get his Gatorade out of the

16   counsel room.

17         **THE COURT:** Say the last part again.

18         **MS. WILLIAMS:** We let him get his Gatorade out of

19   the counsel room.

20         **MR. CHIBNALL:** No conversations with Mr. Tardy.

21         **THE COURT:** Mr. Henderson, are you satisfied with

22   that?

23         **MR. HENDERSON:** Yes, Your Honor.

24         **THE COURT:** I'm satisfied with that as well.  Thank

25   you very much.

*Steak N Shake, Inc. v. Melissa White | 4:18-CV-00072*

1          While we are here, you think you -- ten more minutes
2   based on what you told me before?  How long do you expect
3   cross?
4          **MR. HENDERSON:**  I am thinking probably no more than
5   an hour.
6          **THE COURT:**  Okay.  So you may have redirect.  I
7   don't know, but be prepared to call your next witness.
8          **MS. WILLIAMS:**  Our next witness is Ms. White.
9          **THE COURT:**  There you go.  All right.  Good.  Great.
10  Thank you.
11          (The following proceedings were held in the
12  courtroom in the presence of the jury:)
13          **THE COURT:**  Welcome back, ladies and gentlemen of
14  the jury.  Mr. Chibnall, you may proceed.
15          **MR. CHIBNALL:**  Thank you, Your Honor.
16  Q.   (By Mr. Chibnall)  Welcome back from our quick break
17  there, Mr. Tardy.  I want to continue with my line of
18  questioning here and try to finish up as soon as I can.  The
19  last thing we had talked about was the Florissant Health
20  Department.  I want to move now to the actual post in
21  question, the Facebook post of Ms. White.
22  A.   Okay.
23  Q.   Did you know that Ms. White made a Facebook post shortly
24  after leaving the restaurant that day?
25  A.   I was made aware a little bit after, yes.

*Steak N Shake, Inc. v. Melissa White | 4:18-CV-00072*

1    Q.    Have you ever seen that post?

2    A.    Yes.

3    Q.    I'm going to show you that post now, which has been

4    marked and admitted as Plaintiff's Exhibit 1.  Do you recall

5    when you first saw this post, Mr. Tardy?

6    A.    A little bit after I left the restaurant.

7    Q.    And that was on January 5th?

8    A.    Yes.

9    Q.    How did you become aware of the post?

10   A.    I don't really recall who first gave it to me, but I know

11   it went around my area like a little wildfire very quickly.

12   Q.    So possibly more than one person told you about it?

13   A.    More than ten.

14   Q.    More than ten you said?

15   A.    About more than ten.

16   Q.    And what was your initial reaction to it?

17   A.    It's not true.

18   Q.    Did it bother you in any way?

19   A.    Yes.

20   Q.    And you discussed this previously, but did you fire

21   Ms. White?

22   A.    No.

23   Q.    Is her statement "just got fired" true?

24   A.    No.

25   Q.    Were there live worms in the steak burgers at Steak N

*Steak N Shake, Inc. v. Melissa White | 4:18-CV-00072*

1    Shake that day?

2    A.    No.

3    Q.    And do you know what happened to that burger after

4    Ms. White left that day?

5    A.    No.

6    Q.    Did you ever see it in a to-go container?

7    A.    Say it again.

8    Q.    Did you ever see it in a to-go container?

9    A.    When I first arrived at the restaurant, I briefly saw the

10   container, yes.

11   Q.    But after that you never saw it again?

12   A.    No.

13   Q.    Ms. White stated that she refused to sell the meat.  To

14   your knowledge, was it ever for sale?

15   A.    No.

16   Q.    Was it ever sold to any customer?

17   A.    No.

18   Q.    Did you ever instruct anyone to sell any alleged

19   contaminated meat?

20   A.    No.

21   Q.    So is Ms. White's statement that she refused to sell that

22   meat in particular a true statement?

23   A.    It is not.

24   Q.    Ms. White also stated that as of 12:23 p.m. on

25   January 5th, 2018, that Steak N Shake was still selling,

1  quote/unquote, "same meat."  Did you ever witness or authorize

2  anyone to sell that same meat?

3  A.   No, I did not.

4  Q.   And you never instructed anyone to sell the burger that

5  Ms. White cooked and alleged had worms in it?

6  A.   That is correct.

7  Q.   Was it even possible to sell that meat?

8  A.   It was not possible.

9  Q.   Did Ms. White take the patty with her?

10  A.   Yes.

11  Q.   So is Ms. White's statement true that, quote, "Well right

12  now #RIGHTNOW, they are still selling same meat"?

13  A.   No, it's not true.

14  Q.   She also states "#NOONEEVENCHECKEDIT."  Did you check the

15  meat that day at Steak N Shake?

16  A.   Yes, I did.

17  Q.   Did the health inspector check the meat that day in Steak

18  N Shake?

19  A.   Yes, she did.

20  Q.   In fact, we previously went through those clips of you

21  inspecting the meat; correct?

22  A.   Yes.

23  Q.   Were you ever able to inspect or check that exact burger

24  that Ms. White cooked?

25  A.   No, I was not.

*Steak N Shake, Inc. v. Melissa White | 4:18-CV-00072*

```
 1   Q.   To your knowledge was anyone able to inspect or check
 2   that burger?
 3   A.   No.
 4   Q.   Why not?
 5   A.   Melissa refused to give it to us.
 6   Q.   So is Ms. White's statement "#NOONEEVENCHECKEDIT" true?
 7   A.   No, it's not.
 8   Q.   Ms. White also states that she, quote, "did nothing
 9   wrong."  Is that statement true?
10   A.   No, it's not.
11   Q.   What did Ms. White do wrong?
12   A.   She refused to give up the meat patty.  She refused to
13   cooperate with the investigation.
14   Q.   Did she act unprofessionally?
15   A.   Very much so, yes.
16   Q.   Is an employee required to cooperate with an
17   investigation, such as the one you were conducting?
18   A.   Yes.
19   Q.   And that's part of Steak N Shake's policy; correct?
20   A.   That is correct.
21   Q.   Did Ms. White violate that particular rule of the
22   handbook?
23   A.   Yes, she did.
24   Q.   So Ms. White did something wrong?
25   A.   Yes.
```

*Steak N Shake, Inc. v. Melissa White* | *4:18-CV-00072*

1  Q.    And you mentioned that that wasn't the only thing;

2  correct?

