UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| STEAK N SHAKE, INC., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Case No. 4:18-cv-00072-SRC |
| | ) |
| MELISSA WHITE, | ) |
| | ) |
| Defendants. | ) |

**Memorandum and Order**

Social-media platforms may foster the reflexive, rather than reflective, behavior that provides fertile ground from which the law of unintended consequences often springs forth. On the job at Steak N Shake, Melissa White thought she found worms in hamburger meat, and insisted her manager inspect the meat. And when she didn't find her manager's inspection up to her own standards, White, perhaps cloaking herself as a modern-day Upton Sinclair, rushed to post her accusations of Steak N Shake's purported sale of contaminated meat sales on Facebook. Encouraged by White's **#SHARESHARESHARE**, the velocity of social media soon took hold, and White's post received thousands of comments, largely (as perhaps White hoped) expressing disgust and outrage.

Steak N Shake then sued, claiming White defamed the restaurant and cost it lost sales of over a quarter-million dollars. After a four-day trial, the jury rendered a verdict against White for $70,000 in actual damages and $10,000 in punitive damages. White now seeks either a new trial or to have the Court reduce the verdict. The Court finds that while White aimed at—and reached—the stomachs of the social-media community, she did not reach the minds or the hearts of the jury, and she has provided no basis for a second run.

I.     Background

Steak N Shake presented a single defamation claim against White.  After both parties rested their cases, the Court instructed the jury,  Doc. 213, and an eight-person jury found in favor of Steak N Shake through a general verdict, Doc. 217.

White now moves for a New Trial, Doc. 223, and for a New Trial and Remittitur, Doc. 224.  White insists that the verdict was against the weight of the evidence and that the damages award was excessive.  Docs. 223–224.  White also contends that she deserves a remittitur of the $80,000 in damages awarded by the jury.  Doc. 224.  The Court first addresses White's grounds for a new trial, before evaluating whether the jury's damages award warrants remittitur.

II.    New trial motion

White contends that the jury's verdict was a miscarriage of justice because it was against the weight of the evidence and because the damages award was excessive.  Doc. 223-1 at pp. 2, 5.  The Court disagrees.

A.     Standard

"The court may, on motion, grant a new trial on all or some of the issues—and to any party . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A).  Respecting the Constitutional role of the jury, the law sets a high bar for granting a motion for a new trial, *Howard v. Missouri Bone and Joint Center, Inc.*, 615 F.3d 991, 995 (8th Cir. 2010), and such motions are "generally disfavored."  *United States v. Petroske*, 928 F.3d 767, 774 (8th Cir. 2019)*, cert. denied,* 140 S. Ct. 973 (2020) (quoting *United States v. Morris*, 817 F.3d 1116, 1121 (8th Cir. 2016)).  Under Rule 59(a)(1)(A) of the Federal Rules of Civil Procedure, "[a] new trial is appropriate when the first trial, through a verdict against the weight of the evidence, an excessive damage award, or

2

legal errors at trial, resulted in a miscarriage of justice." *Gray v. Bicknell*, 86 F.3d 1472, 1480 (8th Cir. 1996) (citations omitted).

    **B.**    **Discussion**

        **1.**    **Verdict as against the weight of the evidence**

District courts have "great deference" in ruling on motions for a new trial. *Wilson v. Lamp,* 995 F.3d 628, 631 (8th Cir. 2021) (citation omitted). In fact, "[w]hen the basis of the motion for a new trial is that the jury's verdict is against the weight of the evidence, the district court's denial of the motion is virtually unassailable on appeal." *Lincoln Composites, Inc. v. Firetrace USA, LLC,* 825 F.3d 453, 459 (8th Cir. 2016) (quoting source omitted). In determining whether the jury's verdict is against the weight of the evidence, the Court "can rely on its own reading of the evidence—it can weigh the evidence, disbelieve witnesses, and grant a new trial even where there is substantial evidence to sustain the verdict." *Id*. (quoting source and internal quotation marks omitted). "The crucial determination 'is whether a new trial should have been granted to avoid a miscarriage of justice.'" *PFS Distribution Co. v. Raduechel*, 574 F.3d 580, 589 (8th Cir. 2009) (quoting *Keeper v. King*, 130 F.3d 1309, 1314 (8th Cir. 1997).