3  A.    That is correct, no.

4  Q.    Following Ms. White's resignation and departure from the

5  store, did you receive any complaints from customers that

6  there were worms in the meat on January 5th?

7  A.    We received several calls to the restaurant, yes.

8  Q.    Did anybody complain in store to you?

9  A.    No.

10  Q.    Did you receive any complaints following January 5th?

11  A.    Yes.

12  Q.    Were those complaints about worms being in the burger?

13  A.    Yes, the one that was posted, yes.

14  Q.    As district manager, did you receive any of those calls

15  from customers directly?

16  A.    Yes, I did.

17  Q.    How many calls were you receiving?

18  A.    A lot.

19  Q.    And over how long a period of time were you receiving

20  those calls?

21  A.    About six weeks, maybe longer.

22  Q.    Did anyone else receive calls that you know of?

23  A.    My direct boss did, Lucy Laton.  The surrounding

24  restaurants received phone calls.  General managers.

25  Q.    And those surrounding restaurants were under your

*Steak N Shake, Inc. v. Melissa White | 4:18-CV-00072*

1  management; correct?

2  A.    Yes.

3  Q.    Did Mr. Nicholson receive phone calls at the Florissant

4  store?

5  A.    He received the most out of probably all of us, yes.

6  Q.    Were they all about allegations of worms in the burger?

7  A.    Yes.  Or asking us if we had worms in our burgers.

8  Q.    And that was a repeated conversation you had?

9  A.    Yes.

10  Q.    Did anyone call and complain to you about specifically

11  maggots or flies?

12  A.    No.

13  Q.    It was just worms?

14  A.    Yes.

15  Q.    And this persisted for, you said, approximately six

16  weeks?

17  A.    About six weeks, yes.

18  Q.    Do you believe that Steak N Shake's reputation was

19  damaged by Ms. White's posting?

20  A.    Yes.

21  Q.    Did you notice any downturn in business following the

22  events of January 5th?

23  A.    Yes.  Not just in New Florissant.  The five surrounding

24  restaurants surrounding that restaurant decreased in business

25  as well.

1   Q.   And what were those five surrounding restaurants?

2   A.   New Halls Ferry, Bellefontaine, St. Ann, Howdershell.

3   Q.   And you testified previously that the most important

4   aspect of operating a restaurant is safety and the quality of

5   the food.  Do you believe that Ms. White's post damaged Steak

6   N Shake's reputation for providing safe quality food?

7   A.   Yes, I do.

8   Q.   Do you believe it had a negative effect on Steak N

9   Shake's business?

10  A.   It did, yes.

11  Q.   Did you see it have a negative effect on the business?

12  A.   I did.

13  Q.   Do you believe that Steak N Shake lost customers because

14  of that post?

15  A.   Yes, we did.

16  Q.   As district manager, were you ever provided sales data

17  regarding stores in your district?

18  A.   Yes, daily.

19  Q.   Would you personally review that data?

20  A.   Yes.

21  Q.   Would you -- how would you receive it?  Would it be in a

22  spreadsheet form?  An e-mail?  How would you receive it?

23  A.   We could pull it up on the Steak N Shake website, but it

24  came to us automatically every morning at about 7:30, 8:00 for

25  the stores that you were in control of.

*Steak N Shake, Inc. v. Melissa White | 4:18-CV-00072*

1   Q.   So specific to your units?

2   A.   Yes.

3   Q.   And you would receive these as part of your job as

4   managing director?

5   A.   Yes.

6   Q.   Or district manager, excuse me.

7        Would you create those spreadsheets?

8   A.   No.

9   Q.   I'm going to show you what's been marked as Plaintiff's

10  Exhibit 20.  Mr. Tardy, do you recognize this document?

11  A.   Yes.

12  Q.   And I believe we have a few pages here.  We are going to

13  focus on the first three pages.  But is this the spreadsheet

14  that you were just referring to that you would receive in the

15  mornings?

16  A.   Yes.

17  Q.   And so you've personally reviewed this document before?

18  A.   Yes.

19       **MR. CHIBNALL:**  Your Honor, Plaintiff moves to admit

20  Exhibit 20 into evidence.

21       **MR. HENDERSON:**  No objection, Your Honor.

22       **THE COURT:**  Court receives Exhibit 20.

23  Q.   (By Mr. Chibnall)  What does this document show you?

24  A.   It shows the week-over-week sales, same store sales.

25  Q.   And when you say week-over-week sales, is the week

Steak N Shake, Inc. v. Melissa White | 4:18-CV-00072

1  identified by the number one, two, three, four?

2  A.    Yes.  Starting with the first week in January, yes.

3  Q.    And under the heading that says "row labels," there is a

4  series of five numbers there.  There's 153, 176, 45, 291 and

5  44.  Do you see those numbers?

6  A.    Yes, I do.

7  Q.    What do those numbers represent?

8  A.    Those are the store numbers to the locations.  So New

9  Halls Ferry was 153.

10  Q.    Which was the -- which was the store that was in

11  Florissant?

12  A.    176.

13  Q.    And that was the store that Ms. White worked at?

14  A.    That is correct.

15  Q.    Based on your understanding and review of this document,

16  does this indicate Steak N Shake suffered any losses in 2018?

17  A.    This indicates a massive loss in 2018, yes.

18  Q.    And approximately how much was that loss, according to

19  this document?

20  A.    Roughly $755,000.

21  Q.    And that's on that third page of the document, is that

22  the number you are referring to?