In Jury Instruction No. 8, the Court instructed the jury on the elements of Steak N Shake's defamation claim:

> Your verdict must be for plaintiff Steak N Shake if you believe:
>
> *First*, defendant White published a Facebook post containing the following statements:
>
>> **#SHARESHARESHARE** JUST GOT FIRED FROM STEAK N SHAKE ON FLORRISANT AND LINBERGH ROAD BECAUSE I FOUND LIVE WORMS WHILE COOKING A STEAKPATTY MOVING INSIDE OF IT AND REFUSED TO SELL THAT MEAT ……WELL RIGHT NOW **#RIGHT NOW** THEY ARE STILL SELLING SAME MEAT **#NOONEEVENCHECKEDIT**. I JUST DON'T WANT EVERYONE GETTING SICK. I JUST GOT FIRED FOR NOTHING I HAVE A

3

> FAMILY THIS SHIT IS NOT RIGHT I DID NOTHING WRONG **#FOX2 #ELLIOT** WAY

and

*Second*, defendant White was at fault in publishing such Facebook post, and

*Third*, such statement tended to expose plaintiff Steak N Shake to contempt and ridicule or deprive Steak N Shake of the benefit of public confidence, and

*Fourth*, such statement was read by the public, and

*Fifth*, plaintiff Steak N Shake's reputation was thereby damaged.

Doc. 213 at p. 9. And in Jury Instruction No. 9, the Court instructed the jury that: "Your verdict must be for defendant Melissa White if you believe that the Facebook post was substantially true." *Id.* at p. 10. The parties stipulated that White published the Facebook post and that members of the public read the statements in White's Facebook post, leaving the jury to focus on the second, third, and fifth elements. Doc. 126 at pp. 1–2.

White argues that the jury's verdict was against the weight of the evidence because the statements in her Facebook post were substantially true. Doc. 223-1 at pp. 2, 7 (citing *Others First, Inc. v. Better Business Bureau of Greater St. Louis, Inc.*, 829 F.3d 576, 580 (8th Cir. 2016) ("If a statement is true, it is not defamatory as a matter of law.")). White asserts "truth" on the basis that she presented evidence during the trial that fly larvae were in the beef patty that she took from Steak N Shake. *Id.* at p. 2. White points to the testimony of her two expert witnesses: forensic entomologist Dr. Jeffery Tomberlin and food-safety expert Dr. Catherine Hutt. *Id.* at pp. 2–3. Dr. Tomberlin testified that he examined White's patty and identified fly larvae (maggots) inside of it, though he could not testify to when or how the larvae first appeared in the meat, leaving a significant gap in White's evidence. Dr. Hutt testified that Frank Tardy, White's manager at Steak N Shake, had failed to perform an adequate investigation into White's report of

4

meat contamination and that the presence of maggots indicates that the other meat at the Steak N Shake store would have also been contaminated by maggots. *Id.* at pp. 2–3.

White suggests that Tardy's testimony was insufficient for the jury to find in Steak N Shake's favor. *Id.* at pp. 3–4. Tardy testified that he found no maggots in the meat after conducting his investigation, yet Tardy admitted that he did not look at White's patty and did not "tear apart" the meat that was already sitting at the grill. Further, White claims that Tardy did not stop the sale of the meat while he was at the store. *Id.* at p. 4. Therefore, White claims that the statements in her Facebook post were substantially true. White argues that because she "demonstrated" the presence of maggots in the patty, she cannot be liable for defamation. *Id.* at p. 2. She argues that Steak N Shake presented insufficient evidence to show that her statement in the Facebook post about the "worms" was untrue.