23  A.    Yes.

24  Q.    And that's the number that's highlighted there in the

25  yellow cell?

1   A.    Yes.

2   Q.    Based upon your personal experience as district manager

3   in the North St. Louis County area, did you see -- you saw a

4   decline in business at all of those stores; correct?

5   A.    Yes, I did.

6   Q.    Would you ever receive any other sales information as

7   district manager?

8   A.    Yes.

9   Q.    And would those -- would those -- would that information

10  also show a loss for those stores in that North County area?

11  A.    The trend that you are seeing here, it would show that

12  North County was trending in the right direction and then once

13  this happened, it just went backwards.

14  Q.    Do you remember how much the store was -- the Florissant

15  store, the 176 store, do you remember how much that store was

16  losing immediately after Ms. White's post?

17  A.    A week, 9, $10,000.

18  Q.    And you personally witnessed that business decline?

19  A.    Yes.

20  Q.    Throughout the duration of your employment at Steak N

21  Shake, did you ever see a worm in any meat product at Steak N

22  Shake?

23  A.    No.

24  Q.    Did you ever have any other employee make any other

25  allegation to you that there were worms in the meat at Steak N

```
 1    Shake?

 2    A.   No.

 3    Q.   On January 5th, 2018, did you see any worms in any meat

 4    at Florissant?

 5    A.   No.

 6    Q.   And you were certain that there were no worms in the meat

 7    at Florissant on January 5th?

 8    A.   I am certain, yes.

 9    Q.   What do you believe that Ms. White actually saw?

10    A.   She saw the gristle of the fat that's in the patties.

11    Q.   Would you have ever terminated an employee for simply

12    reporting an alleged contaminant in the food product?

13    A.   No, I would not have.

14    Q.   Do you believe the burger that Ms. White made on the

15    morning of January 5 had maggots or flies in it?

16    A.   I do not.

17    Q.   Do you believe that Ms. White was reckless in posting

18    what she did without confirming what was in the patty?

19    A.   Yes, I do.

20    Q.   Do you believe that her reckless behavior caused monetary

21    and reputational damage to Steak N Shake?

22    A.   It did, yes.

23              MR. CHIBNALL:  No further questions, Your Honor.

24              THE COURT:  Thank you.  Cross-examination.

25              MR. HENDERSON:  Thank you, Your Honor.
```

*Steak N Shake, Inc. v. Melissa White | 4:18-CV-00072*

1       Ready, Your Honor.

2                        **CROSS-EXAMINATION**

3   **BY MR. HENDERSON:**

4   Q.   Hello, Mr. Tardy.

5   A.   How are you doing?

6   Q.   I just want to go through some things here.  And you

7   admitted that January 5th, 2018 was the first time you

8   investigated a fly maggot inside a Steak N Shake meat?

9   A.   That's correct.

10  Q.   You hadn't had any experience before investigating

11  maggots inside Steak N Shake meat?

12  A.   That's correct.

13  Q.   And will you agree that when you were there you were on

14  the phone talking to someone as you were doing your

15  investigation?

16  A.   I do not recall that at all.

17  Q.   Okay.  Would you be surprised if a witness come and said

18  that they heard you asking, you know, just what to do?

19        **MR. CHIBNALL:**  Objection.  Form of question.  I'm

20  not sure what you are asking.

21        **THE COURT:**  Rephrase.

22  Q.   (By Mr. Henderson)  Okay.  Were there -- will you agree

23  that employees heard you asking for what to do while speaking

24  on the phone?

25  A.   No, I will not agree.

*Steak N Shake, Inc. v. Melissa White | 4:18-CV-00072*

```
 1   Q.   Okay.  Will you agree that there's a policy at Steak N
 2   Shake when an employee see something, they have to step up and
 3   say something, in regards to food safety?
 4   A.   I do agree.
 5   Q.   Would you agree -- and I'm going to read this.  And you
 6   let me know if you agree -- if this is part of the Steak N
 7   Shake handbook.
 8   A.   Okay.
 9   Q.   That safety and well-being of guests and of associates
10   are top priority?
11            MR. CHIBNALL:  Objection, Your Honor.  Lack of
12   foundation for this question.  If there's an exhibit, we would
13   love to see it.  Otherwise, Mr. Henderson is just reading.
14            MR. HENDERSON:  I will break it down to questions,
15   Your Honor.
16            THE COURT:  Okay.
17   Q.   (By Mr. Henderson)  Are you familiar with the Steak N
18   Shake handbook?
19   A.   I am.
20   Q.   Are you familiar with the Steak N Shake having a policy
21   in regards to employees reporting food safety?
22   A.   Yes.
23   Q.   Will you agree that a part of that statement is that
24   safety and well-being of guests and associates are top
25   priority.  Will you agree with that?
```

Steak N Shake, Inc. v. Melissa White | 4:18-CV-00072

1  A.   I won't say I -- I can't say yes or no without seeing the
2  policy.  I haven't been there in three years.  I don't know
3  how to answer that, sir.
4  Q.   Well, generally, when employees see food safety issue,
5  they should report it?
6  A.   That is a general rule of thumb, but that's not a policy
7  at every company.  So, again, I can't . . .
8  Q.   I'm going to move on here.
9       I know that you testified before that Ms. White
10 brought a lot of safety concerns to you before this
11 January 5th, 2018?
12      **MR. CHIBNALL:**  Objection.  Mischaracterizes the
13 witness's prior testimony.
14      **THE COURT:**  Overruled.  The jury will recall.
15 A.   I don't recall saying safety issues, but there were
16 issues that Ms. White brung to my attention.
17 Q.   (By Mr. Henderson)  Okay.  And when she brought those
18 attentions to you, was she behaving in a professional manner?
19 A.   Yes.
20 Q.   And there wasn't any incidents before where she was
21 unprofessional to you?
22 A.   Not that I can recall, no.
23 Q.   Okay.  And will you agree that Ms. White brought concerns
24 to you when people was leaving food out?
25 A.   I don't recall that, no.