White essentially asks the Court to cast aside the jury's verdict because the jury should have believed her evidence and disregarded the evidence Steak N Shake presented, but doing so would gut the right to trial by jury. When a jury issues a general verdict which could be supported by more than one theory of liability, the Court may not speculate as to why the jury reached its decision. *Coterel v. Dorel Juv. Grp., Inc.*, 827 F.3d 804, 808 (8th Cir. 2016); *Lopez v. Tyson Foods, Inc.*, 690 F.3d 869, 878 (8th Cir. 2012); *Regions Bank v. BMW N. Am., Inc.*, 406 F.3d 978, 980 (8th Cir. 2005); *see also U.S. S.E.C. v. Quan*, 817 F.3d 583, 592 n.6 (8th Cir. 2016) ("Quan's real concern seems to be that the general verdict leaves open the possibility the jury's finding of liability rested on alleged misrepresentations of which—he says—there was not enough evidence. But that speculative risk does not justify a new trial.") (citing *Griffin v. United States*, 502 U.S. 46, 59–60 (1991)). Here, the jury could have found that any number of the statements in her Facebook post were not true.

First, the parties hotly contested the presence of maggots in the meat, so the jury could have determined the patty did not contain maggots. White was the only witness who testified that she saw "worms" moving in her meat patty on January 5, 2018, and Tardy explained that sometimes fatty gristle can move about in the meat when the patty is placed on the grill. Police officer Rashad Lambert, who arrived on the scene as White was exiting the store, testified that he saw something moving in White's patty when she showed it to him, but he was not entirely sure that it was a "worm." Tardy testified that he found no maggots in any of the meat he examined during his investigation, even after he inspected meat from the grill, the walk-in cooler, and the freezer.

Although White initially offered to show Tardy her patty, he followed what he testified to was best practices for food-contamination inspection and did not look at that particular patty immediately, instead concentrating on the meat that was being cooked on the griddle and then on the raw meat in the cooler. When he later asked for White's patty, White refused to show it to him and took it from the store. White then refused to let anyone from Steak N Shake see her patty. The St. Louis County Health Department conducted an inspection of the store later that day, and according to the inspection reports, the inspection found no contaminated meat at the store. Finally, Dr. Tomberlin testified that he had no knowledge of where the patty came from or whether it contained maggots on the date that White removed the patty from the store. Although White testified that she showed Dr. Tomberlin the same patty that she had taken from the store, no other source corroborated her account, or the chain of custody. Based on this evidence, the jury could have discredited White's testimony and reasonably concluded that White's patty was not contaminated with maggots on January 5, 2018, when she published her Facebook post.

6

Second, even if the jury believed that White's patty contained maggots, the jury nevertheless could have rendered a verdict in favor of Steak N Shake if it found that the other statements White made in the Facebook post were not substantially true. White's Facebook post contained numerous statements about Steak N Shake unrelated to the existence of "worms" in her patty. The Facebook post states that White was "fired" from Steak N Shake "because [she] found live worms while cooking a steakpatty moving inside of it and refused to sell that meat[.]" Doc. 126 at p. 2. The Facebook post further claimed that Steak N Shake was "still selling same [sic] meat" and that no one had even checked the meat in question. *Id.* She went on to say that "[she] just got fired for nothing" and that she "did nothing wrong[.]" *Id.*

White's Facebook post claimed, twice, that Steak N Shake had fired her, but the company provided evidence to the contrary. Tardy testified that White had quit by saying she was leaving and never coming back. White denied quitting, asserting that Tardy had fired her. Here, the jury was entitled to evaluate each of the witnesses' credibility and believe Tardy's account over White's. *Coterel*, 827 F.3d at 808; *Lopez*, 690 F.3d at 878; *Regions Bank*, 406 F.3d at 980; *see also Quan*, 817 F.3d at 592 n.6. While White's Facebook post also claimed that White was "fired for nothing" and that she "did nothing wrong," Steak N Shake presented evidence that White refused to turn over her patty to Tardy when he asked for it and then took it with her when she left the store. Steak N Shake's employee handbook states that an employee's "[f]ailure to cooperate fully and completely with a [Steak N Shake] investigation is grounds for disciplinary action up to and including termination of employment." Trial Exhibit 2 at p. 6. The jury could have concluded that, even if Steak N Shake had fired White, it had legitimate grounds for its decision, so her claims to the contrary were not substantially true. *Coterel*, 827 F.3d at 808; *Lopez*, 690 F.3d at 878; *Regions Bank*, 406 F.3d at 980; *see also Quan*, 817 F.3d at 592 n.6.