*Steak N Shake, Inc. v. Melissa White | 4:18-CV-00072*

1    Q.    Will you agree that Ms. White was bringing to your

2    attention when people were leaving food uncovered, pans

3    uncovered?

4    A.    I do not recall that, sir.

5    Q.    Do you recall her bringing attentions to you dealing with

6    just cleanliness problems at the Steak N Shake restaurant?

7    A.    I recall an incident at one point in time when Melissa

8    brought to my attention that she felt like we should have a

9    dishwasher earlier in the day.  And that is something I agreed

10   with her on and that was scheduled appropriately.  I can't go

11   back and say it exactly how you are saying it because it

12   wasn't in those phrase ways in what you are putting it.

13          Me and Melissa's communication in that restaurant

14   revolved around things that mostly affected her -- servers not

15   rolling silverware, the schedule not being populated

16   correctly.  So it wasn't necessarily a safety concern.

17   Q.    But would you agree that when there was people not

18   following policy in regards to the safety of food, she brought

19   that to your attention?

20   A.    I don't recall it in the way that you are asking the

21   question, sir, no.

22   Q.    Okay.  Is it your testimony today that you took some of

23   the meat out of each pan?

24   A.    Yes.

25   Q.    Okay.  Is it true that you provided answers stating that

1  you took one patty out of five pans?

2          **MR. CHIBNALL:**  Objection, Your Honor.  That lacks

3  foundation.  Mr. Tardy never testified to that, nor is there

4  any record of him testifying to that.

5          **THE COURT:**  Overruled.  Again, the jury will recall

6  what Mr. Tardy testified earlier, as will Mr. Tardy.  You may

7  proceed.

8  Q.   (By Mr. Henderson)  Will you agree -- did you ever make a

9  statement that you took five patties out of -- took a patty

10  out of five pans, one patty out of five pans?

11  A.   I recall removing patties out of pans, but I won't agree

12  to a specific number.

13  Q.   Will you be surprised if we provide an answer from Steak

14  N Shake saying that you took one patty out of five -- out of

15  five pans?

16  A.   This happened over three years ago.  I've been out of

17  Steak N Shake for three years.  Nothing would necessarily

18  surprise me, but I don't recall it just like that.

19  Q.   If I give you a document to look at, would that refresh

20  your memory?

21  A.   We can try.

22          **THE COURT:**  Mr. Henderson, in the interest of time

23  for the jury, I would have you use the document camera.

24          **MR. HENDERSON:**  Yes, Your Honor.

25  Q.   (By Mr. Henderson)  Do you recall having -- hearing an

*Steak N Shake, Inc. v. Melissa White | 4:18-CV-00072*

1    answer describe in detail what you and/or your former employee

2    did with remaining beef patties on the premises of Florissant

3    restaurant?

4    A.   This is not something that I made or ever seen before.

5    I'm not sure what I should be doing here.

6    Q.   You were the only person doing the investigation on

7    behalf of Steak N Shake?

8    A.   This is correct.

9    Q.   So at some point someone had to talk to you to file what

10   happened?

11   A.   This is correct.

12   Q.   And did you ever provide this information that the

13   general manager, George Nicholson, removed beef patties

14   located in the pan near the grill from the line and put it in

15   the walk-in refrigerator?

16           **MR. CHIBNALL:**  Your Honor, I'm going to object to

17   this question.  Any information that Mr. Tardy provided Steak

18   N Shake would have been under the guise of attorney-client

19   privilege, which would have been factored into any sort of

20   response, but that would --

21           **THE COURT:**  Counsel, approach.

22           (Counsel approached the bench and the following

23   proceedings were had:)

24           **THE COURT:**  All right.  First of all, no speaking

25   objections.  Okay?  Second of all, you are objecting to an

*Steak N Shake, Inc. v. Melissa White | 4:18-CV-00072*

1    interrogatory answer that was signed by your client?  Go
2    ahead.

3              **MR. CHIBNALL:**  I'm objecting to -- I'm objecting to
4    the question here because, first of all, Mr. Tardy has never
5    seen them.  He has never had any involvement in it.  Any
6    information he provided regarding his investigation was
7    provided to in-house legal counsel at Steak N Shake.

8              **THE COURT:**  How does that make it privileged?

9              **MR. CHIBNALL:**  Any conversation that he had or --
10   I'm sorry.  I don't mean to point to you, Mr. Henderson.  Any
11   conversation that Mr. Tardy had and recollection of that
12   conversation or recitation of that conversation would be
13   privileged communication.  What's in the interrogatory is not
14   necessarily -- is not necessarily privileged, but what
15   Mr. Tardy said to anyone at Steak N Shake would be.  And
16   hopefully I'm making myself -- a distinction clear.

17             **THE COURT:**  I understand the distinction.
18   Mr. Henderson.

19             **MR. HENDERSON:**  Judge, what I'm trying to do is that
20   he's the main one doing the investigation, did he make the
21   statements in the interrogatories?  That's what I'm asking.
22   If he is saying he never saw it before, he had to tell
23   someone.  And I'm asking him, the interrogatories that Steak N
24   Shake produced, is that his statement?  Did he provide that
25   statement to them?

*Steak N Shake, Inc. v. Melissa White | 4:18-CV-00072*

1      **THE COURT:**  I will allow that.  There's nothing
2  objectionable.

3      **MR. CHIBNALL:**  I agree.  I just -- I was afraid we
4  were getting into that area that we were uncomfortable with,
5  and that is asking what he said to anybody at Steak N Shake.
6  And that would have been to counsel.

7      **THE COURT:**  Well, I don't think we are there.  I
8  understand your concern.  But, Mr. Henderson, you understand
9  obviously you are not going to get into privileged materials.

10      **MR. HENDERSON:**  Absolutely.

11      **THE COURT:**  I didn't understand your question to go
12  to that.