7

White's Facebook post claimed she was fired "because [she] found live worms while cooking a steakpatty moving inside of it and refused to sell that meat[.]"  Doc. 126 at p. 2.  But the undisputed testimony at trial demonstrated that the meat patty that she found the "worms" in was intended for her own employee meal.  Steak N Shake did not instruct her to sell the patty or any other contaminated meat to store customers, so a jury could have found that this statement was also untrue.  And the evidence at trial flatly contradicted her claim in the Facebook post that "#NOONEEVENCHECKEDIT[.]"  *See id.*  Tardy testified that he inspected the meat at the grill, in the cooler, and in the freezer, and the security footage clearly shows Tardy examining the meat.  And Steak N Shake presented an inspection report from the St. Louis County Health Department, which had sent an inspector to examine the meat at the store on the very same day.  Even if White's post was only referring to the patty that she had taken home with her, she deprived Steak N Shake the opportunity to inspect it when she refused to turn it over to Tardy; as importantly, she deprived Steak N Shake the opportunity to inspect it at what Tardy's training and experience in food safety told him was the appropriate point in time to do so.  The jury reasonably could have found that her statement that no one had checked the meat was not substantially true.  *Coterel*, 827 F.3d at 808; *Lopez*, 690 F.3d at 878; *Regions Bank*, 406 F.3d at 980; *see also Quan*, 817 F.3d at 592 n.6.

Finally, White's Facebook post claimed that "right now #RIGHTNOW they are still selling same [sic] meat[.]"  Doc. 126 at p. 2.  But the evidence at trial demonstrated that she had already taken the allegedly-contaminated patty out of the store with her and that the meat remaining at the store had been checked by Tardy.  While White left the store at 11:40 a.m., she did not post on Facebook until 12:23 p.m., so she had no personal knowledge about the store's status.  White claimed at trial that she received texts from certain individuals about what was

8

going on in the store, but she did not produce those texts in discovery or present them in evidence. Thus, the jury reasonably could have found that her statement that Steak N Shake was currently selling the "same meat" was not substantially true.

Based on the evidence offered by Steak N Shake regarding White's statements in her Facebook post, the Court finds that the jury's verdict did not go against the weight of the evidence. *See Coterel*, 827 F.3d at 808; *Lopez*, 690 F.3d at 878; *Regions Bank*, 406 F.3d at 980; *see also Quan*, 817 F.3d at 592 n.6. Steak N Shake presented sufficient evidence for the jury to conclude that White's statements in her Facebook post were not substantially true. Accordingly, the Court denies White's Motion for New Trial on this ground. Doc. 223.

**2.      Excessive verdict**

White contends that the jury awarded excessive damages, resulting in a miscarriage of justice. Doc. 223-1 at p. 5. In Jury Instruction No. 10, the Court instructed the jury on compensatory and punitive damages. Doc. 213 at p. 11. During trial, Steak N Shake presented evidence that the fallout from White's Facebook caused it to lose $755,488 in sales. *See* Trial Exhibit 20 and related testimony of Mike Conner. In closing argument, Steak N Shake did not ask for a specific amount, instead leaving it to the jury to award compensatory and punitive damages that the jury deemed appropriate. As detailed below, the evidence supported the jury's award of $70,000 in actual and $10,000 in punitive damages. Doc. 217.

White claims that Steak N Shake is not entitled to compensatory damages because it provided insufficient evidence of its actual damages and that Steak N Shake is not entitled to punitive damages because it presented no evidence that White acted with malice. Doc. 223-1 at pp. 5–6. White asserts that Steak N Shake's witness, Mike Connor, did not consider Steak N Shake's overall financial condition or the potential mismanagement of the stores when he

9

testified that numerous stores in the St. Louis area suffered revenue loss after White's Facebook post. *Id.* White also contends that based on the evidence, the jury could not find that she knew her statements were false or acted with reckless disregard for their falsity, so she cannot be liable for punitive damages. *Id.* at pp. 6–7. These arguments lack merit.