13      **MR. HENDERSON:**  Okay.  What I am going to do --
14  well, I can rephrase the question and ask him did he -- I'll
15  just go, "Did you make this statement?"  Did you make this
16  statement.  If that's what I can do.

17      **THE COURT:**  Go ahead and rephrase.

18      **MR. CHIBNALL:**  I don't have a problem with that.

19      (The proceedings returned to open court.)

20      **THE COURT:**  Counsel, you may proceed.

21      **MR. HENDERSON:**  Thank you, Your Honor.

22  Q.   (By Mr. Henderson)  Mr. Tardy, did you ever -- I'm going
23  to ask you of these statements.  Did you ever make a statement
24  in regards to that general manager, George Nicholson, removed
25  the beef patties located in the pan near the grill from the

Steak N Shake, Inc. v. Melissa White | 4:18-CV-00072

1  line.  Did you ever make that statement?

2  A.   I don't recall making that statement, sir.

3  Q.   Did you recall making that -- it was put -- put them in a

4  walk-through, that he put them in a walk-in refrigerator where

5  they remained until district manager, Frank Tardy, arrived to

6  investigate Melissa White complaint.  Did you ever make that

7  statement?

8  A.   I don't recall it, sir.

9  Q.   Did you ever make a statement, when you arrive at the

10  Florissant restaurant on January 5, 2018, that you inspected a

11  beef patty?

12  A.   Did I inspect beef patties?

13  Q.   Did you make the statement that's inside this document?

14  A.   I don't recall writing this statement, so I am not going

15  to say those are my words.  Because that's not what I turned

16  in to Steak N Shake.

17  Q.   Okay.  We agree -- okay.  Let's go with -- so you never

18  told anyone from Steak N Shake that you removed one beef patty

19  from each of the pans located in the walk-in refrigerator?

20  Did you ever make that statement?

21  A.   Yes.

22  Q.   So that's a different statement, then, that you removed

23  some patties out of the pans of meat that was in the

24  refrigerator?

25  A.   No.  When you started, you asked me if it was five pans

Steak N Shake, Inc. v. Melissa White | 4:18-CV-00072

1  and I removed five pucks out of five different pans.  And I

2  told you I don't recall that statement because I don't recall

3  how many pans I took out of.  You are asking it to me in a

4  different way now.  Yes, I did tell Steak N Shake I removed

5  pucks out of pans to examine them, yes.

6  Q.   Well, my question is:  Did you remove one out of each

7  pan?

8  A.   Out of pans, yes.

9  Q.   Okay.  And did you remove a frozen beef patty from a box?

10 A.   Yes.  That was on the video, yes, sir.

11 Q.   Did you inspect them and you said -- did you ever tell

12 them that you closely -- that you used a -- you used a knife

13 to tear apart the meat of the frozen patty.  Did you ever make

14 that statement?

15 A.   George and I did use a knife to indent the frozen meat to

16 make sure that the meat was exactly frozen.  That was on the

17 video footage as well.  I took a picture of that as well that

18 I think was shown somewhere.

19 Q.   Would you agree that on the pan of meat that you

20 inspected, there were only five patties on there?

21 A.   On the line?

22 Q.   On the plate that you showed?

23 A.   That meat was out of the specific pan that was -- that

24 Melissa had got her puck out of, yes.

25 Q.   I'm sorry.  I'm asking -- the question I'm asking is that

*Steak N Shake, Inc. v. Melissa White | 4:18–CV–00072*

1   the pan -- the plate that you put the meat on it?

2   A.   Uh-huh.

3   Q.   How -- will you agree that there was only five patties on

4   that plate?

5   A.   Can I look at the picture?

6   Q.   Yes.

7         **MR. HENDERSON:**   I'm going to move on, Your Honor,

8   and have -- let me move on.

9   Q.   (By Mr. Henderson)   Did you ever -- will you agree that

10   the pan of meat that was left on the stove, it was thrown

11   away?

12   A.   The pan of meat thrown on the stove?

13   Q.   The pan of meat when you arrived -- when you arrived --

14   let's break this down like this.  Okay.  We agree that you

15   arrive at the restaurant at 11:15?

16   A.   Yes.

17   Q.   Okay.  As you proceeded to the grill, there is a pan of

18   meat towards the left of the grill.  Will you agree with that?

19   A.   Yes, I will.

20   Q.   That particular meat that was at -- that was located near

21   the grill, will you agree that that meat was thrown away?

22   A.   I do not recall it like that, no.

23   Q.   Did you ever make the statement -- well, there was --

24   were you ever asked -- admit to the employer or manager threw

25   away the beef patty that were on the cooking grill, the beef

*Steak N Shake, Inc. v. Melissa White | 4:18-CV-00072*

1  patty in the pan next to the cooking grill or the beef patty

2  that the district manager allegedly inspected on January 5?

3  Is your response, "Plaintiff denies this request"?

4         Did you ever -- did you ever make a statement that

5  the meat was thrown away?

6  A.   Not that I recall, no.

7  Q.   Are you aware that the meat was thrown away?

8  A.   I am having a hard time recalling that part, sir,

9  so . . .

10 Q.   Okay.  For the record, I would like to pull up Camera 4.

11 We can start with 11:21:50 through 11:22:21.

12         (Camera 4 video clip was played in open court.)

13         **MR. HENDERSON:**  Let's pause.  Let's stop it at

14 11:22:21.  If we can go to 11:22:21.  If we could pause it

15 there or close near there.  Okay.  Go back.  Further back.

16 I'll tell you when to pause it.  It's going to be 11:21:50.

17 Pause right there.

18         **THE COURT:**  Mr. Henderson, we need to keep this

19 moving here.

20         (Camera 4 video clip was played in open court.)

21 Q.   (By Mr. Henderson)  Did you just see the video that's

22 been marked?  Have you had a chance to look at the video?

23 A.   This is my first time seeing this particular video.

24 Q.   Okay.  Do you know who is the gentleman that is in the --

25 have a tie on in all black?