First, Steak N Shake provided sufficient evidence of its revenue losses at the Steak N Shake store where White worked, as well as at four neighboring stores. Connor calculated the loss in revenue for those five Steak N Shake stores based on each of their specific anticipated revenues, considering their management, staffing, location, ratings, and other factors. In comparing their actual revenue against their predicted revenue, Connor did not compare the stores' revenue against stores elsewhere in the country, he only compared them against their own performance history. To the extent Connor considered the St. Louis market as a whole, he testified he did consider other general fluctuations in the market, but the five locations in question suffered losses far beyond any market trends, which he posited could only stem from White's Facebook post. Those revenue losses totaled $755,488. Steak N Shake asked the jury to award it a reasonable amount in damages to make up for its lost revenue of $755,488. Thus, the Court finds that Steak N Shake presented sufficient evidence of its actual damages for the jury to award Steak N Shake $70,000 in compensatory damages.

Second, Steak N Shake presented sufficient evidence that White acted with malice because she knew her statements were false, or that she acted with reckless disregard for their falsity. White admitted she was angry at Tardy when she left the store on January 5, 2018, and she attempted to reach a broad online audience with her Facebook post. The post starts with the hashtag "#SHARESHARESHARE" and has additional tags at the end: "#FOX2 #ELLIOT WYA," a reference to a local TV news reporter, with "WYA" meaning "where you at." As the

10

Court already discussed, White's Facebook post alleges that Steak N Shake fired her for not selling contaminated meat to customers, while the evidence at trial indicated that this account was false. White also refused to take down her Facebook post for over two weeks, even when several commenters posted images from the Health Department report. White left her Facebook post up even after Steak N Shake's in-house and outside attorneys sent her letters putting her on notice of Steak N Shake's position. *See* Trial Exhibits 10 and 15. The jury reasonably could have inferred that White knew her statements were false or that she acted with reckless disregard for their falsity. The Court finds that Steak N Shake presented sufficient evidence to support an award of $10,000 in punitive damages.

Accordingly, the Court holds that the jury's damage verdict was not excessive and denies White's Motion for New Trial on this ground. Doc. 223.

### III.   New trial or remittitur for excessive verdict

White also argues that the jury reached an excessive verdict that warrants a new trial or remittitur. Doc. 224. The Court finds that the jury did not reach an excessive verdict and thus denies White's motion.

####   A.   Standard

A district court may remit a jury verdict or grant a new trial based on an excessive verdict "only when [the verdict] is so grossly excessive that there is plain injustice or a monstrous or shocking result." *Eckerberg v. Inter-State Studio & Publ'g Co.*, 860 F.3d 1079, 1088 (8th Cir. 2017) (quoting *Hudson v. United Sys. of Arkansas, Inc.*, 709 F.3d 700, 705 (8th Cir. 2013)).

The parties agree that Missouri law governs whether the jury reached an excessive verdict. Doc. 224 at p. 1; Doc. 227 at p. 2; *see also Wright v. Byron Fin., LLC*, 877 F.3d 369, 374 (8th Cir. 2017) ("The law of the forum state governs when a verdict is excessive[.]"). Under

11

Missouri law, a verdict is excessive when it exceeds "fair and reasonable compensation." *Wright*, 877 F.3d at 374 (citing *Eckerberg*, 860 F.3d at 1088 and Mo. Rev. Stat. § 537.068). "There are two general types of excessive verdicts: (1) a verdict that is disproportionate to the evidence of injury and results from an 'honest mistake' by the jury in assessing damages; and (2) a verdict that is excessive due to trial error that causes bias and prejudice by the jury." *Stewart v. Partamian*, 465 S.W.3d 51, 56 (Mo. 2015) (citation omitted). A finding that the verdict is excessive due to an "honest mistake" by the jury may be cured by ordering remittitur or granting a new trial. *Id.* (citation omitted). However, if the excessive verdict resulted from trial error that caused jury prejudice, the Court must order a new trial. *Id.* (citation omitted).