Steak N Shake, Inc. v. Melissa White | 4:18-CV-00072

1  A.   That is Rashad.

2  Q.   Do you see him taking a pan of meat, throwing it in the

3  trash can?

4  A.   I see him taking some patties and putting them in the

5  trash as they are changing over from breakfast to lunch, yes.

6  Q.   Would you disagree with that he was taking the patty

7  and -- that that, what he threw in there, was actually right

8  next to the grill?

9  A.   I'm going to assume that based on -- I don't see the full

10  footage.  What I see is I see the young lady walk past with

11  the hash browns, taking them back to the cooler, which is an

12  indication to me that they are breaking down from breakfast to

13  lunch, which means that pan of meat could have been expired.

14  Because when that pan of meat is on the line, it's only good

15  in production for four hours.  So if breakfast is from 6:00 to

16  10:00, 6:00 to 11:00, whatever the case may be, that pan of

17  meat was expired.

18  Q.   Okay.  But my question is:  Were you aware that an

19  employee took a pan of meat and threw it away?

20  A.   Not until right at this very moment, but that's not

21  uncommon.

22  Q.   Is it your testimony that when you heard of the complaint

23  from Ms. White that you told staff to stop the sell of all

24  meat?

25  A.   That I told the staff to stop selling meat?

1    Q.   Yeah.

2    A.   Not that I recall.

3    Q.   So are you saying the meat was still being sold as you

4    were going on your way to the restaurant?

5    A.   What I'm saying is I never made the call to stop

6    production.  I never said that.  I just said I was on my way.

7    Q.   Okay.  At any point did you -- so is your testimony that

8    you never told the employees to stop the sale of meat until

9    after you complete your investigation?

10   A.   I don't recall it.  I'm sorry.

11   Q.   Okay.  And I believe you testified that you arrive at

12   11:15?

13   A.   That is correct.

14   Q.   I want to go through some -- let's go through Camera 2.

15   11:19:45, it's on the sheet, through 11:20:37.  So 11:19:45

16   through 11:20:37.  It's Camera 2.

17            (Camera 2 video clip was played in open court.)

18   Q.   (By Mr. Henderson)  Will you agree that at -- at least --

19   let's start with 11:19:45.  Replay this all the way to

20   11:20:37.

21            (Camera 2 video clip was played in open court.)

22            **MR. HENDERSON:**  We can pause it.

23   Q.   (By Mr. Henderson)  Mr. Tardy, have you had a chance to

24   look at this video that was produced?

25   A.   As you just played it, yes.

*Steak N Shake, Inc. v. Melissa White | 4:18-CV-00072*

1    Q.    Will you agree that meat is still being sold?

2    A.    I would agree that meat is being sold, but not the same

3    meat that's on the line.

4    Q.    But my question is:  Meat is still being sold?

5    A.    Okay.  Yes.

6    Q.    And the time is showing is 11:20 -- 11:20:35; is that

7    correct?

8    A.    Yes.

9    Q.    Are you aware that Ms. White is just not saying that the

10   line was contaminated, that the meat in the back was

11   contaminated as well?

12   A.    It wouldn't -- yes, I was aware of that.

13   Q.    Okay.  And you were aware that she took one of those

14   patties from a pan that was in the back?

15   A.    I am aware of that, yes.

16   Q.    Will you agree that this pan is one of those pans from

17   the back?

18   A.    Yes.

19   Q.    Will you agree that it took you some time -- it would

20   have to take you some time to do an investigation?

21   A.    Yes.

22   Q.    Okay.  Will you agree -- let me ask you this:  When did

23   you complete, what time did you complete your investigation?

24   A.    I do not remember, but I know it didn't take me that long

25   to get through the walk-in cooler.

*Steak N Shake, Inc. v. Melissa White | 4:18-CV-00072*

1  Q.    Okay.  Do you have an estimation of how long it took you?

2  A.    Seven to 10 minutes.

3  Q.    So is your testimony that within 7 to 10 minutes you were

4  able to inspect multiple pans of meat?

5  A.    Yes.

6  Q.    And it's your testimony that 7, 8 minutes you looked

7  through all of the pans in the back of -- back of the freezer?

8  A.    It's my testimony between 7 and 10 minutes I looked

9  through pans of meat, yes.

10 Q.    And at the same time, as you were looking through pans,

11 meat is still being sold at the restaurant?

12 A.    That's not -- that's not true.

13 Q.    Okay.

14 A.    Because --

15 Q.    Well, if it took you -- let's say if you arrive at 11:15.

16 A.    Okay.

17 Q.    This is showing at 11:21.  Will you agree that from 15 to

18 21, that is --

19 A.    Seven minutes.

20 Q.    -- that is close to -- so you saying after 7 minutes you

21 decided that you searched all of the meat in the refrigerator?

22 A.    So I would need to go back to the time stamp of me in the

23 office, when me and George are in the office inspecting the

24 freezer.  That would tell me when I was done in the walk-in

25 cooler.  So until I can see that, I'm not going to just say

1   "no" to your question.  I am going to tell you I don't recall.

2   Q.   But it's your testimony it only took you 7 to 8 minutes?

3   A.   Seven to 10 minutes is my testimony.

4   Q.   Seven to 10 minutes?

5   A.   Yes.

6   Q.   Will you agree that the pan right next to the grill, you

7   never tore apart those patties?

8   A.   Three or four in there, yes, that is correct.

9   Q.   You never took those and smashed it and look at them?

10  A.   You are correct.

11  Q.   Will you agree that you never even asked Ms. White, "Take

12  me to the pan where you got your patty from"?

13  A.   Didn't get a chance to have that sit-down conversation

14  with Ms. White as I planned.  The investigation was first.

15  The conversation was second.

16  Q.   But asking that question, is that part of your

17  investigation?

18  A.   No, it's not.

19  Q.   It wasn't a part of your investigation to find out where

20  the meat came from, what pan the meat came out of?

21  A.   I found out what pan it came out of.

22  Q.   Is it true -- but isn't it true that Ms. White never told

23  you which pan it came out?