"'There is no precise formula for determining whether a verdict is excessive,' but the 'ultimate test is what fairly and reasonably compensates plaintiff for the injuries sustained.'" *Estate of Snyder v. Julian*, 789 F.3d 883, 888 (8th Cir. 2015) (quoting *Graeff v. Baptist Temple of Springfield*, 576 S.W.2d 291, 309 (Mo. 1978)). "A verdict is not excessive unless the result is monstrous or shocking." *Id.*; *Miller v. Huron Regional Med. Ctr.*, 936 F.3d 841, 846 (8th Cir. 2019) ("[R]emittitur is reserved for cases where the verdict is so grossly excessive as to shock the judicial conscience."); *Bennett v. Riceland Foods, Inc.*, 721 F.3d 546, 553 (8th Cir. 2013) ("Remittitur is appropriate where the verdict is so grossly excessive as to shock the judicial conscience.").

"[T]he trial court may not substitute its judgment for that of the jurors. The determination of the amount of damages is peculiarly within the province of the jury. Such determination rests largely in its discretion." *Taylor v. Otter Tail Corp.*, 484 F.3d 1016, 1020 (8th Cir. 2007) (quoting source and internal quotation marks omitted). "A new trial or remittitur is not appropriate merely because we may have arrived at a different amount from the jury's award."

12

*Joseph J. Henderson & Sons, Inc. v. Travelers Property Casualty Ins. Co. of America*, 956 F.3d 992, 1001 (8th Cir. 2020) (quoting source and internal quotation marks omitted); *Bennett*, 721 F.3d at 553 ("We will not order a new trial or remittitur merely because we may have arrived at a different amount from the jury's award."). "Remittitur is not appropriate merely because the district court would have awarded a different amount than the jury. Rather, the court orders remittitur when it believes the jury's award is unreasonable on the facts." *Miller*, 936 F.3d at 846 (internal citations omitted). "Only if damages are so excessive as to be without the support of the evidence should the court disturb a jury's verdict of damages." *Taylor*, 484 F.3d at 1020.

  **B.**  **Discussion**

  White seeks to reduce the jury's damages award to $8,000, exactly ten percent of the total awarded amount of $80,000. Doc. 224-1 at p. 4. The Court declines to grant remittitur.

  White first argues that she is entitled to remittitur because the jury's damages award was against the weight of the evidence. *Id.* at p. 2. This argument lacks merit. "Remittitur is a device for reviewing the amount of a damages award, not whether there was a basis for any award at all." *Hudson*, 709 F.3d at 705. "A motion for remittitur is not a vehicle for challenging the legal sufficiency of the evidence supporting a claim." *Miller*, 936 F.3d at 847. Thus, White's argument for remittitur based on the sufficiency of the evidence fails. Additionally, as the Court has already discussed at length, the evidence presented at trial was sufficient for a jury to find White liable on the defamation claim.

  White argues next that the compensatory damages award was excessive. Doc. 224-1 at p. 4. In a defamation case, "[t]he evidence proffered to establish actual damages may not be too speculative and must be founded upon more than the plaintiff's embarrassment or perception of their own reputation." *The Fireworks Restoration Co., LLC v. Hosto*, 371 S.W.3d 83, 87 (Mo.

App. E.D. 2012). "[A] plaintiff should offer some concrete proof that his reputation has been injured." *Id.* at 89 (internal citation omitted). "'Ultimately, the question of whether a plaintiff's damages were caused by the defamatory statement is for the jury to decide." *Johnson v. Allstate Indem. Co.*, 278 S.W.3d 228, 236 (Mo. App. E.D. 2009) (quoting *Overcast v. Billings Mut. Ins. Co.*, 11 S.W.3d 62, 71 (Mo. banc 2000)).

  The Court finds that the compensatory damages were not excessive. During trial, Steak N Shake presented evidence of a multitude of Facebook comments from numerous members of the public, many declaring that they will never eat at Steak N Shake again or that they thought Steak N Shake was "gross" and "disgusting." Tardy testified that after White published her Facebook post, he observed a significant decline in business at the store where White worked, as well as in other stores in the neighboring area. Steak N Shake presented Connor's testimony, detailing revenue losses at five Steak N Shake stores in the area, amounting to $755,488 total. *See* Trial Exhibit 20. This evidence is sufficient to demonstrate that Steak N Shake suffered actual damages as a result of White's Facebook post and that the $70,000 awarded in compensatory damages—less than 10% of the amount of damages presented at trial—was not excessive.