24  A.   I didn't need Ms. White to tell me what pan it came out

25  of.  When I opened the door, I quickly identified what pan it

Steak N Shake, Inc. v. Melissa White | 4:18-CV-00072

1    came out of.  Because she did not replace the wrapper on top

2    of the pan.  So I quickly identified it.

3    Q.   Are you aware that Ms. White said when she got a patty,

4    she covered it up.  Are you aware of her testimony?

5    A.   Actually, I'm not.

6    Q.   Okay.  Did you ever make a statement that Mr. Nicholson,

7    the district manager Mr. Nicholson, took the meat and waited

8    for you to arrive at the store so you can inspect it?  Did you

9    ever make that statement?

10   A.   I couldn't have made that statement because when I pulled

11   on the parking lot, Mr. Nicholson was just now getting back

12   from the bank walking in the back door.  So that's not a

13   statement that I made.

14   Q.   Are you surprised that Steak N Shake issued a

15   statement -- have a document that says that Mr. George

16   Nicholson took a pan of meat and put it in the freezer and

17   waited for you to arrive?

18   A.   Can't say if they did or didn't because I haven't seen

19   it, sir.

20   Q.   Okay.  But you never made that statement.  What I'm

21   trying to find is did you ever make that statement to Steak N

22   Shake?

23   A.   Don't recall making it and I don't see how I could have

24   made that statement, sir.

25   Q.   But you wouldn't be surprised if an answer that was

Steak N Shake, Inc. v. Melissa White | 4:18-CV-00072

1    provided like that and represent -- a representative from the

2    company signed it saying this was accurate and it was a true

3    answer that was being provided?

4    A.    I don't recall.  I didn't -- I don't know how to answer

5    that question, sir.

6    Q.    I'm going to walk through a few things from January 5th,

7    2018.  Will you agree that when -- when you arrive at the

8    restaurant, that Ms. White was trying to give you the patty?

9    A.    I will agree when I was at the line, yes, Ms. White did

10   have the patty in her hand, yes.

11   Q.    Would you agree that she at least tried to give it to you

12   at least three times?

13   A.    No, I won't necessarily agree to that like that, no.

14   Q.    Is it true that Ms. White was telling you to look at the

15   meat, wanting to show you the meat?

16   A.    I don't recall it like that because when I turned around

17   and she was right there, I specifically told Ms. White to give

18   me a chance to do my investigation and her and I will talk at

19   the end.  There was very little conversing back between me and

20   her at that point in time.

21   Q.    Isn't it true that you told her to stop talking about the

22   meat and don't show anyone the meat?

23   A.    I don't recall it like that, no.

24   Q.    Okay.  So is your testimony that Ms. White got upset

25   because you told her that "I will see the meat later after I

*Steak N Shake, Inc. v. Melissa White | 4:18-CV-00072*

1    complete my investigation."  Is that your testimony today?

2    A.    Yes.

3    Q.    And it's your testimony that you didn't yell at her or

4    raise your voice or put your hands in her face?

5    A.    The camera show -- I did not.

6    Q.    Wouldn't you agree that there's a policy at the

7    restaurant when you are talking to employees you want to take

8    them away and not just say different things out like in the

9    public when dealing with issues when there is an employee that

10   is making a complaint?

11   A.    There is a policy there at Steak N Shake that does say

12   that under different guidelines, not in which the way you are

13   using it right now with this situation.  No.

14   Q.    So are you saying that it's your training that if someone

15   was complaining that there's a worm in the patty, that you

16   don't look at it, but you go to where the patty came out --

17   came from?

18   A.    It will be the same as if when the health department

19   walks in the store, sir.  They don't look at the contamination

20   first.  We follow the path of food first and then we come back

21   to the infected area.

22   Q.    But wouldn't you agree that you didn't know the path of

23   the contamination because you never spoke with Ms. White, you

24   never talked to her?

25   A.    I disagree.  Because I didn't need to know the path of

Steak N Shake, Inc. v. Melissa White | 4:18-CV-00072

1  the contamination because all I needed to know was the path of
2  pucks, which was the line, the walk-in cooler and the freezer.
3  Q.   How many pans of meat did you observe back there in the
4  refrigerator?
5  A.   Again, I can't answer that particular question.  This
6  happened over three-some years ago.  I do not recall it.
7  Q.   Well, let's ask -- just for one pan of meat, how much
8  normally -- how many patties are inside one pan of meat?
9  A.   Haven't been there in over three years.  I do not recall
10 that, sir.
11 Q.   Okay.  Where the source where I'm getting from is it's
12 your testimony that you examined the patties, allowed these
13 patties out of pans and the freezer within 7 to 10 minutes?
14 A.   That is correct.
15 Q.   And you think that that's a sufficient investigation?
16 A.   Yes, sir.
17 Q.   Did you interview people within that 7 to 10 minutes?
18 A.   No, I did not.
19 Q.   So you spent exactly 7 to 10 minutes actually looking
20 through the meat.  Is that your testimony?
21 A.   My testimony is I spent 7 to 10 minutes following the
22 path of pucks and making sure that pucks were not
23 contaminated.  That's my testimony.  My testimony is also the
24 health department did the exact same thing that I did when she
25 walked in the door.  So, yes, that is the training to follow

1   the path of food.

2   Q.   What I'm asking you is your investigation.

3   A.   Okay.

4   Q.   And are you saying that ServSafe tells you to follow the

5   path of where the contaminant is?

6   A.   Follow the path of food until you get to it, yes.

7   Q.   So it's never appropriate to look at the source, the very

8   source that someone is complaining of?

9   A.   That's not what I'm saying.  We are going to look at the

10   source, but that's not the first step.

11   Q.   So what steps are you saying is the first step?  Is there

12   a particular policy or something that you can identify that

13   this is how you should do it?  You should go through and go

14   through and not look at the contaminated source?