  White also argues that the punitive damages award was excessive. Doc. 224-1 at p. 4. "In Missouri, 'punitive damages are imposed for the purpose of punishment and deterrence.'" *Parsons v. First Investors Corp.*, 122 F.3d 525, 530 (8th Cir. 1997) (quoting *Rodriguez v. Suzuki Motor Corp.*, 936 S.W.2d 104, 110 (Mo. banc 1996)). "Imposing punitive damages requires that a proper balance be struck. The award must be enough to ensure that the tortfeasor is adequately punished and deterred from future similar conduct; yet the award must not be grossly excessive."

14

*The Fireworks Restoration Co., LLC*, 371 S.W.3d at 91.  In determining whether a punitive damages award is excessive:

> Several factors may be considered, including the degree of malice or outrageousness of the defendant's conduct, aggravating and mitigating circumstances, the defendant's financial status, the character of both parties, the injury suffered, the defendant's standing or intelligence, and the relationship between the two parties.

*Parsons*, 122 F.3d at 530 (applying Missouri law) (citing *Kimzey v. Wal-Mart Stores, Inc.*, 107 F.3d 568, 576 (8th Cir. 1997)).

The Court finds that the punitive damages were not "grossly excessive" in light of the evidence presented at trial.  First, as the Court already discussed, Steak N Shake presented sufficient evidence for a jury to conclude that White acted with malice:  that she knew when she published the Facebook post that at least some of her statements were false or that she acted with reckless disregarded for their falsity.

Moving to the other factors, the jury heard evidence of all of the aggravating and mitigating circumstances on the day in question, including that White published her Facebook post within an hour of leaving Steak N Shake and that she had attempted to reach a broad audience by encouraging others to share her post.  The jury heard evidence of White's financial status, as she testified to her current employment status and the number of her children.  Steak N Shake's counsel even acknowledged in its closing argument that White likely did not have the financial resources to pay a large judgment.  The jury seemed to consider this factor in its punitive damages award, as it awarded punitive damages of less than 15% of actual damages.  The Supreme Court's holding in *State Farm Mut. Auto Ins. v. Campbell*, 538 U.S. 408, 425 (2003) that punitive-damages awards of single-digit multiples generally pass constitutional

15

muster perforce implies that punitive damages of a fraction of actual damages likewise comport with due process.

The jury considered evidence of the character of the parties, as the jury observed White giving testimony as well as the testimony of several current and former employees from Steak N Shake.  Thus, the jury could properly determine the credibility and motives of the parties.  The jury considered the injury suffered by Steak N Shake.  The jury also considered evidence of White's intelligence by observing her demeanor and responses on the stand, so the jury could conclude that she understood the nature and consequences of her actions.  Finally, the jury considered evidence on the relationship between the two parties, hearing testimony that White was a former employee of Steak N Shake who quit her job but had claimed in her Facebook post that she had been fired.  Moreover, the jury considered what the Court observes was a tense and at times contentious relationship between White and Tardy that involved what appeared to be common power struggle.  Her position as a former employee lent credibility to the statements in her Facebook post, harming Steak N Shake's reputation in the eyes of the public.  These factors demonstrate that the $10,000 punitive damages award in this case was not excessive, much less "grossly excessive."

In sum, upon applying the factors and considering the evidence in the case, the compensatory and punitive damages awarded in this case were not "so grossly excessive as to be monstrous, shocking, or plainly unjust" as to require a new trial or remittitur.  *Wright,* 877 F.3d at 374 (citing *Eckerberg*, 860 F.3d at 1087).  Rather, the verdict "fairly and reasonably compensates [Steak N Shake] for the injuries sustained." *Estate of Snyder*, 789 F.3d at 888 (quoting *Graeff*, 576 S.W.2d at 309).  Accordingly, the Court denies White's Motion for New Trial or Remittitur.  Doc. 224.

16

## IV. Conclusion

For all the reasons stated above, the Court denies White's [223] Motion for New Trial and [224] Motion for New Trial or Remittitur.

So Ordered this 14th day of October 2021.

_____
STEPHEN R. CLARK
UNITED STATES DISTRICT JUDGE