15   A.   Again, I'm not saying don't look at the contaminated

16   source.  I am saying it's not the first step in following the

17   path of food.

18   Q.   And it's your testimony that you believe what she saw was

19   actually fatty gristle and it wasn't worms?

20   A.   That is my testimony, yes.

21   Q.   Would it be reasonable just to look at the patty to see

22   if it was a worm or fatty gristle?

23   A.   I mean, sir, for you, as an attorney, yes, I can see your

24   point in that.  But for me that works in the food service

25   industry, in the space, I follow my training and protocol.  I

Steak N Shake, Inc. v. Melissa White | 4:18-CV-00072

 1  follow the path of pucks.

 2  Q.    Okay.  Are you aware that Ms. White was not just talking

 3  about just the puck that was in the back; that she was

 4  actually saying there was something wrong with the meat that

 5  was at the grill?

 6  A.    And I checked that as well, sir.  I looked at it.  It was

 7  four our five -- we also saw it when Rashad threw it in the

 8  trash.  There were four or five pucks thrown in the trash.  I

 9  didn't need to break those apart and do all of that.  They

10  were already right there.  I seen it.

11  Q.    But you admit they were still cooking when you even

12  arrived, so there could have been more than those amount of

13  pucks inside the pan?

14  A.    That was not part of my testimony.  Because Melissa

15  stopped production at the restaurant before I got there.  So I

16  never made the call to stop production.  My crew trainer made

17  the call to stop production.  That wasn't me.

18  Q.    Would you agree that part of the policy if someone is

19  making the complaint of contaminated meat, they should stop

20  the production?

21  A.    That's not a policy.  The policy is to report it and

22  follow those instructions.  That's the policy at Steak N Shake

23  and any other company.

24  Q.    So is your testimony that even when someone is reporting

25  contaminated meat, that the meat should still be served?

*Steak N Shake, Inc. v. Melissa White | 4:18-CV-00072*

1   A.    That's not what I said.

2   Q.    I'm asking you is that --

3   A.    I disagree.

4         **MR. HENDERSON:**  Your Honor, if I can take a quick

5   break -- with a question.

6         **THE COURT:**  You may.

7         **MR. HENDERSON:**  Your Honor, before I pass the

8   witness, I would like to ask the Court to admit

9   interrogatories as well as the -- as the admissions into

10  evidence.

11        **THE COURT:**  Which ones?

12        **MR. HENDERSON:**  The ones that are --

13        **THE COURT:**  Just be specific with the numbers that

14  you are asking.

15        **MR. HENDERSON:**  I would like to ask that

16  Interrogatory 17 and then Interrogatory No. 20.  I would like

17  to admit Admission 4, and Admission 6, 7 and 8 into evidence.

18        **THE COURT:**  Any objections other than those

19  previously discussed?

20        **MR. CHIBNALL:**  Other than those previously

21  discussed, Your Honor, no.

22        **THE COURT:**  The Court admits Interrogatory 17 and 20

23  and their answers and then Requests for Admissions 4, 6, 7 and

24  8 and the responses.

25        **MR. HENDERSON:**  Thank you, Your Honor.  No further

```
 1   questions.
 2               THE COURT:  Thank you, Mr. Henderson.  All right.
 3   Any redirect?
 4               MR. CHIBNALL:  Your Honor, just a few questions.
 5                      REDIRECT EXAMINATION
 6   BY MR. CHIBNALL:
 7   Q.   Mr. Tardy, I just have a few follow-up questions for you.
 8   The document that you were shown by Mr. Henderson there
 9   contained what are called interrogatory answers.  Had you --
10   did you have any part in drafting those answers?
11   A.   No.
12   Q.   And same with the documents called requests for
13   admissions.  Do you have any part in answering those
14   documents?
15   A.   No.  I never seen them until right now.
16   Q.   Mr. Henderson also showed you some video footage.  It
17   appeared to be video footage of pucks being placed on the
18   grill approximately 11:19, 11:20.  Were those -- do you know
19   if those pucks were being sold at all?
20   A.   The pucks that were --
21   Q.   The pucks that were on the grill, do you know if they
22   were ever sold at all?
23   A.   Without seeing all of the cameras in action, no.
24   Q.   You also said that it took you about 7 to 10 minutes to
25   complete your inspection.  Did you do anything else as part of
```

*Steak N Shake, Inc. v. Melissa White | 4:18-CV-00072*

1    your inspection after Ms. White had left?

2    A.   Yes.  I talked to all the employees in the restaurant and

3    got written statements.

4    Q.   And when you went through the pucks, whether they be in

5    the cooler or in the freezer, did you find any worms?

6    A.   No.

7    Q.   Did anyone find any worms?

8    A.   No, sir.

9    Q.   Did anyone find anything contaminating in those patties?

10   A.   Nothing physical other than the fat.

11   Q.   The burger at issue here, the one that Ms. White had, was

12   it ever sold to any customer?

13   A.   No, sir, it was not.

14   Q.   So when it was taken out of commission by Ms. White when

15   she cooked it and took it off the line, was it really a threat

16   to public safety at that point?

17   A.   No, sir.

18          **MR. CHIBNALL:**  No further questions, Your Honor.

19

20

21

22

23

24

25

*Steak N Shake, Inc. v. Melissa White | 4:18–CV–00072*

<u>CERTIFICATE</u>

I, Reagan A. Fiorino, Certified Court Reporter, do hereby certify that I am an official court reporter for the United States District Court, Eastern District of Missouri; that on June 14, 2021, I was present and reported all the proceedings had in the case of Steak N Shake, Inc., Plaintiff, vs. Melissa White, Defendant, Cause No. 4:18-CV-00072-SRC.

I further certify that the foregoing pages contain the excerpts ordered by requesting party and are a true and accurate, but incomplete, reproduction of the proceedings.

/s/ Reagan A. Fiorino
Reagan A. Fiorino, MO CCR #810
RDR, CRR, CRC, IL-CSR

TRANSCRIBED:  June 14, 2021